**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: PASSENGER VEHICLE REPLACEMENT TIRES ANTITRUST LITIGATION | Case No. 5:24-md-3107 |
| | MDL No. 3107 |
| | CHIEF JUDGE SARA LIOI |
| This Document Applies to: | |
| End Payor Plaintiffs ("EPPs") | CONSOLIDATED CLASS ACTION COMPLAINT |
| | JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

NATURE OF THE ACTION .......................................................................................... 1

JURISDICTION, VENUE, AND EFFECT ON INTERSTATE COMMERCE .......................... 3

PARTIES .................................................................................................................. 4

    A.   Plaintiffs ........................................................................................................ 4

    B.   Defendants ................................................................................................... 14

        a.   Continental Defendants ............................................................................ 14

        b.   Michelin Defendants ................................................................................ 15

        c.   Nokian Tyres Defendants .......................................................................... 15

        d.   Goodyear .................................................................................................. 16

        e.   Pirelli Defendants .................................................................................... 17

        f.   Bridgestone Defendants ............................................................................ 17

        g.   Unnamed Co-Conspirators and Agents ...................................................... 18

FACTUAL ALLEGATIONS ........................................................................................ 19

    A.   Tire Inputs ................................................................................................... 19

    a.   Rubber ........................................................................................................ 19

    b.   Fillers ......................................................................................................... 20

    c.   Reinforcing materials ................................................................................. 20

    d.   Chemical Agents ........................................................................................ 20

    B.   Defendants' Tires Are Interchangeable with Each Other ............................... 21

    C.   U.S. Tire Market ......................................................................................... 23

    D.   Replacement Tire Prices Increased Significantly During the Class Period ..................... 25

    E.   Defendants Make Up a Significant Portion of the United States Replacement Tire Market 37

    F.   EC Investigation ......................................................................................... 39

    a.   Dawn Raids of Defendant Tire Manufacturers ............................................ 39

    b.   Dawn Raid of Consultancy Firm ............................................................... 41

    G.   "Plus Factors" in the Replacement Tire Industry Provide Additional Evidence of a Conspiracy .................................................................................................. 44

        1.   Opportunities to Collude ........................................................................... 45

           a. United States Tire Manufacturers' Association ......................................... 45

           b. Tire Manufacturing Ambassadors .......................................................... 46

i

c. Congressional Tire Caucus ................................................................................ 46

d. Tire Industry Association & Global Tire Expo ................................................. 47

e. Tire Political Action Committee ....................................................................... 48

f. Off-the-Road Tire Conference .......................................................................... 48

g. European Tyre and Rubber Manufacturers' Association Events ....................... 49

h. International Tire Exhibition and Conference ................................................... 49

i. International Elastomer Conference .................................................................. 49

j. Tire Technology Expo ....................................................................................... 50

k. Tire Society ...................................................................................................... 50

l. Clemson University Global Tire Industry Conference ..................................... 51

m.   Wolfe Research Global Auto Industry Conference ...................................... 51

n. Deutsche Bank Auto Industry Conference ....................................................... 51

o. The Global Data Service Organization for Tyres and Automotive Components ......... 52

p. Traction Summit ............................................................................................... 52

q. Tire Industry Project ........................................................................................ 53

r. Other Regional and Mission-Specific Events .................................................. 53

2.   High Barriers to Entry and Exit ........................................................................ 53

3.   Price Inelasticity ............................................................................................... 55

4.   Standardized Products with a High Degree of Interchangeability .................... 56

5.   Defendants Can Monitor Each Other's Pricing ................................................ 57

6.   Defendants are Recidivist Violators of Antitrust Laws .................................... 59

a. U.S. Department of Justice Antitrust Enforcement .......................................... 59

b. California Attorney General Enforcement ........................................................ 68

c. European Commission Enforcement ................................................................. 69

d. Korea Fair Trade Commission Enforcement .................................................... 71

e. Brazilian Administrative Council for Economic Defense Enforcement ........... 71

f. South African Competition Authority Enforcement ......................................... 72

H.   The Inflated Prices of Replacement Tires Were Passed Through to Plaintiffs and the
Classes They Represent ........................................................................................ 73

a.   Replacement Tires Are Commodity-Like Products That Are Physically Traceable
Throughout the Distribution Chain ....................................................................... 73

b.   Increased Costs Will Be Passed through to Customers in Competitive Markets ............ 74

c.   The Markets for Replacement Tire Distribution and Retail Are Highly Competitive ..... 75

d.   Economic and Legal Literature Indicates that Unlawful Overcharges Are Normally
Passed On to Ultimate Consumers ........................................................................ 79

e.    The Precise Overcharge Passed Through to Plaintiffs and the End-Payor Classes Can Be Measured with Regression Analysis ....................................................................................... 80

STATUTE OF LIMTATIONS ............................................................................................... 81

CLASS ACTION ALLEGATIONS ....................................................................................... 82

CLAIMS FOR RELIEF ......................................................................................................... 85

End Payor Plaintiffs, on behalf of themselves and all others similarly situated, bring this Class Action Complaint for damages and injunctive relief against Defendants Continental Aktiengesellschaft; Continental Tire the Americas, LLC; Compagnie Générale des Établissements; Michelin North America, Inc.; Nokian Tyres plc; Nokian Tyres Inc; Nokian Tyres U.S. Operations LLC; The Goodyear Tire & Rubber Company; Pirelli & C. S.p.A.; Pirelli Tire LLC; Bridgestone Corporation; Bridgestone Americas, Inc.; and unidentified Doe Defendants for violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and various state laws. All allegations herein other than those concerning Plaintiffs are based on information and belief.

## NATURE OF THE ACTION

1.      This action arises from a *per se* unlawful understanding or agreement among Defendants—some of the largest tire manufacturers in the United States and the world—to artificially increase, maintain, and fix the prices of new replacement tires for passenger cars, vans, trucks, and buses ("Replacement Tires") sold in the United States, from at least January 1, 2020 until the time when the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period").

2.      On January 30, 2024, the European Commission ("EC") announced dawn raids at the premises of companies "active in the tyres industry in several Member States." The EC justified its dawn raids because of suspicion that these companies "violated EU antitrust rules that prohibit cartels and restrictive business practices," specifically that price coordination took place amongst these companies.[1] Following the announcement of the raids, Defendants issued official statements confirming that they were subject to the EC inspections.

---

[1] European Commission, *Commission carries out unannounced antitrust inspections in the tyres sector* (Jan. 30, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

3.      As part of the same investigation, in June 2024 the EC carried out further unannounced antitrust inspections at the premises of a consultancy firm in the tire industry in two member states, based on "concerns that the company may have violated EU antitrust rules that prohibit cartels and restrictive business practices."[2]

4.      Evidence that Defendants have entered into and maintained an unlawful understanding or agreement to increase prices of Replacement Tires includes: (i) Defendants' sudden and dramatic parallel price increases for Replacement Tires, which, absent a conspiracy to fix prices, ran contrary to their independent economic interests; (ii) the EC dawn raids of Defendants to investigate unlawful price-fixing conduct involving tires; (iii) the high level of market concentration in the Replacement Tire market; (iv) significant barriers to entry in the Replacement Tire market; (v) lack of economic substitutes for Replacement Tires; (vi) the standardization of Replacement Tires with a high degree of interchangeability; and (vii) the myriad opportunities that employees of Defendants had to conspire with one another to increase prices of Replacement Tires. Additionally, Defendants are recidivist antitrust violators—some with prior guilty pleas.

5.      Plaintiffs seek to represent Classes of individuals and entities who purchased Replacement Tires manufactured by Defendants indirectly (from third parties), and not for resale, at supracompetitive prices to recover damages, injunctive relief, and other relief as is appropriate, based on Defendants violations of the Sherman Act and various state laws. Plaintiffs demand a trial by jury.

---

[2] European Commission, *Commission carries out further unannounced antitrust inspections in tyres sector cartel investigation* (June 18, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ip_24_3365.

## JURISDICTION, VENUE, AND EFFECT ON INTERSTATE COMMERCE

6.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members in the proposed Classes; and at least one member of the proposed Classes is a citizen of a state different from that of one of the Defendants.

7.      This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.      This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a).

9.      Venue is proper within this District under 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b), (c), and (d). During the Class Period, Defendants, themselves or through their owned or controlled subsidiaries and affiliates, transacted business within this District and/or have agents in and/or that can be found in this District, and a substantial portion of the affected interstate trade and commerce discussed below was carried out in this District.

10.     Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

11.     During the Class Period, Defendants manufactured, sold, and shipped Replacement Tires in a continuous and uninterrupted flow of interstate commerce, which included sales of Replacement Tires in this District, advertisement of Replacement Tires in media in this District, and employment of sales personnel in this District. Defendants' conduct had and continues to have

a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

## PARTIES

### A. Plaintiffs

12.     Plaintiff Marcie Aberman is a citizen of Illinois, residing in Cook County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Illinois.

13.     Plaintiff Rachelle Ackerman is a citizen of Minnesota, residing in Murray County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in South Dakota.

14.     Plaintiff Jose Acosta is a citizen of Virginia, residing in Fairfax County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Virginia.

15.     Plaintiff Matt Altieri is a citizen of Connecticut, residing in New Haven County. During the Class Period, he bought Tires indirectly from one or more Defendants in Connecticut.

16.     Plaintiff Laura Ammons is a citizen of Nevada, residing in the independent city of Carson City. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Nevada.

17.     Plaintiff Thomas Bates is a citizen of Wisconsin, residing in Winnebago County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Wisconsin.

18.     Plaintiff Kirk Begley is a citizen of Nebraska, residing in Scotts Bluff County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Nebraska.

19.     Plaintiff Josh Biggs is a citizen of Colorado, residing in Weld County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Colorado.

4

20.     Plaintiff Brian Boberick is a citizen of Colorado, residing in Douglas County.  During the Class Period, he bought Tires indirectly from one or more Defendants in Colorado.

21.     Plaintiff Paula Bondy is a citizen of Michigan, residing in Oakland County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Michigan.

22.     Plaintiff David Brandt is a citizen of Montana, residing in Lincoln County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Montana.

23.     Plaintiff Kimberly Bruns is a citizen of Kansas, residing in Johnson County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Kansas.

24.     Plaintiff Harley Carroll is a citizen of Illinois, residing in Sangamon County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Illinois.

25.     Plaintiff Tony Clark is a citizen of Tennessee, residing in Davidson County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Tennessee.

26.     Plaintiff Thomas Corcoran is a citizen of Arizona, residing in Maricopa County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Arizona.

27.     Plaintiff Robert Cotter is a citizen of Colorado, residing in Summit County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Colorado.

28.     Plaintiff Luke Cuddy is a citizen of Massachusetts, residing in Essex County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Massachusetts.

29.     Plaintiff Telly Dent is a citizen of Tennessee, residing in Shelby County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Tennessee.

30.     Plaintiff Brandon Derrick is a citizen of North Carolina, residing in Johnston County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in North Carolina.

31.     Plaintiff Corey Desimoni is a citizen of Colorado, residing in Adams County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Colorado.

32.     Plaintiff Letia Dickerson is a citizen of North Carolina, residing in Wake County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in North Carolina.

33.     Plaintiff Donald Doherty is a citizen of New York, residing in Jefferson County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in New York.

34.     Plaintiff Joshua Sébastien Dutton is a citizen of New York, residing in Queens County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in New York and Vermont.

35.     Plaintiff Charles Dvorak is a citizen of Illinois, residing in DuPage County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Illinois.

36.     Plaintiff John Eisenberg is a citizen of Florida, residing in St. Luice County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Florida.

37.     Plaintiff Colleen Ezell is a citizen of South Carolina, residing in Aiken County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in South Carolina.

38.     Plaintiff John Finch is a citizen of Rhode Island, residing in Newport County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Rhode Island.

39.     Plaintiff Natalie Gianne is a citizen of California, residing in Los Angeles County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in California.

40.     Plaintiff Brenda Griffiths is a citizen of Iowa, residing in Plymouth County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Iowa.

41.     Plaintiff Keshia Harvey is a citizen of Nebraska, residing in Lancaster County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Nebraska.

42.     Plaintiff Pamela Heidtke is a citizen of South Carolina, residing in Beaufort County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in South Carolina.

43.     Plaintiff Jeffrey Holt is a citizen of Illinois, residing in Lee County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Illinois.

44.     Plaintiff Jose Javier is a citizen of California, residing in Alameda County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in California.

45.     Plaintiff Vincent Jackson is a citizen of Mississippi, residing in Forrest County. During the Class Period, he bought Tires indirectly from one or more Defendants in Mississippi.

46.     Plaintiff Todd Jones is a citizen of North Dakota, residing in Stark County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in North Dakota.

47.     Plaintiff Keith Klawes is a citizen of New Hampshire, residing in Merrimack County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in New Hampshire.

48.     Plaintiff David Landavazo is a citizen of New Mexico, residing in Bernalillo County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in New Mexico.

49.     Plaintiff Matt Landry is a citizen of Arkansas, residing in Hot Spring County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Arkansas.

50.     Plaintiff John Larancuent is a citizen of Colorado, residing in Arapahoe County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Colorado.

51.     Plaintiff Karen Larsen is a citizen of Illinois, residing in DuPage County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Illinois.

52.     Plaintiff Rafael Lim is a citizen of Nevada, residing in Clark County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in California and Nevada.

53.     Plaintiff Gustave Link is a citizen of California, residing in Alameda County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in California.

54.     Plaintiff Matthew Llabres is a citizen of Vermont, residing in Chittenden County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Vermont.

55.     Plaintiff Phương Việt Mai is a citizen of California, residing in Alameda County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in California.

56.     Plaintiff Roger Mayo is a citizen of West Virginia, residing in Logan County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in West Virginia.

57.     Plaintiff Jerry Merkel is a citizen of Missouri, residing in the independent city of St. Louis. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Arizona.

58.     Plaintiff Robert Messick is a citizen of Colorado, residing in Moffat County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Colorado.

59.     Plaintiff Belinda Miles is a citizen of Mississippi, residing in Prentiss County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Mississippi.

60.     Plaintiff Matthew Montross is a citizen of Maine, residing in Cumberland County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Oregon.

61.     Plaintiff Matthew Musikar is a citizen of New York, residing in Rockland County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in New York.

62.     Plaintiff Wendy Nixon is a citizen of Arizona, residing in Mohave County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Arizona.

63.     Plaintiff Frank Novak is a citizen of Michigan, residing in Oakland County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Michigan.

64.     Plaintiff Megan Ohlrich is a citizen of Michigan, residing in Saginaw County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Colorado.

65.     Plaintiff Stephen Perrine is a citizen of Maine, residing in Sagadahoc County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Maine.

66.     Plaintiff Chris Petroskas is a citizen of Minnesota, residing in Ramsey County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Minnesota.

67.     Plaintiff Sharon Poitra is a citizen of Oregon, residing in Lane County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Oregon.

68.     Plaintiff Daniel Purcell is a citizen of New York, residing in Westchester County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in New York.

69.     Plaintiff Charles Rancourt is a citizen of New Hampshire, residing in Rockingham County.  During the Class Period, he bought Tires indirectly from one or more Defendants in New Hampshire.

70.     Plaintiff Andrea Renee Richardson is a citizen of Arkansas, residing in Hot Spring County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Arkansas.

71.     Plaintiff Juan David Rojas is a citizen of Florida, residing in Broward County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Florida.

72.     Plaintiff Ricardo Rosario is a citizen of Puerto Rico, residing in Guaynabo Municipio. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Puerto Rico.

73.     Plaintiff Sharon Reif is a citizen of Wisconsin, residing in Winnebago County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Wisconsin.

74. Plaintiff James Reynolds is a citizen of Connecticut, residing in Hartford County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Connecticut.

75. Plaintiff Benjamin Roberts is a citizen of Minnesota, residing in Hennepin County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Minnesota.

76. Plaintiff William Santoyo is a citizen of California, residing in Los Angeles County. During the Class Period, he bought Tires indirectly from one or more Defendants in California.

77. Plaintiff Lynn Seda is a citizen of California, residing in San Bernardino County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in California.

78. Plaintiff Todd Serotte is a citizen of New York, residing in Erie County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in New York.

79. Plaintiff Kimberly Smathers is a citizen of Arizona, residing in Yavapai County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Arizona.

80. Plaintiff Jerry Smith is a citizen of Missouri, residing in St. Charles County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Missouri.

81. Plaintiff Bruce Snyder is a citizen of South Carolina, residing in Dorchester County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in South Carolina.

82.     Plaintiff Michael Spadafino is a citizen of New York, residing in Westchester County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in New York.

83.     Plaintiff Oliver Tsuya is a citizen of Utah, residing in Summit County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Utah.

84.     Plaintiff Elizabeth Twitchell is a citizen of Virginia, residing in the independent city of Alexandria. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in Virginia.

85.     Plaintiff James Valenzano is a citizen of Arizona, residing in Pinal County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Arizona.

86.     Plaintiff Manuel Veloso is a citizen of Massachusetts, residing in Middlesex County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Massachusetts.

87.     Plaintiff William Wallace is a citizen of the District of Columbia, residing there. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants within the District of Columbia.

88.     Plaintiff Benjamin Wood is a citizen of Maryland, residing in Harford County. During the Class Period, he bought Replacement Tires indirectly from one or more Defendants in Maryland.

89.     Plaintiff Amy Zawadzki is a citizen of New York, residing in Erie County. During the Class Period, she bought Replacement Tires indirectly from one or more Defendants in New York.

### B.  Defendants

#### a.  Continental Defendants

90.     Defendant Continental Aktiengesellschaft ("Continental AG") is a German company with its headquarters at Vahrenwalder Strasse 9, 30165 Hannover, Germany. Continental AG has four group sectors: Automotive, Tires, ContiTech, and Contract Manufacturing. The Tires group has five business areas: (i) Original Equipment, (ii) Replacement APAC, (iii) Replacement EMEA, (iv) Replacement the Americas, and (v) Specialty Tires. In 2022, Continental AG reported that its "Tires group sector achieved a particularly positive result, even surpassing expectations with an adjusted EBIT margin of 13.1 percent."[3] In 2022, Continental AG reported sales of €14 billion (over $15 billion) globally for the Tires group. Continental AG manufactures tires in Europe, the United States, and China for sale in the United States and elsewhere.

91.     Defendant Continental Tire the Americas, LLC ("Continental U.S.") is a limited liability company incorporated under the laws of Ohio, with its principal place of business at 1830 MacMillian Park Drive, Fort Mill, South Carolina 29707. Continental U.S. manufactures and distributes a complete line of passenger, light truck, and commercial tires for original equipment and replacement markets. Continental US sells its tires through independent tire dealers, car dealers, and mass retail companies across North America. Continental U.S. has manufacturing facilities across the United States, including in Barnseville, Georgia; Mt. Vernon, Illinois; Sumter, South Carolina; and Jackson, Missouri. Continental U.S. employs hundreds of individuals in its United States facilities.

92.     Continental AG and Continental U.S. are referred to collectively as "Continental."

---

[3] 2022 Chairman's Letter, Continental AG, available at
https://annualreport.continental.com/2022/en/shareholders/chairmans-letter.php.

### b. Michelin Defendants

93.     Defendant Compagnie Générale des Établissements ("CGEM") is organized under the laws of France with its principal place of business at 23 place des Carmes-Déchaux, 63000 Clermont-Ferrand, France. CGEM is the Michelin Group's parent company, which directly or indirectly owns all of its subsidiaries. CGEM's two main subsidiaries are Manufacture Française des Pneumatiques Michelin ("MFPM"), a wholly-owned subsidiary that coordinates all of the Group's manufacturing, sales, and research operations in France, and Compagnie Financière Michelin ("CFM"), a wholly-owned subsidiary that owns most of the Group's manufacturing, sales, and research companies outside of France and coordinates their operations.

94.     Defendant Michelin North America, Inc. ("Michelin North America") is a corporation organized under the laws of the State of New York with its principal place of business at One Parkway South, Greenville, South Carolina 29615-5022. Michelin designs, manufactures, and sells tires for every type of vehicle, including airplanes, automobiles, bicycles, earthmovers, farm equipment, heavy-duty trucks, and motorcycles. Michelin is one of the leading manufacturers of tires in the United States. In 2022, Michelin had €10.92 billion (over $11.75 billion) in sales, 80% of which were generated in the United States. Michelin employs 23,000 people across 34 plants in the United States and Canada. Michelin has manufacturing facilities in Alabama (light trucks and passenger tires), Indiana (passenger tires), Oklahoma (passenger tires), and South Carolina (passenger tires and truck and bus tires).

95.     CGEM and Michelin North America are referred to collectively as "Michelin."

### c. Nokian Tyres Defendants

96.     Defendant Nokian Tyres plc is organized under the laws of Finland with its principal place of business at Pirkkalaistie 7, P.O. Box 20, 37101 Nokia, Finland. Nokian Tyres

plc is the parent company of the Nokian Tyres Group, which includes subsidiaries worldwide. Nokian Tyres plc develops and manufactures tires for passenger cars, trucks, and heavy machinery. In 2019, the company's net sales were $1.8 billion, and it employed some 4,700 people.

97.     Defendant Nokian Tyres Inc. is a corporation organized under the laws of the State of Delaware. It is a wholly-owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc. In December of 2018, Nokia Tyres announced its new headquarters located in Nashville, Tennessee, which would house Nokia Tyres' Vice President, along with members of the company's sales, customer service, IT, logistics, finance, and marketing teams. In 2017, Nokian Tyres announced it had opened a $360 million manufacturing facility located in Tennessee. The manufacturing facility produces car and light truck all season tires and all-weather tires for consumers in the United States and Canada.

98.     Defendant Nokian Tyres U.S. Operations LLC is a limited liability company organized under the laws of the State of Tennessee. It is a wholly-owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.

99.     Nokian Tyres plc, Nokian Tyres Inc., and Nokian Tyres U.S. Operations LLC are referred to collectively as "Nokian Tyres."

### d.    Goodyear

100.    Defendant The Goodyear Tire & Rubber Company ("Goodyear") is a corporation organized under the laws of the State of Ohio with its principal place of business at 200 Innovation Way, Akron, Ohio 44316-0001. Goodyear manufactures its products in facilities in 23 countries and has operations in most regions of the world. Goodyear manufactures and sells under the Goodyear, Cooper, Dunlop, Kelly, Debica, Sava, Fulda, Mastercraft, and Roadmaster brands. Approximately 86% of Goodyear's sales in 2022, 85% in 2021 and 84% in 2020 were for tire

units. The principal channel for the sale of Goodyear and Cooper brand tires in the United States is a large network of independent dealers. Goodyear, Cooper, Dunlop, Kelly, and Mastercraft brand tires are also sold to numerous national and regional retailers, in Goodyear Company-owned stores in the United States, and through the wholesale channel, including through TireHub, LLC, Goodyear's national wholesale tire distributor in the United States, and a network of aligned U.S. regional wholesale tire distributors.

### e. Pirelli Defendants

101. Defendant Pirelli & C. S.p.A. ("Pirelli & C") is organized under the laws of Italy with its principal place of business at Via Bicocca degli Arcimboldi, 3, 20126 Milano MI, Italy. Pirelli & C designs, manufactures, and distributes tires for cars, motorcycles, and bicycles. Pirelli & C has a commercial presence in over 160 countries and 19 manufacturing sites in 12 countries.

102. Defendant Pirelli Tire LLC ("Pirelli Tire") is a limited liability company organized under the laws of Delaware with its principal place of business located at 100 Pirelli Drive, Rome, Georgia 30161. Pirelli Tire's facilities include a research and development center at its Rome, Georgia headquarters, as well as sales and marketing offices in New York City, Los Angeles, Detroit, Montreal, and Atlanta, and a flagship store in Los Angeles, California. The company manufactures, distributes, and markets original equipment and replacement tires for export and domestic car/motorcycle applications.

103. Pirelli & C and Pirelli Tire are referred to collectively as "Pirelli."

### f. Bridgestone Defendants

104. Defendant Bridgestone Corporation is organized under the laws of Japan with its principal place of business at 1-1, Kyobashi 3-chome, Chuo-ku, Tokyo 104-8340. Bridgestone Corporation is the parent corporation of the Bridgestone Group (the "Group"), which refers to all

Group companies, including Bridgestone Americas ("BSAM"), Bridgestone China, Asia Pacific ("BSCAP"), Bridgestone Europe, Russia, Middle East, India, and Africa ("BSEMIA"), and Bridgestone Japan ("BSJP"). Bridgestone Corporation is the world's largest tire and rubber company.

105.    Defendant Bridgestone Americas, Inc. ("BSAM") is incorporated under the laws of Nevada with its principal place of business at 200 4th Ave, Suite 100, Nashville, Tennessee, 37201-2256. BSAM and its subsidiaries develop, manufacture, and market a wide range of Bridgestone, Firestone, and associate brand tires to address the needs of a broad range of customers, including consumers, automotive and commercial vehicle original equipment manufacturers, and those in the agricultural, forestry and mining industries. BSAM has U.S. manufacturing facilities in Arkansas, Georgia, Iowa, Illinois, North Carolina, Ohio, South Carolina, Tennessee, and Texas.

106.    Bridgestone Corporation and BSAM are referred to collectively as "Bridgestone."

**g.    Unnamed Co-Conspirators and Agents**

107.    DOE Defendants 1–100 are other individuals or entities who engaged in the unlawful conduct as co-conspirators to Defendants. Plaintiffs may amend this Complaint to allege the names of additional Defendants as they are discovered.

108.    Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

109.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or

representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

110.    Each Defendant named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

111.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## **FACTUAL ALLEGATIONS**

### A.    **Tire Inputs**

112.    Tires are made up of dozens of raw ingredients. In a competitive commodity market, the cost of these ingredients acts as a key determinant of the price of a Replacement Tire.

113.    Tire inputs fall into the following groups: (a) natural and synthetic rubber; (b) fillers (c) steel and textiles; and (d) chemical agents.

### a.    **Rubber**

114.    Tire production involves the use of up to thirty different types of rubber, both natural and synthetic.

115.    Natural rubber comprises approximately 19% of tire material. Natural rubber is the main component of the tire tread layer.

116.    Synthetic rubbers, including butadiene rubber, styrene butadiene rubber, and halogenated polyisobutylene rubber, comprise approximately 24% of the tire material. Synthetic rubbers are also part of the treads of a tire. Physical and chemical properties of these synthetic rubbers determine the performance of each component in the tire as well as the overall tire performance (rolling resistance, wear and traction, inflation).

**b.**    **Fillers**

117.    Fillers, such as carbon black and silica, constitute 26% of tire composition. These fillers are used as reinforcing agents to improve tire durability.

118.    Carbon black is a byproduct of the combustion of various petroleum products. When added as a filler in rubber, it increases abrasion resistance and tensile strength significantly. The usage of carbon black in tire manufacturing leads to the black color commonly seen in tires today.

**c.**    **Reinforcing materials**

119.    Steel and textile reinforcement cables (e.g. "Tire cords") form the "skeleton" of a tire. These components give the tires their shape and provide rigidity. Reinforcing materials comprise approximately 16% of a tire.

**d.**    **Chemical Agents**

120.    Numerous chemical agents make up the remainder of a tire. These chemicals include plasticizers, chemicals for vulcanization, such as sulfur and zinc oxide, and anti-ageing agents.

**Figure 1: Tire input materials.**



### B. Defendants' Tires Are Interchangeable with Each Other

121.    Tires are commodity-like products that are interchangeable at the design stage.
They are also interchangeable at the replacement stage.  Most tire manufacturers label tires with
the tire's type, width, aspect ratio, construction type, diameter, load index, and speed rating.

**Figure 2: Tire Code Diagram.**



122.  **Type.**  The first letter of the tire code sequence represents the vehicle type. "P" stands for passenger vehicle Tire which includes sedans, coupes, crossover, SUVs, minivans. "LT" represents light trucks and "ST" indicates special trailer tires.

123.  **Width.**  The next three numbers on a tire correspond with the width of the tire in millimeters measured from sidewall to sidewall.

124.  **Aspect Ratio.**  The aspect ratio follows the tire width. The aspect ratio is the percentage of the tire's height to its width where height is measured in millimeters from the edge of the wheel rim to the top of the tread.

125.  **Construction Type.**  The letter following the aspect ratio describes the construction type.  The most common construction types are "R" meaning the layers run radially across the tire, "D" for a diagonal or bias ply construction, and "B" where the tire has a belted bias.

22

126.  **Wheel Diameter.**  After the construction type, the manufacturer lists the wheel diameter, describing the width of the rim upon which the tire will fit.  This is the number used to describe the tire size.

127.  **Load Index.**  The next two to three-digit number describes how much weight the tire can bear.

128.  **Speed Rating.** The last letter in the tire code shows the maximum speed a tire is designed to ride. For example, "S" means the tire can travel at a maximum speed of 112 mph under ideal conditions.

      **C.**     **U.S. Tire Market**

129.  Virtually all wheeled land vehicles in operation, whether off-road or on-road, use tires. This dependence makes tire manufacturing a critical component of the U.S. automobile industry. Demand for tires in the U.S. market is substantial: the U.S. economy produced 9.2 million passenger and commercial vehicles in 2022, and Americans purchased almost 14 million vehicles in that year.

130.  Automobile tire manufacturers have existed in the United States for as long as there have been cars. For example, Defendant Goodyear began producing automobile tires in 1899, around the same time the first American car companies were founded.

131.  U.S. tire manufacturing has an annual economic footprint of $170.6 billion. The United States Tire Manufacturers Association ("USTMA") projected total U.S. tire shipments of 334.2 million units in 2023. Sales of Replacement Tires in the United States were approximately $61 billion in 2022 and $57 billion is 2023.

132.  Manufactured tires are used in new cars as "Original Equipment Tires" (OE tires) or as dedicated Replacement Tires. OE tires are specified by the vehicle manufacturer and initially

fitted to the vehicle when new. The car manufacturer collaborates with tire companies to choose a tire that meets various requirements for their brand-new vehicle. They select a tire that balances ride noise, handling, longevity, and fuel efficiency to achieve the overall characteristics important to the end-user. In contrast, Replacement Tires are selected by individual consumers as replacements for OE tires. This action alleges a scheme among the Defendants to fix prices for Replacement Tires in the United States.

133.    The supply chain for Replacement Tires involves three main participants: tire manufacturers, tire distributors, and tire dealers. Distribution to end purchasers generally differs between retail tires (for passenger cars and light trucks, which include SUVs and minivans) and commercial/off-road tires, which includes those used on busses and heavy trucks. Typically, these two segments are served by different specialized dealers. However, some stores are considered 'hybrid', serving both commercial and retail customers. In 2022, retail tires made up the majority of the overall US tire market in terms of unit shipments and in dollar value.

**Figure 3: U.S. Replacement Tire Market**

| Segment | 2023 | 2022 |
|---|---|---|
| Passenger | $37.6 | $38.0 |
| Light Truck | $8.5 | $9.0 |
| Commercial Truck | $8.4 | $11.7 |
| Off-the-road (OTR) | $1.8 | $2.0 |
| Agricultural Tractor (Ag) | $0.7 | $0.7 |
| Total | $57.0 | $61.4 |

*Source: Modern Tire Dealer*

134.    The U.S. Replacement Tire market is massive.  As shown in Figure 3, in 2022 the market was worth over $61 billion and in 2023 it was worth over $57 billion.

135.     In North America, retail tire outlets comprise a variety of outlets which include auto dealerships, general automotive service shops and warehouse clubs such as Costco and Sam's Club. In addition, there are tire retailers which are focused on the tire business exclusively, known as mass tire merchandisers. A small share of local tire retail stores in North America are directly owned and managed by tire manufacturers.

136.     Most tire distributors are independent from tire manufacturers, but recent decades have seen a growing trend of major tire manufacturers setting up their own vertically-integrated distribution networks. Examples include Goodyear's G3Xpress, Goodyear and Bridgestone's TireHub or Michelin and Sumitomo's NTW. Michelin also maintains an official online storefront on Amazon for direct-to-consumer sales.

**D.     Replacement Tire Prices Increased Significantly During the Class Period**

137.     For most of the 2010s, the price level of Replacement Tires remained stable, with only minor fluctuations over time. However, vigorous competition among tire manufacturers ended after Defendants agreed not to compete and to coordinate price increases for Replacement Tires in the United States.

138.     Over the last four years, the prices of Replacement Tires have seen dramatic increases, driven by lock-step price increases from the major U.S. Tire manufacturers, including Defendants. In 2023 it was reported that, "the average price of tires has risen 21.4% over the past two years, more than 70% higher than core inflation."[4] Prices for Replacement Tires have remained

---

[4] Michael Grabell, "Overinflated: The Journey of a Humble Tire Reveals Why Prices Are Still So High," PRO PUBLICA (May 3, 2023), https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices.

high despite easing inflation, the dissipating effects of the COVID-19 pandemic, and a stabilization of input costs. "As of June 2023, the industry average price paid . . . for tires was $220."[5]

**Figure 4: Producer Price Index by Commodity: Tires.[6]**



139.    The following table summarizes Defendants' price increases on passenger and light truck Replacement Tires between 2021 and 2023:

**Figure 5: Defendants' Price Increases During the Class Period**

| Defendant | Effective Date | Price Increase |
|-----------|----------------|----------------|
| Michelin | February 1, 2021 | Up to 5% |
| Continental | March 1, 2021 | Undisclosed |
| Michelin | April 1, 2021 | Up to 8% |
| Goodyear | April 1, 2021 | Up to 8% |
| Pirelli | April 15, 2021 | Up to 7% |
| Bridgestone | May 1, 2021 | Up to 8% |
| Goodyear | June 1, 2021 | Up to 8% |
| Michelin | July 1, 2021 | Up to 6% |
| Continental | July 1, 2021 | Undisclosed |
| Pirelli | July 1, 2021 | Up to 6% |
| Goodyear | September 1, 2021 | Up to 8% |
| Michelin | September 1, 2021 | Up to 14% |
| Continental | October 1, 2021 | Undisclosed |

---

[5] "Tire Market: Top Brands & Retailers, Market Share, Retail Sales Data, & Trends in 2023," TRAQLINE (Oct. 20, 2023), https://www.traqline.com/newsroom/blog/tire-market-top-brands-retailers-market-share-retail-sales-data-trends-in-2023/.
[6] Source: St. Louis Federal Reserve.

| Pirelli | October 1, 2021 | Up to 8% |
|---------|-----------------|----------|
| Michelin | January 1, 2022 | Up to 12% |
| Goodyear | January 1, 2022 | Up to 12% |
| Continental | January 3, 2022 | Undisclosed |
| Pirelli | January 17, 2022 | Up to 10% |
| Continental | April 1, 2022 | Undisclosed |
| Michelin | April 1, 2022 | Up to 5% |
| Bridgestone | April 1, 2022 | Up to 10% |
| Pirelli | April 11, 2022 | Up to 10% |
| Continental | June 1, 2022 | Undisclosed |
| Michelin | June 1, 2022 | 5-12% |
| Pirelli | June 15, 2022 | Up to 10% |
| Goodyear | July 1, 2022 | Up to 10% |
| Bridgestone | July 1, 2022 | Up to 10% |
| Bridgestone | October 1, 2022 | Up to 9% |
| Continental | October 1, 2022 | Undisclosed |
| Michelin | January 1, 2023 | Up to 9% |
| Bridgestone | January 1, 2023 | Undisclosed |
| Pirelli | January 15, 2023 | Up 10% |

140.    These price increases, among others, were not a result of healthy competition. Instead, as alleged herein, they were the result of an unlawful price-fixing conspiracy. Defendants effectuated several conspiratorial price increases for Replacement Tires during the Class Period.

141.    One mechanism Defendants utilized to effectuate their conspiracy, among others alleged herein, were public announcements on their earnings calls. Defendants were able to coordinate pricing through a series of earnings calls. As publicly traded corporations, Defendants Goodyear, Pirelli, Nokian and Bridgestone hold conference calls with securities analysts on a quarterly basis to discuss their financial results for the previous reporting period. These calls are accessible to the public either live or through archived versions. Transcripts of the calls are also publicly available. Although Michelin and Continental are not publicly traded, competitors typically monitor these earnings calls, and these Defendants did, in fact, monitor these calls.  What

is more, the publicly traded Defendants know that their competitors are listening to the announcements made during earnings calls.

142.     Defendants Goodyear, Pirelli, Nokian, and Bridgestone first began publicly communicating their intention to collude on prices of replacement tires in the middle of 2020, following the onset of the COVID-19 pandemic. The pandemic had a global impact on the tire industry and its material suppliers, leading to a shut down for much of the first half of 2020. In the United States, passenger tire production saw a 25.5% reduction, with full stoppages in March, April and May. Due to shelter-in-place and other public safety guidelines imposed by many states, traffic volume decreased substantially. A report by the Auto Care Association revealed that personal travel dropped between 38% and 48% during the work week.

143.     Raw materials prices (which typically drive the retail price) predictably dropped too, starting with the onset of the COVID pandemic and continuing through the middle of 2020. Rubber prices, for example, dropped as much as 50% almost overnight.

144.     For the tire industry, the uncertainty brought by the COVID-19 pandemic came on the heels of shrinking margins due to difficulty passing on higher raw materials costs. In 2017, for example, there was a failed attempt by most major tire manufacturers, including Bridgestone, Continental, Pirelli, Goodyear and Michelin, to push through higher pricing. Manufacturers announced price increases ranging from 5 to 10%. However, after raw materials prices fell quickly, consumers simply turned to lower-priced alternatives produced by other manufacturers, and the manufacturers pushing increases had difficulty making the higher prices stick.

145.     To offset the downward pricing pressure from soft demand, Defendants first began expressing an openness to coordinating on prices in the replacement market on first and second quarter earnings calls in 2020.

146.    On May 5, 2020, in a Q1 2020 earnings call, Nokian's CEO, Korhonen, stated that, as long as all manufacturers stayed in line, tire manufacturers could capture additional profit from the drop in raw materials prices as a result of the drop in demand due to the COVID pandemic: "*if everybody's sensible in this industry, it means that the prices would not be going down as much as the raw material would imply*."

147.    It did not take long for the other Defendants to understand Korhonen's call to arms and begin broadcasting the message on pricing. In its first quarter 2020 earnings call, held two weeks after Nokian's call, Bridgestone executives indicated that the Company was open to "tak[ing] active ambitious steps now" on pricing in North America. Pirelli stated that "[w]e don't see any price erosion in industry. I think there was an erosion last year and now we see that the price discipline doesn't have a sign of weakening." Pirelli's CEO, Andrea Casaluci, echoed the same message on its next earnings call: "As we mentioned, there is price stability in the industry and there is a low level of inventory that is supporting some thoughts, positive thoughts concerning the price environment for the beginning of 2021 as well." Casluchi and Marco Provera, another Pirelli executive, said that the outlook on price was "positive" and "we expect in the coming weeks and months that something positive can happen in the market."

148.    In a Q3 2020 earnings call, held on October 30, 2020, Goodyear's CEO, Richard Kramer, was asked whether the current environment was favorable for price increases. In response, Kramer indicated that the Company "do[es] see a favorable pricing environment." He added that it "is a pretty good environment" for producer pricing.

149.    Now knowing that they could move on price without fear of being undercut, Defendants Goodyear, Pirelli, Nokian and Bridgestone publicly announcing their intention to do so and promptly implemented multiple rounds of substantial price increases. In a Q4 2020 earnings

call, Naoki Hishinuma, Executive Officer in charge of Finance Global CFO for Bridgestone, stated that "we will further strengthen pricing and sales mix by bringing pricing discipline and increasing HRD sales." Three months later, a Bridgestone executive stated emphatically: "*We will raise prices*."

150.    Within weeks of the Q3 2020 earnings calls, and over the next few months, Defendants announced price increases of about 5% to 8%. Goodyear, for example, announced an increase of up to 5% on its replacement business effective December 1, 2020 – one of *four* increases in a span of nine months.

151.    Michelin increased prices on select Michelin and BFGoodrich brand passenger and light truck Replacement Tires, as well as on select commercial truck tires, up to 5%, effective February 1, 2021. It publicly claimed the price increases were "due to changing business dynamics of the U.S. market."

152.    Around the same time, Continental increased prices on select passenger and light truck Replacement Tires in the U.S. within the Continental and General brands by an undisclosed amount, effective March 1, 2021.

153.    Soon thereafter, Michelin and Goodyear both increased prices on Replacement Tires, effective April 1, 2021. Michelin increased prices on select Michelin, BFGoodrich, and Uniroyal passenger and light truck Replacement Tires up to 8%, publicly claiming the price increase was due to "changing business dynamics and rising costs of raw materials." Goodyear raised prices of its Goodyear, Dunlop, and Kelly-brand Replacement Tires by up to 8%.

154.    Pirelli also increased prices on passenger and light truck Replacement Tires in the United States at this time, up to 7%, effective April 15, 2021. Pirelli publicly claimed the price increases were due to "higher price of raw materials and changing market conditions."

30

155.    Then Bridgestone increased prices on select Bridgestone and Firestone brand passenger and light truck Replacement Tires up to 8% in the United States and Canada, effective May 1, 2021. It publicly claimed the price increases were due to "increased business costs and other market dynamics."

156.    Goodyear then increased prices again on Goodyear, Dunlop, and Kelly consumer Replacement Tires by up to 8%, effective June 1, 2021. Goodyear publicly blamed the increase on "changing market dynamics in the industry and [a] reflect[ion of] the strong value of the Goodyear brands"—using identical wording from its April 1, 2021 price increase.

157.    This initial round of price increases was just the beginning. They were followed by a series of further increases, each preceded by public statements informing competitors of the upcoming hikes, continuing through the end of 2022.

158.    Defendants continued to publicly make clear their intention to continue their price increases during earnings calls over the next year.

159.    For example, on April 30, 2021, Goodyear stated on a first quarter 2021 earnings call: "In the US and we realize that we - that the pricing we've announced to date isn't sufficient to get us through the second half. Probably what we've announced so far, it gets us a little more than halfway there, but we've got some time to work with and got some pretty good momentum." Goodyear then increased prices again on Goodyear, Dunlop, and Kelly consumer Replacement Tires by up to 8%, effective June 1, 2021. Goodyear publicly blamed the increase on "changing market dynamics in the industry and [a] reflect[ion of] the strong value of the Goodyear brands"-using identical wording from its April 1, 2021 price increase.

160.    On behalf of Nokian, Jukka Moisio, its President and CEO, stated on May 4, 2021, that his "anticipation" was an increase in prices. Price increases in this environment "are important and necessary," he reiterated on an earnings call held three months later.

161.    Michelin, Continental, and Pirelli then implemented additional price increases on Replacement Tires, effective July 1, 2021. Michelin increased prices on Michelin, BFGoodrich, and Uniroyal passenger and light truck Replacement Tires by up to 6%. Continental increased prices on select Continental and General brand passenger and light truck Replacement Tires by an undisclosed amount. Pirelli increased prices of passenger and light truck Replacement Tires by up to 6%, stating publicly that the increases were due to higher price of raw materials and changing market conditions.

162.    Michelin and Goodyear again implemented price increases on consumer Replacement Tires, effective September 1, 2021. Michelin increased prices on certain aftermarket Michelin, BFGoodrich, and Uniroyal passenger and light truck Replacement Tires by up to 14%. Goodyear increased prices on passenger and light truck Replacement Tires by up to 8%.

163.    On August 5, 2021, Pirelli stated that the Company's "price performance is expected to improve in the second half compared to the first half" as Pirelli "continues to implement price increases" in the replacement market. Five days later, on August 10, 2021, Bridgestone stated that it was "certain that we will raise prices in the second half of the year." It offered these statements about its intentions despite acknowledging that "pricing strategy is a very sensitive matter." Companies are well aware, and have been advised by their attorneys, not to discuss future pricing plans. Despite being advised against making such statements, the Defendants nevertheless discussed their price increase plans publicly, during earnings calls.

164.    Bridgestone continued to reinforce this message nearly every quarter:

- "I think we can continue to see further price hikes, including next year." Q3 2021 Earnings Call, November 11, 2021

- "We will continue to raise prices in Europe and the US in response to the market conditions." Q1 2022 Earnings Call, May 11, 2022

- "In order to ensure profitability, we will reinforce our focus on premium tires while continuing to execute strategic price management, including price increases." Q3 2022 Earnings Call, November 10, 2022.

165. Following Bridgestone's and Pirelli's statements, Continental and Pirelli increased prices again on Replacement Tires, effective October 1, 2021. Continental increased prices on Continental and General passenger and light truck Replacement Tires by an undisclosed amount. Pirelli increased prices on car and light truck Replacement Tires by up to 8%, publicly citing higher prices of raw materials and changing market conditions.

166. The price increases for Replacement Tires continued into 2022. Michelin implemented price increases up to 12% on Michelin, BFGoodrich, and Uniroyal passenger and light truck Replacement Tires, effective January 1, 2022. Similarly, Goodyear raised its prices on consumer Replacement Tires by up to 12% around the same time.

167. Soon thereafter, Continental increased prices on select Continental and General passenger and light truck Replacement Tires by an undisclosed amount, effective January 3, 2022.

168. A few weeks later, Pirelli increased its prices for car and light truck Replacement Tires by up to 10%, effective January 17, 2022.

169. Continental, Michelin, and Bridgestone increased Replacement Tire prices again, effective April 1, 2022. Continental increased its price on Continental and General passenger and light trucks Replacement Tires by an amount that varied across specific products by brand.

33

Michelin increased prices by 5% on the majority of select passenger and light truck Replacement Tires. Bridgestone increased prices by up to 10% on non-winter Bridgestone, Firestone, and Fuzion passenger and light truck Replacement Tires.

170.    Soon thereafter, Pirelli increased its prices for Replacement Tires by up to 10%, effective April 11, 2022.

171.    Continental and Michelin each increased prices on tires, effective June 1, 2022. Continental increased its prices on Continental- and General-branded passenger and light truck Replacement Tires by an undisclosed amount. Michelin increased prices on the majority of its passenger and light truck Replacement Tires ranging from 5 to 12%.

172.    Pirelli increased its prices for car and light truck Replacement Tires by up to 10% soon thereafter, effective June 15, 2022.

173.    Goodyear and Bridgestone then subsequently each increased prices by up to 10% on consumer Replacement Tires, effective July 1, 2022.

174.    Bridgestone and Continental each increased prices on tires, effective October 1, 2022. Bridgestone increased its prices on Bridgestone, Firestone, and Fuzion passenger and light truck Replacement Tires by up to 9%. Continental increased its price on select Continental and General passenger and light trucks Replacement Tires by an amount that varied across specific products by brand.

175.    Defendants' unlawful price increases continued into 2023. Michelin and Bridgestone each increased their Replacement Tire prices, effective January 1, 2023. Michelin increased prices on select passenger and light trucks Replacement Tires by up to 9%. Bridgestone increased its prices on passenger and light truck Replacement Tires by an undisclosed amount.

176.    Soon thereafter, Pirelli increased its prices for car and light truck Replacement Tires by up to 10%, effective January 15, 2023.

177.    The steady stream of price-increase announcements from Defendants—in a few cases, five or more times in a 12-month period—was unprecedented. In announcements accompanying the increases, Defendants repeatedly stated that the increases were legitimate and were necessary due to rising raw materials and other inflation-impacted costs. But these explanations were simply pretext for the impetus of increasing prices: Defendants' unlawful collusion.

178.    The input costs for Replacement Tires did not, and could not have, justified Defendants' price increases. In fact, on occasion, Defendants acknowledged that their price increases were disproportionate to their increased costs. For example, in its Q1 2022 earnings call on May 6, 2022, Goodyear's Chief Financial Officer told investors "[Goodyear's] increase in the replacement tire prices more than offset [its] costs."

179.    Sales volume also did not suffer due to price increases, which would normally be seen in a price-competitive market. For example, Continental's sales volume rose by 19.3% in 2022. Its annual report from that year indicates "agreements reached with customers on price adjustments and to offset inflation-related effects had a positive impact on the sales performance of the Automotive group sector."

180.    Defendants' coordination caused tire prices to increase significantly in the United States. Indeed, during the Class Period, tire prices increased quicker in the United States and in Europe (*i.e.* in markets where Defendants have significant collective market share) than they did during the same period in Japan (*i.e.* a market where Defendants have a much smaller market share). As shown in Figure 6 below, the United States and European Union Producer Price Index

("PPI") increased faster than the Japanese Consumer Price Index ("CPI"). PPI measures the average change over time in the selling prices received by domestic producers for their output. CPI measures the average change over time in the prices paid by consumers for goods or services.

**Figure 6. International Price Comparison.**



181.    Prices for tires manufactured by Defendants are significantly higher than those manufactured by companies outside the conspiracy. Figure 7, below, depicts average prices for passenger tire size 205/55R16, one of the most popular passenger replacement tires in the United States. As Figure 7 shows, prices for 205/55R16 tires manufactured by Defendants Goodyear, Continental, Michelin, and Bridgestone were significantly more expensive than tires manufactured by non-Defendants Hankook and Falken.

**Figure 7.**



Average Price of Major Tire Manufacturers in North America

E. **Defendants Make Up a Significant Portion of the United States Replacement Tire Market**

182. Defendants are among the largest tire manufacturers in the world. Bridgestone is the world's largest tire and rubber company, with about 130 manufacturing plants and R&D facilities in 25 countries and sells products in more than 150 countries worldwide. Michelin has nine R&D centers around the world, 123 production sites in 26 countries, a commercial presence in 170 countries and 125,000 employees worldwide and does business on every continent. Goodyear employs about 72,000 people and manufactures its products in 57 facilities in 23 countries around the world. Pirelli has 18 factories located in 12 countries, production capacity in 2022 of 74 million car tires, and points of sale in over 160 countries (around 20,000 in 2022). Continental employs almost 200,000 people at 519 locations for production, research, and

development, and is present in 57 countries and markets. It has 917 company-owned tire outlets and a total of around 5,228 franchises and operations with a Continental brand presence.

183.    The U.S. Replacement Tire market is oligopolistic and highly concentrated, with three of the Defendants controlling the lion's share of the market: in 2022, Bridgestone, Michelin, and Goodyear (the "Big Three") made up almost 64 percent of the entire Replacement Tire market. Each of the Big Three also encompasses subsidiary brands: (i) Goodyear: Goodyear, Cooper Tires, Dunlop, and Kelly; (ii) Michelin: Michelin, BF Goodrich, and Uniroyal; and (iii) Bridgestone: Bridgestone and Firestone. Continental is the fourth largest Replacement Tires manufacturer in terms of U.S. market share.

**Figure 8: Replacement Tires Market Shares.**



184.    In 2023, brands produced by the Big Three remained the most popular in the United States.

185.    This high market share concentration makes the Replacement Tire market more susceptible to cartelization—a smaller group of competitors is better able to solve the coordination and trust problems that can prevent cartel formation or destabilize an existing cartel. A smaller number of negotiators makes it easier for the conspirators to agree on a cartel price, to allocate

market shares, to conceal their collusion, to develop enforcement mechanisms, and to detect and punish cheaters.

### F.  EC Investigation

#### a.  Dawn Raids of Defendant Tire Manufacturers

186.    On January 30, 2024, the European Commission ("EC') revealed that it was carrying out unannounced inspections—also known as "dawn raids"—of tire manufacturers. Under Article 20 of Regulation 1/2003, the EC is empowered to conduct dawn raids "on the premises of companies suspected of being in breach of EU Competition rules."[7]

187.    When explaining the basis for the dawn raids, the EC expressed that it had "concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices . . . [and that] price coordination took place amongst the inspected companies, including via public communications."[8] The EC stated that the products at issue in the investigation are Replacement Tires for passenger cars, vans, trucks, and buses.

188.    Inspections by the EC are not undertaken without serious deliberation and a belief that a violation has occurred. Inspections are typically performed in situations analogous to "probable cause" in the United States.  Inspections are by an order of the EC, and the EC must have "reasonable grounds for suspecting an infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."

---

[7] European Commission, *Inspections,* https://competition-policy.ec.europa.eu/index/inspections_en.

[8] European Commission, "Commission carries out unannounced antitrust inspections in the tyres sector" (Jan. 30, 2024), *available at* https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

189.    Shortly after the EC's announcement, Defendants confirmed that they were subjects to the investigation. Defendants made the following acknowledgments:

a.      **Bridgestone:** "Bridgestone can confirm that the European Commission is conducting an inspection at its European headquarters."[9]

b.      **Goodyear:** "We confirm that our European offices were subject to unannounced inspections today by the European authorities."[10]

c.      **Continental:** "We can confirm that as of today, investigations by European antitrust authorities are taking place at Continental in Germany."[11]

d.      **Nokian Tyres:** Nokian confirmed the EC conducted an unannounced inspection at its headquarters in Finland and said, "The European Commission has expressed its concerns that the inspected tyre manufacturing companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices."[12]

e.      **Pirelli:** Pirelli confirmed it was under investigation and that it was "guaranteeing full support to the authority in the ongoing investigations."[13]

f.      **Michelin:** Michelin confirmed "it was included in the EU investigation."[14]

---

[9] Andrew Boyce and Tono Gil, "Bridgestone, Goodyear, Continental, Nokian confirm EU antitrust dawn raids." mLex (Jan. 30, 2024), https://content.mlex.com/#/content/1539333/bridgestone-goodyear-continental-nokian-confirm-eu-antitrust-dawn-raids-update

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] Foo Yun Chee and Ilona Wissenbach, "Pirelli, Continental, Michelin and Nokian targeted in EU raids," Reuters (Jan. 31, 2024), https://www.reuters.com/business/autos-transportation/eu-antitrust-regulators-raid-tyre-makers-concerns-about-possible-cartel-2024-01-30/.

[14] *Id.*

### b.  Dawn Raid of Consultancy Firm

190.  Following the dawn raids of Defendants and the taking of documents and other evidence, on June 18, 2024, the EC carried out unannounced antitrust inspections at the premises of a consultancy firm in two EU countries. The EC was concerned that the consultancy firm may have violated EU antitrust rules that prohibit cartels and restive business practices.

191.  According to the EC's June 18, 2024 press release, the EC's inspection of the consultancy firm was "conducted in the context of an investigation for which the [EC] carried out inspections earlier in 2024." The EC was concerned "the consultancy firm may have facilitated or instigated the suspected price coordination amongst [tire] manufacturers, which allegedly also used public communications channels to collude."[15]

192.  According to the European Commission's official website, "Article 20 of Regulation 1/2003 empowers the Commission to conduct inspections or 'dawn raids' on the premises of companies *suspected* of being in breach of EU Competition rules" (emphasis added). Additionally, Article 18 and 19 of Regulation 1/2003 states that the Commission has the power to request information and take statements. The inspections or raids begin, however, after the preliminary stage of investigating for suspicious anticompetitive conduct, like here.

193.  Accordingly, based on evidence it obtained in its prior raids of the Defendants, the EC developed a "reasonable suspicion" that the consultancy assisted, or facilitated, the cartel amongst the Defendants.  The dawn raids of Defendants on January 30, 2024 uncovered evidence confirming price coordination among Defendants and revealing the consultancy firm's

---

[15] European Commission, *Commission carries out further unannounced antitrust inspections in tyres sector cartel investigation* (June 18, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ ip_24_3365.

involvement in such coordination, which led to the dawn raid of the consultancy firm only six months later.

194.    Based on information and belief, Smithers is the consultancy firm that was the subject of the EC's inspection on June 18, 2024. Smithers is an Ohio limited liability company with its principal place of business at 121 South Main Street Suite 300 Akron, Ohio. Smithers is a multinational provider of testing, consulting, information, and compliance services and has 24 offices in North America, Europe, and Asia. In Europe, it has offices in the Netherlands, Italy, and the United Kingdom. Its clients are "OEMs, tier suppliers, product manufacturers, [and] raw materials suppliers," among other companies.

195.    Smithers was initially founded as a "publisher of scientific reports for the rubber industry" in 1925. According to its website (www.smithers.com), with respect to the tire industry, Smithers offers tire technical consulting. Specifically, Smithers "support[s] the tire industry with analytical data." It holds itself out as a "[t]hird-party, independent source for confidential data."

196.    Since 1925, Smithers has published the Tire Analysis Report, a benchmarking report covering global tire markets, exclusively for tire manufacturers and raw materials suppliers to the tire industry. Smithers' Tire Analysis Reports, which is based on "a targeted selection of tires from various global manufacturers," provide its clients with "benchmarking data needed to make key product development decisions." These reports also include information regarding, among other things, "product management and marketing," "cost analysis," and "product benchmarking." Smithers also publishes periodic supplements to its Tire Analyses Reports by region (*e.g.*, North America, Europe).

197.    Additionally, Smithers publishes The Smithers Report, a regular email news service that brings its clients "the latest information on the global tire industry as it happens - including

market insights from the Smithers expert editorial team of journalists, analysts, and scientists." Smithers represents that "[t]his subscription service helps global tire and rubber stakeholders stay informed about industry developments." As an illustrative example, the January 26, 2024 edition of The Smithers Report disclosed one tire manufacturer's increase in daily tire output at its Philippines plant, the extra cost of importing tires from India during the Red Sea crisis and its temporal impact on tire shipments to the East Coast of the United States, and the annual amount of dry rubber, a raw material for tires, exported from Cambodia.

198.    Besides the Tire Analysis Report and The Smithers Report, Smithers is a prolific publisher of other reports about the global tire industry for global tire industry participants. For example, on December 22, 2023, Smithers published The Future of Global Tires to 2028, a report that analyzes and forecasts the tire market by raw material, tire type, end-use, geographic region, and leading national market through 2028. This report contains statistical data for the global tire market by material type, end use, and region.

199.    Smithers provides its clients access to several additional tools, including the Tire Database System (TDS), a web-based database system that allows users to view, sort, and export data for in-depth technical investigations on all reports included in their subscription, and Component Volume & Weight (CV&W) reports, which include raw material information with reconstructed formulas.

200.    Upon information and belief, many—if not all—Defendants are Smithers' clients and use Smithers' comprehensive qualitative and quantitative data for business planning purposes. Specifically, Smithers' various publications and tools, which include data by tire type, end use, country, and raw material and by dollar, volume, and market share, facilitated price coordination by its clients, including Defendants.

201.    Smithers' business relationships with Defendants goes back many years. For example, in 2017, Smithers jointly invested in a new tire testing facility (MTS Flat-Trac CT Plus Tire Test System) at an existing Smithers' office (Smithers Tire and Wheel Test Center) in Ravenna, Ohio, with Defendants Bridgestone, Continental, Goodyear, and Michelin, among others.

202.    As another example, each year, Smithers holds a multi-day Traction Summit, a conference that allows participants to "discuss and understand future opportunities for tires, and to make the connections needed to capitalize on those prospects." Attendees of the Traction Summit include Defendants Bridgestone, Continental, Goodyear, Michelin, and Pirelli.

**G.    "Plus Factors" in the Replacement Tire Industry Provide Additional Evidence of a Conspiracy**

203.    Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[16] Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism.

204.    Here, several plus factors support the plausible inference that Defendants are members of an unlawful price fixing cartel. These include: (1) opportunities to collude; (2) high barriers to entry; (3) a highly inelastic product; (4) interchangeable products; and (5) Defendants are also recidivist bad actors.

---

[16] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

44

### 1. Opportunities to Collude

205. Defendants had numerous opportunities to meet and conspire under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy. At least throughout the Class Period, Defendants and/or their parent companies had ample opportunities to collude and fix the prices of Replacement Tires, through trade association meetings and public communications.

### a. United States Tire Manufacturers' Association

206. The principal industry association is the United States Tire Manufacturers' Association ("USTMA"). Headquartered in Washington, D.C., its members include Bridgestone, Continental, Goodyear, Hankook, Michelin, Nokian, Pirelli, Toyo, and others.

207. The leadership of USTMA is drawn from the upper ranks of the member companies. The current Chair is Alexis Garcin, who is also the current Chair and President of Defendant Michelin North America. Board of Directors members include representation from Bridgestone Americas, Goodyear, Michelin NAM, Nokian NAM, Hankook, Giti Tires USA, Pirelli NAM, Continental Americas. Indeed, most USTMA Board Members are directors or officers of the member companies.

208. USTMA Board Members include: Paolo Ferrari - former President & CEO of Bridgestone Americas, CEO of Bridgestone West; Jochen Etzel - CEO of Continental Tire the Americas LLC; Alan Yarcusco - Vice-President of Government & Regulatory Affairs and General Counsel Diversified Businesses, Bridgestone Americas; Blake Eaddy - General Counsel & Secretary at Giti Tire USA; David Reese - VP of Off-Highway Business Unit, The Good Year Tire & Rubber Company; Rob Williams - President of Hankook Tire America Corporation; Nam Hwa (Ed) Cho - CEO of North & South Americas Kumho Tires U.S.A, Inc.; David K. Chapman - Vice-

President of public Affairs at Michelin North America; Tommi Heinonen - Vice-President at Nokian Tyres North America; Claudio Zanardo - President & CEO of Pirelli Tire North America; Darren Thomas - President & CEO of Sumitomo Rubber Industries, Inc.; James Tsai - General Counsel & Corporate Secretary at Toyo Tire Holdings of Americas, Inc.; and Jeff Barna - President & CEO at Yokohama Tire Corporation.

209.    USMTA holds lobbying events that bring industry figures together for multiple days, including, for example, on June 14-16, 2022. The main purpose of these events is to visit Senators and Congressional Representatives on issues of concern to the members, and the multi-day format puts key personnel together in Washington with opportunities to speak.

210.    USMTA also hosts a recycling conference, an annual event held in May, together with the Scrap Tire Research and Education Foundation.

**b.    Tire Manufacturing Ambassadors**

211.    Lobbying efforts are conducted via the Tire Manufacturing Ambassadors, a group of 12 unidentified individuals each representing one of 12 member companies. Every June, the USTMA sends its 12 ambassadors to visit congress in person, in a visit dubbed the "Capitol Hill Fly-In."

**c.    Congressional Tire Caucus**

212.    USTMA successfully lobbied in 2019 for the creation of the Congressional Tire Caucus, a bi-partisan committee, currently co-chaired by Rep. Richard Hudson (R-NC) and Rep. Emilia Strong Sykes (D-OH). Since its inception, the Congressional Tire Caucus has been chaired by representatives from states with large physical presence from major tire manufacturers. For instance, Bridgestone Americas operates four manufacturing plants in North Carolina and one in Ohio, Continental Tires maintains a corporate headquarters in Fairlawn, OH, and Michelin Tires

operates plants in North Carolina and Ohio, with a total of 34 domestic manufacturing plants, primarily in the southeastern US.

### d. Tire Industry Association & Global Tire Expo

213.    Defendants also participate in the Tire Industry Association (TIA). This organization hosts the Global Tire Expo annually, an event under the umbrella of Specialty Equipment Market Association (SEMA), a massive auto industry tech expo in Las Vegas annually.

214.    Defendant sponsors of the Global Tire Expo are Bridgestone Americas, AME International, RiteSensor of Bartee USA, Schrader TPMS Solutions, Vogue Tyres, 1800 Every Rim OEM Wheels, Federated Insurance, Haltee Corporation, Hylant, Merrick Printing, Purcell Tire & Rubber Company. Prior to the event, there are two days of off-site meetings and events, beginning with a TIA executive committee meeting, a TIA "Board & Friends" reception by invite only, with the following day hosting a two day-long events, the Tread Rubber + Tire Repair Materials Manufacturer's Group (TRMG) meeting and the Tire Retread & Repair Information Bureau (TRIB) meeting, with membership meetings, a press conference, the TIA Retail Advisory Council Meeting, and additional invite only sessions including a TIA Board Lunch. Both in formal sessions and informally by placing key personnel at the same location, the Global Tire Expo offers opportunities for Defendants, who are direct competitors, to confer and collude.

215.    TIA's officers and board of directors include, among others, the following: Debra Hamlin, Director of Operations at Bridgestone; Keith Jarman, President of AME International; Jim Pangle, Vice-President of Operations at Fountain Tire; Gary Schroeder, Executive Vice-President at Bob Sumerel Tire Co.; Adam Moffat, Executive Director, Tire Dealers Association of Canada; Leigh Ann Stewart, CRSP, Co-Founder of Simply Safe; Josephine Foley, Manager of Safety & Fleet at Sullivan Tire & Automotive Service; Mike Lukavsky, President of K&S Tire

Recycling; Glen Nicholson, Training & Program Manager at Midas International, LLC.; Craig Jay Tinklenberg, Sales/Training at Fuller Brothers Inc.; Gary MacCausland, Senior Vice-President of Operations & Merchandise at VIP Tires & Service; Chuck Space, Executive Director at Texas Tires + Automotive Association; Chris Rhoades, Vice-President at BKT Tires, Don Vanderheyden – Consultant; and Craig Stevens, General Manager at Big Horn Tire.

216.    TIA has an antitrust policy that, on its face, encourages competitors to walk right up to the line of impermissible information exchange: discussion of pricing models, strategies, and methods are expressly permitted as long as actual prices or anything which would lead to a consensus on prices are not shared. Further, members are allowed to share price and fee data if exchanged pursuant to a well-considered plan approved by TIA's legal counsel.

217.    TIA also lists as resources dozens of other state, regional, national, and international tire organizations as well as other related industry organizations.

### e.    Tire Political Action Committee

218.    TIA also includes a subgroup called the Tire Political Action Committee (TirePAC), which directly supports election/reelection of desired officials, and makes donations. TirePAC brings key industry figures together for political fundraising events. Very limited public information is available regarding TIA's TirePAC. TirePAC provides weekly/monthly updates surrounding lobbying and legislative efforts, providing a contact to Roy Littlefield IV for additional information.

### f.    Off-the-Road Tire Conference

219.    The Off-the-Road Tire Conference, organized by the TIA, is held annually. This event includes sessions on industry insights, professional development, and networking activities. In 2022, for example, the OTR Tire Conference offered an educational session on the "U.S.

Economic Forecast."[17] Major tire manufacturers and suppliers such as Bridgestone, Goodyear, Michelin, and Pirelli, regularly attend. Michelin and Goodyear have sponsored the conference.

### g.    European Tyre and Rubber Manufacturers' Association Events

220.    The European Tyre and Rubber Manufacturers' Association (ETRMA) runs a series of events throughout the year that bring together some of the largest companies operating in the major European tire markets. Many of the board members in ETRMA are drawn from companies like Bridgestone Europe, Continental, Michelin, and Pirelli Tyre.

### h.    International Tire Exhibition and Conference

221.    Rubber News organizes the International Tire Exhibition and Conference (ITEC) – "the largest tire manufacturing trade show and conference in North America."[18] The 16th edition of this event took place May 14-16, 2024 in Ohio. Major tire companies, including Bridgestone, Goodyear, Michelin, and Continental, are regular participants. The 2024 event speakers, for example, include Michelin's Vice President of Business to Business Products, Pierluigi Cumo; Smither's Vice President of Consultancy, Josh Guilliams; Continental Tire of the America's LLC's Quality Director, Quiana Kee; The Goodyear Tire & Rubber Company's Compounder Principal, Jeffery Lin; and Bridgestone Tires' Director of Sustainable Materials and Circular Economy, Bill Niaura, among others.

### i.    International Elastomer Conference

222.    The International Elastomer Conference, organized by the Rubber Division, is an annual event focusing on rubber and tire technology. This conference has been held since at least

---

[17] https://www.tireindustry.org/resources/resources/press-releases/2022/2022-otr-tire-conference-to-offer-12-educational-sessions/

[18] https://web.cvent.com/event/bb938bd3-6a93-44dc-82b8-424035493b52/websitePage:9613f419-fe0e-42ba-a3a5-bbd718d1d857

2021 and will continue through 2029 in various locations. It provides a venue for tire manufacturers to discuss technological advancements and industry standards and participate in networking events.

**j.      Tire Technology Expo**

223.    The Tire Technology Expo is an annual event dedicated to tire design, manufacturing, and performance. It is "the tire industry's essential annual event, gathering a global community of scientists, engineers, academics and professionals . . . ." This expo attracts major tire manufacturers such as Michelin, Goodyear, Sumitomo, Bridgestone, Continental, and Pirelli.[19] The event's focus on technological advancements and industry trends provides a platform for competitors to discuss and potentially align their business practices.

**k.      Tire Society**

224.    Defendants also participate in the Tire Society, a technology and innovation group, giving awards. This Society holds events annually in the second week of September.

225.    The nominating committee for the group's awards includes Gregory Smith – Quality Business Leader at Goodyear; Ric Mousseau – Technical Specialist at General Motors; Joerg Denhert – Director of Tire Contour & Mechanics at Continental AG; Bin Chung – Senior Vice-President of Technology at Maxxis International; and Ron Kennedy – former Managing Director of the Center for Tire Research and former Research Engineer and Manager at Hankook Tire Co.

226.    The 2023 nominees included Michelin, Bridgestone Americas, Hankook Tire Co., GRI Tires, Continental, Pirelli, Sumitomo, Goodyear, Firestone, and additional niche manufacturing and technology companies related to the tire industry. Awards are announced at the

---

[19] *See, e.g.,* https://www.tiretechnology-expo.com/en/awards-2024.php

event, suggesting that a representative from each nominated company, not just winners, are typically present.

l.    **Clemson University Global Tire Industry Conference**

227.    Many Defendant personnel also attend the Clemson University Global Tire Industry Conference, a five-day conference held in South Carolina in April each year. Speakers of the 2024 event included: David Shelton, Director of Industry Relations at Giti Tire US; David Johansen, Vice-President of Sumitomo Rubber USA; Lashan De Silva, Carbon Applications Chemist at Continental; Nicole Avramovich, Director of Government & Regulatory Affairs at Bridgestone; June Satterfield, Director of Industry Standards & Government Regulations at Michelin; Stephane Cochard, Director of Materials Research at Michelin.

m.    **Wolfe Research Global Auto Industry Conference**

228.    Defendants also present at the Wolfe Research Global Auto Industry Conference. In 2019, for example, Goodyear's executive vice president and chief financial officer provided a business overview and discussed the company's strategies.

n.    **Deutsche Bank Auto Industry Conference**

229.    Deutsche Bank's Global Auto Industry Conference hosts "senior executive from leading companies in the automotive industry" to "provide presentations to update you on their businesses" as well as "one-on-one / small group meetings." Participants include, for example, Continental and Goodyear.

o.      **The Global Data Service Organization for Tyres and Automotive Components**

230.    Established in January 2022, the Global Data Service Organization for Tyres and Automotive Components ("GDSO"), is an international non-profit association with the mission of digitally standardizing tires' data to share the information with all the actors involved.

231.    Defendants Michelin, Pirelli, Bridgestone, Continental, and Goodyear are members of GDSO and control GDSO's board. For example, Jerome Barrand from Michelin serves as the President of GDSO's Board of Directors, while Marco Spinetto from Pirelli serves as the Vice President. Bridgestone, Continental, and Goodyear also have their executives serve on the board.

232.    Since its establishment, GDSO holds general assembly meeting annually. For example, the 2022 meeting was held on June 7, 2022, the 2023 meeting was held on April 18, 2023, and the 2024 meeting was held on April 3, 2024. Those annual meetings provided Defendants a forum to meet and discuss pricing.

p.      **Traction Summit**

233.    Smithers hosts an annual Traction Summit conference. Maureen Kline, Vice President Public Affairs & Sustainability at Pirelli Tire North America, Andrew Thompson, Global General Manager, Strategic Sustainability at Bridgestone Americas, and Jay Spears, Director of Standards and Regulation at Continental Tire serve on the advisory board.

234.    Smither's annual Traction Summit provided a network for Defendants to connect and coordinate as they are usual participants of the summit. For example, the 2022 summit was held in Charlotte, NC on July 26-27, 2022, with speakers from Goodyear, Bridgestone, Michelin, and Pirelli. The 2023 summit was held in Holiday Inn San Antonio-Riverwalk between May 23rd and 25th, 2023. Goodyear, Michelin, Continental, Bridgestone, and others attended.

### q.     Tire Industry Project

235.     The Tire Industry Project ("TIP") is a global CEO-led initiative of leading tire manufacturers. TIP is currently comprised of 10 leading tire companies that include: Bridgestone, Continental, Goodyear, Hankook, Kumho, Michelin, Pirelli, Sumitomo Rubber Industries, Toyo Tires, and Yokohama. Continental, Bridgestone, Goodyear, and Michelin act as co-chairs.

236.     The CEOs of TIP member companies "meet regularly." For example, the CEOs of TIP member companies gathered at the end of October in 2023 to confirm a two-year TIP workplan. TIP meetings provided Defendants with good opportunities to engage high-level inter-firm communication and coordinate on pricing and outputs.

### r.     Other Regional and Mission-Specific Events

237.     These large organizations are in addition to an array of smaller, regional and distributor-organized events that bring Defendants' personnel together.

238.     For example, Michelin and Bridgestone delivered a joint perspective on sustainability in the tire industry at the November 22, 2021, Smithers Recovered Carbon Black (rCB) Conference.

239.     The combined effect of these industry events is a climate where senior managers know each other and have frequent opportunities to meet and speak unmonitored.

### 2.     High Barriers to Entry and Exit

240.     Replacement Tire manufacturers face significant entry and exit barriers that lead to market concentration, facilitating collusion. Barriers to entry include large up-front capital investments to establish manufacturing plants that can produce Replacement Tires at scale. For example, Nokian recently completed a $360 million manufacturing facility in Dayton, Tennessee. These manufacturing plants need to be close enough to the end consumers to make shipping costs

manageable, as Replacement Tires are heavy products. Manufacturing plants must either have sophisticated and expensive automation or a large and expensive labor force. Established Replacement Tire manufacturers have also erected significant intellectual property protections through patented products.

241.    Exit barriers are also high. Due to a huge amount of investment required to set up a manufacturing plant and to shift to new business, it is extremely difficult to exit from the Replacement Tire industry. For example, Uniroyal and Goodrich had to merge due to high exit barriers. Thus, consolidation is more likely than companies going out of business.

242.    Because the Replacement Tire market has high barriers to entry, it is more conducive to collusion. To maximize long-term profits, the cartel-fixed price must be sufficiently high to warrant participation in a criminal conspiracy but not so high as to attract new competitors. When a market is protected by high entry barriers, conspirators can set a high price with less concern about new firms entering and driving the price down. Conversely, firms may not conspire to fix prices if new entrants cannot be excluded from the market.

243.    The remarkably steady market shares of the leading tire manufacturers demonstrate the high barriers to entry. Figure 9 below shows Defendants' shares in the North American market over the last ten years, with the only significant changes being Goodyear's acquisition of Cooper in 2020.

**Figure 9.**



*Source: Modern Tire Dealer*

### 3. Price Inelasticity

244.     The price elasticity of demand shows the responsiveness of the quantity demanded of a good relative to a change in its price. When a seller of goods or services can increase selling price without suffering a substantial reduction in demand, pricing is considered inelastic.

245.     Demand elasticity affects whether price fixing is likely to be profitable. When demand is inelastic, a seller with market power can charge a higher price without losing significant sales. This market characteristic encourages collusion because rivals can collectively raise price profitably.

246.     The demand for Replacement Tires are is because tire replacement is not an option that can be deferred for long, particularly when a tire is damaged. Further, the cost of Replacement Tires makes up a small percentage of the operating cost of a car.

247.     Furthermore, Replacement Tires do not compete with other products in the functional sense; consequently, there is no inter-industry competition through cross-elasticities of demand. Since the demand for Replacement Tires is derived from the need to use the automobile, buyers cannot be induced to buy more or less of the product in any significant sense through price changes.

248.     Because the demand for Replacement Tires is highly inelastic, Defendants were able to and did collectively raise prices to supracompetitive levels without losing revenue. For example, Bridgestone America's chief operating officer reported: "We're certainly seeing a red-hot economy that, despite the price increases and inflation, demand still remains quite strong."

### 4.     Standardized Products with a High Degree of Interchangeability

249.     Defendants make similar models of Replacement Tires for each of the type-categories listed above (all-season, all-terrain, winter/snow, and summer tires). Within each type-category, Replacement Tires do not differ significantly in quality, appearance, or use—they are essentially commodity products. As a result, Replacement Tire models are functionally interchangeable.

250.     When purchasing a Replacement Tire, consumers can choose almost any brand on the market. Even when consumers are replacing only some of the four tires, they can use tires from different brands or models so long as certain features, such as tread depth, are similar. Thus, Replacement Tire producers are not likely to be able to deviate much from the competitive price without losing sales.

251.     When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where a

product like a Replacement Tire is interchangeable, economics suggests that cartel behavior is facilitated because cartel members can more easily monitor and detect defections from a price-fixing agreement.

### 5. Defendants Can Monitor Each Other's Pricing

252. Price fixing cartels commonly monitor the conduct of the co-conspirators. As noted by a Former Deputy Assistant Attorney General, in the Antitrust Division, Gary R. Spratling, who was responsible for investigating and prosecuting international cartels, cartels "have shared a number of common characteristics." On top of agreed-upon volumes, exchanges of otherwise competitively sensitive information, and prices charged to customers, a common characteristic among cartels includes "sophisticated mechanisms to monitor and police the agreements."

253. Defendants had and used multiple tools to monitor compliance with their price fixing agreement. In addition to both current and forward-looking announcements about prices (described above), the cartel members had a consultancy firm—Smithers— that centralized data across the conspirators, allowing more detailed analysis of compliance with collusive pricing. In addition, during the Class Period, the cartel members began deploying revenue management software that also facilitated granular monitoring of price movements, allowing cartel members to assess each other's compliance.

254. Goodyear's public statements during the Class Period acknowledge that they tracked other's competitively sensitive pricing and sales information, which is also consistent with the existence of Defendants' unlawful agreement to fix prices. During the 4th Quarter 2021, earnings call, Darren Wells, Chief Administrative Office of Goodyear, explained, "There are 9 competitors that we tend to track, and 7 out of the 9 have announced price increases in the first

quarter. And one of the ones who hadn't raised prices right at the end of last year, so we are seeing very consistent pricing across all the significant industry players."

255.    Defendants' efforts to raise prices became more effective through the use of revenue management software. At an earnings call in 2022, Rich Kramer, president of Goodyear, explained, "Our data analytics enable us to evaluate day-to-day movement in end-market pricing for ourselves and our competitors, giving us a clear picture of where we are relative to the market and maximizing our ability to capture value for our business."

256.    One of the tools in question is called Torqata, which started as an analytic arm of American Tire Distributors, designed to identify and create efficiencies in Tire distribution. The company was spun off in 2020 with a mission to allow manufacturers, distributors, and retailers to use data-driven analytics in improving key areas of business performance. The company's goal is to help its customers quickly respond to market trends to drive more revenue. The company's VP of Business Development, Jill Trotta, has explained that "[m]anufacturers and distributors can capture demand signals to optimize inventory and production."

257.    In its Pricing Insights, Torqata touts its ability to assist its customers in revenue and inventory management through analysis of competitors' private information.

258.    A second revenue management tool the cartel members use is made by Lizeo Group, which acquired Tire Intelligence in 2015.[20] It sells its Retail Price Pro software to Defendants Bridgestone, Continental, and Michelin. The software allows Defendants to filter hundreds of lines of pricing data by part number, brand, product, size, and speed rating. It then allows customers to set a pricing strategy based on competitor prices.

---

[20]    Lizeo, About Us, https://www.lizeo-group.com/en-us/home-us/about-us-us/ (lase visited Aug. 6, 2024).

259.    One former Michelin employee responsible for pricing in the United States recounted that Lizeo Group was founded by an "ex-Michelin employee" who started the company to provide pricing data.

260.    While Defendants may use different revenue management software, all such programs allow Defendants to analyze large data sets of competitor pricing information in real time, allowing Defendants to monitor the conspiracy by ensuring prices remain at supracompetitive levels.

### 6.    Defendants are Recidivist Violators of Antitrust Laws

261.    The U.S. Tire industry for years has been highly concentrated, and there is a history of antitrust violations by Replacement Tire manufacturers.

### a.    U.S. Department of Justice Antitrust Enforcement

### i.    Automotive Parts

262.    On February 13, 2014, the United States Department of Justice ("DOJ") announced that Defendant Bridgestone Corporation had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere. Defendant Bridgestone Corporation and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of anti-vibration rubber parts sold to automobile and component manufacturers in the United States and elsewhere from at least as early as January 2001 and continuing until as late as December 2008 in violation of the Sherman Act, 15 U.S.C. § 1. Like Replacement Tires, which are the subject of this Complaint, anti-vibration rubber parts are automotive parts. They comprise

primarily of rubber and metal and are installed in suspension systems and engine mounts, as well as other parts of an automobile, to reduce engine and road vibration.

263.    According to the Criminal Information filed, Defendant Bridgestone and its co-conspirators carried out the anti-vibration rubber parts conspiracy by:

i.       participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to Toyota Motor Corporation, Nissan Motor Corporation, Fuji Heavy Industries, Ltd., Suzuki Motor Corporation, Isuzu Motors, Ltd., and certain of their subsidiaries, affiliates and suppliers (collectively, for the purposes of this Section, "Automobile and Component Manufacturers") in the United States and elsewhere;

ii.      agreeing, during those meetings, conversations, and communications, to allocate among the companies certain sales of certain anti-vibration rubber parts sold to Automobile and Component Manufacturers in the United States and elsewhere;

iii.     agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere;

iv.      exchanging information on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere, in order to effectuate the agreements;

v.       submitting bids, price quotations, and price adjustments to Automobile and Component Manufacturers in the United States and elsewhere in accordance with the agreements;

vi.      selling anti-vibration rubber parts to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

vii.      accepting payment for anti-vibration rubber parts sold to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices.

264.      On April 15, 2014, the DOJ announced that a Cleveland federal grand jury returned an indictment against a then-current executive of Defendant Bridgestone Corporation, Yoshiyuki Tanaka, and two former executives of Defendant Bridgestone Corporation, Yasuo Ryuto and Isao Yoshida, for their roles in a conspiracy to fix prices of anti-vibration rubber parts sold in the United States and elsewhere. Mr. Tanaka, Mr. Ryuto and Mr. Yoshida and their co-conspirators entered into and participated in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of anti-vibration rubber parts sold to automobile manufacturers in the United States and elsewhere from at least as early as January 2001 and continuing until as late as December 2008 in violation of the Sherman Act, 15 U.S.C. § 1.

265.      According to the Criminal Indictment filed, Mr. Tanaka, Mr. Ryuto and Mr. Yoshida and their co-conspirators carried out the anti-vibration rubber parts conspiracy by:

i.      participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to automobile manufacturers in the United States and elsewhere;

ii.      agreeing, during those meetings, conversations, and communications, to allocate sales of certain anti-vibration rubber parts sold in the United States and elsewhere for various automobiles including, but not limited to, the Toyota Tacoma, Camry, Tundra, Sequoia, Corolla, Sienna, Venza, and Highlander;

iii.        agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to automobile manufacturers in the United States and elsewhere;

iv.        exchanging information on bids, price quotations, and price adjustments to be submitted to automobile manufacturers in the United States and elsewhere, in order to effectuate the agreements;

v.        submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements;

vi.        selling anti-vibration rubber parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

vii.        accepting payment for anti-vibration rubber parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

viii.        employing measures to keep their conduct secret, including but not limited to using code words and meeting at rented conference rooms.

266.    On April 16, 2014, the DOJ announced that a former executive of Defendant Bridgestone Corporation, Yusuke Shimasaki, had agreed to plead guilty and to pay a $20,000 criminal fine and serve 18 months in a United States prison for his role in a conspiracy to fix prices and rig bids of anti-vibration rubber parts sold in the United States and elsewhere. Mr. Shimasaki and his co-conspirators participated in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of anti-vibration rubber parts sold to automobile and component manufacturers in the United States and elsewhere from at least as early as January 2001 and continuing until as late as December 2008 in violation of the Sherman Act, 15 U.S.C. § 1.

267.    According to the Criminal Information filed, Mr. Shimasaki and his co-conspirators carried out the anti-vibration rubber parts conspiracy by:

i.      participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere;

ii.     agreeing, during those meetings, conversations, and communications, to allocate among the companies the supply of certain anti-vibration rubber parts sold in the United States and elsewhere;

iii.    agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere;

iv.     exchanging information on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere, in order to effectuate the agreements;

v.      submitting bids, price quotations, and price adjustments to Automobile and Component Manufacturers in the United States and elsewhere in accordance with the agreements;

vi.     selling anti-vibration rubber parts to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

vii.    accepting payment for anti-vibration rubber parts sold to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

viii.   employing measure to keep their conduct secret, including but not limited to using code words and meeting at rented conference rooms.

### ii. Marine Hoses

268. On September 15, 2011, DOJ announced that Defendant Bridgestone Corporation had agreed to plead guilty and to pay a $28 million fine for its role in conspiracies to rig bids and to make corrupt payments to foreign government officials in Latin America related to the sale of marine hose and other industrial products manufactured by the company and sold throughout the world. A Marine hose is a flexible rubber hose used to transfer oil between tankers and storage facilities.

269. According to the Criminal Information filed, Defendant Bridgestone and its co-conspirators carried out the marine hose conspiracy by:

i. attending meetings and engaging in discussions in the United States and elsewhere by telephone, facsimile and electronic mail regarding the sale of marine hose;

ii. agreeing during those meetings and discussions to allocate shares of the marine hose market among the conspirators;

iii. agreeing during those meetings and discussions to a price list for marine hose in order to implement and monitor the conspiracy;

iv. agreeing during those meetings and discussions not to compete for one another's customers, either by not submitting prices or bids to certain customers or by submitting intentionally high prices or bids to certain customers;

v. submitting bids in accordance with the agreements reached;

vi. providing information received from customers in the United States and· elsewhere about upcoming marine hose jobs to a co-conspirator who was not an employee of any of the marine hose manufacturers, but who served as the coordinator of the conspiracy, acted as a

clearinghouse for information to be shared among the conspirators, and was paid by the manufacturers for coordinating the conspiracy;

vii.    receiving marine hose prices for customers in the United States and elsewhere from the co-conspirator coordinator of the conspiracy;

viii.    selling marine hose to customers in the United States and elsewhere at collusive and noncompetitiye prices pursuant to the agreements reached;

ix.    accepting payment for marine hose sold in the United States and elsewhere at collusive and noncompetitive prices; and

x.    concealing the conspiracy and conspiratorial contacts through various means, including the use of code names and private email accounts and telephone numbers.

270.    On December 10, 2008, the DOJ announced that a then-executive of Defendant Bridgestone Corporation, Misao Hioki, had agreed to plead guilty and to pay an $80,000 criminal fine and serve two years in a United States prison for his role in two conspiracies: First, Mr. Hioki and his co-conspirators participated in a conspiracy to rig bids, fix prices, and allocate market shares of marine hose in the United States and elsewhere and, second, Mr. Hioki and his co-conspirators participated in a conspiracy to violate the Foreign Corrupt Practices Act (FCPA) by making corrupt payments to government officials in Latin America and elsewhere to obtain and retain business.

271.    According to the Criminal Information filed, Mr. Hioki and his co-conspirators carried out the marine hose price-fixing conspiracy by:

i.    Attending meetings or otherwise engaging in discussions in the United States and elsewhere by telephone, facsimile and electronic mail regarding the sale of marine hose;

ii.      Agreeing during those meetings and discussions to allocate shares of the marine hose market among the conspirators;

iii.      Agreeing during those meetings and discussions to a price list for marine hose in order to implement and monitor the conspiracy;

iv.      Agreeing during those meetings and discussions not to compete for one another's customers either by not submitting prices or bids to certain customers or by submitting intentionally high prices or bids to certain customers;

v.      Submitting bids in accordance with the agreements reached;

vi.      Providing information received from customers in the United States and elsewhere about upcoming marine hose jobs to a co-conspirator who was not an employee of any of the marine hose manufacturers, but who served as the coordinator of the conspiracy, acted as a clearinghouse for information to be shared among the conspirators, and was paid by the manufacturers for coordinating the conspiracy;

vii.      Receiving marine hose prices for customers in the United States and elsewhere from the co-conspirator coordinator of the conspiracy;

viii.      Selling marine hose to customers in the United States and elsewhere at collusive and noncompetitive prices pursuant to the agreements reached;

ix.      Accepting payment for marine hose sold in the United States and elsewhere at collusive and noncompetitive prices;

x.      Authorizing or consenting to the participation of subordinate employees in the conspiracy; and

xi.      Concealing the conspiracy and conspiratorial contacts through various means, including code names and private email accounts and telephone numbers.

66

### iii.      Instrument Panel Clusters

272.    On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. (subsidiaries of Defendant Continental AG) had agreed to plead guilty and to pay a $4 million criminal fine for its role in a conspiracy to fix prices of instrument panel clusters installed in automobiles sold in the United States and elsewhere. Like Replacement Tires, which are the subject of this Complaint, instrument panel clusters are automotive parts. Instrument panel clusters are a set of instruments located on the dashboard of a vehicle that contain gauges such as a speedometer, tachometer, odometer, and fuel gauge, as well as warning indicators for gearshift position, seat belt, parking-brake engagement, engine malfunction, low fuel, low oil pressure and low tire pressure. Continental Automotive Electronics LLC, Continental Automotive Korea Ltd., and their co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of instrument panel clusters sold to automobile manufacturers in the United States and elsewhere from as early as March 2004 and continued until May 2012 in violation of the Sherman Act, 15 U.S.C. § 1.

273.    According to the Criminal Information filed, Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. carried out the instrument panel clusters conspiracy by:

i.      participating in meetings, conversations, and other communications to coordinate bids for instrument panel clusters supplied to vehicle manufacturers for model vehicles sold in the United States and elsewhere;

ii.　　　　entering into agreements during those meetings, conversations and communications to allocate sales of instrument panel clusters supplied to vehicle manufacturers for model vehicles sold in the United States and elsewhere;

iii.　　　exchanging information on bids, price quotations, and price adjustments for submission to vehicle manufacturers in the United States and elsewhere, in order to effectuate the agreed-upon allocations;

iv.　　　coordinating and submitting bids that were the product of collusion for instrument panel clusters supplied to vehicle manufacturers for model vehicles sold in the United States and elsewhere in accordance with the agreed-upon allocations;

v.　　　　supplying instrument panel clusters to vehicle manufacturers for model vehicles sold in the United States and elsewhere at collusive and noncompetitive prices; and

vi.　　　accepting payment for instrument panel clusters supplied to vehicle manufacturers for certain model vehicles sold in the United States and elsewhere at collusive and noncompetitive prices.

### b.　　California Attorney General Enforcement

274.　　In 2019, Defendant Bridgestone Corporation and its subsidiary, Bridgestone APM Company, a Delaware company with its principal place of business in Findlay, Ohio, and Continental Automotive Electronics LLC, Continental Automotive Korea Ltd., and Continental Automotive Systems, Inc. (subsidiaries of Defendant Continental AG) were amongst the 52 automotive suppliers that paid a total of $23 million in settlements for antitrust law violations brought by the California Attorney General.

### c.      European Commission Enforcement

275.    On February 21, 2018, the European Commission ("EC") concluded that Defendant Continental AG and its subsidiaries, Continental Teves AG & Co. oHG and Continental Automotive GmbH (collectively, for the purposes of this Section, "Continental"), violated the European Union's competition law by exchanging information in connection with hydraulic braking systems and electronic braking systems with the aim of coordinating their respective market behaviors, including pricing practices. For the hydraulic braking systems conspiracy, Continental was ultimately fined €44,006,000. For the electronic braking systems conspiracy, Continental was granted immunity from fines as the first to submit information and evidence.

276.    Like Replacement Tires, which are the subject of this Complaint, hydraulic braking systems are automotive parts. Hydraulic braking systems consist of an actuation system and a foundation system. The actuation system is made up of a brake booster and main brake cylinder, while the foundation system is made up of a disc brake with saddle or drum brake and wheel brake cylinder. Hydraulic braking systems use fluid to transfer pressure to the vehicle's braking mechanism, slowing the vehicle. Likewise, electronic braking systems are automotive parts. Electronic braking systems prevent cars from skidding by providing electronic stability controls when braking (anti-lock braking system or ABS) or under all driving conditions (electronic stability control or ESC).

277.    According to the Commission Decision issued by the EC's DG Competition, Continental and its co-conspirators participated in a set of agreements and concerted practices concerning the exchange of sensitive business information for the purposes of reducing competitive uncertainty in the area of sales of hydraulic braking system through:

i.      Participating in meetings, phone conversations, and email correspondences to exchange competitively sensitive business information regarding hydraulic braking systems with the aim of coordinating their market conduct relating to Daimler AG ("Daimler") and Bayerische Motoren Werke AG ("BMW");

ii.     Exchanging, during those meetings, phone conversations, and email correspondences, information regarding their willingness to accept Daimler's three-year-policy and BMW's four-year-policy clause and discussing Daimler and BMW's purchasing terms and conditions;

iii.    Exchanging, during those meetings, phone conversations, and email correspondences, information concerning Daimler relating to raw material cost compensation, cost transparency, and volume reductions; and

iv.     Exchanging, during those meetings, phone conversations, and email correspondences, information with a view to reducing competitive uncertainty for Continental and its co-conspirators' supplies of hydraulic braking systems to Daimler and BMW.

278.    According to the Commission Decision issued by the EC's DG Competition, Continental and its co-conspirators participated in a set of agreements and concerted practices concerning the exchange of sensitive business information for the purposes of reducing competitive uncertainty in the area of sales of electronic braking system through:

i.      Participating in meetings and phone conversations to exchange competitively sensitive business information regarding electronic braking systems following the issuance of Requests for Quotation ("RFQs") for the VW's MLB evo-platform;

ii.     Discussing, during those meetings and phone conversations, their interest in the contract for VW's MLB evo-platform;

iii.      Disclosing, during those meetings and phone conversations, their intentions for VW's MLB evo-platform;

iv.      Exchanging, during those meetings and phone conversations, competitively sensitive business information on their respective offers; and

v.      Exchanging, during those meetings and phone conversations, information with a view of reducing competitive uncertainty for Continental and its co-conspirators' supplies of electronic braking systems to VW for the MLB evo-platform.

### d.      Korea Fair Trade Commission Enforcement

279.      On December 23, 2013, news sources reported that the Korea Fair Trade Commission ("KFTC") fined Continental Automotive Electronics LLC (a subsidiary of Defendant Continental AG) for conspiring to fix the prices of instrument panel clusters sold between January 2008 and March 2012. The panels were installed on 11 million Hyundai and Kia vehicles. The KFTC fined Continental Automotive Electronics LLC $46 billion won (approximately $42 million USD) for its participation in the instrument panel cluster price- fixing conspiracy.

### e.      Brazilian Administrative Council for Economic Defense Enforcement

280.      On March 3, 2021, the Brazilian Administrative Council for Economic Defense ("CADE") formally initiated proceedings against Continental Teves AG & Co oHG, a subsidiary of Defendant Continental AG, and certain former employees for the allegedly unlawful exchange of competition-sensitive information concerning hydraulic brake systems. CADE has not fined Continental Teves AG & Co oHG yet.

281.      On August 18, 2010, CADE determined that Continental Brasil Indústria Automotiva (a subsidiary of Defendant Continental AG) engaged in an "invitation to cartel" with respect to the commercialization of tachographs and imposed a fine of BRL 12.0 million on

Continental Brasil Indústria Automotiva. After multiple appeals, in February 2023, the court of first instance rendered a verdict against Continental Brasil Indústria Automotiva and lifted the ban on the enforcement of the fine against Continental Brasil Indústria Automotiva amounting to BRL 34.2 million.

### f.    South African Competition Authority Enforcement

282.    On April 4, 2008, the South African Competition Authority ("SACA") conducted search and seizure operations at the premises of Bridgestone South Africa (Pty) Ltd. (a subsidiary of Defendant Bridgestone Corporation), non-Defendant Dunlop Tyres International (Pty) Ltd, and non-Defendant the South African Tyre Manufacturers' Conference ("SATMC"), a private company and association of tire manufacturers. A complaint alleging that the tire manufacturers had adjusted their prices around the same time and within the same parameters prompted SACA's investigation into price-fixing in the tire industry. SACA's investigation found that SATMC members used it as a platform for "coffee table discussions" to determine price increases and general coordination in the market amongst the tire manufacturers.

283.    These raids resulted in South African's competition authority issuing fines against Goodyear South Africa (Pty) Ltd (a subsidiary of Defendant Goodyear Tire and Rubber Company) and Continental Tyre South Africa (Pty) Ltd (a subsidiary of Defendant Continental AG) of up to 10% of their annual sales, while Bridgestone South Africa (Pty) Ltd. escaped a fine after admitting to taking part in the alleged cartel and receiving conditional immunity after filing a leniency application with the regulator.

284.    In its application for leniency, Bridgestone South Africa (Pty) Ltd. admitted that it held telephonic discussions and met with its competitors during the period 1999 to 2007 to agree in principle that they should cooperate to ensure stability in the market. The meetings, which were

attended by the tire manufacturers' sales and marketing representatives, coordinated the timing and the average percentage price increase of tires, agreed on the discount structure to be given to tire dealers, and messages to be given to the market explaining the increases.

**H.    The Inflated Prices of Replacement Tires Were Passed Through to Plaintiffs and the Classes They Represent**

**a.    Replacement Tires Are Commodity-Like Products That Are Physically Traceable Throughout the Distribution Chain**

285.    Replacement Tires are considered commodity-like products due to the availability of functionally equivalent options from various defendant manufacturers. Defendants produce Replacement Tires according to standardized specifications, contributing to the industry's high-volume production with millions of units produced each year.[21] The market for Replacement Tires is notably price-sensitive, with pricing serving as a key differentiator. End-payor consumers and businesses prioritize price when purchasing tires, particularly for standard, everyday vehicles.

286.    The highly interchangeable nature of Replacement Tires, especially between Defendants within the same specification class, simplifies the process for Defendants to coordinate pricing. This interchangeability also increases the likelihood of the passthrough of the overcharges caused by the collusion through the distribution chain.

287.    Replacement Tires are purchased in finished form as standalone products[22], making them physically traceable throughout the distribution chain from Defendants to Plaintiffs and

---

[21] *Tire Code,* https://en.wikipedia.org/wiki/Tire_code; *Tire Size Explained: What Do the Numbers on the Side of A Tire Mean?*, Les Schwab, https://www.lesschwab.com/article/tires/tire-size-explained-reading-the-sidewall.html; *Federal Motor Vehicle Safety Standards; Tires,* Federal Register, *available at* https://www.federalregister.gov/documents/2019/12/19/2019-27209/federal-motor-vehicle-safety-standards-tires.

[22] Extra charges for tire purchases may include installation charges, disposal fees for old retires,

members of the Classes. Consequently, any cost increase in Replacement Tires can be traced through the chain of distribution to Plaintiffs and members of the Classes.

**b.      Increased Costs Will Be Passed through to Customers in Competitive Markets**

288.    When a firm's costs rise due to an overcharge or increasing raw materials costs, it typically raises its prices to cover higher costs. Otherwise, it would lose money on each sale and be driven out of business. Conversely, when a firm's costs decrease, such as from improved production efficiency or decreasing energy costs, it will tend to pass on the cost decrease by lowering its price. Otherwise, competitors would be able to undercut its prices, taking market share.

289.    Economic theory predicts that cost pass-through occurs at each stage of the distribution and retail sales process at issue here. When distribution chain participants face an industry-wide, non-transitory increase in the costs, they increase their prices. Thus, when distributors or retailers pay higher prices for the products they purchase, they also increase their prices. This process continues throughout the entire distribution chain.

290.    The economic necessity of passing through cost changes increases with the degree of competition a firm faces. Economic theory shows that pass-through is likely to be close to 100% in markets that are highly competitive. In a highly competitive market, all businesses will set their prices slightly above their costs, resulting in narrow profit margins. If they did not, they would go

---

taxes, cost of new tire stems, cost for rebuilding/resetting the Tire Pressure Monitoring System (TPMS), separate charge to fill the tires with nitrogen, and road hazard warranties. John M Vincent, *How to Buy Tires: A Step-by-Step Guide*, U.S. News (Aug. 29, 2019), available at https://cars.usnews.com/cars-trucks/advice/how-to-buy-tires.

out of business in the long run either by setting prices too low and losing money on every sale, or, setting prices too high and losing business to competitors.

291.    Given that, as shown below, the Replacement Tire distribution chain is highly competitive, economic theory predicts that any overcharge due to the defendants' price-fixing conspiracy would be passed through the distribution chain, ultimately resulting in higher prices paid by Plaintiffs and the End-Payor Classes.

### c.    The Markets for Replacement Tire Distribution and Retail Are Highly Competitive

292.    The distribution and wholesale market for Replacement Tires is a crucial link between tire manufacturers and retail outlets, including automotive service centers and independent tire shops. Distributors and wholesalers often have extensive warehouses and logistics networks to handle the vast volume of tires and meet the demands of various retail customers. These entities ensure that tires are available where and when they are needed, maintaining a steady supply chain from manufacturers to end consumers.

293.    This level of the distribution chain is highly competitive due to low product differentiation and price competition, with distributors and wholesalers competing for regional presence and strong distribution networks.[23] Major distributors in this market include companies

---

[23] *See* ATD Form 10-K (2015), at 10 ("The industry in which we operate is highly competitive and fragmented. Tire manufacturers distribute tires to the retail market by direct shipments to independent tire outlets, national retail chains and manufacturer owned retail stores, as well as through shipments to independent wholesale distributors like us. There are approximately 200 independent wholesale distributors in the United States. We compete with a number of tire distributors on a regional basis. Our main competitors include: TCI Tire Centers, Carroll and Am-Pac Tire, some of whom have retail operations which compete with their distribution customers. We also face some competition from mail order and smaller regional companies. We believe that the principal competitive factors in our business are reputation, breadth of product offering, delivery frequency, price and service."), *available at* https://www.sec.gov/Archives/edgar/data/1068152/000119312505044493/d10k.htm.

like American Tire Distributors (ATD), National Tire Wholesale (NTW), TireHub (a joint venture between Goodyear and Bridgestone), and regional wholesalers. Distributors and wholesalers compete on multiple fronts, including pricing, inventory availability, delivery speed, and customer service.[24] This competition is intensified by the need to balance inventory levels with fluctuating demand, which can be affected by seasonable variations and economic conditions.[25]

294.    Moreover, the rise of online tire sales has added a new layer of competition. Online platforms often work with regional distributors to fulfill orders, leading to additional competitive pressures on traditional wholesalers. These online entities can offer competitive pricing due to their lower overhead costs and efficient logistics systems.

295.    Distributors and wholesalers in the replacement tire market typically operate with relatively low profit margins due to the competitive nature of the market and the significant volume they handle. Several factors contribute to this:

i.    *High volume, low margin business model*: distributors and wholesalers rely on high sales volumes to generate revenue. The per-unit profit on tires is typically low, necessitating large-scale operations to achieve profitability.

ii.    *Intense price competition*: the competitive nature of the market forces distributors to keep prices low to attract and retain customers. This price competition erodes margins, as firms must balance competitive pricing with maintaining profitability. The number of competitors and the low barriers to entry also contribute to the emphasis on price competition, which can further compress margins.

---

[24] *See* ATD Form 10-K (2015), at 10.

[25] *Id.* at 11 ("We typically experience our highest sales levels from March through October of each fiscal year, while sales levels are generally lower during the period from November through February. Our inventories generally fluctuate with anticipated seasonal sales volumes.").

iii.     *Significant operating costs*: The costs associated with warehousing, inventory management, and logistics are substantial. Maintaining large inventories to ensure product availability and managing complex delivery networks add to the operational expenses, further squeezing profit margins.

iv.     *Low barriers to entry*: Concentration in the tire distribution business is low, with a high level of fragmentation, mainly due to low barriers to entry. This further emphasizes the importance of price competition.

v.     *Pass-through of cost changes*: Distributors often have limited ability to absorb cost increases from tire manufacturers. When tire manufacturers raise the prices of Replacement Tires, these increases are typically passed on to retailers.

296.     Retailers sell Replacement Tires directly to End-Payor class members, offering various additional services such as installation, alignment, balancing, and tire repair. The market is highly customer-focused, with an emphasis on providing convenience, expert advice, and value-added services to attract and retain customers. Retailers source their inventory from distributors and wholesalers, and sometimes directly from tire manufacturers.

297.     This level of the distribution chain encompasses a diverse range of sellers, including large national chains, independent tire shops, automotive service centers, and online retailers. Key players in the market include well-known chains such as Discount Tire (and America's Tire), Les Schwab Tire Centers, Firestone Complete Auto Care, Goodyear Tire & Auto Service, Big O Tires, Pep Boys, Walmart, and Costco, alongside numerous independent shops and regional chains.

298.     The retail market for Replacement Tires is characterized by intense competition and moderate to low profit margins, driven by several factors:

i.     *Price competition*: retailers often compete on price to attract price-sensitive

consumers. This is particularly intense in areas with a high concentration of tire shops. Price matching policies are common, forcing retailers to keep prices low to avoid losing customers to competitors.

ii.　　　*Service differentiation*: retailers strive to differentiate themselves through the quality and range of services offered. This includes tire installation, wheel alignment, balancing, and maintenance services. Superior customer services, expert advice, and convenience are key differentiators in this market.

iii.　　　*Online retailing*: the rise of online tire retailers such as Tire Rack and SimpleTire has intensified competition. In 2023, 78% of tire sales are made at a physical retail location and 12% of tire purchases are made online. These platforms offer a wide selection of tires at competitive prices, with the convenience of home delivery or local installation options. Traditional retailers have had to adapt by enhancing their online presence and offering e-commerce capabilities.

299.　　Tire retailers face numerous overhead, operational and pricing-related pressures that similarly make the retail level of tire distribution highly competitive:

i.　　　*High overhead costs*: traditional physical retailers face significant overhead costs, including rent for physical locations, salaries for skilled labor, and investments in equipment and inventory. Maintaining a well-stocked inventory to meet customer demand also tied up capital and incurs storage costs.

ii.　　　*Price sensitivity*: the high level of price sensitivity among consumers means that retailers often have to compete on price and offer price match, leading to lower margins. Aggressive pricing strategies and frequent discounting to attract customers further erode profit margins.

78

iii.      *Inventory management*: efficient inventory management is crucial to avoid overstocking or stockouts. However, managing a diverse inventory to cater to different vehicles and customer preferences can be challenging and costly, affecting profitability.

iv.      *Marketing and promotions*: to stay competitive, retailers invest heavily in marketing and promotional activities. These campaigns are essential to attract customers but can be costly and impact profit margins.

**d.    Economic and Legal Literature Indicates that Unlawful Overcharges Are Normally Passed On to Ultimate Consumers**

300.     Economic and legal literature has recognized that unlawful overcharges normally result in higher prices paid for the price-fixed product by ultimate consumers who are situated at the end of a multiple-level distribution chain. Two antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust)—have observed that "in a multiple- level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[26]

301.     As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

---

[26] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers . . . . Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.[27]

**e.      The Precise Overcharge Passed Through to Plaintiffs and the End-Payor Classes Can Be Measured with Regression Analysis**

302.    The precise amount of the overcharge impacting the prices paid by Plaintiffs and the End-Payor Classes can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through each level in the chain of distribution. Thus, the economic harm to Plaintiffs and class members can be quantified.

303.    Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis—called regression analysis—has been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members. Such analysis can estimate pass-through rates for each participant at every level of the distribution chain.

---

[27] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

304. To the extent that Replacement Tire distributors, wholesalers, and retailers price their sales as their cost plus a fixed markup, this will create an additional reason for pass-through to exceed 100 percent through these channels. For example, if a wholesaler prices its product at manufacturer sales price plus 10 percent, and a retailer prices its product at wholesale plus 10 percent, the total pass through to the final consumer will be 121 percent (i.e., 110 percent times 110 percent) of manufacturer sales price. Certain distributor costs, like the costs of holding inventory, and "shrinkage", may be approximately proportional to the value of the products held, and thus be one factor creating this pricing policy.

305. Thus, Plaintiffs and members of the proposed End-User Classes have been forced to pay supracompetitive prices for Replacement Tires. These inflated prices have been passed on to them by distributors, wholesalers, and resellers, injuring Plaintiffs and End-Payors in a manner that is traceable through every level of the distribution chain to the overcharges caused by Defendants' collusion. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## STATUTE OF LIMTATIONS

306. Class member purchases of Replacement Tires within four years prior to the filing of this Complaint are not barred by any applicable statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

307. Plaintiffs and the Classes did not know and could not have known of Defendants' illegal conduct until the European Commission announced dawn raids in the tire industry on January 30, 2024. Before then, Plaintiffs and the Classes had no reason to believe that they paid prices for Replacement Tires that were affected by Defendants' illegal conduct, and thus had no duty until then to investigate the claims set forth in this Complaint. Defendants' secret price-fixing agreements were inherently self-concealing.

308.    Additionally, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct. For example, Michelin attributed its 12% price increase on passenger and light truck replacement tires in 2022 to "market dynamics." Goodyear justified its July 1, 2022, price increase on consumer tires to rising raw-materials and other inflation-impacted costs. Pirelli justified its April 11, 2022, price increase to "changing market conditions."

309.    Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiffs and the Classes, the various statutes of limitations governing the claims alleged herein were tolled at least until January 30, 2024, pursuant to the injury-discovery rule and the doctrine of fraudulent concealment.

310.    This complaint also alleges a continuing course of conduct (including conduct within the applicable limitations periods). Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

## CLASS ACTION ALLEGATIONS

311.    Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated as a class action under Fed. R. Civ. P. 23(a) and 23(b)(2) and seeking equitable and injunctive relief on behalf of the following classes ("Nationwide Injunctive Class") under Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1):

> All natural persons and entities who indirectly purchased at least one Replacement Tire for their own use and not for resale during the Class Period that was manufactured or sold by the Defendants, or any current or former affiliate thereof.

312.    Plaintiffs also bring this action on behalf of themselves and as a class of purchasers from the Indirect Purchaser States under Rule 23(a) and (b)(3), seeking damages pursuant to state antitrust and consumer protection laws as well as common law unjust enrichment on behalf of the following class ("Damages Class"):

All natural persons and entities who indirectly purchased at least one
Replacement Tire for their own use and not for resale in one of the Indirect
Purchaser States during the Class Period that was manufactured or sold by the
Defendants, or any current or former affiliate thereof.

313.    The "Indirect Purchaser States," for purposes of this Complaint, include Arizona,

Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Illinois,

Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri,

Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North

Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah,

Vermont, Virginia, West Virginia, and Wisconsin.

314.    The Nationwide Injunctive Class and the Damages Class are referred to herein as

the "Classes" unless otherwise indicated.

315.    The class definitions specifically excludes the following persons or entities: (a) any

of the Defendants named herein; (b) any of the corporate Defendants' parent companies,

subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees,

subsidiaries, affiliates or agents; (d) all governmental entities; (e) the judges and chambers staff in

this case, as well as any members of their immediate families; and (f) all jurors assigned to this

case.

316.    Plaintiffs do not know the exact number of members of the Classes, but due to the

nature of the trade and commerce involved, there are millions of members of the Classes

geographically dispersed throughout the United States, such that joinder of all members of the

Classes in the prosecution of this action is impracticable.

317.    Plaintiffs' claims are typical of the claims of their fellow members of the Classes

because Plaintiffs purchased Replacement Tires for their own personal use during the Class Period

from an entity that is not a Defendant or owned by a Defendant. Plaintiffs and all members of the

Classes were damaged in the same manner by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Classes.

318.    Numerous questions of law or fact common to all members of the Classes—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a.  Whether Defendants contracted, combined, or conspired with one another to restrain trade of Replacement Tires at any time during the Class Period;

b.  Whether Defendants' conduct caused the prices of Replacement Tires sold indirectly to consumers and other entities to be higher than the competitive level as a result of their restraint of trade;

c.  Whether Plaintiffs and the other members of the Classes were injured by Defendants' conduct and, if so, the determination of the appropriate classwide measure of damages; and

d.  Whether Plaintiffs and other members of the Classes are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

319.    These and other questions of law and fact are common to the Classes and predominate over any questions affecting the members of the Classes individually.

320.    Plaintiffs will fairly and adequately represent the interests of the Classes because they purchased Replacement Tires indirectly from Defendants, not for resale, within the United States during the Class Period and have no conflicts with any other members of the Classes. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation.

321.     Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

322.     This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation.

323.     The prosecution of separate actions by individuals would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

324.     Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Restraint of Trade**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

325.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

326.     Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

327.     The acts done by the Defendants as part of, and in furtherance of, its and its co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

328.    During the Class Period, the Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially maintain prices for Replacement Tires, thereby creating anticompetitive effects.

329.    The anticompetitive acts were intentionally directed at the United States market for Replacement Tires and had a substantial and foreseeable effect on interstate commerce by fixing, artificially raising, maintaining and/or stabilizing prices, rigging bids for, and allocating the market for Replacement Tires throughout the United States.

330.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Replacement Tires.

331.    As a result of the Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Injunctive Class who purchased Replacement Tires have been harmed by being forced to pay inflated, supra-competitive prices for Replacement Tires.

332.    In formulating and carrying out the alleged agreement, understanding and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

333.    The Defendants and their co-conspirators' conspiracy had the following effects, among others:

i.    Price competition in the market for Replacement Tires has been restrained, suppressed, and/or eliminated in the United States;

ii.    Prices for Replacement Tires sold by the Defendants and their co-conspirators have been maintained at artificially high, non-competitive levels throughout the United States; and

iii.       Plaintiffs and members of the Nationwide Injunctive Class who purchased
Replacement Tires indirectly from the Defendants and their co-conspirators have been deprived of
the benefits of free and open competition.

334.     Plaintiffs and members of the Nationwide Injunctive Class have been injured and
will continue to be injured in their business and property by paying more for Replacement Tires
purchased indirectly from the Defendants and their co-conspirators than they would have paid
and will pay in the absence of the conspiracy.

335.     The alleged contract, combination, or conspiracy is a *per se* violation of the
federal antitrust laws.

336.     Plaintiffs and members of the Nationwide Injunctive Class are entitled to an
injunction against the Defendants, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF
**Violation of Arizona's Uniform State Antitrust Act,**
**Ariz. Rev. Stat. § 44-1401*, et seq.***
**(By Plaintiffs Corcoran, Nixon, Smathers, and Valenzano Individually and**
**on Behalf of the Arizona Class)**

337.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

338.     During the Class Period, the Defendants and their co-conspirators engaged in a
continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in
unreasonable restraint of trade and commerce and in violation of the various state antitrust and
other statutes set forth below.

339.     The contract, combination, or conspiracy consisted of an agreement among the
Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially
supra-competitive prices for Replacement Tires in the United States.

340.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

ii.    allocating products in the United States in furtherance of their agreements; and

iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

341.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

342.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

343.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Replacement Tires.

ii.    During the Class Period, the Defendants' illegal conduct substantially affected

Arizona commerce.

iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

344.    By reason of the foregoing, the Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

### THIRD CLAIM FOR RELIEF
**Violation of California's Cartwright Act,**
**Cal. Bus. & Prof. Code § 16700, *et seq.***
**(By Plaintiffs Gianne, Javier, Link, Việt Mai, Santoyo, and Seda Individually and  On Behalf of the California Class)**

345.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

346.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

347.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

348.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize

effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

    ii.   allocating products in the United States in furtherance of their agreements; and

   iii.   participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

349.   The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

350.   The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

351.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

    i.   During the Class Period, the Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. The Defendants have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Replacement Tires at supra-competitive levels; to prevent competition in the sale of Replacement Tires; and to pool, combine, and directly and indirectly unite their interests connected with the sale of Replacement Tires to elevate the price at which Replacement Tires are sold.

ii.  The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Replacement Tires.

iii.  For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Replacement Tires; and (2) Allocating among themselves the production of Replacement Tires.

iv.  The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of Replacement Tires has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Replacement Tires sold by the Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased Replacement Tires directly or indirectly from the Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

v.  By virtue of the conduct alleged herein, the Defendants have entered into contracts, in concerted action with others, where the effect of such contract was to substantially lessen competition in a line of trade or commerce in

91

California in violation of Section 16720, *et seq.*

352.     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Replacement Tires than they otherwise would have paid in the absence of the Defendants' unlawful conduct. As a result of the Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Colorado State Antitrust Act**
**Colo. Rev. Stat. §§ 6-4-101, *et seq.***
*(*By Plaintiffs Biggs, Boberick, Cotter, Desimon, Larancuent, Messick, and Ohlrich
Individually and on Behalf of the Colorado Class)

353.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

354.     During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

355.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

356.     In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

      i.     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires

at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

ii.   allocating products in the United States in furtherance of their agreements; and

iii.  participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

357.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

358.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

359.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. §§ 6-4-101 *et seq.*

i.    Colorado's legislature conferred broad standing under the Colorado State Antitrust Act of 2023 based on an important principle of protecting the public from anticompetitive behavior and of promoting competition in the marketplace. Colo. Rev. Stat. § 6-4-102.

ii.   Under that Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. Colo. Rev. Stat. § 6-4-115.

iii.  Every contract, combination, or conspiracy in restraint of any part of trade

93

or commerce is illegal. Colo. Rev. Stat. § 6-4-104.

    iv.    Defendants made contracts or engaged in a combination or conspiracy with each other by maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of Replacement Tires for the purpose of, and which had the desired effect of, fixing, controlling, or maintaining prices for Replacement Tires within the intrastate commerce of Colorado.

    v.    Plaintiffs purchased Replacement Tires within the State of Colorado during the Class Period. But for Defendants' conduct set forth herein, the price of Replacement Tires would have been lower, in an amount to be determined at trial.

    vi.    Plaintiffs and members of the Class were injured with respect to purchases of Replacement Tires in Colorado and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs, and injunctive relief under Colo. Rev. Stat. §§ 6-4-101 *et seq.*.

**<u>FIFTH CLAIM FOR RELIEF</u>**
**Violation of the Connecticut Antitrust Act**
**Connecticut General Statutes §§ 35-24 *et seq.***
**(By Plaintiffs Altieri and Reynolds Individually and on Behalf of the Connecticut Class)**

360.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

361.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

362.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

363.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

      i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

      ii.    allocating products in the United States in furtherance of their agreements; and

      iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

364.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

365.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

366.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Connecticut General Statutes § 35-26.

      i.    Connecticut's legislature conferred broad standing under the Connecticut

Antitrust Act based on an important principle of protecting the public from anticompetitive behavior and of promoting competition in the marketplace.

ii. Under the Connecticut Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. Conn. Gen. Stat. § 35-46a.

iii. Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful. Conn. Gen. Stat. § 35-26.

iv. Every contract, combination, or conspiracy that has the purpose of effect of fixing, controlling, or maintaining prices in any part of trade or commerce; or of fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of any part of trade or commerce, is also unlawful. Conn. Gen. Stat. § 35-28.

v. Defendants made contracts or engaged in a combination or conspiracy with each other by maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of Replacement Tires for the purpose of, and which had the desired effect of, fixing, controlling, or maintaining prices for Replacement Tires within the intrastate commerce of Connecticut.

vi. Plaintiffs purchased Replacement Tires within the State of Connecticut during the Class Period. But for Defendants' conduct set forth herein, the price of Replacement Tires would have been lower, in an amount to be determined at trial.

vii. Plaintiffs and members of the Class were injured with respect to purchases of Replacement Tires in Connecticut and are entitled to all forms of relief,

96

including actual damages, treble damages, reasonable attorneys' fees and costs, and injunctive relief under Conn. Gen. Stat. §§ 35-24 *et seq*.

### SIXTH CLAIM FOR RELIEF
**Violation of the District of Columbia Antitrust Act,**
**D.C. Code § 28-4501,** *et seq.*
**(By Plaintiff Wallace Individually and on Behalf of the District of Columbia Class)**

367. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

368. During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

369. The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

370. In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

    ii.    allocating products in the United States in furtherance of their agreements; and

    iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful

agreements they reached.

371.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

372.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

373.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code § 28-4501.

    i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.    During the Class Period, the Defendants' illegal conduct substantially affected District of Columbia commerce.

    iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

374.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

**SEVENTH CLAIM FOR RELIEF**
**Violation of the Illinois Antitrust Act,**
**740 Ill. Comp. Stat. Ann. 10/1, *et seq.***
**(By Plaintiffs Aberman, Carroll, Dvorak, Holt, and Larsen Individually and on Behalf of the Illinois Class)**

375.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

376.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

377.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

378.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

        i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

        ii.    allocating products in the United States in furtherance of their agreements; and

        iii.    participating in meetings and conversations among themselves in the United

States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

379.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

380.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

381.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, Ill. Comp. Stat. 10/1, *et seq* .

    i.    The Illinois Antitrust Act prohibits any contract, combination or conspiracy to fix prices, limit production, or allocate markets. 740 Ill. Comp. Stat. 10/3.

    ii.    Plaintiffs purchased Replacement Tires within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price for Replacement Tires would have been lower, in an amount to be determined at trial.

    iii.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. 10/7(2).

    iv.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling, or maintaining prices for Replacement Tires sold, and/or for allocating products within the intrastate commerce of Illinois.

382.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat.10/3. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act..

### EIGHTH CLAIM FOR RELIEF
**Violation of the Iowa Competition Law**
**Iowa Code § 553.1, *et seq.***
**(By Plaintiff Griffiths Individually and on Behalf of the Iowa Class)**

383.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

384.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

385.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

386.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

      i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

      ii.    allocating products in the United States in furtherance of their agreements; and

      iii.    participating in meetings and conversations among themselves in the United

States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

387.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

388.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

389.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

    i.   The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Iowa; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.   During the Class Period, the Defendants' illegal conduct substantially affected Iowa commerce.

    iii.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    iv.   By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly,

Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

**NINTH CLAIM FOR RELIEF**
**Violation of the Kansas Restraint of Trade Act**
**Kan. Stat. Ann. § 50-101, *et seq.***
**(By Plaintiff Burns Individually and on Behalf of the Kansas Class)**

390.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

391.     During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

392.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

393.     In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

    ii.   allocating products in the United States in furtherance of their agreements; and

    iii.  participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful

103

agreements they reached.

394.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

395.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

396.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Stat. §§ 50-101, *et seq.*

   i. During the Class Period, the Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Kansas Stat. § 50-101. The Defendants have acted in violation of § 50-101 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Replacement Tires at supra-competitive levels; to prevent competition in the sale of Replacement Tires; and to pool, combine, and directly unite their interests in connection with the sale of Replacement Tires to elevate the price at which Replacement Tires are sold.

   ii. The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Kansas; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid

supra-competitive, artificially inflated prices for Replacement Tires.

    iii.    During the Class Period, the Defendants' illegal conduct substantially affected Kansas commerce.

    iv.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

397.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

**TENTH CLAIM FOR RELIEF**
**Violation of the Maine's Antitrust Statute,**
**Me. Rev. Stat. Ann. tit. 10 § 1101, *et seq.***
**(By Plaintiff Perrine Individually and on Behalf of the Maine Class)**

398.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

399.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

400.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

401.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    i.    participating in meetings and conversations among themselves in the United

105

States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

ii.    allocating products in the United States in furtherance of their agreements; and

iii.   participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

402.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

403.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

404.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Me. Rev. Stat. tit. 10, §§ 1101, *et seq.*

i.    The Defendants entered into a combination in restraint of trade in violation of Me. Rev. Stat. tit. 10, § 1101.

ii.   The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Maine; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and

106

open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    iii.      During the Class Period, the Defendants' illegal conduct substantially affected Maine commerce.

    iv.      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

405.      By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. tit. 10, §§ 1101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. tit. 10, §§ 1101, *et seq.*

**ELEVENTH CLAIM FOR RELIEF**
**Violation of the Maryland Antitrust Act**
**Maryland Code, Com. Law § 11-201, *et seq***
**(By Plaintiff Wood Individually and on Behalf of the Maryland Class)**

406.      Plaintiff incorporates by reference the allegations in the preceding paragraphs.

407.      During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

408.      The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

409.      In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

107

     i.     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

     ii.     allocating products in the United States in furtherance of their agreements; and

     iii.     participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

410.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

411.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

412.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq.*

     i.     The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Maryland; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages

Class paid supra-competitive, artificially inflated prices for Replacement Tires.

  ii. During the Class Period, the Defendants' illegal conduct substantially affected Maryland commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

413. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maryland Code, Com. Law § 11-201, *et seq*.

**TWELFTH CLAIM FOR RELIEF**
**Violation of the Michigan Antitrust Reform Act**
**Mich. Comp. Laws § 445.771, *et seq*.**
**(By Plaintiffs Bondy and Novak Individually and on Behalf of the Michigan Class)**

414. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

415. During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

416. The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

417. In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

  i. participating in meetings and conversations among themselves in the United

109

States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

ii.   allocating products in the United States in furtherance of their agreements; and

iii.   participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

418.   The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

419.   The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

420.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §§ 445.771, *et seq.*

i.   The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Michigan; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement

110

Tires.

    ii.   During the Class Period, the Defendants' illegal conduct substantially affected Michigan commerce.

    iii.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

421.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

### THIRTEENTH CLAIM FOR RELIEF
**Violation of the Minnesota Antitrust Law,**
**Minn. Stat. § 325D.49*, et seq.***
**(By Plaintiffs Petroskas and Roberts Individually**
**and on Behalf of the Minnesota Class)**

422.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

423.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

424.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

425.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

111

    i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

    ii.    allocating products in the United States in furtherance of their agreements; and

    iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

426.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

427.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

428.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

    i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Minnesota; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

112

Class paid supracompetitive, artificially inflated prices for Replacement Tires.

ii.     During the Class Period, the Defendants' illegal conduct substantially affected Minnesota commerce.

iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

429.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

## FOURTEENTH CLAIM FOR RELIEF
### Violation of the Mississippi Antitrust Statute,
### Miss. Code Ann. § 75-21-1, *et seq.*
### (By Plaintiff Jackson and Miles Individually and on Behalf of the Mississippi Class)

430.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

431.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

432.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

433.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

113

i.   participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

ii.  allocating products in the United States in furtherance of their agreements; and

iii. participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

434.   The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

435.   The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

436.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

i.   The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Mississippi; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

114

Class paid supracompetitive, artificially inflated prices for Replacement Tires.

ii.   During the Class Period, the Defendants' illegal conduct substantially affected Mississippi commerce.

iii.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

iv.   By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

**FIFTEENTH CLAIM FOR RELIEF**
**Violation of the Nebraska Junkin Act,**
**Neb. Rev. Stat. § 59-801, *et seq.*,**
**(By Plaintiffs Begley and Harvey Individually and on Behalf of the Nebraska Class)**

437.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

438.   During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

439.   The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

440.   In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

115

    i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

    ii.    allocating products in the United States in furtherance of their agreements; and

    iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

441.  The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

442.  The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

443.  The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

    i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Nebraska; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supra-competitive, artificially inflated prices for Replacement Tires.

ii. During the Class Period, the Defendants' illegal conduct substantially affected Nebraska commerce.

iii. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

444. By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

### SIXTEENTH CLAIM FOR RELIEF
**Violation of the Nevada Unfair Trade Practices Act,**
**Nev. Rev. Stat. § 598A.010,** *et seq.*
**(By Plaintiffs Ammons and Lim Individually and on Behalf of the Nevada Class)**

445. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

446. During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

447. The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

448. In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

117

      i.     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

      ii.    allocating products in the United States in furtherance of their agreements; and

     iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

449. The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

450. The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

451. The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

      i.     The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Nevada; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

118

Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.    During the Class Period, the Defendants' illegal conduct substantially affected Nevada commerce.

    iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

452.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

**SEVENTEENTH CLAIM FOR RELIEF**
**Violation of New Hampshire's Antitrust Statute,**
**N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, *et seq.***
**(By Plaintiffs Klawes and Rancourt Individually and**
**on Behalf of the New Hampshire Class)**

453.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

454.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

455.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

456.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

      i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

      ii.    allocating products in the United States in furtherance of their agreements; and

      iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

457.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

458.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

459.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

      i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout

New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

ii.     During the Class Period, the Defendants' illegal conduct substantially affected New Hampshire commerce.

iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

460.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

**EIGHTEENTH CLAIM FOR RELIEF**
**Violation of the New Mexico Antitrust Act,**
**N.M. Stat. Ann. §§ 57-1-1, *et seq.***
**(By Plaintiff Landavazo Individually and on Behalf of the New Mexico Class)**

461.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

462.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

463.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

121

464.   In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    i.   participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

    ii.   allocating products in the United States in furtherance of their agreements; and

    iii.   participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

465.   The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

466.   The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

467.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

    i.   The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout

New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.    During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce.

    iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

468.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

### NINETEENTH CLAIM FOR RELIEF
**Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §340**
**(By Plaintiffs Doherty, Dutton, Musikar, Purcell, Serotte, Spadafino, and Zawadzki**
**Individually and on Behalf of the New York Class)**

469.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

470.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

471.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

472.     In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

      i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

      ii.    allocating products in the United States in furtherance of their agreements; and

      iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

473.     The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

474.     The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

475.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

      i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout New York; (2) Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout New

York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires when they purchased Replacement Tires, or purchased products that were otherwise of lower quality than they would have been absent the Defendants' and their co-conspirators' illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

  ii. During the Class Period, the Defendants' illegal conduct substantially affected New York commerce.

  iii. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

476. By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

**TWENTIETH CLAIM FOR RELIEF**
**Violation of the North Carolina General Statutes**
**N.C. Gen. Stat. § 75-1, *et seq.***
**(By Plaintiffs Derrick and Dickerson Individually and**
**on Behalf of the North Carolina Class)**

477. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

478. During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in

125

unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

479.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

480.     In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

> i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

> ii.   allocating products in the United States in furtherance of their agreements; and

> iii.  participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

481.     The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

482.     The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

126

483.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1.1, *et seq.*

> i.   The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout North Carolina; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

> ii.   During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce.

> iii.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

484.     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

### TWENTY-FIRST CLAIM FOR RELIEF
**Violation of the North Dakota Uniform State Antitrust Act,**
**N.D. Cent. Code § 51-08.1, *et seq.***
**(By Plaintiff Jones Individually and on Behalf of the North Dakota Class)**

485.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

486. During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

487. The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

488. In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    i. participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

    ii. allocating products in the United States in furtherance of their agreements; and

    iii. participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

489. The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

490.     The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

491.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

    i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout North Dakota; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.    During the Class Period, the Defendants' illegal conduct had a substantial effect on North Dakota commerce.

    iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

492.     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

### TWENTY-SECOND CLAIM FOR RELIEF
**Violation of the Oregon Antitrust Law,**
**Or. Rev. Stat. § 646.705, *et seq.***
**(By Plaintiffs Montross and Poitra Individually and on Behalf of the Oregon Class)**

493.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

494.     During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

495.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

496.     In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

   i. participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

   ii. allocating products in the United States in furtherance of their agreements; and

   iii. participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

497.     The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

498. The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

499. The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

    i.   The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.   During the Class Period, the Defendants' illegal conduct had a substantial effect on Oregon commerce.

    iii.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

500. By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

**TWENTY-THIRD CLAIM FOR RELIEF**
**Violation of the Rhode Island Antitrust Act,**
**Rhode Island General Laws §§ 6-36-1, *et seq.***
**(By Plaintiff Finch Individually and on Behalf of the Rhode Island Class)**

501.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

502.     During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

503.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

504.     In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

    ii.    allocating products in the United States in furtherance of their agreements; and

    iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

505.     The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

506.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

507.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island General Laws §§ 6-36-1, *et seq.*

      i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

     ii.    During the Class Period, the Defendants' illegal conduct had a substantial effect on Rhode Island commerce.

   iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

508.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Rhode Island General Laws §§ 6-36-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws §§ 6-36-1, *et seq.*

<u>**TWENTY-FOURTH CLAIM FOR RELIEF**</u>
**Violation of the South Dakota Antitrust Statute,**
**S.D. Codified Laws § 37-1-3.1, *et seq.***
**(By Plaintiff Ackerman Individually and on Behalf of the South Dakota Class)**

133

509.   Plaintiff incorporate by reference the allegations in the preceding paragraphs.

510.   During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

511.   The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

512.   In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    i.   participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

    ii.   allocating products in the United States in furtherance of their agreements; and

    iii.   participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

513.   The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

514.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

515.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

      i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout South Dakota; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

      ii.    During the Class Period, the Defendants' illegal conduct had a substantial effect on South Dakota commerce.

      iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

516.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

**<u>TWENTY-FIFTH CLAIM FOR RELIEF</u>**
**Violation of the Tennessee Trade Practices Act,**
**Tenn. Code Ann. § 47-25-101, *et seq.***
**(By Plaintiffs Clark and Dent Individually and on Behalf of the Tennessee Class)**

135

517. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

518. During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

519. The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

520. In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

i. participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

ii. allocating products in the United States in furtherance of their agreements; and

iii. participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

521. The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

522.     The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

523.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

     i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Tennessee; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

     ii.    During the Class Period, the Defendants' illegal conduct had a substantial effect on Tennessee commerce.

     iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

524.     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

**TWENTY-SIXTH CLAIM FOR RELIEF**
**Violation of the Utah Antitrust Act,**
**Utah Code Ann. §§ 76-10-3101, *et seq.***
**(By Plaintiff Tsuya Individually and on Behalf of the Utah Class)**

525.    Plaintiff incorporate by reference the allegations in the preceding paragraphs.

526.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

527.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

528.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

i.      participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

ii.     allocating products in the United States in furtherance of their agreements; and

iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

529.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

530. The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

531. The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-3101, *et seq.*

     i. The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Utah; (2) Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

     ii. During the Class Period, the Defendants' illegal conduct had a substantial effect on Utah commerce.

     iii. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

532. By reason of the foregoing, the Defendants' have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

## TWENTY-SEVENTH CLAIM FOR RELIEF
**Violation of the Vermont Consumer Fraud Act,**
**Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.***
**(By Plaintiffs Dutton and Llabres Individually and on Behalf of the Vermont Class)**

533. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

139

534. During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

535. The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

536. In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

> i. participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;
>
> ii. allocating products in the United States in furtherance of their agreements; and
>
> iii. participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

537. The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

538.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

539.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

    i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Vermont; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.    During the Class Period, the Defendants' illegal conduct had a substantial effect on Vermont commerce.

    iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

540.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

<u>**TWENTY-EIGHTH CLAIM FOR RELIEF**</u>
**Violation of the West Virginia Antitrust Act,**
**W. Va. Code § 47-18-1, *et seq.***
**(By Plaintiff Mayo Individually and on Behalf of the West Virginia Class)**

141

541.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

542.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

543.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

544.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

        i.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

        ii.    allocating products in the United States in furtherance of their agreements; and

        iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

545.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

142

546.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

547.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

    i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.    During the Class Period, the Defendants' illegal conduct had a substantial effect on West Virginia commerce.

    iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

548.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

**<u>TWENTY-NINTH CLAIM FOR RELIEF</u>**
**Violation of the Wisconsin Antitrust Act,**
**Wis. Stat. Ann. § 133.01(1)*, et seq.***
**(By Plaintiffs Bates and Reif Individually and on Behalf of the Wisconsin Class)**

143

549. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

550. During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

551. The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

552. In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    i. participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

    ii. allocating products in the United States in furtherance of their agreements; and

    iii. participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

553. The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

554.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

555.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

      i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

     ii.    During the Class Period, the Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

    iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

556.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

557.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of the Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid

more for Replacement Tires than they otherwise would have paid in the absence of the Defendants' unlawful conduct. This injury is of the type that the antitrust laws of the above states were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

558.    In addition, the Defendants have profited significantly from the aforesaid conspiracy. The Defendants' profits derived from its anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

559.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

<u>**THIRTIETH CLAIM FOR RELIEF**</u>
**Violation of the Arkansas Deceptive Trade Practices Act,**
**Ark. Code Ann. § 4-88-101, *et seq.***
**(By Plaintiffs Landry and Richardson Individually**
**and on Behalf of the Arkansas Class)**

560.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

561.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

562.    The Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

> i.    The Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Replacement Tires were sold, distributed, or obtained in Arkansas and took efforts to

146

conceal its agreements from Plaintiffs and members of the Damages Class.

ii. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

iii. The Defendants' unlawful conduct had the following effects: (1) Replacement Tires Products price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Replacement Tires Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

iv. During the Class Period, the Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

v. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

563. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code, § 4-88-107(a) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**THIRTY-FIRST CLAIM FOR RELIEF**
**Violations of California's Unfair Competition Law**
**Cal.  Bus. & Prof. Code § 17200***, et seq.* **(the "UCL")**
**(By Plaintiffs Gianne, Javier, Link, Việt Mai, Santoyo, and Sed Individually**
**and on Behalf of the California Class)**

147

564.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

565.     The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

566.     The Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

  i.      During the Class Period, the Defendants marketed, sold, or distributed Replacement Tires in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

 ii.      This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from the Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

iii.      The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of the Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including,

but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

iv. The Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

v. The Defendants' acts or practices are unfair to purchasers of Replacement Tires in the State of California within the meaning of Section 17200, California Business and Professions Code;

vi. The Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

vii. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the Defendants as a result of such business acts or practices.

viii. The illegal conduct alleged herein is continuing and there is no indication that the Defendants will not continue such activity into the future.

ix. The unlawful and unfair business practices of the Defendants have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supra-competitive and artificially-inflated prices for Replacement Tires. Plaintiffs and the members of the Damages Class suffered injury in fact and

lost money or property as a result of such unfair competition.

    x.    The conduct of the Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

    xi.    As alleged in this Complaint, the Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by the Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

### THIRTY-SECOND CLAIM FOR RELIEF
**Violation of the Colorado Consumer Protection Act**
**Colorado Rev. Stat. § 6-1-101, *et seq.***
**(By Plaintiffs Biggs, Boberick, Cotter, Desimon, Larancuent, Messick, and Ohlrich Individually and on Behalf of the Colorado Class)**

567.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

568.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

569.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.*

    i.    The Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs

150

as an actual or potential purchaser of the Defendants' goods and which caused Plaintiffs to suffer injury.

ii.    Defendants took efforts to conceal their agreements from Plaintiffs.

iii.    Defendants' unlawful conduct had the following effects in Colorado: (1) price competition for Replacement Tires was restrained, suppressed, and eliminated; (2) Replacement Tires prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Replacement Tires.

iv.    During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

570.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6- 1-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

<u>**THIRTY-THIRD CLAIM FOR RELIEF**</u>
**Violation of the District of Columbia Consumer Protection Procedures Act,**
**D.C. Code § 28-3901, *et seq.***
**(By Plaintiff Wallace Individually and on Behalf of the District of Columbia Class)**

571.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

572.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

573.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

i. The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Replacement Tires were sold, distributed or obtained in the District of Columbia.

ii. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff were not aware of the Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by the Defendants for Replacement Tires. The Defendants had the sole power to set that price and Plaintiff had no power to negotiate a lower price. Moreover, Plaintiff lacked any meaningful choice in purchasing Replacement Tires because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff could avoid the overcharges. The Defendants' conduct with regard to sales of Replacement Tires, including its illegal conspiracy to secretly fix the price of Replacement Tires at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited the Defendants at the expense of Plaintiff and the public. The Defendants took grossly unfair advantage of Plaintiff. The suppression of competition that has resulted from the Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for

152

Replacement Tires.

    iii.    The Defendants' unlawful conduct had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and the Damages Class were deprived of free and open competition; and (4) Plaintiff and the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

574.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

## THIRTY-FOURTH CLAIM FOR RELIEF
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201,** *et seq.*
**(By Plaintiffs Eisenberg and Rojas Individually and on Behalf of the Florida Class)**

575.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

576.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

577.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

    i.    The Defendants' unlawful conduct had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Florida; (2)  Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.    During the Class Period, the Defendants' illegal conduct substantially affected Florida commerce and consumers.

    iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

578.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**THIRTY-FIFTH CLAIM FOR RELIEF**
**Violation of Hawaii Unfair and Deceptive Trade Practices Act**
**Haw. Rev. Stat. § 480-2**
**(By Plaintiffs on Behalf of the Hawaii Class)**

579.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

580.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

154

581.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes § 480-2.

      i.    The Defendants' unlawful conduct had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Hawaii; (2)  Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

      ii.    During the Class Period, the Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

      iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

582.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Revised Statutes § 480-2, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**THIRTY-SIXTH CLAIM FOR RELIEF**
**Violation of the Massachusetts Consumer Protection Act,**
**Mass. Gen. Laws ch. 93A § 1, *et seq.***
**(By Plaintiffs Cuddy and Veloso Individually and**
**on Behalf of the Massachusetts Class)**

583.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

584. The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

585. The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

  i. The Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

  ii. The Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which Replacement Tires were sold, distributed, or obtained in Massachusetts and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

  iii. The Defendants' unlawful conduct had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

  iv. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are

threatened with further injury.

v.    The Defendants have been or will be served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the Defendants not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

vi.    By reason of the foregoing, the Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. The Defendants and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

**THIRTY-SEVENTH CLAIM FOR RELIEF**
**Violation of the Minnesota Consumer Fraud Act,**
**Minn. Stat. § 325F.68, *et seq.***
**(By Plaintiffs Petroskas and Roberts Individually**
**and on Behalf of the Minnesota Class)**

586.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

587.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

588.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

589.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

590.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*

     i.    The Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as purchasers of the Defendants' goods, and which caused Plaintiffs to suffer injuries.

    ii.    The Defendants took efforts to conceal their agreements from Plaintiffs and the members of the Damages Class.

   iii.    The Defendants' unlawful conduct had the following effects in Minnesota: (1) price competition for Replacement Tires was restrained, suppressed, and eliminated; (2) Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Replacement Tires.

   iv.    During the Class Period, the Defendants' illegal conduct substantially affected Minnesota commerce and consumers.

    v.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## THIRTY-EIGHTH CLAIM FOR RELIEF
**Violation of the Missouri Merchandising Practices Act,**

158

**Mo. Ann. Stat. § 407.010,** *et seq.*
**(By Plaintiffs Merkel and Smith Individually and on Behalf of the Missouri Class)**

591.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

592.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

593.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

    i.    Plaintiffs and the Damages Class purchased Replacement Tires for personal, family, or household purposes.

    ii.    The Defendants engaged in the conduct described herein in connection with the sale of Replacement Tires in trade or commerce in a market that includes Missouri.

    iii.    The Defendants agreed to, and did in fact, affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Replacement Tires were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

    iv.    The Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for Replacement Tires. It concealed,

159

suppressed, and omitted facts that would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Replacement Tires they purchased.

v.    The Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Replacement Tires by making public statements that were not in accord with the facts.

vi.   The Defendants' statements and conduct concerning the price of Replacement Tires were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing Replacement Tires at prices established by a free and fair market.

vii.  The Defendants' unlawful conduct had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Missouri; (2)  Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

viii. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

ix.   As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of

160

money or property.

  x. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

**THIRTY-NINTH CLAIM FOR RELIEF**
**Violation of the Montana Consumer Protection Act of 1973**
**Mont. Code, §§ 30-14-101, *et seq.***
**(By Plaintiff Brandt Individually and on Behalf of the Montana Class)**

594. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

595. The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

596. The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq.*

  i. The Defendants' unlawful conduct had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Montana; (2) Replacement Tire prices were raised,

161

fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.   During the Class Period, The Defendants' illegal conduct substantially affected Montana commerce and consumers.

    iii.   As a direct and proximate result of The Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

    iv.   The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

### FOURTIETH CLAIM FOR RELIEF
**Violation of the Nebraska Consumer Protection Act,
Neb. Rev. Stat. § 59-1601, *et seq.*
(By Plaintiffs Begley and Harvey Individually and on Behalf of the Nebraska Class)**

597.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

598.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

599.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*

162

i.    Defendants' unlawful conduct had the following effects in Nebraska: (1) price competition for Replacement Tires was restrained, suppressed, and eliminated; (2) Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Replacement Tires.

ii.    During the Class Period, Defendants marketed, sold, or distributed Replacement Tires in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

iii.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**<u>FORTY-FIRST CLAIM FOR RELIEF</u>**
**Violation of the New Mexico Unfair Practices Act,**
**N.M. Stat. Ann. §§ 57-12-1, *et seq.***
**(By Plaintiff Landavazo Individually and on Behalf of the New Mexico Class)**

600.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

601.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

602.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

i.    The Defendants agreed to, and did in fact, act in restraint of trade or

163

commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Replacement Tires were sold, distributed or obtained in New Mexico and took efforts to conceal its agreements from Plaintiff and members of the Damages Class.

ii.   The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiff and the members of the Damages Class and the prices paid by them for Replacement Tires as set forth in N.M.S.A., § 57-12-2E. Plaintiff was not aware of the Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by the Defendants for Replacement Tires. The Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiff lacked any meaningful choice in purchasing Replacement Tires because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff could avoid the overcharges. the Defendants' conduct with regard to sales of Replacement Tires, including its illegal conspiracy to secretly fix the price of Replacement Tires at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited the Defendants at the expense of Plaintiff and the public. The Defendants took

grossly unfair advantage of Plaintiff. The suppression of competition that has resulted from the Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Replacement Tires.

iii. The Defendants' unlawful conduct had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

iv. During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

v. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured and are threatened with further injury.

vi. the Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

<strong><u>FORTY-SECOND CLAIM FOR RELIEF</u></strong><br><strong>Violation of Section 349 of the New York General Business Law</strong>

165

**(By Plaintiffs Doherty, Dutton, Musikar, Purcell, Serotte, Spadafino, and Zawadzki Individually and on Behalf of the New York Class)**

603.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

604.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

605.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

      i.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Replacement Tires were sold, distributed or obtained in New York and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

     ii.    The Defendants and their co-conspirators made public statements about the prices of Replacement Tires and products containing Replacement Tires that the Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Replacement Tires and products containing Replacement Tires; and the Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

    iii.    Because of the Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased

166

Replacement Tires were misled to believe that they were paying a fair price for Replacement Tires or the price increases for Replacement Tires were for valid business reasons; and similarly situated consumers were potentially affected by the Defendants' conspiracy.

iv.  The Defendants knew that its unlawful trade practices with respect to pricing Replacement Tires would have an impact on New York consumers and not just the Defendants' direct customers.

v.  The Defendants knew that their unlawful trade practices with respect to pricing Replacement Tires would have a broad impact, causing consumer class members who indirectly purchased Replacement Tires to be injured by paying more for Replacement Tires than they would have paid in the absence of the Defendants' unlawful trade acts and practices.

vi.  The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

vii.  The Defendants' unlawful conduct had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout New York; (2)  Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of

free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supra-competitive, artificially inflated prices for Replacement

Tires.

viii.   During the Class Period, the Defendants marketed, sold, or distributed

Replacement Tires in New York, and the Defendants' illegal conduct

substantially affected New York commerce and consumers.

ix.   During the Class Period, each of the Defendants named herein, directly, or

indirectly and through affiliates dominated and controlled, manufactured,

sold and/or distributed Replacement Tires in New York.

x.   Plaintiffs and members of the Damages Class seek all relief available

pursuant to N.Y. Gen. Bus. Law § 349 (h).

### FORTY-THIRD CLAIM FOR RELIEF
**Violation of the North Carolina Unfair Trade and Deceptive Practices Act,
N.C. Gen. Stat. § 75-1, *et seq.*
(By Plaintiffs Derrick and Dickerson Individually and
on Behalf of the North Carolina Class)**

606.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

607.    The Defendants engaged in unfair competition or unfair, unconscionable,

deceptive or fraudulent acts or practices in violation of the state consumer protection statutes

listed below.

608.    The Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1, *et seq.*

i.   The Defendants agreed to, and did in fact, act in restraint of trade or

commerce by affecting, fixing, controlling and/or maintaining, at artificial

and non-competitive levels, the prices at which Replacement Tires were

sold, distributed or obtained in North Carolina and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

ii.   The Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by the Defendants to cover up its illegal acts. Secrecy was integral to the formation, implementation and maintenance of the Defendants' price-fixing conspiracy. The Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. The Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. The Defendants' public statements concerning the price of Replacement Tires created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by the Defendants' illegal conspiracy. Moreover, the Defendants deceptively concealed its unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

iii.  The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

iv.   The Defendants' unlawful conduct had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout North Carolina; (2)  Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

v.   During the Class Period, the Defendants marketed, sold, or distributed Replacement Tires in North Carolina, and the Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

vi.   During the Class Period, the Defendants, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Replacement Tires in North Carolina.

609.   Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## **FORTY-FOURTH CLAIM FOR RELIEF**

**Violation of the Puerto Rico Antitrust Statute,**
**P.R. Laws Ann. tit. 10 §§ 258, *et seq*.**
**(By Plaintiff Rosario Individually and on Behalf of the Puerto Rico Class)**

610.   Plaintiff incorporate by reference the allegations in the preceding paragraphs.

170

611.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

612.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

613.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

i.      participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Replacement Tires sold in the United States;

ii.     allocating products in the United States in furtherance of their agreements; and

iii.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

614.    The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

615.    The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

616.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of P.R. Laws Ann. tit. 10 §§ 258, *et seq.*

171

i.      The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Puerto Rico; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Puerto Rico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

ii.      During the Class Period, the Defendants' illegal conduct had a substantial effect on Rhode Island commerce.

iii.      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

617.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of P.R. Laws Ann. tit. 10 §§ 258, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under P.R. Laws Ann. tit. 10 §§ 258, *et seq.*

### FORTY-FIFTH CLAIM FOR RELIEF
**Violation of Rhode Island Deceptive Trade Practices Act,**
**R.I. Gen Laws § 6-13.1-1, *et seq.***
**(By Plaintiffs Finch Individually and on Behalf of the Rhode Island Class)**

618.    Plaintiff incorporate by reference the allegations in the preceding paragraphs.

619.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

172

620.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

> i.   Members of this Damages Class purchased Replacement Tires for personal, family, or household purposes.
>
> ii.  The Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Replacement Tires were sold, distributed, or obtained in Rhode Island.
>
> iii. The Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for Replacement Tires. The Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, it breached that duty by its silence. The Defendants misrepresented to all consumers during the Class Period that its  Replacement Tire prices were competitive and fair.
>
> iv.  The Defendants' unlawful conduct had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2)  Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages

Class paid supra-competitive, artificially inflated prices for Replacement Tires.

v.    As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of the Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

vi.    The Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of Replacement Tires, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Replacement Tires at prices set by a free and fair market. The Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Replacement Tires they purchased. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

### FORTY-SIXTH CLAIM FOR RELIEF
**Violation of the South Carolina Unfair Trade Practices Act,
S.C. Code Ann. § 39-5-10 *et seq.*
(By Plaintiff Ezell, Heidtke, and Snyder Individually and
on Behalf of the South Carolina Class)**

621.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

622.     The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

623.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

    i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.    During the Class Period, the Defendants' illegal conduct had a substantial effect on South Carolina commerce.

    iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    iv.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**FORTY-SEVENTH CLAIM FOR RELIEF**
**Violation of the South Dakota Deceptive Trade Practices**
**and Consumer Protection Law, S.D. Codified Laws § 37-24,** *et seq.*
**(By Plaintiff Ackerman Individually and on Behalf of the South Dakota Class)**

624.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

625.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

626.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24, *et seq.*

  i.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Replacement Tires were sold, distributed, or obtained in South Dakota.

  ii.    The Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning the Defendants' unlawful activities and artificially inflated prices for Replacement Tires.

  iii.    The Defendants misrepresented to all purchasers during the Class Period that the Defendants' Replacement Tires were competitive and fair.

  iv.    The Defendants' unlawful conduct had the following effects in South Dakota: (1) price competition for Replacement Tires was restrained, suppressed, and eliminated; (2) Replacement Tires were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition;

176

and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Replacement Tires.

v.     The Defendants' illegal conduct substantially affected South Dakota commerce and those who purchased Replacement Tires in South Dakota.

vi.    As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of the Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

vii.   Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Replacement Tires, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Replacement Tires at prices set by a free and fair market.

viii.  Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Replacement Tires they purchased.

ix.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### <u>FORTY-EIGHTH CLAIM FOR RELIEF</u>
**Violation of the Virginia Consumer Protection Act,**
**Va. Code Ann. § 59.1-196*, et seq.***
**(By Plaintiff Acosta and Twitchell Individually and on Behalf of the Virginia Class)**

177

627.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

628.     The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

629.     By reason of the conduct alleged herein, Defendants have violated Va. Code Ann. § 59.1-196, *et seq.*

630.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Virginia.

631.     Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

632.     Defendants' unlawful conduct substantially affected Virginia's trade and commerce.

633.     Defendants' conduct was willful.

634.     As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Virginia Class have been injured in their business or property and are threatened with further injury.

635.     By reason of the foregoing, Plaintiffs and the members of the Virginia Class is entitled to seek all forms of relief, including treble damages or $1000 per violation, whichever is greater, plus reasonable attorneys' fees and costs under Va. Code Ann. § 59.1-204(A), *et seq.*

**FORTY-NINTH CLAIM FOR RELIEF**
**Violation of the West Virginia Consumer Credit and Protection Act,**
**W. Va. Code § 46A-6-101,** *et seq.*
**(By Plaintiff Mayo Individually and on Behalf of the West Virginia Class)**

636.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

637.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.*

    i.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Replacement Tires were sold, distributed, or obtained in West Virginia.

    ii.    The Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning the Defendants' unlawful activities and artificially inflated prices for Replacement Tires.

    iii.    The Defendants affirmatively misrepresented to all purchasers during the Class Period that the Defendants' Replacement Tire prices were competitive and fair. Defendants' unlawful conduct had the following effects in West Virginia: (1) price competition for Replacement Tires was restrained, suppressed, and eliminated; (2) Replacement Tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Replacement Tires. The Defendants' illegal conduct substantially affected West Virginia commerce and purchasers of Replacement Tires.

    iv.    As a direct and proximate result of the Defendants' violations of law,

Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of the Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

v.  The Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Replacement Tires, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Replacement Tires at prices set by a free and fair market.

vi.  The Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of the Replacement Tires they purchased.

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

### FIFTIETH CLAIM FOR RELIEF
**Violation of the Hawaii Antitrust Act,
Haw. Rev. Stat. § 480-4
(By Plaintiffs on Behalf of the Hawaii Class)**

638.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

639.  During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Replacement Tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

640.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Replacement Tires in the United States.

641.     In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

i.     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Replacement Tires at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Replacement Tires sold in the United States;

ii.     allocating products in the United States in furtherance of their agreements; and

iii.     participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

642.     The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

643.     The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

644.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Rev. Stat. § 480-4.

    i.    The Defendants' combination or conspiracy had the following effects: (1) Replacement Tires price competition was restrained, suppressed, and eliminated throughout Hawaii; (2)  Replacement Tire prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Replacement Tires.

    ii.    During the Class Period, the Defendants' illegal conduct substantially affected Hawaii commerce.

    iii.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

645.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Hawaii Rev. Stat. § 480-4. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Hawaii Antitrust Act.

### FIFTTY-FIRST CLAIM FOR RELIEF
**Unjust Enrichment**
**(by Plaintiffs Individually on Behalf of the Nationwide Class or, Alternatively, on Behalf of Each State Class)**

646.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

647.    Plaintiffs bring this claim under the laws of each of the Indirect Purchaser States.

648.    As a result of its unlawful conduct described above, the Defendants have and will continue to be unjustly enriched. The Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Replacement Tires.

649.    The Defendants have benefited from its unlawful acts and it would be inequitable for the Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and the members of the Damages Class for Replacement Tires.

650.    Plaintiffs and the members of the Damages Class are entitled to the amount of the Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a *pro rata* basis.

651.    Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased Replacement Tires subject to the Defendants' conspiracy would have been futile.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment on his behalf and on behalf of the Classes defined herein, by adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiffs serving as the Class Representatives and their counsel serving as Class Counsel;

B.    Defendants have contracted, combined, and conspired in violation of the Sherman Act and various state laws;

C.    Plaintiffs and the Classes have been injured in their business and property as a result of Defendants' violations;

D.     Plaintiffs and the Classes are entitled to treble damages (*i.e.,* three times overcharges) in an amount to be determined at trial, plus interest, in accordance with law;

E.     Plaintiffs and the Classes are entitled to equitable relief suitable to remedy Defendants' past and ongoing restraint of trade, including:

     i.     A judicial determination declaring the rights of Plaintiffs and the Classes, and the corresponding responsibilities of Defendants; and

     ii.     Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

F.     Defendants are jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification of this action and their rights to the members of the Classes; and

G.     Plaintiffs and the Classes recover their costs of this suit, including reasonable attorneys' fees as provided by law; and Plaintiffs and the Classes receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: August 9, 2024

Respectfully submitted,

*/s/ Gregory S. Asciolla*

Gregory S. Asciolla
Jonathan S. Crevier
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
(646) 933-1000
gasciolla@dicellolevitt.com
jcrevier@dicellolevitt.com

Steve Jodlowski
**DICELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, California 92121
(646) 933-1000
stevej@dicellolevitt.com

*/s/ Thomas H. Burt*

Thomas H. Burt
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LL**P
270 Madison Avenue
New York, NY 10016
(212) 545-4600
burt@whafh.com

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
(312) 984-0000
malmstrom@whafh.com

*/s/ Tina Wolfson*

Tina Wolfson
Theodore Maya
Melissa Ryan Clark
**AHDOOT & WOLFSON, PC**
2600 West Olive Ave, Suite 500
Burbank, CA 91505
(310) 474-9111
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
mclark@ahdootwolfson.com

*/s/ Adam J. Zapala*

Adam J. Zapala
Elizabeth T. Castillo
**COTCHETT, PITRE &
MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000
azapala@cpmlegal.com
ecastillo@cpmlegal.com

*EPP Interim Co-Lead Counsel*

Michelle L. Kranz
**ZOLL & KRANZ, LLC**
6620 Central Avenue, Suite 100
Toledo, OH 43617
(419) 841-9623
michelle@toledolaw.com

*EPP Liaison Counsel*

185

Timothy D. Battin
Christopher V. Le
Joshua Q. Callister
**BOIESBATTIN LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
(703) 764-8700
tbattin@boiesbattin.com
cle@boiesbattin.com
jcallister@boiesbattin.com

James L. Ward, Jr.
**MCGOWAN, HOOD, FELDER &
PHILLIPS, LLC**
10 Shem Drive, Suite 300
Mount Pleasant, SC 29464
(843) 268-4620
jward@mcgowanhood.com

Gretchen Freeman Cappio
Ryan McDevitt
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3400
Seattle, WA 98101
(206) 623-1900
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com

Christopher T. Micheletti
Qianwei Fu
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
(415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com

186

Brian J. Dunne
Edward M. Grauman
**BATHAEE DUNNE LLP**
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
(213) 462-2772
bdunne@bathaeedunne.com
egrauman@bathaeedunne.com

Yavar Bathaee
Andrew C. Wolinsky
**BATHAEE DUNNE LLP**
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835
yavar@bathaeedunne.com
awolinsky@bathaeedunne.com

Allison Watson
**BATHAEE DUNNE LLP**
3420 Bristol Street, Suite 600
Costa Mesa, CA 92626
(213) 458-7075
awatson@bathaeedunne.com

*EPP Steering Committee*

Daniel Zemans
**LAW OFFICES OF DANIEL ZEMANS, LLC**
2023 W. Berteau Ave.
Chicago, IL 60618
(773) 706-7767
dzemans@zemans-law.com

Don Bivens
Teresita Mercado
**DON BIVENS, PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Tel: (602) 708-1450
don@donbivens.com

Justin S. Nematzadeh,
**NEMATZADEH PLLC**
101 Avenue of the Americas, Suite 909
New York, NY 10013
Tel: (646) 799-6729
jsn@nematlawyers.com

Fred T. Isquith, Sr.
**ISQUITH LAW PLLC**
103 East 84th Street
New York, New York 10028
Tel: (718) 775-6478
isquithlaw@gmail.com

*Additional Counsel for EPP Class*

187