**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: PASSENGER VEHICLE REPLACEMENT TIRES ANTITRUST LITIGATION | Case No. 5:24-md-3107 |
| | MDL No. 3107 |
| This Document Applies to: | CHIEF JUDGE SARA LIOI |
| Automobile Dealership and Other Reseller Plaintiffs ("ADPs") | |

**<u>AUTOMOBILE DEALERSHIP AND OTHER RESELLER PLAINTIFFS'</u>**
**<u>CONSOLIDATED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

I.  Introduction ..................................................................................................... 4

II.  Parties ............................................................................................................. 5

   A.  PLAINTIFFS .............................................................................................. 5

   B.  DEFENDANTS .......................................................................................... 6

      1.  Continental ....................................................................................... 6

      2.  Michelin ............................................................................................ 9

      3.  Nokian Tyres ................................................................................... 10

      4.  Goodyear ......................................................................................... 11

      5.  Pirelli .............................................................................................. 12

      6.  Bridgestone ..................................................................................... 12

III.  Agents and Co-Conspirators ........................................................................ 13

IV.  Jurisdiction and Venue ................................................................................. 14

V.  Factual Allegations ...................................................................................... 15

   A.  The Tires Market ....................................................................................... 15

   B.  Defendants' Participation in the Tires Market ........................................ 17

   C.  Defendants effectuated the conspiracy by coordinating prices and controlling the supply of Tires during the Class Period. .................................................. 19

      1.  Defendants signaled to each other in earnings calls that "price discipline" would remain high and monitored each other's pricing announcements. ................................... 19

      2.  Defendants signaled their intent to increase prices, and they increased prices in lockstep. ............................................................................... 21

      3.  Price Coordination through Revenue Management Software ................. 31

      4.  Supply Coordination ....................................................................... 36

   D.  Defendants' conspiracy worked—Tire prices in the United States increased dramatically after long periods of stable pricing. ................................................. 37

   E.  The European Commission conducted "dawn raids" of Defendants' businesses and their consulting firm for suspected tires price fixing. ........................................... 39

      1.  Dawn Raid of Defendants ................................................................. 39

      2.  Dawn Raid of Consultancy Firm ...................................................... 41

   F.  Factors corroborating Defendants' horizontal price-fixing agreement. ........ 41

      1.  Motive ............................................................................................. 41

      2.  Opportunities to collude ................................................................... 42

      3.  Industry Structure ............................................................................ 54

      4.  Changes in input prices do not explain the increase in the price of tires, and they have not affected Defendants' profit margins. ................................................ 55

     5.    Barriers to Entry..................................................................................... 60

     6.    Price inelasticity for Tires makes the market susceptible to collusion. ................... 61

     7.    Tires are standardized products with a high degree of interchangeability............... 62

     8.    Defendants are recidivist violators of antitrust laws................................. 63

   G.    Defendants' Conspiracy ............................................................. 78

VI.  Tolling of the Statute of Limitations.................................................... 78

VII. Class Action Allegations ............................................................. 80

VIII.Claims for Relief........................................................................ 83

   Count I: Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) ..................... 83

   Count II: Violation of State Antitrust Laws ............................................ 84

   Count III: Violation of State Unfair and Trade Practices Laws........................... 86

   Count IV: Unjust Enrichment ......................................................... 88

IX.  Prayer for Relief........................................................................ 89

X.   Demand for Jury Trial................................................................. 90

Plaintiffs Martin-Landers LLC dba Mark Martin Ford; Martin-Landers Imports LLC dba Mark Martin Kia; Northside Automotive & Fleet LLC;  and Worldwide Auto Repair Ltd. individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages and injunctive relief against named Defendants Continental Aktiengesellschaft; Continental Tire the Americas, LLC; Compagnie Générale des Établissements; Michelin North America, Inc.; Nokian Tyres plc; Nokian Tyres Inc.; Nokian Tyres U.S. Operations LLC; The Goodyear Tire & Rubber Company; Pirelli & C. S.p.A.; Pirelli Tire LLC; Bridgestone Corporation; Bridgestone Americas, Inc. for violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and violations of various state antitrust laws. All allegations other than those concerning Plaintiffs are based on information and belief.

## I.    **INTRODUCTION**

1.     This action arises from a per se unlawful agreement between Defendants—some of the largest tire manufacturers in the United States and the world—to artificially increase and fix the prices of new replacement tires for passenger cars, vans, trucks, and buses ("Tires" or "Replacement Tires") sold in the United States. Defendants coordinated price increases, including through public communications.

2.     On January 30, 2024, the European Commission ("EC") announced dawn raids at the premises of "companies active in the tyres industry in several Member States."[1] The EC justified its dawn raids over suspicion that these companies "violated EU antitrust rules that

---

[1] *Commission carries out unannounced antitrust inspections in the tyres sector*, European Commission (Jan. 30, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

prohibit cartels and restrictive business practices," specifically that price coordination took place among these companies.[2]

3.      Defendants' unlawful agreement to fix prices of Tires is evidenced by, among other things: (i) Defendants' sudden and dramatic parallel price increases, which absent a conspiracy to fix prices, ran contrary to their economic interests; (ii) EC dawn raids of Defendants; (iii) the high level of market concentration in the Tires market; (iv) significant barriers to entry; (v) lack of economic substitutes for Tires; (vi) standardization of Tires with a high degree of interchangeability; and (vii) the many opportunities that Defendants' employees had to conspire with one another to fix prices of Tires, coupled with their motivation to achieve an unlawful end.

4.      Plaintiffs seek to represent a Class of individuals and entities that purchased Tires indirectly from Defendants at supra-competitive prices to recover damages, injunctive relief, and other relief as is appropriate, based on Defendants' violation of federal and state antitrust laws. Plaintiffs demand a trial by jury.

## II.      **PARTIES**

### A.      **PLAINTIFFS**

5.      Plaintiff Martin-Landers LLC dba Mark Martin Ford is an Arkansas limited liability company located at 1601 Batesville Blvd., Batesville, AR 72501. Plaintiff Martin-Landers LLC purchased Tires manufactured by one or more of Defendants within the State of Arkansas during the Class Period defined below, and Plaintiff Martin-Landers LLC suffered antitrust injury as a result of the violations alleged in this complaint.

6.       Plaintiff Martin-Landers Imports LLC dba Mark Martin Kia is an Arkansas limited liability company located at 1601 Batesville Blvd., Batesville, AR 72501. Plaintiff Martin-Landers

---

[2] *Id.*

Imports LLC purchased Tires manufactured by one or more of Defendants within the State of Arkansas during the Class Period defined below, and Plaintiff Martin-Landers Imports suffered antitrust injury as a result of the violations alleged in this complaint.

7.     Plaintiff Northside Automotive & Fleet LLC is a Wisconsin limited liability company located at 229 Milwaukee Street, La Crosse, WI 54603. Plaintiff Northside Automotive LLC purchased Tires manufactured by one or more of Defendants within the State of Wisconsin during the Class Period defined below, and Plaintiff Northside Automotive & Fleet LLC suffered antitrust injury as a result of the violations alleged in this complaint.

8.     Plaintiff Worldwide Auto Repair Ltd. is a New York corporation located at 1000 Jericho Turnpike, Huntington Station, NY 11746. Plaintiff Worldwide Auto Repair Ltd. purchased Tires manufactured by one or more of Defendants within the State of New York during the Class Period defined below, and Plaintiff Worldwide Auto Repair Ltd. suffered antitrust injury as a result of the violation alleged in this complaint.

### B.     DEFENDANTS

#### 1.     Continental

9.     **Defendant Continental Aktiengesellschaft** ("Continental AG)," is a German company with its headquarters at Vahrenwalder Strasse 9, 30165 Hannover, Germany. Continental AG is divided into four group sectors: Automotive, Tires, ContiTech, and Contract

6

Manufacturing.[3] The Tires group has five business areas: (i) Original Equipment, (ii) Replacement APAC, (iii) Replacement EMEA, (iv) Replacement the Americas, and (iv) Specialty Tires.[4]

10.     In its 2022 Annual Report, Continental AG reported that its "Tires group sector achieved a particularly positive result, even surpassing expectations with an adjusted EBIT margin of 13.1 percent."[5] In 2022, Continental AG reported sales of €14 billion globally for its tire group.[6] Continental AG's tire group boasts 56,987 employees worldwide.[7]

11.     In the Tires group sector, sales to dealers and end users represent the largest share of the tire-replacement business.[8] For the Tires group sector, economies of scale are important drivers of profitability. For that reason, "manufacturing takes place at major locations in the dominant automotive markets, namely Europe, the U.S., and China."[9]

12.     **Defendant Continental Tire the Americas, LLC** ("Continental U.S.") is a limited liability company incorporated under Ohio law, with its principal place of business at 1830 MacMillian Park Drive, Fort Mill, SC 29707. Continental U.S. "manufactures and distributes a complete premium line of passenger, light truck and commercial tires for original equipment and

---

[3] Continental Group, 2022 Annual Report, at 3, https://cdn.continental.com/fileadmin/__imported/sites/corporate/_international/english/hubpages/30_20investors/30_20reports/annual_20reports/downloads/continental_annual_report_2022.pdf.

[4] *Id.* at 27.

[5] *Id.* at 4.

[6] *Id.* at 75.

[7] *Id.* at 76.

[8] *Id.* at 26.

[9] *Id.* at 28.

replacement markets."[10] Continental US sells its tires through "independent tire dealers, car dealers, and mass retail companies across North America."[11] Continental U.S. has manufacturing facilities in Barnsville, Georgia (Tire Cord [textile]), Mt. Vernon, Illinois (Passenger/light truck/Commercial truck tires), Sumter, South Carolina (passenger/light truck tires), and Jackson, Missouri (commercial truck tires).[12]

13.     Continental U.S.'s headquarters in Fort Mill, SC is the "operational hub for business in the region and oversees all tire product lines including passenger, light truck, commercial, two wheel and specialty tires."[13] The facility has 500+ employees and includes teams for Engineering & Technology, Sales & Marketing, and "Central Functions."[14]

14.     Continental U.S.'s Sumter Plant is "a tire manufacturing facility [that] produces high-quality, premium lines of passenger and light truck tires for original equipment and replacement markets."[15] It has a "State of the Art manufacturing facility with a growing team of more than 1200 employees."[16]

---

[10] *Members: Continental Tire the Americas, LLC*, U.S. Tire Manufacturers Ass'n, https://www.ustires.org/continental-tire-americas-llc.

[11] *Id.*

[12] *Id.*

[13] *Fort Mill, SC*, Continental AG (2024), https://www.continental.com/en-us/career/our-locations/fort-mill/.

[14] *Id.*

[15] *Sumter, SC*, Continental AG (2024), https://www.continental.com/en-us/career/our-locations/sumter/.

[16] *Id.*

### 2. Michelin

15.     **Defendant Compagnie Générale des Établissements** ("CGEM") is organized under the laws of France with its principal place of business at 23 place des Carmes-Déchaux, 63000 Clermont-Ferrand, France. CGEM is the Michelin Group's parent company, which directly or indirectly owns all of its subsidiaries.[17] CGEM's two main subsidiaries are Manufacture Française des Pneumatiques Michelin ("MFPM"), a wholly-owned subsidiary that coordinates all of the Group's manufacturing, sales and research operations in France and Compagnie Financière Michelin ("CFM"), a wholly-owned subsidiary that owns most of the Group's manufacturing, sales and research companies outside of France and coordinates their operations.[18]

16.     **Defendant Michelin North America, Inc**. is a corporation organized under New York law with its principal place of business at One Parkway South, Greenville, SC 29615-5022. Michelin designs, manufactures, and sells tires for every type of vehicle, including airplanes, automobiles, bicycles, earthmovers, farm equipment, and heavy-duty trucks.[19] Michelin is one of the leading manufacturers of tires in the United States. In 2022, Michelin had €10.92 billion in sales North America, 80% of which were generated in the United States.[20] Michelin employs 23,000 people across 34 plants in the United States and Canada.[21] Michelin has manufacturing

---

[17] CGEM, 2022 Universal Registration Document at 403, https://www.michelin.com/en/documents/2022-universal-registration-document/.

[18] *Id.*

[19] *Members: Michelin*, U.S. Tire Manufacturers Ass'n, https://www.ustires.org/michelin-north-america-inc.

[20] CGEM, 2022 Universal Registration Document at 344, https://www.michelin.com/en/documents/2022-universal-registration-document/.

[21] *Michelin North America Fact Sheet 2023*, Michelin North America, Inc., https://michelinmedia.com/site/user/files/1/MNA-Fact-Sheet-2023_2.pdf.

facilities in, among others, Alabama (light trucks and passenger tires), Indiana (car tires), Oklahoma (passenger tires), and South Carolina (passenger tires and truck and bus tires).

### 3. Nokian Tyres

17. **Defendant Nokian Tyres plc** is organized under the laws of Finland with its principal place of business at Pirkkalaistie 7, P.O. Box 20, 37101 Nokia, Finland. Nokian Tyres plc is the parent company of the Nokian Tyres Group, which includes subsidiaries worldwide. Nokian Tyres plc develops and manufactures tires for passenger cars, trucks, and heavy machinery. In 2019, the company's net sales were $1.8 billion, and it employed some 4,700 people.

18. **Defendant Nokian Tyres Inc.** is a corporation organized under Delaware law. It is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc. In December 2018, Nokia Tyres announced its new headquarters located at 501 Union Street in Nashville, Tennessee, which would house Nokia Tyres' Vice President along with members of the company's sales, customer service, IT, logistics, finance, and marketing teams.[22] In 2017, Nokian Tyres announced it had opened a $360 million manufacturing facility located at 520 Nokian Tyres Dr., Dayton, TN., 37321.[23] The manufacturing facility produces car and light truck all season tires and all-weather tires for consumers in the United States and Canada.

19. **Defendant Nokian Tyres U.S. Operations LLC** is a limited liability company organized under Tennessee law. It is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.

---

[22] Wes Boiling, *Nokian Tyres Thriving in New Nashville Headquaters*, Nokian Tyres plc (Dec. 12, 2018), https://www.nokiantires.com/company/news-article/nokian-tyres-thriving-in-new-nashville-headquarters/.

[23] Associate Press, *Nokian Tyres opens $360M tire factory in Tennessee*, The Journal Record (Oct. 3, 2019), https://journalrecord.com/2019/10/nokian-tyres-opens-360m-tire-factory-in-tennessee/.

### 4. Goodyear

20.    **Defendant The Goodyear Tire & Rubber Company** is a corporation organized under Ohio law with its principal place of business at 200 Innovation Way Akron, Ohio 44316-0001. Goodyear is one of the world's leading tire companies, with one of the most recognizable brand names. It develops, manufactures, markets and distributes tires for most applications and manufactures and markets rubber-related chemicals for various uses.[24] Through its worldwide network of aligned dealers and wholesale distributors and its own retail outlets and commercial truck centers, Goodyear offers its products for sale to consumer and commercial customers, along with repair and other services.[25] Goodyear manufactures its products in 57 facilities in 23 countries and has operations in most regions of the world.[26] Goodyear manufactures and sells under the Goodyear, Cooper, Dunlop, Kelly, Debica, Sava, Fulda, Mastercraft and Roadmaster brands.[27] Approximately 86% of Goodyear's sales in 2022, 85% in 2021 and 84% in 2020 were for tire units.[28] The principal channel for the sale of Goodyear and Cooper brand tires in Americas is a large network of independent dealers. Goodyear, Cooper, Dunlop, Kelly and Mastercraft brand tires are also sold to numerous national and regional retailers, in Goodyear Company-owned stores in the United States, and through the wholesale channel, including through TireHub, LLC,

---

[24] The Goodyear Tire & Rubber Co., 2022 Annual Report, 2 (Feb. 14, 2023).

[25] *Id.*

[26] *Id.*

[27] The Goodyear Tire & Rubber Co., 2022 Annual Report, 2 (Feb. 14, 2023).

[28] The Goodyear Tire & Rubber Co., 2022 Annual Report (Form 10-K), 2 (Feb. 14, 2023).

Goodyear's national wholesale tire distributor in the United States, and a network of aligned U.S. regional wholesale tire distributors.[29]

### 5.  Pirelli

21.    **Defendant Pirelli & C. S.p.A.** is organized under the laws of Italy with its principal place of business at Via Bicocca degli Arcimboldi, 3, 20126 Milano MI, Italy. Pirelli designs, manufactures, and distributes tires for cars, motorcycles, and bicycles. Pirelli focuses its business on the high end, premium product segment where it is a world leader. Pirelli has a commercial presence in over 160 countries and 19 manufacturing sites in 12 countries.[30]

22.    **Defendant Pirelli Tire LLC** is a foreign limited liability company organized under Delaware law with its principal place of business located at 100 Pirelli Drive Rome, GA 30161. Pirelli Tire LLC includes the Modular Integrated Robotized System (MIRS) facility and research and development center at its Rome, Georgia headquarters, a state-of-the-art manufacturing plant in Silao, Mexico, sales and marketing offices in New York City, Los Angeles, Detroit, Montreal and Atlanta, and a prestige flagship store in Los Angeles.[31] The company manufactures, distributes, and markets original equipment and replacement tires for export and domestic car/motorcycle applications.

### 6.  Bridgestone

23.    **Defendant Bridgestone Corporation** is organized under the laws of Japan with its principal place of business at 1-1, Kyobashi 3-chome, Chuo-ku, Tokyo 104-8340. Bridgestone Corporation is the parent corporation of the Bridgestone Group (the "Group"), which refers to all

---

[29] *Id.* at 3.

[30] *Members: Pirelli*, U.S. Tire Manufacturers Ass'n, https://www.ustires.org/pirelli-tire-llc.

[31] *Id.*

Group companies, including Bridgestone Americas ("BSAM"), Bridgestone China, Asia Pacific ("BSCAP"), Bridgestone Europe, Russia, Middle East, India, and Africa ("BSEMIA"), and Bridgestone Japan ("BSJP").[32] Bridgestone Corporation is the world's largest tire and rubber company.[33]

24.  **Defendant Bridgestone Americas, Inc.** ("BSAM") is incorporated under Nevada law with its principal place of business at 200 4th Ave, Suite 100, Nashville, Tennessee, 37201-2256. BSAM and its subsidiaries develop, manufacture, and market a wide range of Bridgestone, Firestone, and associate brand tires to address the needs of a broad range of customers, including consumers, automotive and commercial vehicle original equipment manufacturers, and those in the agricultural, forestry and mining industries.[34] BSAM has U.S. manufacturing facilities in Arkansas, Georgia, Iowa, Illinois, North Carolina, Ohio, South Carolina, Tennessee, and Texas.[35] Defendant BSAM also owns Firestone Tire and Rubber Company, which operates twenty commercial retailers in Michigan and hundreds nationwide.

## III.    AGENTS AND CO-CONSPIRATORS

25.  The anticompetitive and unlawful acts alleged against Defendants in this Complaint were authorized, ordered, or performed by Defendants' officers, agents, employees, or representatives, while engaged in the management, direction, or control of Defendants' businesses or affairs.

---

[32] Bridgestone Corp., 2023 Integrated Report at 3, https://www.bridgestone.com/ir/library/integrated_report/pdf/2023/ir2023_single.pdf.

[33] *Members: Bridgestone Americas, Inc,*, U.S. Tire Manufacturers Ass'n, https://www.ustires.org/bridgestone-americas-inc.

[34] *Id.*

[35] *Id.*

26.     Each corporate Defendants' agents operated under the authority and apparent authority of its principals.

27.     Each corporate Defendant, through its subsidiaries, affiliates, and agents, operated as a single unified entity.

28.     Various persons and/or firms not named as Defendants here may have participated as co-conspirators in the violations alleged here and may have performed acts and made statements in furtherance thereof.

29.     Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

30.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Furthermore, if subsidiaries within corporate families distributed the Tire products discussed in this Complaint, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut their pricing agreements. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supra-competitive prices.

## IV.     **JURISDICTION AND VENUE**

31.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367. The Court has jurisdiction over Plaintiff's claim for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

32.     This Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction and had substantial contacts with this

jurisdiction, and because Plaintiffs' claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction.

33.     Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period (defined below), Defendants transacted business in this District, and a substantial portion of the activity at issue here occurred in this District.

34.     Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

35.     During the Class Period, Defendants manufactured, sold, and shipped Tires in a continuous and uninterrupted flow of interstate commerce, which included sales of Tires in this District, advertisement of Tires in media in this District, and employment of sales personnel in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

## V.     FACTUAL ALLEGATIONS

### A.  The Tires Market

36.     Virtually all wheeled land vehicles in operation, whether off-road or on-road, use tires. This dependence makes the tire industry a critical component of the U.S. automobile industry. With nearly 9.2 million passenger and commercial vehicles being produced and almost 14 million vehicles being sold in the United States in 2022, for example, the U.S. market calls for a large number of tires to be manufactured annually.

37.     Given the critical need for tires in all wheeled land vehicles, automobile tire manufacturers have existed in the United States as long as there have been cars. For example, Defendant Goodyear began producing automobile tires in 1899.[36]

38.     U.S. tire manufacturing has an annual economic footprint of $170.6 billion.[37] According to the United States Tire Manufacturers Association ("USTMA"), there were total U.S. tire shipments of 334.2 million units in 2023, compared to 332.0 million units in 2022 and 332.7 million units in 2019.[38] The market for replacement tires in the United States was sized at approximately $61 billion in 2022.

39.     Manufactured tires can either be used in new cars ("Original Equipment Tires" or "OE" tires) or produced as replacement tires ("Dedicated Replacement Tires"). There are differences between OE tires and Dedicated Replacement Tires. OE tires are specified by the vehicle manufacturer and are initially fitted to the vehicle when new. The car manufacturer works with tire companies to choose a tire that will meet performance requirements for their new vehicle. The manufacturer selects a tire that balances ride noise, handling, longevity, and fuel efficiency to achieve the overall characteristics that the vehicle manufacturer believes is important to the end-user.

40.     By contrast, Dedicated Replacement Tires are selected by individual consumers.

---

[36] *Company History*, Goodyear Corporate, https://corporate.goodyear.com/us/en/about/history.html.

[37] *USTMA July 2024 Forecast Predicts Higher 2024 Tire Shipments for U.S. Tire Market*, U.S. Tire Manufacturers Ass'n, https://www.ustires.org/ustma-july-2024-forecast-predicts-higher-2024-tire-shipments-us-tire-market.

[38] *2023 Tire Shipment Outlook*, U.S. Tire Manufacturers Ass'n (Feb. 28, 2023), https://www.ustires.org/2023-tire-shipment-outlook.

B.       **Defendants' Participation in the Tires Market**

41.      Defendants make up some of the largest tire manufacturers in the world.
Bridgestone is the world's largest tire and rubber manufacturer,[39] with about 130 manufacturing
plants and R&D facilities in 25 countries and sells products in more than 150 countries worldwide.
Michelin has nine R&D centers around the world, 123 production sites in 26 countries, a
commercial presence in 170 countries and 125,000 employees worldwide, and does business on
every continent.[40] Goodyear employs about 72,000 people and manufactures its products in 57
facilities in 23 countries around the world.[41] Pirelli has 18 factories located in 12 countries,
production capacity in 2022 of 74 million car tires, and points of sale in over 160 countries (around
20,000 in 2022).[42] Continental employs almost 200,000 people at 519 locations for production,
research, and development, and is present in 57 countries and markets. It has 917 company-owned
tire outlets and a total of around 5,228 franchises and operations with a Continental brand.[43]

42.      The U.S. Tires market is oligopolistic, with three of Defendants controlling nearly
all the market: in 2022, Defendants Bridgestone, Michelin, and Goodyear made up almost 64
percent of the entire replacement tire market. Each of the Big Three also encompasses subsidiary

---

[39] Bridgestone Corp., https://www.bridgestone.com/.

[40] *A Global Footprint*, Michelin, https://www.michelin.com/en/michelin-group/about-us/global-footprint/.

[41] *Our Company*, Goodyear Corporate, https://corporate.goodyear.com/us/en/about.html.

[42] *Pirelli in Brief*, Pirelli Corporate, https://corporate.pirelli.com/corporate/en-ww/aboutus/pirelli-in-brief.

[43] Continental Group, 2022 Annual Report, at 26,
https://cdn.continental.com/fileadmin/__imported/sites/corporate/_international/english/hubpages/30_20investors/30_20reports/annual_20reports/downloads/continental_annual_report_2022.pdf.

brands: (i) Goodyear: Goodyear, Cooper Tires, Dunlop, and Kelly, (ii) Michelin: Michelin, BF Goodrich, and Uniroyal, (iii) Bridgestone: Bridgestone and Firestone.[44] When the percentages of Defendants Continental and Nokian are considered, the market dominance of these few firms is even more clear.



Figure 2.[45]

43.    This concentration makes the Tires market more susceptible to cartelization—a smaller group of competitors is better able to solve the coordination and trust problems that can prevent cartel formation or destabilize an existing cartel. A smaller number of negotiators makes it easier for the conspirators to agree on a cartel price, to allocate market shares, to conceal their collusion, to develop enforcement mechanisms, and to detect and punish cheaters.

---

[44] *The 'Goliaths' of the Replacement Tire Industry Are Getting Bigger. How Can The 'Davids' Compete?*, TraQline (Feb. 14, 2022), https://www.traqline.com/newsroom/blog/the-goliaths-of-the-replacement-tire-industry-are-getting-bigger-how-can-the-davids-compete/.

[45] *Id.*

C.    **Defendants effectuated the conspiracy by coordinating prices and controlling the supply of Tires during the Class Period.**

1.    **Defendants signaled to each other in earnings calls that "price discipline" would remain high and monitored each other's pricing announcements.**

44.    On November 5, 2021, Goodyear's CEO, Rich Kramer, stated on the Q3 2021 earnings call: "So we monitor all those tire manufacturers that are out there. And what we've seen that they've all announced at least three price increases this year…."[46]

45.    On February 11, 2021, Rich Kramer stated on the Q4 2021 earnings call: "It's a really very, very good constructive pricing environment that we've seen right now, probably the best in recent memory."[47]

46.    In the same earnings call, Kramer states: "If we could make more, we can actually even sell more in the environment that we're seeing."[48]

47.    Goodyear's public statements during the Class Period acknowledge that they tracked each other's competitively sensitive pricing and sales information, which is also consistent with the existence of Defendants' unlawful agreement to fix prices. During the 4th Quarter 2021, earnings call, Darren Wells, Chief Administrative Office of Goodyear, explained, "There are 9 competitors that we tend to track, and 7 out of the 9 have announced price increases in the first

---

[46]    *https://seekingalpha.com/article/4466211-goodyear-tire-and-rubber-company-gt-ceo-richkramer-on-q3-2021-results-earnings-call*

[47]    *https://seekingalpha.com/article/4486435-goodyear-tire-and-rubber-companys-gt-ceo-richkramer-on-q4-2021-results-earnings-call*

[48] *Id.*

quarter. And one of the ones who hadn't raised prices right at the end of last year, so we are seeing very consistent pricing across all the significant industry players."[49]

48.     On the Q3 2022 earnings call, an analyst, Rod Lache, asked Goodyear's Richard Kramer, "can you just maybe give us some color on what you're seeing with regard to price discipline? Do you think that the industry is going to kind of take the tack [sic] of trying to support pricing and in order to compensate for inflation?" Richard Kramer answered, "So I would say, yes, I think that there is an acknowledgment of what price and mix has to do in the marketplace to deal with the environment we're in."[50]

49.     During the Q1 2022 earnings call, Continental's CFO, Katja Durrfeld, referred to sustainable pricing several times, including: "[t]o mitigate the broad inflationary headwinds, implementation of sustainable pricing is mandatory."[51]

50.     On June 17, 2022, Nokian announced that it had "succeeded in implementing price increases to mitigate cost inflation."[52]

51.     During a conference call with investors, Defendant Goodyear's Chief Administrative Officer Darren Wells stated, "we've got to acknowledge that we've got major

---

[49] Goodyear, Q4 2021 Interim Results Earnings Call Transcript (Feb. 11, 2022), https://seekingalpha.com/article/4486435-goodyear-tire-and-rubber-companys-gt-ceo-rich-kramer-on-q4-2021-results-earnings-call.

[50] *https://seekingalpha.com/article/4551459-goodyear-tire-and-rubber-co-gt-q3-2022-earnings-call-transcript.*

[51] *https://seekingalpha.com/article/4510196-continental-aktiengesellschafts-cttafmanagement-on-q1-2022-results-earnings-call-transcript.*

[52] *https://www.reuters.com/business/autos-transportation/finlands-nokian-tyres-lifts-salesoutlook-despite-russia-uncertainty-2022-0617/#:~:text=%22However%2C%20tire%20demand%20has%20remained,it%20said%20in%20a%20statement.*

competitors who have announced 2 or 3 price increases during calendar year '22. And Goodyear, North America has announced one increase of up to 12% on January 1. Now the announcements of our competitors generally have been in lower amounts, but there have been a couple of them that have been double digits. So we have to acknowledge that. And then if we go back to last year, Goodyear announced 3 price increases of up to 8% during 2021. And our major competitors announced 3 or 4 price increases generally as well, some of which were unspecified in amounts, but most of which were in the mid-single digits. Yes. So those are the announcements that we've seen."[53]

### 2. Defendants signaled their intent to increase prices, and they increased prices in lockstep.

52.     Defendants coordinated price increases and production limitations through public announcements and statements on earnings calls.

53.     Michelin led the first wave of price hikes in February 2020, announcing that it planned to raise prices up to 7% on select passenger and light-truck tires in the United States

---

[53] Goodyear, Q1 2022 Interim Results Earnings Call Transcript (May 6, 2022), https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call.

effective March 16, 2020.[54]  A month later, Goodyear[55] and Pirelli[56] followed announcing price hikes up to 5% on select consumer tires in the United States effective April 2020.

54.     In July 2020, Michelin instructed its competitors that it was "not a period where you play on prices" (*i.e.*, lowering price).[57]

55.     Heeding this call to continued coordinated action, in November 2020, Goodyear announced price hikes up to 5% on its Goodyear and Dunlop-brand consumer tires in the United States effective December 1, 2020.[58]  During its fourth quarter earnings call in February, Goodyear's Chairman, President, and Chief Executive Officer remarked that after "9 of 10 of [] consumer tire manufacturers" "announced price increases since November [2020] of about 5% to 8%," so Goodyear decided to follow suit and "announce up to 5% on our consumer replacement business . . . ."[59]

---

[54]     *Michelin Implements Price Increase Across North American Passenger Brands for Selected Products*, Michelin Media (Feb. 14, 2020), https://michelinmedia.com/pages/blog/detail/article/c/a953/.

[55]     *Goodyear Will Hike Consumer Tire Prices*, MODERN TIRE DEALER (Mar. 3, 2020), https://www.moderntiredealer.com/industry-news/wholesale-distribution/article/11533513/goodyear-will-hike-consumer-tire-prices-2020-03-04.

[56]     *Pirelli Plans Price Hike*, MODERN TIRE DEALER (Mar. 10, 2020), https://www.moderntiredealer.com/suppliers/article/11533540/pirelli-plans-price-hike-2020-03-11.

[57]     Florent Menegaux, CEO, Managing General Partner & Managing Chairman of Michelin, Remarks at Half Year 2020 Compagnie Generale des Etablissements Michelin SCA Earnings Call (July 27, 2020) (transcript available in Westlaw).

[58]     *Goodyear Consumer Tire Prices Are on Their Way Up*, MODERN TIRE DEALER (Nov. 13, 2020), https://www.moderntiredealer.com/topics/industry-news/article/11475914/goodyear-consumer-tire-prices-are-on-their-way-up-2020-11-13.

[59]     Richard J. Kramer, Chairman of the Board, CEO & President of The Goodyear Tire & Rubber Company, Remarks at Q4 2020 Goodyear Tire & Rubber Co Earnings Call (Feb. 9, 2021) (transcript available in Westlaw).

56.    To ensure that Defendants continued to increase prices in 2021, on December 1, 2020, Bridgestone announced that it would increase prices for select Bridgestone and Firestone passenger and light truck replacement tires in the United States effective January 1, 2021.[60]  Less than a week later, Pirelli announced price increases for car and light truck tires in the United States effective January 1, 2021 purportedly due to "changing market conditions."[61]  On or around December 19, 2020, Michelin announced plans to raise prices by up to 5% in select Michelin and BFGoodrich brand passenger and light truck tires in the United States effective February 1, 2021. Michelin cited to purported "changing business dynamics" as the driving factor of change.[62]

57.    A month later, Continental announced its own price hike effective March 1, 2021.[63]

58.    In March, Defendant Michelin N.A. announced it would again raise its prices effective April 1st, in the amount of 8%.[64] Defendant Goodyear followed suit: two days after Defendant Michelin N.A's announcement, Defendant Goodyear stated it too would be raising its

---

[60]    *Bridgestone Will Hike Consumer Tire Prices Next Month*, MODERN TIRE DEALER (Dec. 1, 2020), https://www.moderntiredealer.com/topic-category/topics/article/11475613/bridgestone-will-increase-consumer-tire-prices-next-month-2020-12-01.

[61]    Tire Review Staff, *Pirelli Announces Price Increase on Car, Light Truck Tires*, TIRE REVIEW (Dec. 3, 2020), https://www.tirereview.com/pirelli-announces-price-increase-on-car-light-truck-tires/.

[62]    *Michelin Will Raise Consumer, Commercial Prices on Feb. 1*, MODERN TIRE DEALER (Dec. 19, 2020), https://www.moderntiredealer.com/topic-category/topics/article/11475158/michelin-will-raise-consumer-commercial-prices-on-feb-1-2020-12-19.

[63]    Motor Tire Dealer, *Continental Plas Price Hike on PLT Tires* (Jan. 6, 2021), https://www.modernTiredealer.com/topics/industry-news/article/11474953/continental-plans-price-hike-on-plt-Tires-2021-01-06.

[64]    *Michelin Will Raise Consumer Tire Prices on April 1*, Modern Tire Dealer (https://www.moderntiredealer.com/topiccategory/topics/article/11473824/michelin-will-raise-consumer-tire-prices-onapril-1-2021-03-01) (March 1, 2021).

prices by 8% "in response to changing market dynamics in the industry."[65] Within a week, Defendant Pirelli Tire announced a price increase of its own of 7% due to "changing market conditions."[66] By the end of March, 2021, Defendant Bridgestone too had announced a price increase of 8%.[67]

59.     In May 2021, Goodyear, Continental, Michelin, Pirelli, and Bridgestone each announced planned price hikes in the United States.  Goodyear led the increase on or around May 3, 2021, when it announced prices increases up to 8% on its Goodyear, Dunlop, and Kelly consumer tires effective June 1, 2021.[68]  That same week, Continental announced price increases by an undisclosed amount on certain Continental and General brand passenger and light truck tires effective July 1, 2021.[69] On or around May 17, 2021, Michelin also announced plans to raise prices by up to 6% on Michelin, BFGoodrich, and Uniroyal passenger and light truck replacement tires

---

[65] *Goodyear to Increase Consumer Tire Prices*, Modern Tire Dealer (https://www.moderntiredealer.com/topics/industrynews/article/11473768/goodyear-to-increase-consumer-tire-prices-2021-03-03) (March 3, 2021).

[66] *Pirelli Will Raise Prices in U.S. on April 15*, Modern Tire Dealer (https://www.moderntiredealer.com/topic-category/topics/article/11473594/pirelliwill-raise-prices-in-us-on-april-15-2021-03-09) (March 9, 2021).

[67] *Bridgestone to Raise Consumer Tire Prices on May 1*, Modern Tire Dealer (https://www.moderntiredealer.com/site-placement/featured-stories/article/11473222/bridgestone-to-raise-consumer-tire-prices-on-may-1-2021-03-24) (March 24, 2021).

[68] *Goodyear Plans Another Consumer Tire Price Hike*, MODERN TIRE DEALER (May 3, 2021), https://www.moderntiredealer.com/topics/industry-news/article/11472039/goodyearplansanother-consumer-tire-price-hike.

[69] *Continental Will Raise Consumer Tire Prices in July*, MODERN TIRE DEALER (May 5, 2021), https://www.moderntiredealer.com/topic-category/topics/article/11471940/continental-willraise-consumer-tire-prices-in-july-1-2021-05-05.

effective July 1, 2021.[70]  A day later, Pirelli announced plans to increase prices of passenger and light truck tires by up to 6% effective July 1, 2021.[71]  On or around May 27, 2021, Bridgestone announced plans to raise prices on select Bridgestone, Firestone, and Fuzion brand passenger and light truck tires by up to 8% in the United States effective July 1, 2021.[72]

60.    Price increase announcements continued through the rest of 2021. In the first week of August 2021, Goodyear[73] and Michelin[74] announced plans to increase prices, again, by up to 8% on passenger and light truck tires effective September 1, 2021. On August 10, 2021, during an earnings call, Bridgestone's Global Chief Executive Officer and Representative Executive Officer announced that he was "certain that [Bridgestone] will raise prices in the second half of the year."[75] He noted that Defendants were all "feeling this same wind" to increase prices and were all "firmly

---

[70]    *Michelin Implements Price Increase Across Passenger Brands and Commercial Offers in North American Market*, PR NEWSWIRE (May 17, 2021), https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across-passenger-brands-and-commercial-offers-in-north-american-market-301292713.html.

[71]    *Pirelli Plans Another Price Hike*, MODERN TIRE DEALER (May 18, 2021), https://www.moderntiredealer.com/topics/industry-news/article/11471596/pirelli-plans-another-price-hike.

[72]    *Bridgestone Will Hike Consumer Tire Prices in July*, MODERN TIRE DEALER (May 27, 2021), https://www.moderntiredealer.com/topic-category/topics/article/11471376/bridgestone-will-hike-consumer-tire-prices-in-july-2021-05-27.

[73]    *Goodyear and Cooper Consumer Tire Prices Are Going Up*, MODERN TIRE DEALER (Aug. 6, 2021), https://www.moderntiredealer.com/retail/article/11469453/goodyear-and-cooper-consumer-tire-prices-are-going-up.

[74]    Stephen Goodchild, *Michelin announces North America price increases*, I&A TYREPRESS (Aug. 3, 2021), https://www.tyrepress.com/2021/08/michelin-announces-north-america-price-increases/.

[75]    Shuichi Ishibashi, Global CEO, Representative Executive Officer & Director of Bridgestone Corp., Remarks at Q2 2021 Bridgestone Corp Earnings Presentation (Aug. 10, 2021) (transcript available in Westlaw).

working with these winds."[76] Following this statement by Bridgestone's officer, in the last week of August and early September, Continental,[77]Pirelli, and Bridgestone announced that they would also raise prices on passenger and light truck tires effective October 2021. Bridgestone and Pirelli[78] increased prices by up to 8% Pirelli claimed that the increase was due to purported "changing market conditions."[79]

61.     Closing out the year, in November 2021, Continental announced price increases that would go into effect in 2022.[80] On December 1, 2021 Michelin announced up to 12% price increases to be effective on January 1, 2022.[81] That same day, Bridgestone also announced price increases on select passenger and light truck replacement tires in the United States effective January 1, 2022.[82] Similarly, Goodyear raised its prices on consumer tires by up to 12%.[83]

---

[76]     *Id.*

[77]     Danielle Hess, *Continental Tire Announces Price Increase*, TIRE REVIEW (Aug. 30, 2021), https://www.tirereview.com/continental-tire-announces-price-increase/.

[78]     The Business Report, *Pirelli Raising Prices for Fourth Time in 2021*, RUBBER NEWS (Aug. 31, 2021), https://www.rubbernews.com/tire/pirelli-raising-us-tire-prices-oct-1.

[79]     *Id.*

[80] Madeline Winer, Continental Tire Announces Price Increases, Tire Review (Nov. 9, 2021), https://www.Tirereview.com/continental-Tire-announces-price-increase-2/.

[81] PR Newswire, Michelin Implements Price Increase Across Passenger Brands and Commercial Offers in North American Market (Dec. 1, 2021), https://www.prnewswire.com/news-releases/michelin-implementsprice-increase-across-passenger-brands-and-commercial-offers-in-north-american-market-301435108.html.

[82]     *Bridgestone Plans Consumer Tire Price Hike*, MODERN TIRE DEALER (Dec. 1, 2021), https://www.moderntiredealer.com/retail/article/11468265/bridgestone-plans-2022-consumer-tire-price-hike.

[83] *Goodyear to Raise North America tire prices July 1*, Tire Business (June 15, 2022), https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1.

62.     Tire manufacturers announced price increases early in 2022. On January 3, Pirelli announced up to 10% increases effective January 17.[84] On March 1, Continental announced price increases.[85] That same day, Michelin announced 5% increases on passenger and light truck replacements Tires.[86] The next day, Bridgestone announced a 10% price increase.[87] Later that month, Pirelli announced its own 10% price increase.[88]

63.     Price increases continued through the spring of 2022. In mid-April, Continental announced another price increase[89] and Nokian announced that it had raised prices in all markets and would continue to do so.[90] On May 2, Michelin announced increases of 5-12%.[91] Pirelli

---

[84] Daneille Hess, Pirelli Announces Price Increases for Car, Light Truck Tires, Tire Review (Jan. 3, 2022), https://www.Tirereview.com/pirelli-price-increases/.

[85] Christian Hinton, Continental Tire Announces Price Increase, Tire Review (Mar. 1, 2022), https://www.Tirereview.com/continental-Tire-announces-price-increase-3/.

[86] Michelin Priess Release, Michelin Implements Price Increase Across Passenger Brands and Commercial Offers in North American Market (Mar. 1, 2022), https://michelinmedia.com/pages/blog/detail/article/c/a1155/#:~:text=Tread%20rubber%20and%20%20associated%20supplies,2%2C%202022.

[87] Christian Hinton, Bridgestone Price Increase for Consumer Replacement Tires, Tire Review (Mar. 2, 2022), https://www.Tirereview.com/bridgestone-price-increase-2/.

[88] Christian Hinton, Pirelli Increases Price for Car and Light Truck Tires, Tire Review (Mar. 23, 2022), https://www.Tirereview.com/pirelli-increases-price-for-Tires/.

[89] Tire Business, Conti to raise U.S. Tire prices again (Apr. 19, 2022), https://www.Tirebusiness.com/news/conti-raise-us-Tire-prices-june-1.

[90] Nokian, 2022 Q1 Interim Report Transcript (Apr. 27, 2022), at 3.

[91] Michelin Press Release (May 2, 2022), https://michelinmedia.com/pages/blog/detail/article/c/a1176/#:~:text=GREENVILLE%2C%20S.C.%2C%20May%202%2C,commercial%20products%20and%20service%20offers.

announced another price increase of up to 10% on May 17.[92] On June 6, Bridgestone announced up to 10% price increases.[93] And on June 15, Goodyear announced price increases up to 10%.[94]

64.     The next quarter, on or around August 26, 2022, Continental announced plans to increase prices on Continental and General-brand passenger and light truck tires in the United States, effective October 1, 2022.[95] On September 8, 2022, A few weeks later, Bridgestone announced plans to raise prices by up to 9% for select passenger and light truck tires in the United States effective October 1, 2022.[96]

65.     Defendants announced price increase for 2023 in December of 2022. Michelin announced a 9% increase effective January 1.[97] Bridgestone also announced increased pricing to

---

[92] Brian Coote, Pirelli to Increase Prices on U.S. PLT Tires, Tire Review (May 17, 2022), https://www.Tirereview.com/pirelli-increase-prices-plt-Tires/.

[93] Brian Coote, Bridgestone to Increase Consumer Tire Prices in U.S., Canada, Tire Review (Jun. 6, 2022), https://www.Tirereview.com/bridgestone-increase-prices/; https://www.Tirebusiness.com/news/goodyear-raisenorth-america-Tire-prices-july-1.

[94] Tire Business, Goodyear to raise North America Tire prices July 1 (Jun. 15, 2022), https://www.Tirebusiness.com/news/goodyear-raise-north-america-Tire-prices-july-1.

[95] *Continental to Hike Consumer Tire Prices*, MODERN TIRE DEALER (Aug. 26, 2022), https://www.moderntiredealer.com/retail/article/11461595/continental-to-hike-consumer-tire-prices.

[96] Christian Hinton, Bridgestone Announces Price Increases up to 15% on Select Tires, Tire Review (Sept. 8, 2022), https://www.Tirereview.com/bridgestone-price-increase-3/.

[97] Samuel Grom, Michelin Introduces Price Increases in Canada, U.S., Tire Review (Dec. 13, 2022), https://www.Tirereview.com/michelin-price-increases/.

take effect on January 1, 2023.[98] Effective January 15, 2023, Pirelli increased its prices for car and light truck tires by up to 10%.[99]

66.    The following table summarizes Defendants' price increases on passenger and light truck replacement tires between 2021 and 2023:

**Defendants' Prices Increases During the Class Period**

| Defendant | Announcement Date | Effective Date | Price Increase |
|---|---|---|---|
| Michelin | February 17, 2020 | March 16, 2020 | up to 7% |
| Goodyear | March 3, 2020 | April 1, 2020 | up to 5% |
| Pirelli | March 12, 2020 | April 6, 2020 | up to 5% |
| Goodyear | November 13, 2020 | December 1, 2020 | up to 5% |
| Bridgestone | December 1, 2020 | January 1, 2021 | undisclosed |
| Pirelli | December 3, 2020 | January 1, 2021 | undisclosed |
| Michelin | December 19, 2020 | February 1, 2021 | up to 5% |
| Continental | January 6, 2021 | March 1, 2021 | undisclosed |
| Michelin | March 1, 2021 | April 1, 2021 | up to 8% |
| Goodyear | March 3, 2021 | April 1, 2021 | up to 8% |
| Pirelli | March 9, 2021 | April 15, 2021 | up to 7% |
| Bridgestone | March 24, 2021 | May 1, 2021 | up to 8% |
| Goodyear | May 3, 2021 | June 1, 2021 | up to 8% |
| Continental | May 5, 2021 | July 1, 2021 | undisclosed |
| Michelin | May 17, 2021 | July 1, 2021 | up to 6% |
| Pirelli | May 19, 2021 | July 1, 2021 | up to 6% |
| Bridgestone | May 27, 2021 | July 1, 2021 | up to 8% |
| Michelin | August 3, 2021 | September 1, 2021 | up to 8% |
| Goodyear | August 6, 2021 | September 1, 2021 | up to 8% |
| Continental | August 30, 2021 | October 1, 2021 | undisclosed |
| Pirelli | August 31, 2021 | October 1, 2021 | up to 8% |
| Bridgestone | September 1, 2021 | October 1, 2021 | up to 8% |
| Bridgestone | December 1, 2021 | January 1, 2022 | undisclosed |
| Michelin | December 1, 2021 | January 1, 2022 | up to 12% |
| Goodyear | unknown | January 1, 2022 | up to 12% |
| Continental | November 9, 2021 | January 3, 2022 | undisclosed |

---

[98] Samuel Grom, Bridgestone Americas Increases Replacement Tire Prices, Tire Review (Dec. 13, 2022), https://www.Tirereview.com/bridgestone-americas-increased-prices/.

[99] Samuel Grom, *Pirelli to Increase Prices for Car and Light Truck Tires*, Tire Review (Dec. 12, 2022), https://www.tirereview.com/pirelli-increase-prices-tires/.

| | | | |
|---|---|---|---|
| Pirelli | January 3, 2022 | January 17, 2022 | up to 10% |
| Michelin | March 1, 2022 | April 1, 2022 | up to 5% |
| Continental | March 1, 2022 | April 1, 2022 | undisclosed |
| Bridgestone | March 2, 2022 | April 1, 2022 | up to 10% |
| Pirelli | March 23, 2022 | April 11, 2022 | up to 10% |
| Continental | April 19, 2022 | June 1, 2022 | undisclosed |
| Michelin | May 2, 2022 | June 1, 2022 | 5-12% |
| Pirelli | May 17, 2022 | June 15, 2022 | up to 10% |
| Bridgestone | June 6, 2022 | July 1, 2022 | up to 10% |
| Goodyear | June 15, 2022 | July 1, 2022 | up to 10% |
| Continental | August 26, 2022 | October 1, 2022 | undisclosed |
| Bridgestone | September 8, 2022 | October 1, 2022 | up to 9% |
| Michelin | December 1, 2022 | January 1, 2023 | up to 9% |
| Bridgestone | December 2, 2022 | January 1, 2023 | undisclosed |
| Pirelli | December 2, 2022 | January 15, 2023 | up to 10% |

67.    In the 1st quarter of 2023, Richard J. Kramer, CEO of Goodyear, highlighted that "over the last 2 years, [Goodyear was] up about 30% in revenue per Tire."[100]

68.    Sales volume did not suffer due to price increases. From 2020, the global Tire market increased 18% year over year in 2021 to around $180 billion.[101] By 2022, demand had returned in line with 2019 levels. For example, Continental's sales volume rose by 19.3% in 2022. Their annual report from that year indicates "agreements reached with customers on price adjustments and to offset inflation-related effects had a positive impact on the sales performance of the Automotive group sector."[102]

---

[100]  Goodyear, 2023 Q1 Interim Report Earnings Call Transcript (May 5, 2023), https://finance.yahoo.com/news/q1-2023-goodyear-tire-rubber-012653565.html.

[101] Michelin, 2022 Results at 2.

[102]  https://annualreport.continental.com/2022/en/service/docs/annual-report-2022-data.pdf  (See page 73).

69.    Goodyear's Chief Administrative Officer Darren Wells has reiterated at earnings calls that its "increase in the replacement Tire prices more than offset [Goodyear's] costs."[103]

70.    Despite Defendants' claims regarding raw material shortages and costs, a spokesman for Bridgestone Tires reported in May 2022 that the company has not experienced any production disruptions. "We monitor all critical raw material sand global logistics closely and do not foresee any impacts to our supply at this time."[104]

### 3.  Price Coordination through Revenue Management Software

71.    Price fixing cartels commonly monitor the conduct of the co-conspirators. As noted by a Former Deputy Assistant Attorney General, in the Antitrust Division, Gary R. Spratling, who was responsible for investigating and prosecuting international cartels, cartels "have shared a number of common characteristics."[105] On top of agreed-upon prices and volumes, exchanges of otherwise competitively sensitive information, and prices charged to customers, a common characteristic among cartels includes "sophisticated mechanisms to monitor and police the agreements."[106]

72.    Defendants' efforts to raise prices became more effective through the use of revenue management software. At an earnings call in 2022, Rich Kramer, president of Goodyear,

[103]  Goodyear, Q1 2022 Interim Results Earnings Call Transcript (May 6, 2022), https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call

[104]  Emmet White, *How Tire Manufacturers Averted Crisis—And Kept Rolling*, Autoweek (May 27, 2022).

[105]  Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, ABA's Criminal Justice Section Presentation "Are the Recent Titanic Fines in Antitrust Case Just the Tip of the Iceberg?" (Mar. 6, 1998).

[106]  *Id.*

explained, "Our data analytics enable us to evaluate day-to-day movement in end-market pricing for ourselves and our competitors, giving us a clear picture of where we are relative to the market and maximizing our ability to capture value for our business."[107]

73.     Torqata started as an analytic arm of American Tire Distributors, designed to identify and create efficiencies in Tire distribution. The company was spun off in 2020 with a mission to allow manufacturers, distributors, and retailers to use data-driven analytics in improving key areas of business performance. The company's goal is to help its customers quickly respond to market trends to drive more revenue. The company's VP of Business Development, Jill Trotta, has explained that "[m]anufacturers and distributors can capture demand signals to optimize inventory and production."

74.     In its Pricing Insigts, Torqata touts its ability to assist its customers in revenue and inventory management through analysis of competitors' private information:



---

[107] Goodyear, Q1 2022 Interim Results Earnings Call Transcript (May 6, 2022), https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call.

75.      Lizeo Group sells its Retail Price Pro software to Defendants Bridgestone and Continental. The software allows the Defendants to filter hundreds of lines of pricing data by part number, brand, product, size, and speed rating. It then allows its customers to set a pricing strategy based on competitor prices.

76.      One "use case" highlighted by Lizeo helping tire manufacturers maintain a "Minimum Advertised Price for tires."[108] Lizeo notes that tire manufactures face challenges "implementing and maintaining a Minimum Advertised Price (MAP) policy," such as "[e]stablishing the correct MAP pricing policy level for the market," "[m]onitoring hundreds of websites for policy compliance," and "[e]xecuting a notification and escalation process for violators."[109] So, Lizeo made software that allows users to "[v]iew weekly MAP violation alerts." "[p]rocess violations," and "[t]rigger violation notification according to the assigned Level."[110]

77.      A second revenue management tool the cartel members use is made by Lizeo Group —which acquired Tire Intelligence in 2015.[111] It sells its Retail Price Pro software to Defendants Bridgestone, Continental, and Michelin.  The software allows the Defendants to filter hundreds of lines of pricing data by part number, brand, product, size, and speed rating.  It then allows its customers to set a pricing strategy based on competitor prices.

---

[108]  Lizeo, *Minimum Advertised Price for tires*, https://www.lizeo-group.com/en-us/use-case/minimum-advertised-price-for-tires/.

[109] *Id.*

[110] *Id.*

[111] Lizeo, *About Us*, https://www.lizeo-group.com/en-us/home-us/about-us-us/.

78.     One former Michelin employee responsible for pricing in the United States recounted that Lizeo Group was founded by an "ex-Michelin employee" who started the company to provide pricing data.

79.     While Defendants may use different revenue management software, all such programs allow Defendants to analyze large data sets of competitor pricing information in real time, allowing Defendants to monitor the conspiracy by ensuring prices remain at supracompetitive levels.

80.     Smithers is an Ohio limited liability company with its principal place of business at 121 South Main Street, Suite 300, Akron, Ohio 44308. Smithers is a multinational provider of testing, consulting, information, and compliance services and has 24 offices in North America, Europe, and Asia. In Europe, it has offices in the Netherlands, Italy, and the United Kingdom. Its clients are "OEMs, tier suppliers, product manufacturers, [and] raw materials suppliers," among other companies.

81.     Smithers was initially founded as a "publisher of scientific reports for the rubber industry" in 1925. According to its website (www.smithers.com), with respect to the tire industry, Smithers offers tire technical consulting. Specifically, Smithers "support[s] the tire industry with analytical data." It holds itself out as a "[t]hird-party, independent source for confidential data."

82.     Since 1925, Smithers has published the Tire Analysis Report, a benchmarking report covering global tire markets, exclusively for tire manufacturers and raw materials suppliers to the tire industry. Smithers' Tire Analysis Reports, which are based on "a targeted selection of tires from various global manufacturers," provide its clients with "benchmarking data needed to make key product development decisions." These reports also include information regarding, *inter alia*, "product management and marketing," "cost analysis," and "product benchmarking."

Smithers also publishes periodic supplements to its Tire Analyses Reports by region (*e.g.*, North America, Europe).

83. Additionally, Smithers publishes The Smithers Report, a regular email news service that brings its clients "the latest information on the global tire industry as it happens - including market insights from the Smithers expert editorial team of journalists, analysts, and scientists." Smithers represents that "[t]his subscription service helps global tire and rubber stakeholders stay informed about industry developments." As an illustrative example, the January 26, 2024 edition of The Smithers Report disclosed one tire manufacturer's increase in daily tire output at its Philippines plant, the extra cost of importing tires from India during the Red Sea crisis and its temporal impact on tire shipments to the East Coast of the United States, and the annual amount of dry rubber, a raw material for tires, exported from Cambodia.

84. Besides the Tire Analysis Report and The Smithers Report, Smithers is a prolific publisher of other reports about the global tire industry for global tire industry participants. For example, on December 22, 2023, Smithers published The Future of Global Tires to 2028, a report that analyzes and forecasts the tire market by raw material, tire type, end-use, geographic region, and leading national market through 2028. This report contains statistical data for the global tire market by material type, end use, and region.

85. Smithers provides its clients access to several additional tools, including the Tire Database System (TDS), a web-based database system that allows users to view, sort, and export data for in-depth technical investigations on all reports included in their subscription, and Component Volume & Weight (CV&W) reports, which include raw material information with reconstructed formulas.

86.     Upon information and belief, many—if not, all—Defendants are Smithers' clients and use Smithers' comprehensive qualitative and quantitative data for business planning purposes. Specifically, Smithers' various publications and tools, which include data by tire type, end use, country, and raw material and by dollar, volume, and market share, facilitated price coordination by its clients, including Defendants.

87.     Smithers' business relationship with Defendants goes back many years. For example, in 2017, Smithers jointly invested in a new tire testing facility (MTS Flat-Trac CT Plus Tire Test System) at an existing Smithers' office (Smithers Tire and Wheel Test Center) in Ravenna, Ohio, with Defendants Bridgestone, Continental, Goodyear, and Michelin, among others.

### 4.  Supply Coordination

88.     Defendants also began colluding on the supply of Tires in 2020. That year, the global pandemic shut down many countries, causing a 13% reduction in the amount of driving and a 23% decline in replacement Tire rates.[112]

89.     Despite most manufacturers shutting down production for a few months in 2020, there was no shortage of Tires on the market in 2020 due to the decrease in demand. Nonetheless, Defendants ramped up supply to more than make up for the shut downs in production, leading to excess supply in the market by 2022. As a result, Defendants announced decreases beginning that year. Goodyear explained that "in order to address softening industry demand and prevent the buildup of excess inventory, we reduced production in the fourth quarter of 2022 at most of our

---

[112] *Business Wire, Effects of Pandemic Bring Tire Industry to Slow Roll, J.D. Power Finds* (Mar. 18, 2021), https://apnews.com/article/business-consumer-products-and-services-diseases-and-conditions-retail-andwholesale-Tire-retail-3f5b8d0a8eef411bbe57549ee4f911a1.

Tire manufacturing facilities, resulting in a reduction of approximately 3.5 million units compared to production in the fourth quarter of 2021."[113]

90.     Various statements by Defendants executives emphasized that this "capacity discipline" had to be exercised collectively by industry members. As Richard Kramer, [CEO] at Goodyear explained at the 2023 1st Quarter earnings call discussed Goodyear's "focus on making sure we're not putting too many Tires in inventory that could impact negatively that supply-demand equation." He further noted that "[t]here's a lot of manufacturing capacity in the industry. And like we did with Cooper, we need to think about how we can use that capacity more wisely as we move ahead."

### D.     Defendants' conspiracy worked—Tire prices in the United States increased dramatically after long periods of stable pricing.

91.     For most of the 2010s, the price level of Tires was stable, changing only by small amounts slowly. Over the last four years, however, the prices of Tires have seen dramatic increases, driven by lock-step prices increases from the major U.S. Tire manufacturers. For example, statistics provided by the Federal Reserve Economic Data (FRED) show a spike in the producer price index by industry for tire manufacturing (except retreading) for pneumatic tires (which includes passenger, truck, bus, tractor, industrial, and other tires):[114]

---

[113] The Goodyear Tire & Rubber Company, Annual Report 2022 (Form 10-K) at 27.

[114] *Producer Price Index by Industry: Tire Manufacturing, Except Retreading: Pneumatic Tires (Including Passenger, Truck, Bus, Tractor, Industrial, and Other Tires) (PCU3262113262110)*, U.S. Bureau of Labor Statistics, https://fred.stlouisfed.org/series/PCU3262113262110.



92.     This drastic increase in the price index cannot be explained by COVID-19 nor is it an historical trend. Prices for tires have remained high despite easing inflation and dissipating effects of the COVID-19 pandemic.[115]

93.     And Defendants' price increases are disproportionate to their increased costs during the pandemic. For example, in its Q1 2022 earnings call on May 6, 2022, Goodyear's Chief Financial Officer, Darren Wells, told investors "[Goodyear's] increase in the replacement tire prices more than offset [its] costs."[116]

94.     Sales volume also did not suffer due to price increases, which would normally be seen in a price-competitive market. For example, Continental's sales volume rose by 19.3% in 2022. Their annual report from that year states, "agreements reached with customers on price

---

[115] *Id.*

[116] *The Goodyear Tire & Rubber Company (GT) Q1 2022 Earnings Call Transcript*, AlphaStreet (May 6, 2022), https://news.alphastreet.com/the-goodyear-tire-rubber-company-gt-q1-2022-earnings-call-transcript/.

adjustments and to offset inflation-related effects had a positive impact on the sales performance of the Automotive group sector."[117]

### E. The European Commission conducted "dawn raids" of Defendants' businesses and their consulting firm for suspected tires price fixing.

#### 1. Dawn Raid of Defendants

95.     On January 30, 2024, the European Commission ("EC') revealed that it was carrying out unannounced inspections—also known as "dawn raids"—of tire manufacturers. Under Article 20 of Regulation 1/2003, the EC is empowered to conduct dawn raids "on the premises of companies suspected of being in breach of EU Competition rules."[118]

96.     When explaining the basis for the dawn raids, the EC expressed that it had "concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices . . . [and that] price coordination took place amongst the inspected companies, including via public communications."[119] The EC stated that the products at issue in the investigation are new replacement tires for passenger cars, vans, trucks, and buses.

97.     Shortly after the EC's announcement, Defendants confirmed that they were subjects of the investigation. Defendants made the following acknowledgments:

    a.      **Bridgestone:** "Bridgestone can confirm that the European

---

[117] Continental Group, 2022 Annual Report, at 73 (https://cdn.continental.com/fileadmin/__imported/sites/corporate/_international/english/hubpages/30_20investors/30_20reports/annual_20reports/downloads/continental_annual_report_2022.pdf.

[118]        "Inspections,"        European        Commission,        https://competition-policy.ec.europa.eu/index/inspections_en.

[119] European Commission, "Commission carries out unannounced antitrust inspections in the tyres sector" (Jan. 30, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

Commission is conducting an inspection at its European headquarters."[120]

        b.      **Goodyear:** "We confirm that our European offices were subject to unannounced inspections today by the European authorities."[121]

        c.      **Continental:** "We can confirm that as of today, investigations by European antitrust authorities are taking place at Continental in Germany."[122]

        d.      **Nokian Tyres:** Nokian confirmed EC conducted an unannounced inspection at its headquarters in Finland and said, "The European Commission has expressed its concerns that the inspected tyre manufacturing companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices."[123]

        e.      **Pirelli:** Pirelli confirmed it was under investigation and that it was "guaranteeing full support to the authority in the ongoing investigations."[124]

        f.      **Michelin:** Michelin confirmed "it was included in the EU investigation."[125]

---

[120] Andrew Boyce and Tono Gil, "Bridgestone, Goodyear, Continental, Nokian confirm EU antitrust dawn raids." mLex (Jan. 30, 2024), https://content.mlex.com/#/content/1539333/bridgestone-goodyear-continental-nokian-confirm-eu-antitrust-dawn-raids-update.

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] Foo Yun Chee and Ilona Wissenbach, "Pirelli, Continental, Michelin and Nokian targeted in EU raids," Reuters (Jan. 31, 2024), https://www.reuters.com/business/autos-transportation/eu-antitrust-regulators-raid-tyre-makers-concerns-about-possible-cartel-2024-01-30/.

[125] *Id.*

### 2. Dawn Raid of Consultancy Firm

98. Following the dawn raid of Defendants, on June 18, 2024, the EC carried out unannounced antitrust inspections at the premises of a consultancy firm in two EU countries. The EC was concerned that the consultancy firm may have violated EU antitrust rules that prohibit cartels and restrictive business practices.

99. According to the EC's June 18, 2024 press release, the EC's inspection of the consultancy firm was "conducted in the context of an investigation for which the [EC] carried out inspections earlier in 2024." The EC was concerned "the consultancy firm may have facilitated or instigated the suspected price coordination amongst [tire] manufacturers, which allegedly also used public communications channels to collude."

100. Upon information and belief, the dawn raids of Defendants on January 30, 2024 uncovered evidence confirming price coordination among Defendants and revealing the consultancy firm's involvement in such coordination, which led to the dawn raid of the consultancy firm less than six months later.

### F. Factors corroborating Defendants' horizontal price-fixing agreement.

101. In addition to lock-step price increases, a European Commission investigation, and a consolidated industry susceptible to collusion, Defendants' unlawful agreement to fix prices of Tires is supported by (i) motive and (ii) opportunity, in a market with (iii) high barriers to entry, (iv) price inelasticity, and (iv) interchangeable products. Defendants are also recidivist bad actors.

### 1. Motive

102. The steadily rising number of total vehicle miles in the United States and the low price of rubber created healthy operating conditions for tire manufacturers leading up to the outbreak of COVID-19. But as measures were put into place to combat the spread of the virus, domestic travel stopped and then slowed, reducing demand for tires.

103.    Investors took note. For example, in February 2022, Goodyear's stock price dropped 24% in one day.[126] Goodyear's stock dropped again in November 2022, this time by 10%.[127]

104.    To remain profitable, Defendants needed to pass on costs to indirect purchasers, including ADPs and consumers.

105.    By 2023, inflation had eased, and supply chain logistics had recovered, but tire prices remained high, despite excess supply. For example, in November 2023, the president of the union at the Bridgestone Americas Inc. tire plant in Morrison, Tennessee stated that "Even with [] lower production levels, we still have huge amounts of inventory — more than our warehouse can handle. Our warehouse is full of truck and bus tires. In addition, we have 150 to 175 trailers on our plant's property that are completely full of tires."[128]

106.    In a normal functioning economy, as costs lowered and there was excess supply, prices would lower too, as inflated prices would lead to a loss of market share. Yet, prices remained high, as noted above.

### 2.  Opportunities to collude

107.    Defendants had numerous opportunities to meet and conspire under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the

---

[126] Richard Clough, *Goodyear Plunges as the Tiremaker Sees Inflation Pressures in 2022*, Bloomberg News (Feb. 11, 2022), https://www.bnnbloomberg.ca/goodyear-plunges-as-the-tiremaker-sees-inflation-pressures-in-2022-1.1722126.

[127] Claudia Assis, *Goodyear stock drops to lowest level in a month as sales volumes worry Wall Street*, MarketWatch (Nov. 1, 2022), https://www.marketwatch.com/story/goodyear-stock-drops-to-lowest-level-in-a-month-as-sales-volumes-worry-wall-street-11667317266.

[128] Joy Kopcha, *Do Tire Tiers Exist, and Are They Competitive?*, Modern Tire Dealer (Nov. 7, 2023), https://www.moderntiredealer.com/suppliers/article/33014539/do-tire-tiers-exist-and-are-they-competitive.

conspiracy. At least throughout the Class Period, the Replacement Tire industry provided ample opportunities for Defendants and/or their parent companies to collude and fix the prices of Replacement Tires, through trade association meetings and public communications.

### a.     United States Tire Manufacturers' Association

108.     The principal industry association is the United States Tire Manufacturers' Association ("USTMA"). It is headquartered in Washington, D.C. and its members include Bridgestone, Continental, Goodyear, Michelin, Nokian, Pirelli and others.

109.     The leadership of the organization is drawn from the upper ranks of the member companies. The current Chair is Alexis Garcin, who is also the current Chair and President of Defendant Michelin North America. Board of Directors members include representation from Bridgestone Americas, Goodyear, Michelin NAM, Nokian NAM, Hankook, Giti Tires USA, Pirelli NAM, Continental Americas. Indeed, most board members are directors or officers of member companies.

110.     USTMA Board Members include: Paolo Ferrari - former President & CEO of Bridgestone Americas, current CEO of Bridgestone West; Jochen Etzel - current CEO of Continental Tire the Americas LLC; Alan Yarcusco - current Vice-President of Government & Regulatory Affairs and General Counsel Diversified Businesses, Bridgestone Americas; Blake Eaddy - General Counsel & Secretary at Giti Tire USA; David Reese - VP of Off-Highway Business Unit, The Good Year Tire & Rubber Company; Rob Williams - current president of Hankook Tire America Corporation; Nam Hwa (Ed) Cho - current CEO of North & South Americas Kumho Tires U.S.A, Inc.; David K. Chapman - current Vice-President of public Affairs at Michelin North America; Tommi Heinonen - current Vice-President at Nokian Tyres North America; Claudio Zanardo - current President & CEO of Pirelli Tire North America; Darren Thomas - President & CEO of Sumitomo Rubber Industries, Inc.; James Tsai - General Counsel

& Corporate Secretary at Toyo Tire Holdings of Americas, Inc.; and Jeff Barna - current President

& CEO at Yokohama Tire Corporation.

111.    USMTA holds lobbying events that bring industry figures together for multiple

days, including, for example, June 14-16 of 2022 in Washington, D.C. The main purpose of these

events is to visit Senators and Congressional Representatives on issues of concern to the members,

and the multi-day format puts key personnel together with opportunities to speak.

112.    USMTA also hosts a recycling conference, together with the Scrap Tire Research

and Education Foundation. This is an annual event held in May. There is limited information

regarding attendees other than knowledge that industry leaders and federal and state officials

attend.

### b.    Tire Manufacturing Ambassadors

113.    Lobbying efforts are conducted via the Tire Manufacturing Ambassadors, a group

of 12 unidentified individuals each representing one of 12 member companies, including

Defendants Bridgestone, Continental, Goodyear, Michelin.[129] In June, annually, the USTMA

sends its 12 ambassadors to visit congress in person, in a visit dubbed the "Capitol Hill fly-in."

### c.    Congressional Tire Caucus

114.    USTMA successfully lobbied in 2019 for the creation of the Congressional Tire

Caucus, a bi-partisan committee, currently co-chaired by Rep. Richard Hudson (R-NC) and Rep.

Emilia Strong Sykes (D-OH). Since its inception, the Congressional Tire Caucus has been chaired

by representatives from states wherein there is large physical presence of major tire manufacturers.

For instance, Bridgestone Americas operates four manufacturing plants in North Carolina and one

---

[129] 2018 USTMA Tire Manufacturing Ambassador Program, U.S. Tire Manufacturers Ass'n (https://www.ustires.org/2018-ustma-tire-manufacturing-ambassador-program.

in Ohio; Continental Tires maintains a corporate headquarters in Fairlawn, OH; and Michelin Tires

operates plants in North Carolina and Ohio, with a total of 34 domestic manufacturing plants,

primarily in the southeastern U.S.

### d.     Tire Industry Association & Global Tire Expo

115.    Defendants also participate in the Tire Industry Association (TIA). This

organization hosts the Global Tire Expo annually, an event under the umbrella of Specialty

Equipment Market Association (SEMA), a massive auto industry tech expo in Las Vegas.

116.    Defendant sponsors of the Global Tire Expo are Bridgestone Americas, AME

International, RiteSensor of Bartee USA, Schrader TPMS Solutions, Vogue Tyres, 1800 Every

Rim OEM Wheels, Federated Insurance, Haltee Corporation, Hylant, Merrick Printing, Purcell

Tire & Rubber Company. Prior to the event, there are two days of off-site meetings and events,

beginning with a TIA executive committee meeting, a TIA "Board & Friends" reception by invite

only, with the following day hosting a two day-long events, the Tread Rubber + Tire Repair

Materials Manufacturer's Group (TRMG) meeting and the Tire Retread & Repair Information

Bureau (TRIB) meeting, with membership meetings, a press conference, the TIA Retail Advisory

Council Meeting, and additional invite only sessions including a TIA Board Lunch. Both in formal

sessions and informally by placing key personnel at the same location, the Global Tire Expo offers

opportunities for the Defendant direct competitors to confer and collude.

117.    TIA's board of directors has included the following Defendant personnel: Debra

Hamlin – VP, Director of Operations at Bridgestone and Gary Schroeder, Executive Director of

Global Truck and Bus Tire Business at Cooper Tire/Goodyear.

118.    TIA has an antitrust policy that, on its face, encourages competitors to walk right

up to the line of impermissible information exchange: discussion of pricing models, methods,

systems, applications, and costs are expressly permitted—as long as actual prices or anything

which would lead to a consensus on prices are not shared. Further, members are allowed to share price and fee data if exchanged pursuant to a well-considered plan approved by TIA's legal counsel.

119.    The TIA also lists as resources dozens of other state, regional, national, and international tire organizations as well as other related industry organizations.

### e.    Tire Political Action Committee

120.    TIA also includes a subgroup called the Tire Political Action Committee (TirePAC), which directly supports election/reelection of desired officials, and makes donations to them. TirePAC brings key industry figures together for political fundraising events. Very limited public information is available regarding TIA's TirePAC. TirePAC provides weekly/monthly updates surrounding lobbying and legislative efforts, providing a contact to Roy Littlefield IV for additional information. Anyone can become a basic membes, but the committee is run by an unknown individual or individuals.

### f.    Off-the-Road Tire Conference

121.    The Off-the-Road Tire Conference, organized by the TIA, is held annually. This event includes sessions on industry insights, professional development, and networking activities. In 2022, for example, the OTR Tire Conference offered an educational session on the "U.S. Economic Forecast."[130] Major tire manufacturers and suppliers such as Bridgestone, Goodyear, Michelin, and Pirelli, regularly attend. Michelin and Goodyear have sponsored the conference.

---

[130]        https://www.tireindustry.org/resources/resources/press-releases/2022/2022-otr-tire-conference-to-offer-12-educational-sessions/.

### g. European Tyre and Rubber Manufacturers' Association Events

122.   The European Tyre and Rubber Manufacturers' Association (ETRMA) runs a series of events throughout the year that bring together some of the largest companies operating in the major European tire markets. Many of the board members in ETRMA are drawn from companies such as Bridgestone Europe, Continental, Michelin, and Pirelli Tyre. ETRMA's events are held with an objective to provide a platform for exchange for top leaders on trends, and the sharing of knowledge.

### h. International Tire Exhibition and Conference

123.   Rubber News organizes the International Tire Exhibition and Conference (ITEC) – "the largest tire manufacturing trade show and conference in North America."[131] The 16th such event took place May 14-16, 2024 in Ohio. Major tire companies, including Bridgestone, Goodyear, Michelin, and Continental, are regular participants. The 2024 event speakers, for example, included Michelin's Vice President of Business to Business Products, Pierluigi Cumo, Smither's Vice President of Consultancy, Josh Guilliams, Continental Tire of the America's LLC's Quality Director, Quiana Kee, The Goodyear Tire & Rubber Company's Compounder Principal, Jeffery Lin, Bridgestone Tires' Director of Sustainable Materials and Circular Economy, Bill Niaura, among others.

### i. International Elastomer Conference

124.   The International Elastomer Conference, organized by Rubber Division, one of 32 divisions in the American Chemical Society, is an annual event focusing on rubber and tire technology. This conference has been held since at least 2021 and will continue through 2029 in

---

[131]                                  https://web.cvent.com/event/bb938bd3-6a93-44dc-82b8-424035493b52/websitePage:9613f419-fe0e-42ba-a3a5-bbd718d1d857.

various locations. It provides a venue for tire manufacturers to discuss technological advancements and industry standards and participate in networking events.

### j.    Tire Technology Expo

125.    The Tire Technology Expo is an annual event dedicated to tire design, manufacturing, and performance. It is "the tire industry's essential annual event, gathering a global community of scientists, engineers, academics and professionals . . . ." This expo attracts major tire manufacturers such as Michelin, Goodyear, Sumitomo, Bridgestone, Continental, and Pirelli.[132] The event's focus on technological advancements and industry trends provides a platform for competitors to discuss and potentially align their business practices. It also hosts sessions related to economics and pricing; next year's conference has sessions in, for example, "Global tire industry – outlook and challenges" and "where is the tire market going?"[133]

### k.    Tire Society

126.    Defendants also participate in the Tire Society, primarily a technology and innovation group, which gives awards. This Society holds events annually in the second week of September, including 2024, the 43rd annual, at the University of Akron. The 2024 event speakers include Rob Williams, current President of Hankook Tire America; Tom Ebbott, Vice-President of Endurica, which provides a niche testing system for the industry, and others.

127.    The nominating committee for the awards includes Gregory Smith – Quality Business Leader at Goodyear; Ric Mousseau – Technical Specialist at General Motors; Joerg Denhert – Director of Tire Contour & Mechanics at Continental AG; Bin Chung – Senior Vice-

---

[132] *See, e.g.,* https://www.tiretechnology-expo.com/en/awards-2024.php.

[133] https://www.tiretechnology-expo.com/en/conference-program.php.

President of Technology at Maxxis International; Ron Kennedy – former Managing Director of the Center for Tire Research and former Research Engineer and Manager at Hankook Tire Co.

128.    The 2023 nominees included Michelin, Bridgestone Americas, Hankook Tire Co., GRI Tires, Continental, Pirelli, Sumitomo, Goodyear, Firestone, and additional niche manufacturing and technology companies related to the tire industry. Awards are announced at the event, suggesting that a representative from each nominated company, not just winners, are typically present.

### l.      Clemson University Global Tire Industry Conference

129.    Many Defendant personnel also attend the Clemson University Global Tire Industry Conference, a five-day conference held in South Carolina in April each year. Each of the five days is moderated by Clemson University faculty, with the exception of day three, which is moderated by Dr. Jim Cuttino, current Director of Advanced Engineering & testing at Yokohama Tires USA. Speakers of the 2024 event included: David Shelton – Director of Industry Relations at Giti Tire US; David Johansen – Vice-President of Sumitomo Rubber USA; Lashan De Silva – Carbon Applications Chemist at Continental; Nicole Avramovich – Director of Government & Regulatory Affairs at Bridgestone; June Satterfield – Director of Industry Standards & Government Regulations at Michelin; Stephane Cochard – Director of Materials Research at Michelin.

### m.      Wolfe Research Global Auto Industry Conference

130.    Defendants are also present at the Wolfe Research Global Auto Industry Conference. In 2019, for example, Goodyear's executive vice president and chief financial officer provided a business overview and discussed the company's strategies.

**n.  Deutsche Bank Auto Industry Conference**

131.    Deutsche Bank's Global Auto Industry Conference hosts "senior executives from leading companies in the automotive industry" to "provide presentations to update you on their businesses," as well as "one-on-one / small group meetings." Participants include, for example, Continental and Goodyear.

**o.  The Global Data Service Organization for Tyres and Automotive Components**

132.    Established in January 2022, the Global Data Service Organization for Tyres and Automotive Components ("GDSO"), is an international non-profit association with the mission of digitally standardizing tires' data to share the information with its members. GDSO believes that "sharing your knowledge is the best way to build benefit for yourself and everyone."[134]

133.    Defendants Michelin, Pirelli, Bridgestone, Continental, and Goodyear are founding members of GDSO and control GDSO's board.  For example, Jerome Barrand from Michelin serves as the president of GDSO's Board of Directors while Marco Spinetto from Pirelli serves as the Vice President. Bridgestone, Continental, and Goodyear also have their executives serve on the board.

134.    To join GDSO, all members must agree to "actively collaborate to the achievement of the Association's purpose"—i.e., standardize data so that it can be shared among its members.

135.    Since its establishment, GDSO holds a general assembly meeting annually.  For example, the 2022 meeting was held on June 7, 2022, the 2023 meeting was held on April 18, 2023, and the 2024 meeting was held on April 3, 2024. Those annual meetings provided Defendants a forum to meet and discuss pricing.

---

[134] https://gdso.org/Purpose-and-mission/Purpos-and-Mission.

p.      **Traction Summit**

136.    Smithers, a leading testing, consulting, information, and compliance firm, hosts an annual Traction Summit conference.  Maureen Kline, Vice President Public Affairs & Sustainability at Pirelli Tire North America, Andrew Thompson, Global General Manager, Strategic Sustainability at Bridgestone Americas, and Jay Spears, Director of Standards and Regulation at Continental Tire serve on the advisory board.

137.    The annual Traction Summit provided a network for Defendants, usual participants of the summit, to connect and coordinate.  For example, the 2022 summit was held in Charlotte, NC on July 26-27, 2022, with speakers from Goodyear, Bridgestone, Michelin, and Pirelli.  The 2023 summit was held in Holiday Inn San Antonio-Riverwalk between May 23 and 25, 2023. Goodyear, Michelin, Continental, and Bridgestone and others attended.

q.      **Tire Industry Project**

138.    The Tire Industry Project ("TIP") is a global CEO-led initiative of leading tire manufacturers.  TIP is currently comprised of 10 leading tire companies that include: Bridgestone, Continental, Goodyear, Hankook, Kumho, Michelin, Pirelli, Sumitomo Rubber Industries, Toyo Tires, and Yokohama. Continental, Bridgestone, Goodyear, and Michelin act as co-chairs.

139.    The CEOs of TIP member companies "meet regularly."  For example, the CEOs of TIP member companies gathered at the end of October in 2023 to confirm a two-year TIP workplan.  TIP meetings provided Defendants with good opportunities to engage high-level inter-firm communication and coordinate on pricing and outputs.

r.      **Other Regional and Mission-Specific Events**

140.    There is also an array of smaller, regional and distributor-organized events that bring the Defendants' personnel together.

141.    For example, Michelin and Bridgestone delivered a joint perspective on sustainability in the tire industry at the November 22, 2021 Smithers Recovered Carbon Black (rCB) Conference.

142.    The combined effect of industry events is a climate where senior managers know each other and have frequent opportunities to meet and speak unmonitored.

143.    Defendants had and have numerous opportunities to meet and conspire under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy. At least throughout the Class Period, the Tire industry provided ample opportunities for Defendants and/or their parent companies to collude and fix the prices of Tires, through trade association meetings and public communications.

144.    Each of the Defendants is a member of the U.S. Tire Manufacturers Association ("USTMA"). The USTMA is the national trade association for tire manufacturers that produce tires in the United States.

145.    Senior executives from each of the Defendants currently serve on the Board of Directors of the USTMA.

146.    The USTMA holds a number of annual conferences and meetings where Defendants had the opportunity to meet and discuss pricing. For example, the USTMA holds a spring and fall meeting for its board members annually, including on July 29, 2020,[135] October 6,

---

[135] Henry Willis, *USMTA makes changes to its director board*, Tire Technology Int'l (Aug. 14, 2020), https://www.tiretechnologyinternational.com/news/business/ustma-makes-changes-to-its-director-board.html.

2021,[136] January 25, 2022,[137] October 6, 2022, April 3-4, 2023,[138] and October 11, 2023.[139] Minutes from these regular meetings are not available to the public.

147.    Defendants also closely monitor their conspiracy by tracking the other cartel members' pricing and sales information. The monitoring of the pricing and other conduct of co-conspirators is a common tactic for price-fixing cartels. Revenue management software enables them to use large data sets that include competitor pricing data to maximize revenues.

148.    While Defendants may use different software, all revenue management software programs allow Defendants to analyze and filter large data sets of pricing information at a granular level and then develop pricing strategies informed by market trends. The programs also allow for close monitoring of competitors' pricing.

149.    One type of revenue management software is sold by Torqata, formerly an analytic division of American Tire Distributors, which was spun off in 2020. Torqata produces revenue management software specific to the tire industry so that manufacturers, distributors, and retailers can use data-driven analytics to quickly respond to market trends and increase revenue. Its Pricing

---

[136] Kim Kleine, *U.S. Tire Manufacturers Ass'n Names Bridgestone's Paolo Ferrari as Board Chair*, (Oct. 11, 2021), https://www.ustires.org/us-tire-manufacturers-association-names-bridgestones-paolo-ferrari-board-chair.

[137] *USTMA Announces Four New Board Members*, Modern Tire Dealer (Jan. 27, 2022), https://www.moderntiredealer.com/retail/article/11466086/ustma-announces-four-new-board-members.

[138] *USTMA Board of Directors Holds Spring Meeting in Washington, DC, Admits Giti Tire USA as 12th Member Company*, U.S. Tire Manufacturers Ass'n, https://www.ustires.org/ustma-board-directors-holds-spring-meeting-washington-dc-admits-giti-tire-usa-12th-member-company.

[139] *Michelin CEO Named USTMA Chairman*, Modern Tire Dealer (Oct. 12, 2023), https://www.moderntiredealer.com/suppliers/article/33013078/michelin-ceo-named-ustma-chairman.

Insights feature allows customers to use an analysis of competitors' private information to maximize revenue.

150.    Lizeo Group's Retail Price Pro software, which is purchased by at least Defendants Bridestone and Continental, also gives access to granularized pricing data from competitor manufacturers. Customers can set a pricing strategy informed by this pricing data.

### 3. Industry Structure

151.    Defendants' market shares have remained largely static over time (with the exception of some growth from Goodyear), which is a hallmark of cartel activity. Defendants dominate the industry with only a few other competitors, whose margins followed similar patterns as Defendants—perhaps as an indirect beneficiary of the cartel activity.



### 4.  Changes in input prices do not explain the increase in the price of tires, and they have not affected Defendants' profit margins.

152.    Defendants claimed in recent years that they raised prices in response to input price increases. "For Michelin, raw materials eat up about 19% of revenue."  Other estimates suggest that "raw material costs comprise 50%-70% of the cost to manufacture a tire."[140]

153.    The typical raw material cost composition illustrated below has remained stable for the industry over recent history.



Source: Company reports and J.P. Morgan estimates.

154.    Not all input commodities have demonstrated rising prices in recent years. According to J.P. Morgan, carbon black (13% of raw material input cost) rose ~65% from roughly 2020-23, steel cord (10% raw material of input costs) rose ~55% from roughly 2020-23, while

---

[140] *See* Bingham et al, "Economic Analysis of the rubber Tire Manufacturing MACT", *Research Triangle Institute Center for Economics Research*, August 2000, p. 2-11; See, also, Park, Jim, "The High Cost of Tires", Trucking Info, May 3, 2013.

other inputs (77% of raw material input costs) generally remained stable or fell over the period. (See below.)[141]



**Figure 37: Raw Materials Price Trends**
Indexed to 100 at December 1999

Source: J.P. Morgan estimates.

155.   J.P. Morgan's own commodities input index shows that input prices fell considerably before 2017 and rose significantly, on net, in only 2017, 2021, and 2022. (See below.)



**Figure 38: Y/Y Change in J.P. Morgan Tire Commodities Index**
% Change Y/Y in average value of index

Source: J.P. Morgan estimates.

---

[141] Brinkman, Ryan, Rajat Gupta, Jesus Gonzales Lopez, Josh Patwa, and Yash Beswala, "Monthly Tire Review, J.P. Morgan, June 28, 2024. (Hereafter, J.P. Morgan).

156.    Yet, Defendants have maintained gross margins in the 30% range both prior to and following the start of the conspiracy period (at the beginning of 2020), even in the face of fluctuating input prices post-COVID.



Source: BVA Analysis of Bloomberg Data

157.    Such margin stability implies increases in raw materials and input costs have been passed through to purchasers.

158.    Bloomberg Intelligence reports that "The tire industry is largely unique in its ability to raise prices when raw material costs accelerate, a key benefit for low-margin sales tied to new passenger vehicles. As raw materials are a significant part of cost, it's no surprise that tire companies' share prices are inversely correlated with natural rubber futures and oil."[142]

---

[142] Davis, Gillian and Michael Dean, "Tire Makers Can Pass on Material-Price Hikes; Inverse Share Link," Bloomberg Intelligence, April 15, 2021.

159.    Bloomberg Intelligence continues, "Importantly for sales of low-margin tires found on new passenger vehicles, mechanisms are in place for manufacturers to adjust prices as input costs diverge…. For tire makers that hedge, it means increased input prices could take up to six months to hit their bottom line."

160.    Hedging, therefore, would alter tire manufacturers' need and ability to raise prices immediately in response to rising input prices. Strategic differences like contract length, volume requirements, RFQ process constraints, seasonality, and/or escalator clauses in contracts would de-link the relationship between raw materials prices and financial performance, as noted by Bloomberg Intelligence. So, while tire manufacturers would be expected to alter prices with raw materials price fluctuations, they would not all be expected to do so at the same time.

161.    Bloomberg Intelligence notes that in a competitive industry with price inelasticity of demand, one would expect to see an inverse correlation between major input prices and tire manufacturers' underlying stock prices. Even in the face of price elasticity of demand, one would still expect the correlation between raw materials input prices and financial performance to be relatively weak and vary across Defendants because of differing strategic choices among the tire manufacturers (*i.e.*, hedging, contract terms, volume requirements, etc., mentioned above). In a perfectly competitive framework, those strategic differences would be expected to create competitive opportunities and threats among manufacturers such that when and if prices rose among Defendants, those increases would not be expected to occur in lockstep and/or the correlation between raw material inputs and tire prices would be less perfect.



**Correlations between Monthly Average Stock Price and Monthly Average Rubber Futures pre and post January 2020**

|  | Continental AG | Michelin | Goodyear | Bridgestone | Pirelli | Nokian |
|---|---|---|---|---|---|---|
| Pre-Class Period | 0.0583 | 0.2576 | 0.2885 | 0.2343 | 0.1878 | 0.2537 |
| Class Period | 0.3563 | 0.8315 | 0.7056 | 0.6892 | 0.7765 | 0.3905 |
| Change | 0.2980 | 0.5739 | 0.4172 | 0.4549 | 0.5887 | 0.1368 |

*Source: BVA Analysis of Bloomberg Data*

162.     Prior to the Class Period, that correlation was appropriately weak, averaging 0.2134 and ranging from 0.0583 for Continental AG to 0.2885 for Goodyear. The standard deviation of those six observations (to the extent it is valid) was 0.0829). (See figure and table.) After the beginning of the class period, the correlation between raw materials prices and all of the Defendants stock prices increased considerably, averaging 0.6249 and ranging from 0.3563 for Continental AG to 0.8315 for Michelin. Thus, individual tire manufacturers' correlations all rose considerably after 2020, rising on average 0.4116 (with a standard deviation of those six

observations, to the extent it is valid, of 0.1721), with increases ranging between 0.1368 for Nokian and 0.5887 for Pirelli. ALL Defendants correlations increasing significantly at the SAME time suggests that they all responded much more quickly to raw materials price changes after the beginning of the class period than before, regardless of the types of strategic differences such as hedging, contract terms, volume requirements, etc., mentioned above.

163.    Lacking convergence upon a similar strategic approach, a reasonable rational explanation for such tightened correlations is collusion that would benefit tire manufacturers by smoothing financial performance.

164.    In addition, while raw material prices fluctuate both up and down over time tire manufacturers' price changes go only one way: up. Deutsche Bank Securities Inc. reports note that "generally speaking, inflationary environments are more favorable for tiremakers, as they provide the industry cover and force discipline to raise prices."[143] That is, tire prices would be correlated with input price inflation, as represented by manufacturers in the quotes used in the existing complaint. In a sticky price/collusive environment, however, inflationary shocks allow tire manufacturers to increase prices then benefit when input prices fall.

### 5.  Barriers to Entry

165.    Tire manufacturers face significant entry and exit barriers that lead to market concentration which facilitates collusion. Barriers to entry include large up-front capital investments to establish manufacturing plants that can produce tires at scale. For example, Defendant Nokian recently completed a $360 million manufacturing facility in Dayton,

---

[143] Rosner, Emmanuel, Winnie Dong, and Conor Waltors, "Dimming outlook for rest of year and 2023," Deutsche Bank, November 2, 2022.

Tennessee.[144] These manufacturing plants need to be close enough to the end consumers to make shipping costs not prohibitive, as tires are heavy products. Manufacturing plants must either have sophisticated and expensive automation or a large and expensive labor force. Established tire manufacturers have also erected significant intellectual property protections through patented products.

166.    As to exit barriers, because a huge amount of investment is required to set up a manufacturing plant and to shift to new business, it is extremely difficult to exit from the tire industry. For example, Uniroyal and Goodrich had to merge due to high exit barriers. Thus, consolidation is more likely than companies going out of business.

167.    Because the Tires market has high barriers to entry, it is more conducive to collusion. To maximize long-term profits, the cartel-fixed price must be high enough to warrant participation in a criminal conspiracy but not so high as to lure new competitors into the market. When a market is protected by high barriers to entry, conspirators are better able to fix a high price with less worry that new firms will come into the market and bid the price down. In contrast, firms may not bother to conspire to fix prices if interlopers cannot be excluded from the market.

### 6. Price inelasticity for Tires makes the market susceptible to collusion.

168.    The price elasticity of demand shows the responsiveness of the quantity demanded of a good relative to a change in its price. When a seller of goods or services can increase selling price without suffering a substantial reduction in demand, pricing is considered inelastic. For example, gasoline has little price elasticity of demand. Drivers will continue to buy as much as they have to, as will airlines, the trucking industry, and nearly every other buyer.

---

[144] *Nokian Tyres' North American Factory*, Nokian Tyres (https://www.nokiantires.com/daytonfactory/.

169.    Demand elasticity affects whether price fixing is likely to be profitable. When demand is inelastic, a seller with market power can charge a higher price without losing significant sales. This market characteristic encourages collusion because rivals can collectively raise price profitably.

170.    Tires are highly inelastic because tire replacement is not an option that can be deferred for long, particularly when a tire is damaged. Further, the cost of replacement Tires makes up a fraction of the operating cost of a car.

171.    Furthermore, Tires do not compete with other products in the functional sense; consequently, there is no inter-industry competition through cross-elasticities of demand. Because the demand for Tires derives from the need to use the automobile, buyers cannot be induced to buy more or less of the product in any significant sense through price changes.

172.    Because the price for Tires is highly inelastic, Defendants were able to and did collectively raise prices to supracompetitive levels without losing revenue. For example, Bridgestone America's chief operating officer reported, "We're certainly seeing a red-hot economy that, despite the price increases and inflation, demand still remains quite strong."[145]

### 7.  Tires are standardized products with a high degree of interchangeability.

173.    Defendants make similar models of Tires for each of the type-categories listed above (all-season, all-terrain, winter/snow, and summer tires). Within each type-category, Tires do not differ significantly in quality, appearance, or use. As a result, Tire models are functionally interchangeable.

---

[145] *Rising tires prices affected by several factors*, Tire Business (July 8, 2022), https://www.tirebusiness.com/news/rising-tire-prices-affected-several-factors.

174.    When purchasing a new set of four replacement tires, consumers can choose almost any brand on the market. Even when consumers are replacing only some of the four tires, they can use tires from different brands or models so long as certain features, such as tread depth, are similar.[146] Thus, Tire "producers are not likely to be able to deviate much from the competitive price without losing sales."[147]

175.    When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where a product like a Tire is interchangeable, economics suggests that cartel behavior is facilitated because, among other things, cartel members can more easily monitor and detect defections from a price-fixing agreement.

### 8.  Defendants are recidivist violators of antitrust laws.

176.    The U.S. Tire industry for years has been highly concentrated, and there is a history of antitrust violations by Tire manufacturers.

### a.    U.S. Department of Justice Antitrust Enforcement

177.    **Automotive Parts:** On February 13, 2014, the United States Department of Justice ("DOJ") announced that Defendant Bridgestone Corporation had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of anti-vibration rubber parts[148]

---

[146] Agota Szabo, *Should you be mixing tire (brands) on the same vehicle?*, Priority Tire (June 17, 2022), https://www.prioritytire.com/blog/should-you-be-mixing-tire-brands-on-the-same-vehicle/.

[147] Subhrendu K. Pattanayak et al., *Economic Analysis of the Rubber Tire Manufacturing MACT*, 2-13 (Aug. 2000), https://www.epa.gov/sites/default/files/2020-07/documents/rubber-tire-mfg_ip_08-2000.pdf.

[148] Like Replacement Tires, which are the subject of this Complaint, anti-vibration rubber parts are automotive parts. They comprise primarily of rubber and metal and are installed in

installed in automobiles sold in the United States and elsewhere. Defendant Bridgestone Corporation and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of anti-vibration rubber parts sold to automobile and component manufacturers in the United States and elsewhere from at least as early as January 2001 and continuing until as late as December 2008 in violation of the Sherman Act, 15 U.S.C. § 1.

178.    According to the Criminal Information filed, Defendant Bridgestone and its co-conspirators carried out the anti-vibration rubber parts conspiracy by:

a.    participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to Toyota Motor Corporation, Nissan Motor Corporation, Fuji Heavy Industries, Ltd., Suzuki Motor Corporation, Isuzu Motors, Ltd., and certain of their subsidiaries, affiliates and suppliers (collectively, for the purposes of this Section, "Automobile and Component Manufacturers") in the United States and elsewhere;

b.    agreeing, during those meetings, conversations, and communications, to allocate among the companies certain sales of certain anti-vibration rubber parts sold to Automobile and Component Manufacturers in the United States and elsewhere;

c.    agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere;

---

suspension systems and engine mounts, as well as other parts of an automobile, to reduce engine and road vibration.

      d.      exchanging information on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere, in order to effectuate the agreements;

      e.      submitting bids, price quotations, and price adjustments to Automobile and Component Manufacturers in the United States and elsewhere in accordance with the agreements;

      f.      selling anti-vibration rubber parts to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

      g.      accepting payment for anti-vibration rubber parts sold to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices.

179.    On April 15, 2014, the DOJ announced that a Cleveland federal grand jury returned an indictment against a then-current executive of Defendant Bridgestone Corporation, Yoshiyuki Tanaka, and two former executives of Defendant Bridgestone Corporation, Yasuo Ryuto and Isao Yoshida, for their roles in a conspiracy to fix prices of anti-vibration rubber parts sold in the United States and elsewhere. Mr. Tanaka, Mr. Ryuto and Mr. Yoshida and their co-conspirators entered into and participated in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of anti-vibration rubber parts sold to automobile manufacturers in the United States and elsewhere from at least as early as January 2001 and continuing until as late as December 2008 in violation of the Sherman Act, 15 U.S.C. § 1.

180.    According to the Criminal Indictment filed, Mr. Tanaka, Mr. Ryuto and Mr. Yoshida and their co-conspirators carried out the anti-vibration rubber parts conspiracy by:

a.    participating in meetings, conversations, and other communications to discuss the bids, price quotations, and price adjustments to be submitted to automobile manufacturers in the United States and elsewhere;

b.    agreeing, during those meetings, conversations, and communications, to allocate sales of certain anti-vibration rubber parts sold in the United States and elsewhere for various automobiles including, but not limited to, the Toyota Tacoma, Camry, Tundra, Sequoia, Corolla, Sienna, Venza, and Highlander;

c.    agreeing, during those meetings, conversations, and communications, on bids, price quotations, and price adjustments to be submitted to automobile manufacturers in the United States and elsewhere;

d.    exchanging information on bids, price quotations, and price adjustments to be submitted to automobile manufacturers in the United States and elsewhere, in order to effectuate the agreements;

e.    submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements;

f.    selling anti-vibration rubber parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g.    accepting payment for anti-vibration rubber parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

h.      employing measures to keep their conduct secret, including but not limited

to using code words and meeting at rented conference rooms.

181.    On April 16, 2014, the DOJ announced that a former executive of Defendant

Bridgestone Corporation, Yusuke Shimasaki, had agreed to plead guilty and to pay a $20,000

criminal fine and serve 18 months in a United States prison for his role in a conspiracy to fix prices

and rig bids of anti-vibration rubber parts sold in the United States and elsewhere. Mr. Shimasaki

and his co-conspirators participated in a conspiracy to suppress and eliminate competition in the

automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, raise, and

maintain the prices of anti-vibration rubber parts sold to automobile and component manufacturers

in the United States and elsewhere from at least as early as January 2001 and continuing until as

late as December 2008 in violation of the Sherman Act, 15 U.S.C. § 1.

182.    According to the Criminal Information filed, Mr. Shimasaki and his co-conspirators

carried out the anti-vibration rubber parts conspiracy by:

a.      participating in meetings, conversations, and other communications to

discuss the bids, price quotations, and price adjustments to be submitted to Automobile and

Component Manufacturers in the United States and elsewhere;

b.      agreeing, during those meetings, conversations, and communications, to

allocate among the companies the supply of certain anti-vibration rubber parts sold in the

United States and elsewhere;

c.      agreeing, during those meetings, conversations, and communications, on

bids, price quotations, and price adjustments to be submitted to Automobile and

Component Manufacturers in the United States and elsewhere;

d.  exchanging information on bids, price quotations, and price adjustments to be submitted to Automobile and Component Manufacturers in the United States and elsewhere, in order to effectuate the agreements;

e.  submitting bids, price quotations, and price adjustments to Automobile and Component Manufacturers in the United States and elsewhere in accordance with the agreements;

f.  selling anti-vibration rubber parts to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g.  accepting payment for anti-vibration rubber parts sold to Automobile and Component Manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

h.  employing measure to keep their conduct secret, including but not limited to using code words and meeting at rented conference rooms.

183. **Marine Hoses:** On September 15, 2011, the DOJ announced that Defendant Bridgestone Corporation had agreed to plead guilty and to pay a $28 million fine for its role in conspiracies to rig bids and to make corrupt payments to foreign government officials in Latin America related to the sale of marine hose[149] and other industrial products manufactured by the company and sold throughout the world.

184. According to the Criminal Information filed, Defendant Bridgestone and its co-conspirators carried out the marine hose conspiracy by:

---

[149] Marine hose is a flexible rubber hose used to transfer oil between tankers and storage facilities.

     a.     attending meetings and engaging in discussions in the United States and elsewhere by telephone, facsimile and electronic mail regarding the sale of marine hose;

     b.     agreeing during those meetings and discussions to allocate shares of the marine hose market among the conspirators;

     c.     agreeing during those meetings and discussions to a price list for marine hose in order to implement and monitor the conspiracy;

     d.     agreeing during those meetings and discussions not to compete for one another's customers, either by not submitting prices or bids to certain customers or by submitting intentionally high prices or bids to certain customers;

     e.     submitting bids in accordance with the agreements reached;

     f.     providing information received from customers in the United States and· elsewhere about upcoming marine hose jobs to a co-conspirator who was not an employee of any of the marine hose manufacturers, but who served as the coordinator of the conspiracy, acted as a clearinghouse for information to be shared among the conspirators, and was paid by the manufacturers for coordinating the conspiracy;

     g.     receiving marine hose prices for customers in the United States and elsewhere from the co-conspirator coordinator of the conspiracy;

     h.     selling marine hose to customers in the United States and elsewhere at collusive and noncompetitiye prices pursuant to the agreements reached;

     i.     accepting payment for marine hose sold in the United States and elsewhere at collusive and noncompetitive prices; and

     j.     concealing the conspiracy and conspiratorial contacts through various means, including the use of code names and private email accounts and telephone numbers.

185.    On December 10, 2008, the DOJ announced that a then-executive of Defendant Bridgestone Corporation, Misao Hioki, had agreed to plead guilty and to pay an $80,000 criminal fine and serve two years in a United States prison for his role in two conspiracies: First, Mr. Hioki and his co-conspirators participated in a conspiracy to rig bids, fix prices, and allocate market shares of marine hose in the United States and elsewhere and, second, Mr. Hioki and his co-conspirators participated in a conspiracy to violate the Foreign Corrupt Practices Act (FCPA) by making corrupt payments to government officials in Latin America and elsewhere to obtain and retain business.

186.    According to the Criminal Information filed, Mr. Hioki and his co-conspirators carried out the marine hose price-fixing conspiracy by:

   a.    Attending meetings or otherwise engaging in discussions in the United States and elsewhere by telephone, facsimile and electronic mail regarding the sale of marine hose;

   b.    Agreeing during those meetings and discussions to allocate shares of the marine hose market among the conspirators;

   c.    Agreeing during those meetings and discussions to a price list for marine hose in order to implement and monitor the conspiracy;

   d.    Agreeing during those meetings and discussions not to compete for one another's customers either by not submitting prices or bids to certain customers or by submitting intentionally high prices or bids to certain customers;

   e.    Submitting bids in accordance with the agreements reached;

   f.    Providing information received from customers in the United States and elsewhere about upcoming marine hose jobs to a co-conspirator who was not an employee

of any of the marine hose manufacturers, but who served as the coordinator of the conspiracy, acted as a clearinghouse for information to be shared among the conspirators, and was paid by the manufacturers for coordinating the conspiracy;

g.      Receiving marine hose prices for customers in the United States and elsewhere from the co-conspirator coordinator of the conspiracy;

h.      Selling marine hose to customers in the United States and elsewhere at collusive and noncompetitive prices pursuant to the agreements reached;

i.      Accepting payment for marine hose sold in the United States and elsewhere at collusive and noncompetitive prices;

j.      Authorizing or consenting to the participation of subordinate employees in the conspiracy; and

k.      Concealing the conspiracy and conspiratorial contacts through various means, including code names and private email accounts and telephone numbers.

187.    On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. (subsidiaries of Defendant Continental AG) had agreed to plead guilty and to pay a $4 million criminal fine for its role in a conspiracy to fix prices of instrument panel clusters[150] installed in automobiles sold in the United States and elsewhere. Continental Automotive Electronics LLC, Continental Automotive Korea Ltd., and their co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain

---

[150] Like Replacement Tires, which are the subject of this Complaint, instrument panel clusters are automotive parts. Instrument panel clusters are a set of instruments located on the dashboard of a vehicle that contain gauges such as a speedometer, tachometer, odometer, and fuel gauge, as well as warning indicators for gearshift position, seat belt, parking-brake engagement, engine malfunction, low fuel, low oil pressure and low tire pressure.

the prices of instrument panel clusters sold to automobile manufacturers in the United States and elsewhere from as early as March 2004 and continued until May 2012 in violation of the Sherman Act, 15 U.S.C. § 1.

188.    According to the Criminal Information filed, Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. carried out the instrument panel clusters conspiracy by:

      a.    participating in meetings, conversations, and other communications to coordinate bids for instrument panel clusters supplied to vehicle manufacturers for model vehicles sold in the United States and elsewhere;

      b.    entering into agreements during those meetings, conversations and communications to allocate sales of instrument panel clusters supplied to vehicle manufacturers for model vehicles sold in the United States and elsewhere;

      c.    exchanging information on bids, price quotations, and price adjustments for submission to vehicle manufacturers in the United States and elsewhere, in order to effectuate the agreed-upon allocations;

      d.    coordinating and submitting bids that were the product of collusion for instrument panel clusters supplied to vehicle manufacturers for model vehicles sold in the United States and elsewhere in accordance with the agreed-upon allocations;

      e.    supplying instrument panel clusters to vehicle manufacturers for model vehicles sold in the United States and elsewhere at collusive and noncompetitive prices; and

      f.     accepting payment for instrument panel clusters supplied to vehicle manufacturers for certain model vehicles sold in the United States and elsewhere at collusive and noncompetitive prices.

### b.    California Attorney General Enforcement

189.    In 2019, Defendant Bridgestone Corporation and its subsidiary, Bridgestone APM Company, a Delaware company with its principal place of business in Findlay, Ohio, and Continental Automotive Electronics LLC, Continental Automotive Korea Ltd., and Continental Automotive Systems, Inc. (subsidiaries of Defendant Continental AG) were amongst the 52 automotive suppliers that paid a total of $23 million in settlements for antitrust law violations brought by the California Attorney General.

### c.    European Commission Enforcement

190.    In 2001, the European Commission fined Michelin nearly €20 million "for abusing its dominant position in replacement tyres for heavy vehicles in France during most of the 90s."[151] Michelin was found guilty of the same behavior in the Netherlands in 1981.

191.    On February 21, 2018, the European Commission ("EC") concluded that Defendant Continental AG and its subsidiaries, Continental Teves AG & Co. oHG and Continental Automotive GmbH (collectively, for the purposes of this Section, "Continental"), violated the European Union's competition law by exchanging information in connection with hydraulic

---

[151] *Commission fines Michelin for abusive commercial behaviour*, European Commission (June 20, 2001), https://ec.europa.eu/commission/presscorner/detail/en/IP_01_873.

braking systems[152] and electronic braking systems[153] with the aim of coordinating their respective market behaviors, including pricing practices. For the hydraulic braking systems conspiracy, Continental was ultimately fined €44,006,000. For the electronic braking systems conspiracy, Continental was granted immunity from fines as the first to submit information and evidence.

192.    According to the Commission Decision issued by the EC's DG Competition, Continental and its co-conspirators participated in a set of agreements and concerted practices concerning the exchange of sensitive business information for the purposes of reducing competitive uncertainty in the area of sales of hydraulic braking system through:

a.    Participating in meetings, phone conversations, and email correspondences to exchange competitively sensitive business information regarding hydraulic braking systems with the aim of coordinating their market conduct relating to Daimler AG ("Daimler") and Bayerische Motoren Werke AG ("BMW");

b.    Exchanging, during those meetings, phone conversations, and email correspondences, information regarding their willingness to accept Daimler's three-year-policy and BMW's four-year-policy clause[154] and discussing Daimler and BMW's purchasing terms and conditions;

---

[152] Like Replacement Tires, which are the subject of this Complaint, hydraulic braking systems are automotive parts. Hydraulic braking systems consist of an actuation system and a foundation system. The actuation system is made up of a brake booster and main brake cylinder, while the foundation system is made up of a disc brake with saddle or drum brake and wheel brake cylinder. Hydraulic braking systems use fluid to transfer pressure to the vehicle's braking mechanism, slowing the vehicle.

[153] Like Replacement Tires, which are the subject of this Complaint, electronic braking systems are automotive parts. Electronic braking systems prevent cars from skidding by providing electronic stability controls when braking (anti-lock braking system or ABS) or under all driving conditions (electronic stability control or ESC).

[154] In 2008, Daimler asked for price commitments for after-series components. Suppliers were asked to supply components for three years after the end of production at the same price as during

c. Exchanging, during those meetings, phone conversations, and email correspondences, information concerning Daimler relating to raw material cost compensation, cost transparency, and volume reductions; and

d. Exchanging, during those meetings, phone conversations, and email correspondences, information with a view to reducing competitive uncertainty for Continental and its co-conspirators' supplies of hydraulic braking systems to Daimler and BMW.

193. According to the Commission Decision issued by the EC's DG Competition, Continental and its co-conspirators participated in a set of agreements and concerted practices concerning the exchange of sensitive business information for the purposes of reducing competitive uncertainty in the area of sales of electronic braking system through:

a. Participating in meetings and phone conversations to exchange competitively sensitive business information regarding electronic braking systems following the issuance of Requests for Quotation ("RFQs") for the VW's MLB evo-platform;

b. Discussing, during those meetings and phone conversations, their interest in the contract for VW's MLB evo-platform[155];

c. Disclosing, during those meetings and phone conversations, their intentions for VW's MLB evo-platform; and

---

the active series production phase of a given vehicle, hence "three-year policy" or "3YP." BMW's "4YP" (also 4JPB or "4-Jahrespreisbindung") led to a similar customer request.

[155] This platform is used to produce certain Audi models and the Porsche Macan.

d.      Exchanging, during those meetings and phone conversations, competitively sensitive business information on their respective offers; and

e.      Exchanging, during those meetings and phone conversations, information with a view of reducing competitive uncertainty for Continental and its co-conspirators' supplies of electronic braking systems to VW for the MLB evo-platform.

### d.      Korea Fair Trade Commission Enforcement

194.    On December 23, 2013, news sources reported that the Korea Fair Trade Commission ("KFTC") fined Continental Automotive Electronics LLC (a subsidiary of Defendant Continental AG) for conspiring to fix the prices of instrument panel clusters sold between January 2008 and March 2012. The panels were installed on 11 million Hyundai and Kia vehicles. The KFTC fined Continental Automotive Electronics LLC $46 billion won (approximately $42 million USD) for its participation in the instrument panel cluster price- fixing conspiracy.

### e.      Brazilian Administrative Council for Economic Defense Enforcement

195.    On March 3, 2021, the Brazilian Administrative Council for Economic Defense ("CADE") formally initiated proceedings against Continental Teves AG & Co oHG, a subsidiary of Defendant Continental AG, and certain former employees for the allegedly unlawful exchange of competition-sensitive information concerning hydraulic brake systems. CADE has not fined Continental Teves AG & Co oHG yet.

196.    On August 18, 2010, CADE determined that Continental Brasil Indústria Automotiva (a subsidiary of Defendant Continental AG) engaged in an "invitation to cartel" with respect to the commercialization of tachographs[156] and imposed a fine of BRL 12.0 million on

---

[156] The tachograph is the device that records driving times and rest periods as well as periods of other work and availability taken by the driver of a heavy vehicle.

Continental Brasil Indústria Automotiva. After multiple appeals, in February 2023, the court of first instance rendered a verdict against Continental Brasil Indústria Automotiva and lifted the ban on the enforcement of the fine against Continental Brasil Indústria Automotiva amounting to BRL 34.2 million.

### f.     South African Competition Authority Enforcement

197.    On April 4, 2008, the South African Competition Authority ("SACA") conducted search and seizure operations at the premises of Bridgestone South Africa (Pty) Ltd. (a subsidiary of Defendant Bridgestone Corporation), non-Defendant Dunlop Tyres International (Pty) Ltd, and non-Defendant the South African Tyre Manufacturers' Conference ("SATMC"), a private company and association of tire manufacturers. A complaint alleging that the tire manufacturers had adjusted their prices around the same time and within the same parameters prompted SACA's investigation into price-fixing in the tire industry. SACA's investigation found that SATMC members used it as a platform for "coffee table discussions" to determine price increases and general coordination in the market amongst the tire manufacturers.

198.    These raids resulted in South African's competition authority issuing fines against Goodyear South Africa (Pty) Ltd (a subsidiary of Defendant Goodyear Tire and Rubber Company) and Continental Tyre South Africa (Pty) Ltd (a subsidiary of Defendant Continental AG) of up to 10% of their annual sales, while Bridgestone South Africa (Pty) Ltd. escaped a fine after admitting to taking part in the alleged cartel and receiving conditional immunity after filing a leniency application with the regulator.

199.    In its application for leniency, Bridgestone South Africa (Pty) Ltd. admitted that it held telephonic discussions and met with its competitors during the period 1999 to 2007 to agree in principle that they should cooperate to ensure stability in the market. The meetings, which were attended by the tire manufacturers' sales and marketing representatives, coordinated the timing

and the average percentage price increase of tires, agreed on the discount structure to be given to tire dealers, and messages to be given to the market explaining the increases.

### G.    Defendants' Conspiracy

200.    On January 30, 2024, the European Commission said in a press statement that is carrying out inspections at the premises of various tire manufacturing companies in Member States related to suspected anticompetitive practices.

201.    The European Commission stated that it suspects "price coordination took place amongst the inspected companies," constituting a secret cartel to fix the prices of "new replacement t[i]res for passenger cars, vans, trucks and buses."[157]

202.    The European Commission Antitrust Division is running its investigation in partnership with its counterparts from the relevant national competition authorities of the Member States where the inspections were carried out, which would include France, Belgium, Germany, Italy, and Finland.

203.    The six industry giants confirmed that they were under investigation and were cooperating with the various competition authorities.

## VI.    <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

204.    Class member purchases of Tires within four years prior to the filing of this Complaint are not barred by the applicable four-year statutes of limitations; the statutes need not be tolled for these claims to be actionable.

205.    Plaintiffs and the Class did not know and could not have known of Defendants' illegal conduct until the European Commission announced dawn raids in the tire industry on

---

[157] *Commission carries out unannounced antitrust inspections in the tyres sector*, European Commission (Jan. 30, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

January 30, 2024. Before then, Plaintiffs and the Class had no reason to believe that they paid prices for tires that were affected by Defendants' illegal conduct, and thus had no duty until then to investigate the claims set forth in this Complaint. Defendants' secret price-fixing agreements were inherently self-concealing.

206.    Additionally, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct. For example, Michelin attributed its 12% price increase on passenger and light truck replacement tires in 2022 to "market dynamics."[158] Goodyear justified its July 1, 2022 price increase on consumer tires to rising raw-materials and other inflation-impacted costs.[159] Pirelli justified its April 11, 2022 price increase to "changing market conditions."[160]

207.    Accordingly, if tolling is necessary to advance some or all of the claims alleged by Plaintiffs and the Class, the four-year statutes of limitations governing claims under the Sherman Act were tolled at least until January 30, 2024, under the injury-discovery rule and the doctrine of fraudulent concealment.

---

[158] *Michelin Implements Price Increase Across Passenger Brands and Commercial Offers in North American Market*, PR Newswire (Dec. 1, 2021), https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across-passenger-brands-and-commercial-offers-in-north-american-market-301435108.html.

[159] *Goodyear to raise North America tire prices July 1*, Tire Business (June 15, 2022), https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1.

[160] Christian Hinton, *Pirelli Increases Price for Car and Light Truck Tires*, Tire Review (Mar. 23, 2022), https://www.tirereview.com/pirelli-increases-price-for-tires/.

## VII.    CLASS ACTION ALLEGATIONS

208.    Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (3), Plaintiffs bring this

suit on their behalf and on behalf of two proposed classes of all other similarly situated persons

consisting of:

Nationwide Injunctive Relief Class (All States)

All persons or entities who indirectly purchased for resale Tires manufactured by
any Defendant within a state or territory of the United States of America from
February 8, 2020 until the anticompetitive effects of Defendants' unlawful conduct
cease (the "Class Period").


Automobile Dealership and Other Reseller Plaintiffs' Class

All residents or citizens of a state or territory of the United States of America whose
laws permit an indirect purchaser to pursue a claim for anticompetitive conduct
who indirectly purchased for resale Tires manufactured by any Defendant from
February 8, 2020 until the anticompetitive effects of Defendants' unlawful conduct
cease (the "Class Period").

Excluded from each Class are: (a) the Defendant and its officers, directors,
management, employees, subsidiaries or affiliates; (b) any entity in which the
Defendant has a controlling interest; (c) any divisions, subsidiaries, and
predecessors of the Defendant; (d) all governmental entities; (e) the judges in this
case and any members of their immediate families and judicial staff; (f) any juror
assigned to this action; (g) all persons who are presently in bankruptcy proceedings
or who obtained a bankruptcy discharge in the last three years; (h) and all persons
who are currently incarcerated.

209.    The Class consists of millions of purchasers residing throughout the United States.

Accordingly, it would be impracticable to join all Class Members before the Court.

210.    Plaintiffs' claims are typical of the claims of the Class Members, in that they share

the facts above and legal claims or questions with the Class Members, there is a sufficient

relationship between the damage to Plaintiffs and Defendants' conduct affecting Class Members,

and Plaintiffs have no interests adverse to the interests of other Class Members.

211.    Under Rule 23(b)(3), there are numerous and substantial questions of law or fact common to all the members of the Classes and which predominate over any individual issues. Included within the common question of law or fact are:

      a.     The definition of the relevant product markets;

      b.     Defendants' market power within the relevant product markets;

      c.     Whether Defendants contracted, combined, or conspired with one another to restrain trade of Tires at any time during the Class Period;

      d.     Whether Defendants' conduct caused the prices of Tires sold to consumers to be higher than the competitive level as a result of their restraint of trade (supracompetitive prices);

      e.     Whether Plaintiffs and the other Class Members were injured by Defendants' conduct;

      f.     The quantum of overcharges paid by the Classes in the aggregate; and

      g.     and Whether Plaintiffs and Class Members are entitled to, among other things, injunctive relief and the nature and extent of such relief.

212.    Plaintiffs will fairly and adequately protect the interests of Class Members and has retained counsel experienced and competent in the prosecution of complex class actions including complex questions that arise in antitrust litigation.

213.    A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable and no other group method of adjudication of all claims asserted here is more efficient and manageable for at least the following reasons:

a.      The liability claims presented predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

b.      Absent certification of the Class, the Class Members will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendant profits from and enjoys its ill-gotten gains;

c.      Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

d.      When the liability of Defendants has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court; and

e.      This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and Class Members can seek redress for the harm caused to them by Defendants.

214.    Because Plaintiffs seek relief for the entire Classes, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants.

215.    Further, bringing individual claims would overburden the courts and be an inefficient method of resolving the dispute, which is the center of this litigation. Adjudications with respect to individual members of the Classes would, as a practical matter, dispose of the interest of other members of the Classes who are not parties to the adjudication and may impair or

impede their ability to protect their interests. Consequently, class treatment is a superior method for adjudication of the issues.

## VIII.    CLAIMS FOR RELIEF

### Count I: Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

#### Against all Defendants
#### (Declaratory and Equitable Relief)

216.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

217.    The relevant market is the Tires market and the relevant geographic market is the United States. Defendants have possessed and continue to hold at least a 65% market share in the Tires market in the United States.

218.    Defendants entered into and engaged in a continuing combination, conspiracy, or agreement to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of new replacement tires for passenger cars, vans, trucks, and buses sold within the United States for the purpose and effect of raising prices.

219.    Defendants' agreements are transactions in interstate commerce, as are the replacement tires themselves, which are delivered using and themselves constitute, instrumentalities of interstate commerce.

220.    Defendants' agreements are together and individually *per se* violations of Section 1 of the Sherman Act. This is in part because the primary objective of the agreements is to force prices in the new replacement tires market to increase, maintain or stabilize at levels above what would have occurred in a competitive market. In fact, because Defendants achieved that objective, the prices for new replacement tires have increased 21.4% in the last few years.

221.    Defendants are recidivists and continue to assert that their conduct was legitimate. The fact that the conduct alleged in this complaint may have ceased at some point does not mean that Defendants will not engage in similar types of price-fixing in the future.

222.    Plaintiffs and all others similarly situated have been injured in their business or property because of Defendants' violations of Sections 1 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

223.    Plaintiffs and all others similarly situated are threatened with future injury to their business and property because of Defendants' continuing violation of Section 1 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

224.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), Plaintiffs and the Class seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described in the preceding paragraphs violates Section 1 of the Sherman Act.

225.    Plaintiffs and members of the Class seek and are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

226.    For this conduct, Plaintiffs and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs under Section 4 of the Clayton Act (15 U.S.C. § 15) and 15 U.S.C. § 26.

### Count II: Violation of State Antitrust Laws
### Against all Defendants

227.    Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

228.    On account of the combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires, Defendants have violated, and Plaintiffs and members of the Class are entitled to relief under, the antitrust laws of the states of Arizona, California,

Colorado, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

     a.       Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*;

     b.       Cal. Bus. Code §§ 16700, *et seq.*;

     c.       Colo. Rev. Stat. § 6-4-101, *et seq.*;

     d.       Conn. Gen. Stat. §§ 35-27, *et seq.*;

     e.       D.C. Code §§ 28-4503, *et seq.*;

     f.       Haw. Rev. Stat. §§ 480-2, 480-9, *et seq.*;

     g.       740 Ill. Comp. Stat. §§ 10/3, *et seq.*;

     h.       Iowa Code §§ 553.5, *et seq.*;

     i.       Kan. Stat. Ann. §§ 50-112, *et seq.*;

     j.       Me. Rev. Stat. Ann. 10 §§ 1102, *et seq.*;

     k.       MD Code Ann., Com. Law, §§ 11-204, *et seq.*;

     l.       Mich. Comp. Laws Ann. §§ 445.773, *et seq.*;

     m.       Minn. Stat. §§ 325D.52, *et seq.* and Minn. Stat. §§ 8.31, *et seq.*;

     n.       Miss. Code Ann. §§ 75-21-3, *et seq.*;

     o.       Neb. Rev. Stat. §§ 59-802, *et seq.*;

     p.       Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*;

     q.       N.H. Rev. Stat. Ann. §§ 356:3, *et seq.*;

     r.       N.M. Stat. Ann. §§ 57-1-2, *et seq.*;

     s.       N.Y. Gen. Bus. Law § 340;

| | |
|---|---|
| t. | N.C. Gen. Stat. §§ 75-2.1, *et seq.*; |
| u. | N.D. Cent. Code Ann. §§ 51-08.1-03, *et seq.*; |
| v. | Or. Rev. Stat. §§ 646.730, *et seq.*; |
| w. | R.I. Gen. Laws §§ 6-36-5, *et seq.*; |
| x. | S.D. Codified Laws §§ 37-1-3.2, *et seq.*; |
| y. | Tenn. Code Ann. §§ 47-25-101, *et seq.*; |
| z. | Utah Code Ann. §§ 76-10-3104, *et seq.*; |
| aa. | Vt. Stat. Ann. 9, §§ 2453, *et seq.*; |
| bb. | W.Va. Code §§ 47-18-4, *et seq.*; and |
| cc. | Wis. Stat. §§ 133.03, *et seq.* |

229.    Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in herein. Their injuries consist of paying higher prices for Replacement Tires than they would have paid in the absence of Defendants' conduct. These injuries are of the type that the antitrust laws were designed to prevent and flow from Defendants' conduct unlawful.

230.    Plaintiffs and the proposed Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

### Count III: Violation of State Unfair and Trade Practices Laws

### Against all Defendants

1.    Plaintiffs incorporates each allegation in the preceding paragraphs of this Complaint.

2.    Defendants engaged in unfair competition and unfair/unconscionable or deceptive acts or practices in violation of the state consumer protection statutes identified below by entering

into the combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires.

3.  To the extent deception is required under the state laws below, Defendants concealed the anticompetitive and unlawful nature of their combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires.

4.  Accordingly, consumers and other indirect purchasers of Replacement Tires were induced into purchasing, and will continue to purchase, Replacement Tires at inflated prices. Plaintiffs and members of the Class could not reasonably have avoided injury from Defendants' wrongful conduct. This injury is of the type the state consumer protection statutes were designed to prevent and directly flows from Defendants' unlawful conduct. Defendants' conduct occurred in connection with consumer transactions related to the availability and sale of Replacement Tires.

5.  Defendants have violated, and Plaintiffs and members of the Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws of the states of Arkansas, California, Connecticut, Florida, Idaho, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Utah and Vermont, as well as the District of Columbia, as follows:

      a.      Ark. Code Ann.§§ 4-88-101, *et seq.*;

      b.      Cal. Bus. & Prof Code §§ 17200, *et seq.*;

      c.      Conn. Gen. Stat. §42-110a, *et seq.*;

      d.      D.C. Code §§ 28-3901, *et seq.*;

      e.      Fla. Stat. §§ 501.201, *et seq.*;

      f.      Idaho Code §§ 48-601, *et seq.*

      g.      Mass. Gen. Laws ch. 93A, *et seq.*;

h.     Mo. Rev. Stat. §§ 407.010, *et seq.*;

i.     Mont. Code Ann., §30-14-103, et seq., and §30-14-201, *et seq.*;

j.     N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

k.     N.Y. Gen. Bus. Law §§ 349, *et seq.*;

l.     N.C. Gen. Stat. §§ 75-1, *et seq.*;

m.     R.I. Gen. Laws §§ 6-13.1-1, *et seq.*;

n.     S.C. Code Ann. §39-5-10, *et seq.*;

o.     Utah Stat. §§ 13-11-1, *et seq.*; and

p.     VT. Stat. Ann., tit. 9, §2451, *et seq.*

## Count IV: Unjust Enrichment

## Against all Defendants

6.     Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

7.     Alternatively, from the acts of Defendants as alleged above, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

8.     Through Defendants' combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires, Defendants have artificially increased the price of Replacement Tires charged to Plaintiffs and members of the Class.

9.     Defendants have collected from Plaintiffs and members of the Class artificially high earnings from the sale of Replacement Tires.

10.     Defendants have been unjustly enriched by retaining the artificially high earnings from the sale of Replacement Tires collected from Plaintiffs and members of the Class.

11.     The retention of these earnings by Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiffs and members of the Class.

## IX.     <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully ask the Court for a judgment that:

12.     Certifies the Class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) and directs that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declares Plaintiffs as representatives of the Class;

     a.     Appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively;

     b.     Enters judgment against Defendants, and in favor of Plaintiffs and the Class, holding Defendants liable for the antitrust violations alleged;

     c.     Awards a declaratory judgment that Defendants restraint of trade was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the U.S. market for Tires in violation of the Sherman Act, § 1. Grants permanent injunctive relief:

          i.     enjoining Defendants from engaging in future anticompetitive conduct; and

          ii.     requiring Defendants to take affirmative steps to dissipate the continuing effects of its prior unlawful conduct;

d.      Awards Plaintiffs and the Class actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with law;

e.      Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

f.      Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

g.      Directs such further relief as it may deem just and proper.

## X.      **DEMAND FOR JURY TRIAL**

13.      Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 9, 2024                                        Respectfully submitted,

/s/ Michael J. Flannery (consent)            /s/ Daniel C. Hedlund (consent)
Michael J. Flannery                          Daniel C. Hedlund
**CUNEO, GILBERT & LADUCA, LLP**             **GUSTAFSON GLUEK PLLC**
Two CityPlace Drive, Second Floor            Canadian Pacific Plaza
St. Louis, MO 63141                          120 So. Sixth Street, Suite 2600
Phone: (314) 226-1015                        Minneapolis, MN 55402
Email: mflannery@cuneolaw.com                Phone: (612) 333-8844
                                             Fax: (612) 339-6622
                                             Email: dhedlund@gustafsongluek.com

*Interim ADP Co-Lead Counsel*

                                             *Interim ADP Co-Lead Counsel*

/s/ Warren T. Burns (consent)
Warren T. Burns
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Phone: (469) 904-4550
Email: wburns@burnscharest.com

*Interim ADP Co-Lead Counsel*

/s/ Steven N. Williams (consent)
Steven N. Williams
**STEVEN WILLIAMS LAW, P.C.**
201 Spear Street, Suite 1100
San Francisco, CA 94105
Phone: 415-697-1509
Email: swilliams@stevenwilliamslaw.com

*Interim ADP Co-Lead Counsel*

/s/ Robin F. Zwerling (consent)
Robin F. Zwerling
**ZWERLING, SCHACHTER &
ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Phone: (212) 223-3900
Email: rzwerling@zsz.com

*Interim ADP Co-Lead Counsel*