**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: PASSENGER VEHICLE | ) | Case No. 5:24-md-3107-SL |
| REPLACEMENT TIRES ANTITRUST | ) | |
| LITIGATION | ) | MDL No. 3107 |
| | ) | |
| | ) | CHIEF JUDGE SARA LIOI |
| This Document Applies to: | ) | |
| ALL CASES | ) | ORAL ARGUMENT SCHEDULED FOR |
| | ) | JANUARY 9, 2025 |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED COMPLAINTS**

## TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENT ...................................................................................1

II.   BRIEF STATEMENT OF ISSUES TO BE DECIDED ......................................................5

III.  BACKGROUND ...................................................................................................6

    A.    Plaintiffs.............................................................................................6

    B.    Defendants and the Wide Variety of "Replacement Tires" ....................................8

    C.    The Alleged Conduct ..............................................................................9

IV.   LEGAL STANDARD FOR PLEADING ANTITRUST CONSPIRACY CLAIMS ........13

V.    PLAINTIFFS FAIL TO PLEAD AN UNLAWFUL AGREEMENT AND, THUS,
    FAIL TO STATE A CONSPIRACY CLAIM UNDER FEDERAL OR STATE
    LAW ...............................................................................................................15

    A.    Plaintiffs Have Not Pleaded Direct Evidence of an Unlawful Agreement ............15

    B.    Plaintiffs Have Pleaded No Facts or Circumstantial Evidence from Which
        the Court May Infer an Unlawful Agreement .......................................................16

        1.    Plaintiffs' Allegations About Defendants' Pricing Conduct Do Not
            Suggest an Unlawful Agreement .............................................................16

            a.    Both the Supreme Court and the Sixth Circuit Recognize
                that Parallel Pricing Is Commonplace and Lawful in an
                Oligopoly .................................................................................17

            b.    Plaintiffs Do Not Even Allege Parallel Price Increases .................20

            c.    Statements on Routine Earnings Calls Also Do Not Support
                an Inference of Conspiracy .........................................................23

            d.    The Use of Third-Party Pricing Software Does Not
                Plausibly Raise an Inference of Unlawful Agreement .................29

            e.    DPPs Cannot Use a Vague "Preliminary Regression
                Analysis" to Manufacture an Unlawful Agreement ......................32

        2.    The Complaints (and the Articles Cited and Incorporated by
            Reference) Provide Obvious Alternative Explanations to Plaintiffs'
            Conclusory Assertions of Conspiracy.........................................................34

        3.    Plaintiffs' Other Purported "Plus Factors" Are Conclusory
            Allegations that Do Not Suggest an Unlawful Agreement ........................37

i

        a.     Plaintiffs Confuse "Motive" to Conspire and Economic
Interdependence ........................................................................37

        b.     Plaintiffs' "Opportunities to Collude" Allegations Fail................37

        c.     Allegations about the Structure of the Tire Industry Do Not
Make Plaintiffs' Claims More Plausible .......................................39

        d.     The Mere Fact of an EC Investigation Is Not a Basis to
Infer a Violation of U.S. Antitrust Law ........................................40

        e.     Prior Unrelated Legal Violations Do Not Make Plaintiffs'
Claims More Plausible ..................................................................44

      4.     The Totality of Plaintiffs' Allegations Do Not Support a
Conspiracy Claim .........................................................................45

VI.     PLAINTIFFS FAIL TO ALLEGE FACTS TYING EACH INDIVIDUAL
DEFENDANT TO THE ALLEGED CONSPIRACY .........................................45

VII.    PLAINTIFFS ALLEGE NO FUTURE INJURY ENTITLING THEM TO
INJUNCTIVE RELIEF .................................................................................46

VIII.   THERE ARE ADDITIONAL INDEPENDENT GROUNDS TO DISMISS
THE STATE LAW CLAIMS ..........................................................................47

    A.    EPPs and ADPs Lack Standing Under the Laws of States Where No
Named Plaintiff Was Injured ...............................................................48

    B.    ADPs' Threadbare Allegations Fail to State a Claim .............................49

    C.    EPPs and ADPs Fail to Plead Required Elements of Many State Antitrust
Claims .................................................................................................50

      1.     Failure to Plead Intrastate Commerce or "Substantial Effect" on
Commerce (MS, NC, TN, WV, and WI) .....................................50

      2.     A Recent Amendment to Create an Indirect Purchaser Cause of
Action Has No Retroactive Effect (CO) .....................................53

    D.    Many of EPPs' and ADPs' Consumer Protection Claims Are Also
Defective ............................................................................................54

      1.     Indirect Purchasers Cannot Sue under Consumer Protection Laws
(AR, CT, MA, NY, and SC) ........................................................54

      2.     Price-Fixing Is Not a Consumer Protection Violation (AR, ID, and
RI) ................................................................................................54

3.  EPPs and ADPs Fail to Plead Unconscionable Conduct or Other Aggravating Circumstances (CO, NM, and UT) ......................................55

4.  ADPs Allege Purchases for Resale and, Thus, Cannot Allege Their Purchases Were for Household, Personal, or Family Purposes (DC, MO, MT, RI, UT, and VT) ........................................................................56

5.  EPPs and ADPs Fail to Plead the Requisite Fraud, Deception, and Reliance with Particularity (MN, NY, SC)..................................................58

E.  EPPs' and ADPs' Claims Cannot Be Brought as a Class Action (IL, MT, SC, and UT) ........................................................................................59

F.  EPPs' and ADPs' Unjust Enrichment Claims Are Defective ..............................60

G.  Many of EPPs' and ADPs' State Law Claims Are Partly Time-Barred ..............60

IX.  CONCLUSION ...........................................................................................................62

# TABLE OF ABBREVIATIONS

| PARTIES & NAMES | |
|---|---|
| Direct Purchaser Plaintiffs | "DPPs" |
| End Payor Plaintiffs | "EPPs" |
| Automobile Dealership and Other Reseller Plaintiffs | "ADPs" |
| European Commission | "EC" |

| PLEADINGS | | |
|---|---|---|
| Direct Purchaser Plaintiffs' Consolidated Complaint | ECF No. 174 | "DPP ¶ __" |
| End Payor Plaintiffs' Consolidated Class Action Complaint | ECF No. 175 | "EPP ¶ __" |
| Automobile Dealership and Other Reseller Plaintiffs' Consolidated Class Action Complaint | ECF No. 176 | "ADP ¶ __" |
| Direct Purchaser Plaintiffs' Consolidated Complaint, End Payor Plaintiffs' Consolidated Class Action Complaint, and Automobile Dealership and Other Reseller Plaintiffs' Consolidated Class Action Complaint | ECF Nos. 174-176 | Collectively, "Complaints" |

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Adam A. Weschler & Son, Inc. v. Klank*,
  561 A.2d 1003 (D.C. 1989) ...................................................................56

*Alsides v. Brown Inst., Ltd.*,
  592 N.W.2d 468 (Minn. 1999)...............................................................58

*Am. Copper & Brass, Inc. v. Halcor S.A.*,
  494 F. Supp. 2d 873 (W.D. Tenn. 2007)................................................41

*Armengau v. Cline*,
  7 F. App'x 336 (6th Cir. 2001) ..............................................................36

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................13, 20

*Atuahene v. City of Hartford*,
  10 F. App'x 33 (2d Cir. 2001) ...............................................................46

*Audiology Distrib., LLC v. Hawkins*,
  No. 5:13CV154, 2014 WL 3548833 (N.D.W. Va. July 17, 2014) .........52

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................ *passim*

*Bishop v. Lucent Techs., Inc.*,
  520 F.3d 516 (6th Cir. 2008) .................................................................60

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993).........................................................................17, 18

*Brothers v. Saag*,
  No. 13-466, 2014 WL 838890 (N.D. Ala. Mar. 4, 2014) .................32, 33

*Browning v. Levy*,
  283 F.3d 761 (6th Cir. 2002) .................................................................62

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)...................................................................16

*Cataldo v. U.S. Steel Corp.*,
  676 F.3d 542 (6th Cir. 2012) .................................................................60

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
    92 F.4th 381 (2d Cir. 2024) ...............................................................................33, 43, 45

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
    851 F.2d 478 (1st Cir. 1988) ...............................................................................19

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*,
    715 F.2d 1115 (6th Cir. 1983) ...............................................................................30

*Cotte & Mercedes Hidalgo v. CVI SGP Acquisition Tr.*,
    No. 2:21-cv-00299, 2022 WL 464307 (D. Utah Feb. 15, 2022)............................56

*D'Augusta v. Am. Petroleum Inst.*,
    No. 23-15878, 2024 WL 4195329 (9th Cir. Sept. 16, 2024) .................................36

*Doll v. Major Muffler Ctrs., Inc.*,
    687 P.2d 48 (Mont. 1984) ...............................................................................57

*E.I. du Pont de Nemours & Co. v. FTC*,
    729 F.2d 128 (2d Cir. 1984)...............................................................................18

*Embassy Realty Invs., LLC v. City of Cleveland*,
    877 F. Supp. 2d 564 (N.D. Ohio 2012)...............................................................................1

*Emergency One, Inc. v. Waterous Co., Inc.*,
    23 F. Supp. 2d 959 (E.D. Wis. 1998)...............................................................................52

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012) ...................................................................... *passim*

*Est. of Pilgrim v. Gen. Motors LLC*,
    344 F.R.D. 381 (E.D. Mich. 2023) ...............................................................................59

*Fenner v. Gen. Motors, LLC*,
    --- F.4th ---, No. 23-1648, 2024 WL 3886692 (6th Cir. Aug. 21, 2024) ................................53

*Fin. Acquisition Partners LP v. Blackwell*,
    440 F.3d 278 (5th Cir. 2006) ...............................................................................32

*Flex Homes, Inc. v. Ritz–Craft Corp. of Mich.*,
    721 F. Supp. 2d 663 (N.D. Ohio 2010)...............................................................................1

*Fox v. Saginaw Cnty., Mich.*,
    67 F.4th 284 (6th Cir. 2023) ...............................................................................48

*Frame-Wilson v. Amazon.com, Inc.*,
    591 F. Supp. 3d 975 (W.D. Wash. 2022)...............................................................................50

*Freeman Indus., LLC v. Eastman Chem. Co.*,
    172 S.W.3d 512 (Tenn. 2005)............................................................................52

*Gibson v. Cendyn Grp., LLC*,
    No. 2:23-cv-00140, 2024 WL 2060260 (D. Nev. May 8, 2024) ..................................3, 29, 31

*Guy v. Mercantile Bank Mortg. Co.*,
    711 F. App'x 250 (6th Cir. 2017) ......................................................................61

*Hall v. United Air Lines, Inc.*,
    296 F. Supp. 2d 652 (E.D.N.C. 2003)..................................................................22

*Hess v. Chase Manhattan Bank, USA, N.A.*,
    220 S.W.3d 758 (Mo. 2007) ............................................................................57

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
    48 F.4th 656 (6th Cir. 2022) .....................................................................*passim*

*Hoover v. Langston Equip. Assocs., Inc.*,
    958 F.2d 742 (6th Cir. 1992) ..........................................................................60

*Icon Health & Fitness, Inc. v. ConsumerAffairs.com*,
    No. 1:16-cv-00168, 2018 WL 1183372 (D. Utah Mar. 6, 2018)...........................................57

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...............................................................................47, 53

*In re Aggrenox Antitrust Litig.*,
    94 F. Supp. 3d 224 (D. Conn. 2015)....................................................................50

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016)...........................................................................50

*In re Aluminum Warehousing Antitrust Litig.*,
    No. 13-md-2481, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ...........................................41

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
    No. 1:14–md–2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015)....................................52

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015)........................................................................18, 38

*In re Commodity Exch., Inc. Gold Futures & Options Trading Litig.*,
    328 F. Supp. 3d 217 (S.D.N.Y. 2018)...................................................................22

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
    No. 11 Md. 02213, 2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013).........................................32

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   362 F. Supp. 3d 510 (N.D. Ill. 2019) ........................................................................51

*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
   245 F. Supp. 3d 1343 (N.D. Ga. Mar. 28, 2017) .......................................26, 28, 45

*In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*,
   No. CIV. 12-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013) ..................................60

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   516 F. Supp. 2d 1072 (N.D. Cal. 2007) ....................................................................55

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
   28 F.4th 42 (9th Cir. 2022) .......................................................................................25

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007)..............................................................4, 41, 44, 45

*In re Fla. Cement & Concrete Antitrust Litig.*,
   746 F. Supp. 2d 1291 (S.D. Fla. 2010) ...............................................................41, 43

*In re German Auto. Mfrs. Antitrust Litig.*,
   497 F. Supp. 3d 745 (N.D. Cal. 2020) ................................................................41, 43

*In re German Auto. Mfrs. Antitrust Litig.*,
   612 F. Supp. 3d 967 (N.D. Cal. 2020) ......................................................................41

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...............................................................38, 55

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
   647 F. Supp. 2d 1250 (W.D. Wash. 2009) ................................................................45

*In re Humira (Adalimumab) Antitrust Litig.*,
   465 F. Supp. 3d 811 (N.D. Ill. 2020) .................................................................56, 59

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)..............................................................................34, 46

*In re Late Fee & Over-Limit Fee Litig.*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007) ......................................................................37

*In re Lidoderm Antitrust Litig.*,
   103 F. Supp. 3d 1155 (N.D. Cal. 2015) ....................................................................55

*In re Loestrin 24 FE Antitrust Litig.*,
   410 F. Supp. 3d 352 (D.R.I. 2019).............................................................................54

*In re Mexican Gov't Bonds Antitrust Litig.*,
   412 F. Supp. 3d 380 (S.D.N.Y. 2019) ................................................................33, 46

*In re Milk Prods. Antitrust Litig.*,
   84 F. Supp. 2d 1016 (D. Minn. 1997) ...............................................................15

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ................................................................18, 25, 37

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   845 F.3d 470 (1st Cir. 2017) ................................................................46

*In re Niaspan Antitrust Litig.*,
   42 F. Supp. 3d 735 (E.D. Pa. 2014) ................................................................54

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
   997 F. Supp. 2d 526 (N.D. Tex. 2014) ...............................................................40, 43

*In re Opana ER Antitrust Litig.*,
   162 F. Supp. 3d 704 (N.D. Ill. 2016) ................................................................15

*In re Packaged Ice Antitrust Litig.*,
   779 F. Supp. 2d 642 (E.D. Mich. 2011)...............................................................49

*In re Packaged Seafood Prod. Antitrust Litig.*,
   242 F. Supp. 3d 1033 (S.D. Cal. 2017)...............................................................60

*In re Photochromic Lens Antitrust Litig.*,
   No. 8:10-CV-1158-T-27EAJ, 2011 WL 13141933 (M.D. Fla. Oct. 26, 2011) ......................52

*In re Polyurethane Foam Antitrust Litig.*,
   314 F.R.D. 226 (N.D. Ohio 2014) ................................................................33

*In re Polyurethane Foam Antitrust Litig.*,
   799 F. Supp. 2d 777 (N.D. Ohio 2011)...............................................................55

*In re Pork Antitrust Litig.*,
   495 F. Supp. 3d 753 (D. Minn. 2020)................................................................51

*In re Pre-Filled Propane Tank Antitrust Litig.*,
   893 F.3d 1047 (8th Cir. 2018) ................................................................36

*In re Processed Egg Prods. Antitrust Litig.*,
   851 F. Supp. 2d 867 (E.D. Pa. 2012) ................................................................58

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
   No. 3:23-MD-03071, 2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023) .........................22, 31

*In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*,
No. 20-1076-CFC, 2022 WL 2438934 (D. Del. July 5, 2022) ...............................................58

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
150 F. Supp. 3d 593 (D.S.C. 2015) ...........................................................59

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015) ...........................................................29

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ...........................................................*passim*

*In re Treasury Sec. Auction Antitrust Litig.*,
No. 15 MD 2673, 2021 WL 1226670 (S.D.N.Y. Mar. 31, 2021)......................................33, 34

*In re Urethane Antitrust Litig.*,
663 F. Supp. 2d 1067 (D. Kan. 2009) ...........................................................53

*In re Wellbutrin XL Antitrust Litig.*,
260 F.R.D. 143 (E.D. Pa. 2009)...........................................................49, 54, 60

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
601 F. Supp. 3d 625 (C.D. Cal. 2022) ...........................................................58

*Indep. Cnty. v. Pfizer, Inc.*,
534 F. Supp. 2d 882 (E.D. Ark. 2008)...........................................................54

*Johnson v. Blendtec, Inc.*,
500 F. Supp. 3d 1271 (D. Utah 2020) ...........................................................59

*Jones v. Micron Tech. Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019) ...........................................................25, 28

*Jung v. Ass'n of Am. Med. Colls.*,
300 F. Supp. 2d 119 (D.D.C. 2004) ...........................................................5, 46

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ...........................................................31

*Kleen Prods. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) ...........................................................19, 29

*Lynch Display Corp. v. Nat'l Souvenir Ctr., Inc.*,
640 S.W.2d 837 (Tenn. Ct. App. 1982)...........................................................51

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...........................................................42

*Mayor & City Council of Balt. v. AbbVie Inc.*,
  42 F.4th 709 (7th Cir. 2022) ................................................................................................56

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013).........................................................................................16, 34

*Merck & Co. Inc. v. Lyon*,
  941 F. Supp. 1443 (M.D.N.C. 1996) ....................................................................................51

*Miami Prods. & Chem. Co. v. Olin Corp.*,
  546 F. Supp. 3d 223 (W.D.N.Y. 2021)................................................................................57

*Mitchael v. Intracorp, Inc.*,
  179 F.3d 847 (10th Cir. 1999) ............................................................................................46

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
  795 F.3d 1124 (9th Cir. 2015) ............................................................................................34

*Olstad v. Microsoft Corp.*,
  700 N.W.2d 139 (Wis. 2005)...............................................................................................52

*Patterson v. Novartis Pharms. Corp.*,
  451 F. App'x 495 (6th Cir. 2011) ........................................................................................32

*Persian Gulf v. BP W. Coast Prods. LLC*,
  632 F. Supp. 3d 1108 (S.D. Cal. 2022)................................................................................29

*Pomerantz v. Microsoft Corp.*,
  50 P.3d 929 (Colo. App. 2002) ...........................................................................................53

*Precious Creation, Inc. v. Mercantile Bank Mortg. Co., LLC*,
  731 F. App'x 498 (6th Cir. 2018) ........................................................................................61

*PREI, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993)...............................................................................................................38

*Prosterman v. Am. Airlines, Inc.*,
  747 F. App'x 458 (9th Cir. 2018) ........................................................................................29

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
  917 F.3d 1249 (11th Cir. 2019) ...........................................................................................19

*Robertson v. Univ. of Akron Sch. of Law*,
  No. 5:20-cv-1907, 2021 WL 3709915 (N.D. Ohio Aug. 20, 2021).......................................45

*Rosen v. Tenn. Comm'r of Fin. & Admin.*,
  288 F.3d 918 (6th Cir. 2002) ..............................................................................................48

*RSD Leasing, Inc. v. Navistar Int'l Corp.*,
    319 A.3d 734 (Vt. 2024) ................................................................................58

*Rsrv. Supply Corp. v. Owens-Corning Fiberglas Corp.*,
    971 F.2d 37 (7th Cir. 1992) .........................................................................18

*Salazar v. Paramount Glob.*,
    683 F. Supp. 3d 727 (M.D. Tenn. 2023) ....................................................36

*Schumacher v. Tyson Fresh Meats, Inc.*,
    No. CIV 02-1027, 2006 WL 47504 (D.S.D. Jan. 5, 2006) .......................33

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
    No. 15-cv-6549, 2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ..............57

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
    737 F. Supp. 2d 380 (E.D. Pa. 2010) ........................................................56

*Sherwood v. Microsoft Corp.*,
    No. M2000-01850-COA-R9CV, 2003 WL 21780975 (Tenn. Ct. App. July 31,
    2003) .....................................................................................................51, 52

*Solis v. Emery Fed. Credit Union*,
    459 F. Supp. 3d 981 (S.D. Ohio 2020) ......................................................62

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ...................................................................................48

*State ex rel. Fitch v. Yazaki N. Am., Inc.*,
    294 So. 3d 1178 (Miss. 2020) ...................................................................51

*State v. Daicel Chem. Indus., Ltd.*,
    106 P.3d 428 (Idaho 2005) .........................................................................55

*Szep v. Gen. Motors LLC*,
    491 F. Supp. 3d 280 (N.D. Ohio 2020) ................................................48, 49

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .......................................................................26

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) .....................................................................15

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................................................48

*United States ex rel. Bledsoe v. Cmty. Health Sys.*,
    342 F.3d 634 (6th Cir. 2003) .......................................................................5

*United States v. Citizens & S. Nat'l Bank*,
  422 U.S. 86 (1975)........................................................................22, 43

*United States v. Garcia*,
  855 F.3d 615 (4th Cir. 2017) .................................................................36

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 ...........................................................................30, 43

*Vacco v. Microsoft Corp.*,
  260 Conn. 59 (Conn. 2002)....................................................................54

*Valspar Corp. v. E.I. Du Pont de Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017)................................................................17, 19

*Valspar Corp. v. E.I. Du Pont De Nemours*,
  152 F. Supp. 3d 234 (D. Del. 2016)...........................................................28

*Van Sickle v. Boyes*,
  797 P.2d 1267 (Colo. 1990)...................................................................53

*Whittiker v. Deutsche Bank Nat'l Trust Co.*,
  605 F. Supp. 2d 914 (N.D. Ohio 2009)........................................................1

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ......................................................4, 18, 39, 44

*Withrow v. FCA US LLC*,
  No. 19-13214, 2021 WL 2529847 (E.D. Mich. June 21, 2021) ...........................49

*Yeary v. Goodwill Indus.-Knoxville*,
  107 F.3d 443 (6th Cir. 1997) .................................................................36

## STATUTES

Clayton Act § 16, 15 U.S.C. § 26 ............................................................46

Colo. Rev. Stat. Ann.
  § 6-1-105..................................................................................55
  § 6-1-115..................................................................................61
  § 6-4-115, *amended by* 2023 Colo. Ch. 427 (HB 1192)......................................53

Conn. Gen. Stat. Ann. § 42-110g(f)...........................................................61

D.C. Code
  § 28-3901(a)(2)(B)(i).......................................................................56
  § 28-3905(d)(1)............................................................................61

G.L. c. 93A................................................................................54

Idaho Code § 48-619 ............................................................................................. 61

Ill. Comp. Stat. § 10/7(2) ....................................................................................... 59

Kan. Stat. Ann. § 60-512 ....................................................................................... 61

Miss. Code § 15-1-49(1) ........................................................................................ 61

Mo. Ann. Stat. § 407.025 ...................................................................................... 57

Mont. Code Ann.
 § 27-2-211 ........................................................................................................ 61
 § 30-14-102(1) .................................................................................................. 57
 § 30-14-133(1) .................................................................................................. 59

N.M. Stat. Ann. § 57-12-2(D) ............................................................................... 55

New York Gen. Bus. Law § 349 ............................................................................ 54

R.I. Gen. Laws Ann.
 § 6-13.1-1(6) ..................................................................................................... 55
 § 6-13.1-5.2 ...................................................................................................... 57

S.C. Code Ann.
 § 39-5-140(a) .................................................................................................... 59
 § 39-5-150 ......................................................................................................... 61

Tenn. Code Ann. § 28-3-105 ................................................................................. 61

Utah Code Ann.
 § 13-11-3(2)(a)(i) ............................................................................................. 57
 § 13-11-4 ........................................................................................................... 55
 § 13-11-5 ........................................................................................................... 55
 § 13-11-19(2) .................................................................................................... 59

Va. Code Ann. § 59.1-204.1 .................................................................................. 61

Vt. Stat. Ann. Title 9, § 2451a ............................................................................. 57

# RULES

Fed. R. Civ. P. 9(b) ............................................................................................... 58

N.Y. C.P.L.R. 214 .................................................................................................. 61

# REGULATIONS

17 C.F.R. § 229.303(b)(2)(ii) (2021) ..................................................................... 27

## OTHER AUTHORITIES

Code Monétaire et Financier [Monetary and Financial Code] Art. L. 451-1-2 ............................27

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* The Reference
    Manual on Scientific Evidence ("*Reference Manual*") 303 (F.3d 2011)....................................3

Dep't of Labor Statistics, *How Does the Producer Price Index Differ from the
    Consumer Price Index? Comparing the Personal Consumption PPI with the
    CPI* (Mar. 10, 2023), https://www.bls.gov/ppi/methodology-
    reports/comparing-the-producer-price-index-for-personal-consumption-with-
    the-us-all-items-cpi-for-all-urban-consumers.htm ....................................................................42

Frankfurter Wertpapierbörse [FWB] [Frankfurt Stock Exchange Rules], last
    updated Jul. 11, 2024, §§ 53, 55 (Ger.)....................................................................................28

Handelsgesetzbuch [HGB] [Commercial Code], Oct. 5, 1897, last updated Jun.
    19, 2020, § 289 (Ger.)..............................................................................................................27

In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of
    Operation, Release No. 33-8350 (Dec. 19, 2003)......................................................................27

Regulation (EU) No 596/2014 of the European Parliament and of the Council of
    16 April 2014 on Market Abuse Regulation (MAR), art. 17.1,  O.J. (L 173) ..........................27

U.S. Bureau of Labor Statistics ("USBLS"), *Beyond the Numbers: Exploring
    price increases in 2021 and previous periods of inflation* (Oct. 2022),
    https://www.bls.gov/opub/btn/volume-11/exploring-price-increases-in-2021-
    and-previous-periods-of-inflation.htm .....................................................................................36

USBLS, *Beyond the Numbers: How currency appreciation can impact prices: the
    rise of the U.S. dollar* (Mar. 2022), https://www.bls.gov/opub/btn/volume-
    12/how-currency-appreciation-can-impact-prices-the-rise-of-the-us-dollar.htm ...................36

Wertpapierhandelsgesetz [WpHG] [Securities Trading Act], Sept. 9, 1998, last
    updated May 16, 2019, § 114 (Ger.).........................................................................................27

Wertpapierhandelsgesetz [WpHG] [Securities Trading Act], Sept. 9, 1998, last
    updated May 16, 2019, § 114 (Ger.).........................................................................................27

## I.    SUMMARY OF ARGUMENT

Plaintiffs filed these cases in a knee-jerk reaction to an announcement by the European Commission that it had opened a preliminary investigation into potential infringements of European competition law by "companies active in the tyres industry" in Europe.[1]  The problem for Plaintiffs is that the existence of an investigation—especially one outside the U.S. under a different antitrust regime, focused on alleged conduct abroad—is never sufficient to state a claim, nor is it a basis to infer any wrongdoing.  The European Commission press release that instigated these class actions says the same:  "Unannounced inspections are a preliminary investigatory step into suspected anticompetitive practices.  The fact that the Commission carries out such inspections does not mean that the companies are guilty of anti-competitive behaviour, nor does it prejudge the outcome of the investigation itself."[2]

Six months and a collective 352 pages later, Plaintiffs' amended and consolidated Complaints still plead no facts to substantiate their far-fetched claims of conspiracy.  There is not a single well-pleaded allegation to substantiate what Defendants supposedly *agreed* to do.  This pleading failure dooms Plaintiffs' claims because there is no conspiracy when there is no agreement.

---

[1] Ex. 1 (cited at DPP ¶¶ 2 n.1, 161 n.210; EPP ¶¶ 2 n.1, 186-187, ¶ 187 n.8; ADP ¶¶ 2 n.1, 95-96, ¶ 96 n.119) ("EC Press Release").  The Court can, and should, consider materials cited in the Complaints when deciding this Motion to Dismiss.  *See Embassy Realty Invs., LLC v. City of Cleveland*, 877 F. Supp. 2d 564, 570 (N.D. Ohio 2012) (Lioi, J.) (finding that "a court may consider documents referred to in the pleadings that are integral to the claims"); *Flex Homes, Inc. v. Ritz–Craft Corp. of Mich.*, 721 F. Supp. 2d 663, 669 (N.D. Ohio 2010) ("In ruling on a motion to dismiss, a court may consider: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion to dismiss that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice." (citing *Whittiker v. Deutsche Bank Nat'l Trust Co.*, 605 F. Supp. 2d 914, 924-25 (N.D. Ohio 2009)).

[2] *Id.*

What Plaintiffs lack in facts, they try to make up for with volume.  But that volume is, at best, insufficient as a matter of law and, at worst, an incomplete and misleading compilation of what are otherwise benign answers to questions asked by stock analysts during routine earnings calls.  Plaintiffs stretch so far that they misquote and connect answers separated by over a dozen pages of earnings call transcripts in their accusations that Defendants are "signaling" each other.  Regardless, even taken as true, Plaintiffs' allegations amount, at most, to consciously parallel conduct—which both the Supreme Court and Sixth Circuit recognized, long ago and repeatedly, is never enough to state a Section 1 claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (holding that "parallel conduct does not suggest conspiracy"); *In re Travel Agent Comm'n Antitrust Litig.* ("*Travel Agent*"), 583 F.3d 896, 902-03, 909-10 (6th Cir. 2009) (same); *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012) ("[T]he bare fact that defendants engaged in parallel conduct is not sufficient to establish a Sherman Act violation.").

The Complaints, and the sources they cite and incorporate by reference, also supply the "obvious alternative explanation" that *Twombly* instructs courts to consider.  550 U.S. at 567. Plaintiffs acknowledge, as they must, that during their putative Class Periods, the U.S. economy experienced unprecedented inflation from a series of events including the COVID-19 pandemic, the unexpected war in Ukraine, and the resulting supply-chain shocks that impacted the tire industry.  Plaintiffs claim Defendants' references to these events are "pretextual justifications" to "conceal illegal conduct," *e.g.*, DPP ¶¶ 113-14, but those mere labels and speculation carry no weight, particularly in the face of the sources Plaintiffs chose to incorporate.

Ignoring these market realities, Plaintiffs slap conclusory labels on public statements regarding price increases to spin an unfounded tale of price-fixing and "plus factors."  But such allegations raise no plausible inference of conspiracy:

1.      Plaintiffs do not sufficiently allege parallel conduct.  But even if they did, parallel price moves and public price announcements are consistent with—and typical of—independent economic action in a transparent and complex distribution chain like the tire industry.  Plaintiffs allege the tire industry is an oligopoly (*i.e.*, a market with a small number of major competitors), which means there is nothing unusual or unexpected about the follow-the-leader pricing Plaintiffs also allege.  Such pricing is common and expected in oligopolies.  It is also lawful.  In other words, parallel conduct is not evidence of conspiracy; it is a reflection of rational and competitive behavior in a concentrated market.  *See Travel Agent*, 583 F.3d at 909-10.  Allegations that certain Defendants use revenue management software do not change that outcome.  *See Gibson v. Cendyn Grp., LLC*, No. 2:23-cv-00140, 2024 WL 2060260, at *6 (D. Nev. May 8, 2024) ("[M]ere use of algorithmic pricing based on artificial intelligence by a commercial entity . . . does not plausibly allege an illegal agreement").  And DPPs' references to a vague and "preliminary" regression analysis purporting to show certain parallel conduct do not change that outcome either.  *See* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* The Reference Manual on Scientific Evidence ("*Reference Manual*") 303, 310 (Fed. Jud. Ctr. 3d ed. 2011) ("causality can never be inferred [by data analysis alone]").

2.      Plaintiffs' allegations of "motive" and "opportunities to collude" amount to nothing more than the inconsequential fact that Defendants participate in the sorts of trade associations and conferences that are common to most industries.  *See Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 668 (6th Cir. 2022) (dismissing allegation of "strong incentives to collude" as "conjecture"); *Travel Agent*, 583 F.3d at 911 (finding a "mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement").

3.      Plaintiffs' allegations ascribing different market characteristics to the tire industry do not suffice to create a conspiracy out of thin air.  Allegations that the tire industry is a concentrated oligopoly with high barriers to entry, inelastic demand, and high interchangeability are so generic that they could apply to numerous industries.  These allegations are all just different ways of stating that the tire market is prone to *lawful* parallel behavior.  *See Erie Cnty.*, 702 F.3d at 869-70 (finding that allegations of "stable market shares," "high incumbency," and "high prices and profits" were "simply descriptions of the market, not allegations of anything that the defendants did.  Standing alone, they indicate only that the market is a duopoly, and do not give rise to an inference of an unlawful agreement . . . .").

4.      European competition law differs from U.S. antitrust law, and the existence of an EC investigation is insufficient, as a matter of law, to infer an unlawful agreement under U.S. federal and state law.  *See In re Elevator Antitrust Litig.* ("*Elevators*"), 502 F.3d 47, 52 (2d Cir. 2007) (finding "[a]llegations of anticompetitive wrongdoing in Europe" insufficient to nudge claims "across the line from conceivable to plausible" (quoting *Twombly*, 550 U.S. at 570)).  This is especially true here, as Plaintiffs have alleged no finding of wrongdoing—just the EC's self-described "preliminary" investigation that does not "prejudge the outcome of the investigation."

5.      References to decades-old antitrust violations—involving mostly non-Defendants and unrelated products outside the United States—do not move the needle either.  *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317-18 (11th Cir. 2003) (rejecting "history of antitrust violations" as a plus factor because it is not "indicative of a present antitrust violation").

6.      Plaintiffs engage in improper "group pleading," attributing many allegations to "Defendants" generally, without specifying who did what, or when.  Plaintiffs also improperly obfuscate the distinctions between Defendants within specific company groups (*e.g.*, failing to

distinguish Defendants Pirelli & C. S.p.A. and Pirelli Tire LLC, and referring to both as "Pirelli"). This style of pleading renders the Complaints insufficient to state a conspiracy claim. *See United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 643 (6th Cir. 2003) (finding that an "amended complaint should provide fair notice to [d]efendants and enable them to prepare an informed pleading responsive to the specific allegations [against them]," and "may not rely on blanket references to acts or omissions by all of the 'defendants'"); *see also Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 163 (D.D.C. 2004) (plaintiffs "cannot escape their burden of alleging that each defendant participated in or agreed to join the conspiracy by using the term 'defendants' to apply to numerous parties without any specific allegations as to" each defendant).

Whether viewed in whole, or in part, Plaintiffs' allegations add up to nothing more than empty legal conclusions and innuendo. There are no well-pleaded facts of an unlawful agreement, and none that plausibly suggest an unlawful agreement. Plaintiffs' federal Section 1 claims, and corresponding state law claims, must be dismissed for failure to state a claim.

Finally, Plaintiffs' claims against individual Defendants, request for injunctive relief, and state law claims fail for a number of additional and independent grounds, as discussed below.

Defendants respectfully request Plaintiffs' three Complaints be dismissed with prejudice.

## II.   BRIEF STATEMENT OF ISSUES TO BE DECIDED

1.   Whether Plaintiffs state a claim for relief under Section 1 of the Sherman Act, or state antitrust or consumer protection laws, when they plead no more than a patchwork of conduct by Defendants that is not contrary to their independent economic self-interest;

2.   Whether Plaintiffs state a claim for relief against each individual Defendant when they lack sufficient allegations about each Defendant and, instead, use only group pleading;

5

3.      Whether Plaintiffs state a claim for injunctive relief when they allege no ongoing or future injury; and

4.      Whether EPPs' and ADPs' state law claims should be dismissed for the independent reasons that:

a.      EPPs and ADPs lack standing to bring claims under the laws of states where no named plaintiff resides or was injured;

b.      ADPs make no attempt to identify or plead the elements of their 29 state antitrust and 16 state consumer protection claims;

c.      EPPs and ADPs bring state law claims in states that do not authorize indirect purchaser claims for alleged price-fixing conduct;

d.      EPPs and ADPs bring class action claims under Illinois, Montana, South Carolina, and Utah law, which prohibit such class actions;

e.      EPPs and ADPs allege unjust enrichment claims without specifying the particular state law(s) under which they intend to proceed; and

f.      EPPs' and ADPs' state law claims are partly time-barred.

## III.    BACKGROUND

### A.    Plaintiffs

Plaintiffs are direct and indirect purchasers of "'replacement tires' for passenger cars, vans, trucks, and buses sold in the United States."[3]  DPP ¶ 1; EPP ¶ 1; ADP ¶ 1.  They allege claims on behalf of individuals (all Plaintiffs) and entities (ADPs only) who made purchases during different

---

[3]  Defendants accept the facts as alleged in Plaintiffs' Complaints for purposes of this Motion to Dismiss only and do not admit the truth of any allegations for any other purposes.

"Class Periods," which begin on February 8, 2020 for ADPs and DPPs versus one month earlier on January 1, 2020 for EPPs.[4]  DPP ¶ 176; EPP ¶ 1; ADP ¶ 208.

**DPPs.**  The eight DPP named plaintiffs sue on behalf of all individuals in the U.S. who purchased replacement tires "directly from one or more Defendants" from "February 8, 2020 until the present."  DPP ¶ 176.  However, they allege purchasing tires directly from only unidentified Bridgestone or Goodyear entities.  *Id.* ¶¶ 13-20.  This allegation reflects the fact that most of the Defendants do *not* sell directly to individuals in the U.S. and, instead, each sell their many different types of replacement tires through different channels and complex networks of distributors.

**EPPs.**  The EPP named plaintiffs are 78 individuals who sue on behalf of individuals or entities who indirectly purchased replacement tires "manufactured or sold" by Defendants "for their own use and not for resale" since January 1, 2020.  EPP ¶¶ 1, 12-89, 311.  These individuals each allege where they reside and bought replacement tires, but they do not allege the type or brand of tires they bought or from whom.  *Id.*

**ADPs.**  The ADP named plaintiffs are two automobile dealerships in Arkansas and two auto repair centers in Wisconsin and New York who sue on behalf of individuals or entities who indirectly purchased replacement tires manufactured by any Defendant "for resale" since February 8, 2020.  ADP ¶ 208.  ADPs also do not allege the type or brand of tires they bought or from whom.

---

[4]  EPPs allege a class period beginning in January 2020 even though they allege "Defendants Goodyear, Pirelli, Nokian, and Bridgestone first began publicly communicating their intention to collude on prices of replacement tires in the *middle* of 2020."  EPP ¶ 142 (emphasis added). Defendants Michelin and Continental are not included in that allegation, and EPPs never allege when those Defendants supposedly began colluding.  DPPs allege a class period beginning on "February 8, 2020 until the present" even though they allege Defendants' "coordinated and parallel price increases" began in "*late* 2020 through early 2023."  DPP ¶¶ 4 (emphasis added), 176.

**B.** **Defendants and the Wide Variety of "Replacement Tires"**

Defendants are 12 different entities located in six different countries: Finland, France, Germany, Italy, Japan, and the United States.  Other than a handful of allegations about each Defendant's address and corporate status, Plaintiffs make no meaningful allegations about any individual Defendant.  Instead, they mix these different corporations into six groups based on brand names:  "Bridgestone," "Continental," "Goodyear," "Michelin," "Nokian," and "Pirelli."  Plaintiffs distinguish "replacement tires" from "Original Equipment" or "OE" tires, which are sold on new passenger vehicles and selected by the vehicle manufacturers.  DPP ¶ 58; EPP ¶ 132; ADP ¶ 39.  Replacement tires travel through a complex distribution chain, often involving multiple levels of wholesalers and distributors.  *See* EPP ¶¶ 289, 295, 297.  When OE tires wear out, buyers choose replacements based on their individual needs, preferences, and budgets.  *See* DPP ¶¶ 59, 159; EPP ¶¶ 132, 250; ADP ¶¶ 39-40, 174.  Buyers can choose the same make and model of their OE tires or opt for "functionally interchangeable" options among "different brands or models."  *See* DPP ¶¶ 158-159; EPP ¶¶ 249-250; ADP ¶¶ 173-174.  Replacement tires are sold in myriad sizes, types, widths, aspect ratios, construction types, diameters, load indexes, and speed ratings.  DPP ¶ 61; EPP ¶ 121.  As noted in several of the original complaints, buyers can also choose among thousands of different types of tires made by non-Defendant tire manufacturers that sell replacement tires in the U.S. (including, but not limited to Giti, Hankook, Kumho, Sumitomo Rubber, Toyo, and Yokohama).[5]

---

[5]  *See Curran et al. v. The Goodyear Tire & Rubber Co. et al.*, 1:24-cv-01419 (S.D.N.Y. Feb. 23, 2024); *Shumate v. The Goodyear Tire & Rubber Co. et al.*, No. 5:24-cv-00449 (N.D. Ohio Mar. 8, 2024); *Price v. The Goodyear Tire & Rubber Tire Co. et al.*, No. 1:24-cv-01981 (S.D.N.Y. Mar. 15, 2024).  ECF Nos. 1, 20.

**C.**     **The Alleged Conduct**

What follows is a summary of what Plaintiffs allege and also what they do **not** allege:

**No Agreement.**  Plaintiffs' three Complaints still do not allege who purportedly conspired, when or where Defendants reached an unlawful agreement, or what that agreement supposedly entailed.  Was it an agreement to raise the price of all replacement tires, or just some of them?  Was it an agreement to restrict output across the industry or only as to particular sectors and distribution channels?  Was it an agreement to fix list prices across the board, or was it an agreement to fix prices to specific customers?  When did the agreement start, and when did each Defendant join the agreement?  Who entered the alleged agreement on behalf of each Defendant?  The Complaints do not answer any of these questions.

**European Investigation.**  Plaintiffs use group pleading to allege there is an ongoing EC investigation in Europe of all six Defendant families (without identifying which individual Defendants are involved) and a consultancy firm, which EPPs claim "on information and belief" is named "Smithers" and allegedly serves all Defendants.  DPP ¶¶ 2, 102, 161-163; EPP ¶¶ 186-202; ADP ¶¶ 95-100.  There are no allegations that this EC investigation relates to products sold in the U.S.  Rather, the EC press release cited in all three Complaints states that the EC's investigation concerns products "sold in the European Economic Area."[6]  The EC press release also confirms that this investigation is "preliminary."  *Id.*

**Public Price Announcements.**     DPPs include a table purportedly summarizing "Defendants' announced price increases on passenger and light truck replacement tires between

_____

[6]  EC Press Release, *supra* n.1.

2020 and 2023."[7]  DPP ¶ 76.  EPPs and ADPs include nearly identical tables described as "Defendants' price increases," but omit that the tables summarize only announcements.  EPP ¶ 139; ADP ¶ 66.  Plaintiffs do **not** allege that all Defendants made price announcements for every price change, that Defendants adjusted prices by the same amounts, the same percentages, at the same time, or that Defendants all raised U.S. prices for the same or comparable products or classes of products.  *Id.*  Rather, they merely allege *some* Defendants *sometimes* made public price announcements on *some* unidentified products.  And the public price announcements Plaintiffs cite vary materially in terms of their scope and potential impact, if any.  In fact, Plaintiffs do not allege Defendant Nokian Tyres made any public price announcements prior to implementing them; Nokian Tyres is entirely missing from Plaintiffs' tables.  *Id.*  And while Defendant Continental allegedly announced price increases, according to Plaintiffs, it did so without disclosing the amounts or percentages of those increases and caveating that "increases will vary across specific products" and will only apply to "select tires."[8]  Plaintiffs allege the other four company groups (Bridgestone, Goodyear, Michelin, and Pirelli) announced price increases "up to" specific percentages—*i.e.*, they announced the *maximum* possible price adjustment, not the *actual* price adjustment, if any, that each Defendant made to each product it sells.  DPP ¶¶ 76-101; EPP ¶¶ 139-177; ADP ¶¶ 52-66.  But even these alleged announcements, cited in the Complaints, noted substantial variation—for Michelin: "[p]rice changes may vary across specific products,"[9] or for

---

[7]  Though Plaintiffs attribute price increases to company groups (*e.g.*, "Bridgestone" or "Pirelli") the press releases and other sources Plaintiffs cite for these price announcements clearly state that the price increases are for U.S. (or in some instances, North American) tire prices, not tire prices elsewhere (*e.g.*, Japan or Europe).

[8]  Ex. 2 (cited at DPP ¶ 89 n.117; ADP ¶ 60 n.77); Ex. 3 (cited at DPP ¶ 86 n.108; ADP ¶ 59 n.69); Ex. 4 (cited at ADP ¶ 57 n.63).  *See also* EPP ¶ 152.

[9]  Ex. 5 (cited at DPP ¶ 95 n.136; ADP ¶ 63 n.91).

Pirelli:  "depending on the tire line and size."[10]  Put simply, the cited public price announcements did not say that the price adjustments would apply to *all* replacement tires in that Defendant's product line.

**Earnings Calls.**  Plaintiffs allege certain[11] Defendants made statements in "earnings calls" to send each other price signals.  DPP ¶¶ 75-101; EPP ¶¶ 141-142; ADP ¶¶ 44-51.  These so-called "signals" are archetypal investor communications made by publicly-traded companies in response to questions from stock analysts—observations of market trends and general statements about Defendants' own independent behavior.  *See, e.g.*, DPP ¶ 92 (stating that "constructive pricing environment" was "probably the best in recent memory"); *id.* ¶¶ 79-88, 92, 96, 99-100; EPP ¶¶ 146-164; ADP ¶¶ 45-50, 60.  Plaintiffs take what are routine earnings calls and selectively quote only portions of them (sometimes just cherry-picking a short phrase or partial sentence).

**Revenue Management Software.**  Plaintiffs speculate that "[c]onsultancy firms with revenue management software *may have* facilitated Defendants' conspiracy by helping them monitor and police each other's prices."  DPP ¶ 103 (emphasis added).  Plaintiffs also allege third-party vendors Lizeo and Torqata sell "revenue management software," which supposedly "enables [Defendants] to use large data sets that include competitor pricing data to maximize revenues."  ADP ¶ 147; *see also* DPP ¶ 112; EPP ¶ 260.  Plaintiffs do not allege which Defendants used the Torqata software, and they allege only a subset of Defendants used Lizeo.  DPP ¶ 106; EPP ¶ 258; ADP ¶ 75.  Plaintiffs also do not allege when any Defendant allegedly started using Torqata and/or

---

[10]  Ex. 6 (cited at DPP ¶ 100 n.149).

[11]  Plaintiffs do not allege Bridgestone Americas, Inc., Continental Tire the Americas, LLC, Michelin North America, Inc., Nokian Tyres Inc., Nokian Tyres U.S. Operations LLC, or Pirelli Tire LLC made any statement in earnings calls.

Lizeo, how they use Torqata and/or Lizeo, or how the use of commercially available software somehow suggests that Defendants entered into a price-fixing conspiracy.

**DPPs' "Preliminary" Regression Analysis.**  DPPs alone allege a "preliminary regression analysis, based on publicly available data."  DPP ¶¶ 123-125.  A regression is an "econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members."  EPP ¶ 303.  DPPs' regression cannot be tested or proven reliable because DPPs do not identify who prepared the analysis, the sources of data examined, or any specifics of the methods used.

**Public Trade Associations and Industry Meetings.**  Plaintiffs point to Defendants' general participation in industry events and trade associations as "forums for conspirators to exchange sensitive information."  DPP ¶ 131; EPP ¶ 205; ADP ¶ 107.  However, Plaintiffs do not allege any Defendant entered into any *agreement* (or even exchanged any competitively sensitive information) with any other Defendant before, during, or after any of those events.  DPP ¶¶ 131-48; EPP ¶¶ 205-239; ADP ¶¶ 107-146.  Instead, Plaintiffs hypothesize that Defendants "could have" conspired during these events, even while identifying the legitimate business purposes trade associations serve, such as providing a platform for constitutionally-protected lobbying and legislative efforts, discussions on innovation in material and chemical technologies, and collaboration on industry standards of the sort needed to ensure that consumers have access to functionally interchangeable tires for their cars.  *See* DPP ¶ 137; EPP ¶¶ 218, 222-223; ADP ¶¶ 124-126.

**Market Characteristics.**  Plaintiffs allege replacement tires are a "concentrated" and "oligopolistic" market that is "susceptible to collusion," characterized by high barriers to entry, inelastic demand, and a high degree of interchangeability.  DPP ¶¶ 126, 149-157; EPP ¶¶ 183, 240-

247; ADP ¶¶ 42, 167-172. What Plaintiffs allege are the typical traits of any oligopoly, DPP ¶ 69, where competitors are expected to engage in follow-the-leader pricing changes.

Plaintiffs do not plead, or even acknowledge, the presence and market shares of other existing tire companies, including but not limited to the six competitor company groups previously named as Defendants in this MDL: Giti, Hankook, Kumho, Sumitomo Rubber, Toyo, and Yokohama. Assuming, as pled, that replacement tires are interchangeable across different manufacturers, the presence of these and other competitors in the market undermines Plaintiffs' allegations of barriers to entry and market concentration, as those non-defendant competitors could readily undercut any alleged coordinated price increases and thereby capture market share to the detriment of Defendants.

**Prior Antitrust Cases.** Plaintiffs label three of the six Defendant company groups as "recidivist" antitrust offenders, even though many of the alleged violations are decades old and involved different corporate entities (*e.g.*, Bridgestone South Africa (Pty) Ltd. and Continental Teves AG & Co oHG), different products (*e.g.*, anti-vibration rubber parts and marine hoses), different geographic markets (*e.g.*, Brazil and South Africa), and/or entirely different legal theories (*e.g.*, single-firm monopolization). *See* DPP ¶¶ 164-169; EPP ¶¶ 261-284; ADP ¶¶ 176-199.

## IV. LEGAL STANDARD FOR PLEADING ANTITRUST CONSPIRACY CLAIMS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* Per the Sixth Circuit: "We need not accept as true legal conclusions or unwarranted

factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Travel Agent*, 583 F.3d at 903 (alteration and citations omitted).

The seminal case on pleading conspiracy claims is the Supreme Court's 2007 *Twombly* decision.  550 U.S. at 554-55 ("This case presents the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act.").  In *Twombly*, a putative class of local telephone and Internet subscribers alleged that four "Baby Bells" (also known as "Incumbent Local Exchange Carriers" or "ILECs") formed a conspiracy to block competitors ("Competitive Local Exchange Carriers" or "CLECs") from entering their respective service areas and to refrain from competing with each other.  *Id.* at 551-52.  The plaintiffs based their claims against the ILECs on three categories of allegations:  (1) "an absence of meaningful competition"; (2)  a "parallel course of conduct to prevent competition from CLECs"; and (3) "other facts and market circumstances."  *Id.* at 564-65.  The Supreme Court found these allegations of parallel conduct and market characteristics were insufficient to support a Section 1 claim.  Specifically, because parallel unilateral conduct is not illegal, pleading a Section 1 conspiracy claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  *Id.* at 556.

The *Twombly* Court continued:  "It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, *not merely parallel conduct that could just as well be independent action*."  *Id.* at 556-57 (emphasis added).  When evaluating whether plaintiffs have pleaded sufficient facts "plausibly suggesting (not merely consistent with) agreement," a court should consider "common

14

economic experience" and "obvious alternative explanation[s]." *Id.* at 557, 565, 567.  *Twombly* also encouraged trial courts to be mindful of "the costs of modern federal antitrust litigation" when ruling on motions to dismiss.  *Id.* at 558.

An antitrust plaintiff must also plead facts demonstrating an entitlement to relief as to *each* named defendant.  To survive a motion to dismiss, allegations must be specific enough to establish the relevant "who, what, where, when, how or why."  *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008); *see also In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997) (dismissal required where defendant was simply "lump[ed]" together with other defendants without any well-pleaded allegations), *aff'd*, 195 F.3d 430 (8th Cir. 1999).

## V.  PLAINTIFFS FAIL TO PLEAD AN UNLAWFUL AGREEMENT AND, THUS, FAIL TO STATE A CONSPIRACY CLAIM UNDER FEDERAL OR STATE LAW

Plaintiffs fail to plead an unlawful agreement—the "crucial" element of a Section 1 conspiracy claim.  *Twombly*, 550 U.S. at 553 ("[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from *an agreement*, tacit or express." (emphasis added) (citation omitted)).  This also dooms EPPs' and ADPs' state law claims.  *See, e.g.*, *Hobart-Mayfield*, 48 F.4th at 663 (holding that state law antitrust claims "prevail or fail in tandem with [] Sherman Act claims"); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016) (dismissing state-law consumer protection claims where plaintiffs failed to state antitrust claims and "have merely alleged that those claims are also actionable under state consumer protection laws").

### A.  Plaintiffs Have Not Pleaded Direct Evidence of an Unlawful Agreement

Plaintiffs have not directly alleged an unlawful agreement between Defendants.  "Direct" allegations of agreement would consist, for example, of "smoking gun" allegations of "a recorded

phone call in which two competitors agreed to fix prices at a certain level." *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Plaintiffs' stray "references to an agreement" are not sufficient.  *Twombly*, 550 U.S. at 565 n.10.  "[T]he pleadings mentioned no specific time, place, or person involved in the alleged conspiracies."  *Id.*; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (holding plaintiffs failed to plead direct evidence of an agreement because they did not "specify a time or place that any actual agreement to fix credit terms occurred, nor [did] they indicate that any particular individuals or [defendants] made such an agreement").

### B.  Plaintiffs Have Pleaded No Facts or Circumstantial Evidence from Which the Court May Infer an Unlawful Agreement

In the absence of any direct factual allegations of unlawful agreement, Plaintiffs bear the burden of pleading facts that raise a plausible *inference* of conspiracy.  *Twombly*, 550 U.S. at 556. They have not done so.  The Sixth Circuit has identified four "plus factors" for evaluating circumstantial evidence of concerted action:  "(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to conspire."  *Travel Agent*, 583 F.3d at 907.  Plaintiffs' alleged plus factors are conclusory and come up short.

### 1.  Plaintiffs' Allegations About Defendants' Pricing Conduct Do Not Suggest an Unlawful Agreement

Plaintiffs decry Defendants' alleged "coordinated and parallel increases" in prices, press releases announcing U.S. price changes, earnings call "signals," and use of third-party software. DPPs also claim "economic evidence" in the form of a "preliminary" regression, which purports

to show "Defendants' price-fixing . . . created higher prices than Plaintiffs and the Class would have paid absent the conspiracy." DPP ¶ 123.  But, stripped of these conclusory labels, the pricing conduct Plaintiffs allege is not "contrary to" each Defendant's independent economic self-interest and is, therefore, lawful business conduct that raises no plausible inference of an antecedent agreement.  *See Travel Agent*, 583 F.3d at 907.

### a.    Both the Supreme Court and the Sixth Circuit Recognize that Parallel Pricing Is Commonplace and Lawful in an Oligopoly

The Supreme Court and Sixth Circuit have repeatedly held that even consciously parallel price increases do not suffice to state a conspiracy claim.  *See Twombly*, 550 U.S. at 556-57; *Travel Agent*, 583 F.3d at 903; *Erie Cnty.*, 702 F.3d at 868.  Plaintiffs allege the U.S. replacement tires market is "oligopolistic" and "highly concentrated."[12]  DPP ¶¶ 6, 69; EPP ¶ 183; ADP ¶ 42 ("Defendants Bridgestone, Goodyear, and Michelin made up almost 64 percent of the entire replacement tire market").  As the Sixth Circuit explained in *Travel Agent*, it is natural and expected in a concentrated market to see companies unilaterally adjust prices in reaction to each other's price moves.  583 F.3d at 908-10.  Quoting the "respected antitrust authority" by Professors Areeda and Hovenkamp, the Sixth Circuit noted:  "When one oligopolist raises its price, each of its rivals must decide whether to follow. . . .  Accordingly, each rival asks itself whether it is better off at the lower price when it is charged by all or at the higher price when charged by all.  If the latter, as will often be the case, the leader's price increase is likely to be followed." *Id.* at 910.  The court continued:  "[a] firm in a concentrated industry typically has reason to decide

---

[12]    An oligopoly is a market with few participants, where firms "will naturally follow a competitor's price increase in the hopes that each firm's profits will increase." *Valspar Corp. v. E.I. Du Pont de Nemours & Co.*, 873 F.3d 185, 190 (3d Cir. 2017); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).

(individually) to copy an industry leader. . . .  One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry."  *Id.* (quoting *Rsrv. Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 53 (7th Cir. 1992)).[13]

This principle was the foundation of *Twombly*, which reasons that parallel conduct by competitors is "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  550 U.S. at 554.  "A statement of parallel conduct, even conduct consciously undertaken" is not enough to plead a conspiracy and defeat a motion to dismiss.  *Id.* at 557.  To support a conspiracy claim, allegations of parallel conduct must be "placed in a context that raises a suggestion of a preceding agreement," *id.* at 557, and Plaintiffs must allege "additional facts that 'ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior,'" *id.* at 552 (citation omitted); *see Brooke Grp.*, 509 U.S. at 227 (holding that "conscious parallelism" is a common reaction of "firms in a concentrated market . . . recognizing their shared economic interests and their interdependence with respect to price and output decisions" and is "not in itself unlawful").  "Without more, parallel conduct does

---

[13]  In addition to the Sixth Circuit, numerous other Courts of Appeal have rejected conscious parallelism as suggestive of an antecedent agreement.  *See In re Musical Instruments & Equip. Antitrust Litig.* ("*Musical Instruments*"), 798 F.3d 1186, 1193 (9th Cir. 2015) ("In an interdependent market, companies base their actions in part on the anticipated reactions of their competitors.  And because of this mutual awareness, two firms may arrive at identical decisions independently, as they are cognizant of—and reacting to—similar market pressures."); *Williamson Oil*, 346 F.3d at 1299 (finding it inevitable that firms "recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions"); *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 139 (2d Cir. 1984) (finding that the "mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws"); *In re Chocolate Confectionary Antitrust Litig.* ("*Chocolates*"), 801 F.3d 383, 398 (3d Cir. 2015) ("evidence of conscious parallelism cannot alone create a reasonable inference of conspiracy").

not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57.

Indeed, competitive prices in an oligopolistic market *should* move in parallel. Firms are free to independently follow or account for competitors' announced strategies, including pricing and output decisions—and such behavior is common and lawful. *See Valspar*, 873 F.3d at 192 (explaining that this kind of behavior does not violate antitrust laws, because "[h]ow does one order a firm to set its prices *without regard* to the likely reactions of its competitors?"); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 817, 819 (N.D. Ill. 2017) (finding defendants' 25 price increases over a period of 6.5 years to be "[t]he kind of interdependent conduct . . . variously known as conscious parallelism, tacit collusion, follow-the-leader strategy, or interdependent parallelism. However it is referred to, the crucial thing is that such conduct is lawful"). Plaintiffs do not, and cannot, explain why typical follow-the-leader conduct might suggest the existence of a conspiracy here. *See, e.g.*, *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1267 (11th Cir. 2019) (en banc) (a "complaint merely alleging several common and obvious industry practices should not proceed directly past a motion to dismiss and into the expensive and settlement-inducing quagmire of antitrust discovery"); *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) ("A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader. After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-than-leader's price might simply lead competitors to match the lower price, reducing profits for all. One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.").

Plaintiffs ask the Court to read a conspiracy into ordinary business behavior readily observed in any concentrated industry: follow-the-leader pricing strategies implemented by

competitors in a free, competitive market.  Defendants' alleged parallel conduct is "more likely explained by lawful, unchoreographed free-market behavior."  *Travel Agent*, 583 F.3d at 904 (citing *Iqbal*, 556 U.S. at 680).

### b.  Plaintiffs Do Not Even Allege Parallel Price Increases

Plaintiffs' Complaints lack any factual allegations to support their claims of "coordinated and parallel price increases."  To the contrary, Plaintiffs allege only parallel price *announcements* by some Defendants on some, unspecified tire products sold in the U.S.  The alleged U.S. pricing announcements, summarized in tables and cited in Plaintiffs' Complaints, did not reveal the amount of any future price increases—only that some tire products would go up in price "up to" varying percentages.  These allegations of vague parallel price announcements are anemic, at best, and not the sort of parallel conduct that supports a plausible inference of conspiracy.

What Plaintiffs do **not** allege is key.  *First*, Plaintiffs do not allege *all* Defendants made parallel price announcements.  Nokian Tyres U.S. Operations LLC, Nokian Tyres Inc., and Nokian Tyres plc are entirely absent from the tables purporting to show "Defendants' Price Increases During the Class Period" and are not alleged to have sent any "signals" via public pricing announcements.  DPP ¶ 76; EPP ¶ 139; ADP ¶ 66.  *Second*, Plaintiffs do not allege any Defendant announced its actual intended price increases.  For example, Plaintiffs allege Continental Tire the Americas LLC made pricing announcements without any detail at all while certain other Defendants announced price increases "up to" ceilings (maximum percentages).  DPP ¶ 76; EPP ¶ 139; ADP ¶ 66.  Plaintiffs therefore do not provide the Court with any basis to infer Nokian Tyres or Continental increased prices at a similar time or rate as other Defendants.  As for the other company groups—Bridgestone, Goodyear, Michelin, and Pirelli—Plaintiffs' tables do not allege that the *actual* U.S. price increase was announced.  Rather, their supposedly "parallel price

increases" were statements announcing future increases "up to" maximum percentages on certain unspecified tires, and explicitly not all tires.  DPP ¶ 76; EPP ¶ 139; ADP ¶ 66.  Plaintiffs also do not allege that price increases were, in fact, implemented by each Defendant afterwards and consistent with each announcement.

Plaintiffs' allegations and cited sources actually demonstrate that announced price increases varied across products, even within a manufacturer's line.  For example, Plaintiffs allege Continental announced price increases at various times, but their own sources show Continental did not disclose the amounts or percentages of any increases, and stated that increases "will vary across specific products" and will only apply to "select tires."[14]  Plaintiffs rely on similarly vague and partial announcements by Michelin North America, Inc. (which noted that "[p]rice changes may vary across specific products"),[15] Pirelli (which noted that price changes would "depend[] on the tire line and size"),[16] and Bridgestone Americas Inc. (which noted that "[p]ricing adjustments will vary by channel and at the article and pattern levels").[17]  The announcements did not say that the price adjustments would apply to *all* replacement tires in that Defendant's product line.  Rather, there could be price increases, *decreases*, or *no change at all* on any given tire.  *Third*, Plaintiffs do not allege Defendants uniformly raised prices across brands of tires sold, and instead acknowledge that Goodyear, Michelin, and Bridgestone did not increase prices on all of the brands they owned at the same time.[18]

---

[14]  Ex. 2 (cited at DPP ¶ 89 n.117; ADP ¶ 60 n.77); Ex. 3 (cited at DPP ¶ 86 n.108; ADP ¶ 59 n.69); Ex. 4 (cited at ADP ¶ 57 n.63).  *See also* EPP ¶ 152.

[15]  Ex. 5 (cited at DPP ¶ 95 n.136; ADP ¶ 63 n.91).

[16]  Ex. 6 (cited at DPP ¶ 100 n.149).

[17]  Ex. 7 (cited at DPP ¶ 100 n.148).

[18]  *See* DPP ¶ 80, ADP ¶ 55 (alleging price increase on the Goodyear and Dunlop brand tires); *cf.* DPP ¶¶ 82, 86, EPP ¶¶ 153, 156, 159 (alleging price increase on Goodyear, Dunlop and *Kelly*

Public price announcements made for legitimate business reasons do not violate U.S. antitrust laws. *See United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975) (holding that "the dissemination of price information is not itself a per se violation of the Sherman Act"). Indeed, "[t]he public announcement of a pricing decision cannot be twisted into an invitation or signal to conspire; it is instead an economic reality to which all other competitors must react." *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 670 n.23 (E.D.N.C. 2003) (citation omitted). As the Sixth Circuit observed, in a different context:  "Rational people, after all, do not conspire in the open . . . ." *Erie Cnty.*, 702 F.3d at 869.

The alleged public price announcements were nothing more than public announcements to the marketplace in an industry with a complex distribution system. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)* ("*RealPage*"), No. 3:23-MD-03071, 2023 WL 9004806, at *14 (M.D. Tenn. Dec. 28, 2023) (noting that "courts do not credit charts and analyses that are 'as consistent with parallel, market-following behavior . . . as they are with participation in a price-fixing scheme'") (quoting *In re Commodity Exch., Inc. Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 227 (S.D.N.Y. 2018)).  These allegations provide no basis to infer an unlawful agreement by Defendants to increase prices on all replacement tires.  Rather, Plaintiffs' allegations about changing prices give rise, at most, to an inference of conscious parallelism, which does not suffice to allege a conspiracy claim.

---

brand tires); DPP ¶ 81, EPP ¶ 151, ADP ¶ 56 (alleging price increase on Michelin and BF Goodrich brand tires); *cf.* DPP ¶ 82, 86, 93, EPP ¶ 153, 162, ADP ¶ 59 (alleging price increase on Michelin, BF Goodrich and *Uniroyal* brands); DPP ¶ 81, 84, EPP ¶ 155, ADP ¶ 56 (alleging price increase on Bridgestone and Firestone brand tires); *cf.* DPP ¶ 86, EPP ¶ 169, 174 (alleging price increase on Bridgestone, Firestone, and *Fuzion* brand tires).

### c. Statements on Routine Earnings Calls Also Do Not Support an Inference of Conspiracy

This Court should not accept Plaintiffs' attempts to splice together certain Defendants' public statements—often just short phrases or partial sentences—taken out of their full context. *See Twombly*, 550 U.S. at 568 n.13 ("This was only part of what [the CEO] reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn."). There are many examples:

1. DPPs allege Bridgestone's CEO "pledged that Bridgestone would 'continu[e] to execute strategic price management, including price increase[s]' and that 'all other competitors . . . *have* to do the same.'" DPP ¶ 99 (emphasis added). But these two statements are not part of the same sentence or even same paragraph. Rather, Bridgestone's CEO's statement about "strategic price management" appears on page 3 of the earnings call transcript, and the quoted language about competitors appears *fifteen pages later*, as part of a discussion about an entirely different topic (production, not pricing). *See* Ex. 8, pp. 3, 18. DPPs also misquote the second of these separate quotations, replacing a past tense with a present tense to make the quote sound forward looking, when it was not. Bridgestone's CEO responded to a question asking his opinion and observations on "the market situation in Europe." He explained that, faced with a "recessionary trend" characterized by "inflation" and "energy costs," Bridgestone "*had* burden [sic] to make the adjustments into our production plans. But it's not only at Bridgestone or other competitors of ours in Europe. They *had* – they *have had* to do the same." *Id.* (emphasis added). This was a statement about the past, not a "signal" about the future.

2. DPPs and ADPs allege "Michelin instructed its competitors that it was 'not a period where you play on prices,'" DPP ¶ 79; ADP ¶ 54, but omit the fact that Michelin's CEO was

responding directly to an investor who asked:

> Q: "The first question is on the prices in such a volume environment.  What is the pricing evolution in each and every segment, if you could elaborate a bit on this."
>
> A: "[W]e have had several times that question.  It's very clear.  This not a period where you play on prices.  This is a period where you maintain what you have.  So we've been very strict on this.").  Ex. 9, p. 12.

The full response shows Michelin's CEO was likewise speaking about the past ("we've been").
*Id*.

3.       EPPs adopt the same tactic and claim "Nokian's CEO. . . stated that, as long as all manufacturers stayed in line, tire manufacturers could capture additional profit from the drop in raw materials prices as a result of the drop in demand due to the COVID pandemic: 'if everybody's sensible in this industry, it means that the prices would not be going down as much as the raw material would imply.'"  EPP ¶ 146 (emphasis omitted).  But the transcript shows Nokian Tyres's CEO was asked about the relationship between raw materials and Nokian Tyres's pricing strategy. She explained that Nokian Tyres's decisions did not only account for raw materials, but also took into account the anticipated impact of weaker currencies on trade and ordinary follow-the-leader strategy.  *See* Ex. 10, p. 8 (listing "a weakening Krona [currency] in Norway and Sweden," a weakening currency in Russia, and "competitors' prices" as factoring into pricing).  Nothing about this quotation suggests an invitation to "stay[] in line" as EPPs allege.  EPP ¶ 146.

4.       In yet other instances, Plaintiffs cherry-pick a few words and phrases and rob them of their full context.  For example, Plaintiffs quote a Pirelli & C. S.p.A. executive to claim "Defendants signaled to each other the imperatives of 'price resilience,' 'price discipline [with no] sign of weakening'. . . ."  DPP ¶ 77 (alteration in original).  Stripped of Plaintiffs' unsupported

speculation that the executive was "signaling" to others, this allegation amounts to a simple observation that the executive used the phrases "price resilience" and "price discipline," which is unsurprising since he was responding to the question:  "Do you expect the industry pricing to remain as disciplined as possible?  Or do you anticipate that pricing will become more complex?" Ex. 11, p. 17.

5.     Splicing together two truncated quotations, DPPs allege Goodyear's CEO stated on an earnings call that "'coming into 2022' 'all [the main] tire manufacturers out there essentially announc[ed] double-digit price increases.'"  DPP ¶ 92 (alteration in original).  But they omit that he was responding to an analyst question that specifically asked him to address the past "announced price hikes" of other manufacturers.  Ex. 12, p. 10.  Plaintiffs' piecemeal quotation also obscures the fact that, in addressing those previously announced price hikes, Goodyear's CEO made a past-tense statement that we "came into '22 with all of . . . the tire manufacturers out there essentially announcing a double-digit price increase."  *Id.*  This statement *summarizing past events* in response to an analyst's direct question about those past events cannot reasonably be construed as "signal[ing] . . . another wave of price increases" in the future.  DPP ¶ 92.

Numerous courts have rejected this same ploy and misuse of earnings call statements, finding that defendants' statements about their "own future behavior and descriptions of their past behavior, predictions of industry trends, and observations about competitor behavior" do not give rise to an inference of collusion.  *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 919 (N.D. Cal. 2019) (finding statements made during earnings calls "insufficient to support an inference of conspiracy because they are not 'largely inconsistent with unilateral, lawful conduct'" (citing *Musical Instruments*, 798 F.3d at 1194)); *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 50 (9th Cir. 2022) ("If no conspiracy existed, Defendants

25

would likely make the same public statements about their observations, predictions, and strategies for the future, particularly in response to investor and analyst questions.").

Plaintiffs quote numerous statements that are merely observations of market trends—exactly what investors and analysts expect and seek.  *See, e.g.*, DPP ¶¶ 83, 85, 92, 96, 99; EPP ¶¶ 146-148, 156, 164; ADP ¶¶ 45-49.   Other statements simply indicate Defendants' own independent behavior in especially vague and generic terms (*e.g.*, "we will raise prices").  *See, e.g.*, DPP ¶¶ 88, 100; EPP ¶¶ 149, 159-160, 163-164; ADP ¶ 60.  The remainder of the earnings call statements Plaintiffs point to are general observations of market behavior.  *See, e.g.*, ADP ¶ 51 ("[W]e've got to acknowledge that we've got major competitors who have announced 2 or 3 price increases during calendar year '22."); *see also* DPP ¶¶ 80-91, 99; ADP ¶¶ 44-55, 60.

Earnings calls are commonplace, essential to the functional operation of capital markets, and, of course, regulated by securities laws.  Information about pricing is "precisely 'the type of information companies legitimately convey to their shareholders,'" during earnings calls and "courts are properly reluctant to characterize them as evidence of unlawful conspiracies," even if they also benefit rivals, customers, and all of the other industry participants who monitor the calls for their own reasons.  *In re Delta/Airtran Baggage Fee Antitrust Litig.* ("*Delta/Airtran*"), 245 F. Supp. 3d 1343, 1372-74 (N.D. Ga. Mar. 28, 2017) (citation omitted), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018).   Plaintiffs' speculation that Defendants' earnings calls were "signals" to each other cannot overcome the economic reality that for Defendants to publicly share information with the market tends to render markets more, rather than less, competitive.  *See Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) (finding that "[p]ublic dissemination is a primary way for data exchange to realize its procompetitive potential.

For example, in the traditional oligopoly . . . context, access to information may better equip buyers to compare products, rendering the market more efficient . . . .").

Several of the Defendants are publicly traded on a U.S. stock exchange, meaning they are *legally obligated* to disclose this type of information to investors. *See* EPP ¶ 141; 17 C.F.R. § 229.303(b)(2)(ii) (2021) (public companies must "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"); *see also* In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation, Release No. 33-8350 (Dec. 19, 2003) ("In addressing prospective financial condition and operating performance, there are circumstances, particularly regarding known material trends and uncertainties, where forward-looking information is required to be disclosed."). Plaintiffs themselves acknowledge that "Goodyear, Pirelli, Nokian and Bridgestone hold conference calls with securities analysts on a quarterly basis" because they are "publicly traded corporations." EPP ¶ 141. The same is true for Michelin, which is publicly traded in France. *See* Code Monétaire et Financier [Monetary and Financial Code] Art. L. 451-1-2 (requiring French public companies to communicate qualitative information on the foreseeable evolution of the company). Continental Aktiengesellschaft is likewise publicly traded on the regulated market in Germany, which subjects it to reporting and disclosure requirements. *See* Wertpapierhandelsgesetz [WpHG] [Securities Trading Act], Sept. 9, 1998, last updated May 16, 2019, § 114 (Ger.) and Handelsgesetzbuch [HGB] [Commercial Code], Oct. 5, 1897, last updated Jun. 19, 2020, § 289 (Ger.) (describing requirements for listed companies to publish forward-looking information in the form of forecasts); Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on Market Abuse Regulation (MAR), art. 17.1, O.J. (L 173) (concerning ad hoc disclosure requirements for certain information,

including price-sensitive information); Frankfurter Wertpapierbörse [FWB] [Frankfurt Stock Exchange Rules], last updated Jul. 11, 2024, § 53 (Ger.) (concerning quarterly reporting requirements); *id.* § 55 (requiring companies to hold analysts' events at least annually).

Many of the statements Plaintiffs quote were made in response to investor and analyst queries, which further undermines any inference of collusion.  *See*, *e.g.*, DPP ¶¶ 79, 83, 99; ADP ¶¶ 48, 54, *cf.* Exs. 7-12.  It is implausible to suggest that an off-the-cuff response to an investor query on a live, public earnings call is part of a scheme to collude.  *See Jones*, 400 F. Supp. 3d at 920 ("[T]he fact that a number of these comments were made . . . in response to investor questions, addressing topics about which investors would be concerned . . . weighs against their illegality.") And the fact that investors routinely ask about pricing shows that the topic is appropriate for investor communications.  Plaintiffs' alleged "signaling" amounts to no more than general statements to investors about the trajectory of the industry and is far from evincing any conversations, coordination, or even parallel conduct.  *See Delta/Airtran*, 245 F. Supp. 3d at 1372-73 (declining to "construe corporate communications as invitations to collude" where the statements were made publicly on quarterly earnings calls and "concerned a topic that was of interest to the . . . industry" as a whole).

Nor is the *timing* of these statements and following price increases any more indicative of conspiratorial behavior:  what Plaintiffs describe as a "call and response," DPP ¶ 6, simply points to the quarterly nature of business.  *See Valspar Corp. v. E.I. Du Pont De Nemours*, 152 F. Supp. 3d 234, 246-47 (D. Del. 2016) (finding that plaintiffs' logic about the "temporal proximity of price increases" in relation to quarterly meetings "would find suspect any announcement which occurred in eight out of twelve months").  Many of the alleged price increases were effective on the first day of the quarter, *see* DPP ¶ 76; EPP ¶ 139; ADP ¶ 66—undoubtedly a typical day across

industries to implement pricing changes.

Finally, Plaintiffs' claim that Defendants "monitored each other's pricing announcements" is irrelevant. *See* DPP ¶ 75; EPP ¶ 141; ADP ¶ 44. Even if Defendants did monitor each other's communications, such behavior is not indicative of a conspiracy to fix prices. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) ("We can . . . without suspecting illegal collusion, expect competing firms to keep close track of each other's pricing and other market behavior and often to find it in their self-interest to imitate that behavior rather than try to undermine it—the latter being a risky strategy, prone to invite retaliation"). Making public statements to investors, announcing price changes to the marketplace, and monitoring competitors' earnings calls are neither notable nor unlawful. Plaintiffs' misquotations and conclusory allegations do not change that.[19]

### d. The Use of Third-Party Pricing Software Does Not Plausibly Raise an Inference of Unlawful Agreement

Consulting public sources to determine how to price a product is a common and lawful business practice. *See Gibson*, 2024 WL 2060260, at *4 ("[C]onsulting public sources to see your competitors' rates . . . does not violate the Sherman Act."); *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 462 (9th Cir. 2018) (finding revenue management software comparable to a "trade

---

[19] ADPs also make the conclusory claim that Defendants "collud[ed] on the supply of Tires." ADP ¶¶ 88-90. However, parallel output restrictions would not violate antitrust laws for the same reasons parallel pricing would not violate antitrust laws. *See Twombly*, 550 U.S. at 553. ADPs fail to provide any detail about how the alleged supply coordination was achieved. They cite only *one* Defendant (Goodyear) whose CEO mentioned not overstocking inventory during a 2023 earnings call. ADP ¶ 90. But "reducing supply does not, by itself, suggest conspiracy," particularly when doing so is in a firm's independent interest. *Kleen Prods.*, 276 F. Supp. 3d at 828; *Persian Gulf v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1149 (S.D. Cal. 2022) ("Antitrust law does not compel Defendants to produce the maximum amount of [output] possible.").

organization," which is not "suggestive of collusion").  The law is clear that even the direct exchange of price data is consistent with a competitive market.  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (holding that "[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects," but may "in certain circumstances increase economic efficiency and render markets more, rather than less, competitive"); *see also Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119 (6th Cir. 1983) ("[I]n the absence of a purpose or effect to restrain competition, or some other evidence of an actual agreement to restrain competition, we hold that the exchange of price data does not offend § 1 of the Sherman Act.").

Plaintiffs' entirely conclusory allegations that "[c]onsultancy firms with revenue management software *may* have facilitated Defendants' conspiracy" and that "[r]evenue management software enables [Defendants] to use large data sets that include competitor pricing data to maximize revenues" would therefore be unavailing even if it were true.  ADP ¶ 147 (emphasis added); *see also* DPP ¶¶ 103, 112; EPP ¶ 260.

Plaintiffs rely only on paltry allegations that Bridgestone, Continental, and Michelin use Lizeo software to monitor competitor pricing (DPP ¶ 106; EPP ¶ 258; ADP ¶ 77)—but provide no allegations as to which Defendants allegedly used the Torqata software referenced in their Complaints.  Nor do Plaintiffs specify when Defendants used either software, whether the data that the software analyzes pertains to retail or wholesale pricing, what features or services of either software were used, or how Defendants utilized each software or any resulting data.

Furthermore, Plaintiffs' allegation that revenue management software enables Defendants to share "private" information is not supported by any well-pleaded facts.  DPPs allege Lizeo "leverages data from 1,000+ top websites," suggesting that Lizeo's software scrapes public data

from the internet.  DPP ¶ 106.  Indeed, the Lizeo website advertises its services as a tool to analyze an "abundance of *available* online data."[20]  And Plaintiffs allege Torqata uses "competitors' private information" without identifying what the source of that supposedly non-public data is.  *Cf. RealPage*, 2023 WL 9004806, at *17 (finding pleading sufficient only because plaintiffs alleged that "RealPage . . . tells its RMS clients exactly whose non-public data is being used for pricing decisions").

But even if the software did use private data to formulate recommendations, Plaintiffs' allegations still would not nudge the alleged conspiracy over the threshold of plausibility.  The *Gibson* court concluded that the "mere use of algorithmic pricing based on artificial intelligence by a commercial entity, without any allegations about any agreement between competitors— whether explicit or implicit—*to accept the prices that the algorithm recommends* does not plausibly allege an illegal agreement, or 'raise a reasonable expectation that discovery will reveal evidence of illegal agreement' sufficient to survive [a motion to dismiss]."  2024 WL 2060260, at *6 (emphasis added) (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)).  The Court should reach the same conclusion here:  Plaintiffs do not allege Defendants all used the same software, received the same price recommendations, or accepted those recommendations— let alone agreed in advance to do so.  Plaintiffs claim broadly that Defendants use revenue management software and, more specifically, that three company groups use Lizeo software, which does not support any inference of agreement.[21]  DPP ¶ 106.  Indeed, DPPs' claim that

---

[20]  Ex. 13, p.1 (emphasis added) (cited at DPP ¶ 106 n.160; EPP ¶ 258 n.20; ADP ¶ 76 n.108).

[21]  EPPs further claim an unidentified consultancy firm allegedly contracted by all Defendants was responsible for using the alleged revenue management software to "centralize[] data" about Defendants, and allowed them to "monitor" each other's prices.  EPP ¶¶ 252-253.  But that allegation, even if true, further distances Defendants from the software in question.

"consultancy firms . . . *may* have facilitated Defendants' conspiracy" is as vague and equivocal as it is speculative.  DPP ¶¶ 103, 112; EPP ¶ 260; ADP ¶ 147 (emphasis added).  The law is clear that a "complaint [that] only permits [one] . . . to infer the *possibility*" of a claim for relief "does not meet the requirements of *Twombly* and *Iqbal*." *Patterson v. Novartis Pharms. Corp.*, 451 F. App'x 495, 497-98 (6th Cir. 2011) (emphasis added).

> **e.  DPPs Cannot Use a Vague "Preliminary Regression Analysis" to Manufacture an Unlawful Agreement**

DPPs' purported regression analysis does not make Plaintiffs' claims more plausible.  To begin with, DPPs allege no facts about their "preliminary regression analysis," just its ultimate conclusion:  an image of a chart with two lines that purport to show "actual" and "but-for [tire] prices" over time.  DPP ¶ 123.  DPPs do not allege their data sources, the types of "tires" that purportedly were analyzed, or any specifics of the methodology they used.  Absent any allegations of these building-block facts, DPPs' analysis amounts to nothing more than a bald conclusion, which is insufficient under *Twombly*.  550 U.S. at 555; *see also In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, No. 11 Md. 02213, 2013 WL 1100770, at *4 (S.D.N.Y. Mar. 18, 2013) (rejecting statistical allegations that are not "sufficiently factual" as unreliable and "mere conclusory statements").

Further, DPPs allege no information about the person who performed this analysis—let alone her qualifications.  Without this information, DPPs' regression allegations are nothing more than the *ipse dixit* of an unidentified "expert."  The Court should refuse to consider such unsupported statistics and/or evidence at the pleading stage.  *See Brothers v. Saag*, No. 13-466, 2014 WL 838890, at *6 (N.D. Ala. Mar. 4, 2014) ("[C]onsidering expert opinions at the pleading stage is inappropriate."); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (declining to consider an expert's opinion as it, inter alia, "might require ruling on the

expert's qualifications," and would be "inappropriate at the pleading stage").

Even putting aside those threshold pleading deficiencies, DPPs' chart says nothing about the conduct of any individual Defendant or of Defendants collectively. *In re Treasury Sec. Auction Antitrust Litig.*, No. 15 MD 2673, 2021 WL 1226670, at *16 (S.D.N.Y. Mar. 31, 2021) ("[T]he core deficiency in Plaintiffs' statistical analyses . . . is that they are not aimed at any particular . . . Defendant."). Rather, the chart appears to depict aggregated average prices across an unidentified "market."[22] But "analyses in which defendants are grouped together are no substitute for well-pleaded allegations demonstrating that each named defendant engaged in anti-competitive conduct." *Id.* at 15; *see also In re Mexican Gov't Bonds Antitrust Litig.* ("*MGB*"), 412 F. Supp. 3d 380, 389 (S.D.N.Y. 2019) (holding that "statistical analyses proffered by Plaintiffs are simply 'group pleading in another form'" (citation omitted)).

Even if the Court considers DPPs' purported regression analysis, that analysis fails to support the causal connection DPPs argue for. DPP ¶ 123. "Even the best regression equation cannot prove causation." *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 260 (N.D. Ohio 2014) (quoting *Schumacher v. Tyson Fresh Meats, Inc.*, No. CIV 02-1027, 2006 WL 47504, at *7 (D.S.D. Jan. 5, 2006)); *see also Reference Manual*, at 310 ("Causality cannot be inferred by

---

[22] DPPs' dataset appears to not be limited to Defendants or to the claimed product market of replacement tires. The blue line ("actual prices") in DPPs' Figure 3 is identical to the graph in DPPs' Paragraph 74, but with somewhat different scaling. *Compare* DPP ¶ 74, *with id.* ¶ 123. As the title of the graph in Paragraph 74 shows, it includes "industrial" tires (for forklifts, bulldozers, etc.), fails to exclude original equipment tires, and includes "other tires." *Id.* ¶ 74; *see id.* ¶ 1 (this case is about replacement tires for "passenger" vehicles), ¶¶ 58-59 (distinguishing passenger *replacement* tires, the subject of the complaint, from *original equipment* tires). The graph in Paragraph 74—and, thus, presumably DPPs' dataset as well—also appears to span all U.S. tire companies, not just Defendants. *See City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 399 (2d Cir. 2024) (affirming dismissal of antitrust complaint where "[p]laintiffs' statistics are fundamentally flawed because they do not focus on . . . Defendants in particular").

data analysis alone[.]"); *In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *15 (granting motion to dismiss and noting that statistical analysis was "no substitute for well-pleaded allegations" showing a conspiracy).  At most, DPPs' regression suggests "parallel conduct that could just as well be independent action," *Twombly*, 550 U.S. at 557, especially where DPPs included no facts to show that the regression correctly accounted for all non-collusive factors that affect prices.

> **2.     The Complaints (and the Articles Cited and Incorporated by Reference) Provide Obvious Alternative Explanations to Plaintiffs' Conclusory Assertions of Conspiracy**

*Twombly* emphasizes the importance of "obvious alternative explanation[s]" when assessing allegations that observed behavior came about because of conspiracy.  550 U.S. at 557, 565, 567; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010) ("[A]llegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged" (alteration in original)); *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1130 (9th Cir. 2015) ("[C]ourts must consider obvious alternative explanations for a defendant's behavior when analyzing plausibility").  When "each defendant was faced with the same dilemma," similar conduct "is unsurprising, and expected . . . ."  *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d at 138.  It does not suggest conspiracy.

Rather, Plaintiffs' allegations show Defendants' pricing followed industry-wide conditions:  changing market dynamics, inflation, rising costs, and increased scarcity of raw materials led to price increases.[23]  *See* DPP ¶ 172; EPP ¶ 153; ADP ¶ 152.  Plaintiffs acknowledge

---

[23]  The ProPublica article cited by Plaintiffs, Ex. 14 (cited at DPP ¶ 156 n.204; EPP ¶ 138 n.4) states that over the past two years "the price of almost everything reached new heights."  It explains that "[t]ires have been buffeted by nearly every force driving inflation since the pandemic began – from border shutdowns that prevented migrant workers overseas from reaching rubber

these market conditions, but then ignore them altogether in crafting their conspiracy claims.  *See,*
*e.g.*, EPP ¶ 142 ("The pandemic had a global impact on the tire industry and its material suppliers,
leading to a shut down for much of the first half of 2020.  In the United States, passenger tire
production saw a 25.5% reduction, with full stoppages in March, April and May [2020].").  In
addition, as Plaintiffs' own sources explain, carbon black, a stabilizing agent that "[e]very single
tire manufacturer" relies on, experienced shortages even before the pandemic.  Ex. 15 (cited at
DPP ¶ 101 n.152; ADP ¶ 70 n.104).  These shortages only worsened when Russia invaded Ukraine
in 2022, and "many tire manufacturers were suddenly cut off from their supply . . . ."  *Id.*  Plaintiffs'
sources likewise acknowledge that some manufacturers saw their overall "[r]aw material unit costs
. . . in manufacturing, including inbound logistics cost, increase[] by 35% [from 2021 to 2022]."
*Id.*  And these common cost increases hit all tire manufacturers at roughly the same time.  As one
non-defendant competitor explained in a source cited by both DPPs and ADPs:  "Price increases
have been a necessary counteraction to increased costs in raw materials, logistics and labor for
[non-defendant] Toyo and everyone else in the industry. . . ."[24]

Thus, Defendants' decisions to increase prices on certain products were in line with
industry- and economy-wide conditions.  *See* DPP ¶ 74; EPP ¶ 138; ADP ¶ 91.  Prices across the
U.S. economy during 2021 experienced the largest period of inflation since 2008, and ongoing
complications from the COVID-19 pandemic and supply chain disruptions (including port
congestion) contributed to price increases across many industries.  *See* DPP ¶ 172; EPP ¶ 153;

---

plantations to the war in Ukraine's toll on an obscure but essential ingredient in tires called carbon
black."

[24]  Ex. 16 (cited at DPP ¶ 157 n.206; ADP ¶ 172 n.145).

ADP ¶ 152.[25]  The U.S. economy continued to face significant inflation in 2021 and 2022, due to "issues with the supply chain and disruption in the fuel market" which "contributed to higher price levels within the United States."[26]  By 2022, the U.S. was experiencing "the worst period of inflation since the early 1980s."  Ex. 14 (cited at DPP ¶ 4 n.5; EPP ¶ 138 n.4).  During this inflationary period, input costs for tires increased *32 percent* in 2021 and *12.7 percent* the following year.  ADP ¶ 155.  Plaintiffs' assertion that Defendants' price increases are not explained by input prices, *see* DPP ¶ 113, is conclusory—and also incorrect—as explained by the articles incorporated by reference in the Complaints, which speak to the actual increase in input costs.  *See, e.g.*, *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1057 (8th Cir. 2018) (finding allegation that conspiracy caused propane tank prices to remain at "high, non-competitive levels" despite decrease in propane gas prices insufficient to sustain claim).  Plaintiffs ask the Court to "infer[] . . . an agreement when an 'obvious alternative explanation,'" one they themselves provide, "accounts for that same conduct.  The 'obvious alternative explanation' was the outbreak of the global Covid-19 pandemic."  *D'Augusta v. Am. Petroleum Inst.*, No. 23-15878, 2024 WL 4195329,

---

[25]  *See also* U.S. Bureau of Labor Statistics ("USBLS"), *Beyond the Numbers: Exploring price increases in 2021 and previous periods of inflation* (Oct. 2022), https://www.bls.gov/opub/btn/volume-11/exploring-price-increases-in-2021-and-previous-periods-of-inflation.htm; *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) (holding that courts "may . . . consider public records" and other "extrinsic materials" at the motion to dismiss stage when they "merely 'fill in the contours and details of a complaint'") (citing *Yeary v. Goodwill Indus.-Knoxville*, 107 F.3d 443, 445 (6th Cir. 1997)); *Salazar v. Paramount Glob.*, 683 F. Supp. 3d 727, 732 n.4 (M.D. Tenn. 2023) (considering extrinsic "background information" about a source "repeatedly cit[ed]" by plaintiffs in their complaint); *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (noting that courts "routinely take judicial notice of information contained on state and federal government websites").

[26]  *See* USBLS, *Beyond the Numbers: How currency appreciation can impact prices: the rise of the U.S. dollar* (Mar. 2022), https://www.bls.gov/opub/btn/volume-12/how-currency-appreciation-can-impact-prices-the-rise-of-the-us-dollar.htm.

at *7 (9th Cir. Sept. 16, 2024) (quoting *Twombly*, 550 U.S. at 567) (taking "judicial notice of this historical event to acknowledge an alternative explanation" (citation omitted)).

### 3. Plaintiffs' Other Purported "Plus Factors" Are Conclusory Allegations that Do Not Suggest an Unlawful Agreement

#### a. Plaintiffs Confuse "Motive" to Conspire and Economic Interdependence

Plaintiffs' formulaic recitation that Defendants had a "motive to conspire" does not save their Complaints.  DPP ¶ 127; ADP ¶ 101.  "[S]weeping conclusions about the motives and actions" of antitrust defendants without supporting evidence, should not be given weight, particularly where those allegations about motive are entirely speculative.  *Hobart-Mayfield*, 48 F.4th at 668 (dismissing allegation that manufacturers have "strong incentives to collude" as "conjecture").  Threadbare assertions about motive have weak probative value for the simple reason that "[a]ny firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors.  Thus, alleging 'common motive to conspire' simply restates that a market is interdependent (*i.e.*, that the profitability of a firm's decisions regarding pricing depends on competitors' reactions)."  *Musical Instruments*, 798 F.3d at 1194-95, 1194 n.8 (further explaining that "[c]ommon motive for increased profits always exists," and that "interdependence . . . does not entail collusion").  Indeed, "if 'a motive to achieve higher [profits]' were sufficient, every company in every industry could be accused of conspiring because they all 'would have such a "motive."'"  *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) (citation omitted).

#### b. Plaintiffs' "Opportunities to Collude" Allegations Fail

Plaintiffs spill many pages of ink over the unremarkable allegations that Defendants participate in trade associations and industry events.  DPP ¶¶ 131-148; EPP ¶¶ 205-239; ADP

¶¶ 107-146.  But "[a]ttendance at industry trade shows and events is *presumed legitimate* and is not a basis from which to infer a conspiracy, without more." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007).  Plaintiffs come nowhere close to overcoming this presumption.  Their allegations amount to a speculative "same time, same place" theory and are devoid of any facts about what Defendants supposedly discussed or agreed on. *Chocolates*, 801 F.3d at 409 (finding evidence that executives "were in the same place at the same time . . . insufficient to support a reasonable inference of concerted activity").  For instance, Plaintiffs mention the USTMA's "lobbying events" and that the USTMA "successfully lobbied in 2019 for the creation of the Congressional Tire Caucus, a bi-partisan committee . . . ."  EPP ¶ 212; ADP ¶ 114.  This successful result of USTMA's *Noerr-Pennington*-protected lobbying efforts only underscores the association's legitimate business functions—and Plaintiffs do not contend otherwise.[27]  As the Supreme Court explained, defendants should not have to "devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy" because they are members of the same industry groups or attend the same industry events.  *Twombly*, 550 U.S. at 567 n.12; *see also Travel Agent*, 583 F.3d at 911 (the "mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement").  This Court should reject Plaintiffs' unsupported attempt to recast these lawful activities as "opportunities to collude."

---

[27]  Lobbying is protected by the First Amendment, and the *Noerr-Pennington* doctrine protects lobbying and even the filing of lawsuits unless such conduct is a "sham."  *PREI, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 57-58 (1993).  There are no allegations that any lobbying was a sham, nor could there be.

       **c.**     **Allegations about the Structure of the Tire Industry Do Not Make Plaintiffs' Claims More Plausible**

Plaintiffs' generalized description of the replacement tires "market" does not constitute a plus factor, either.  Plaintiffs aver the tire market is ripe for collusion because it: (1) is oligopolistic and highly concentrated, DPP ¶ 6; EPP ¶ 183; ADP ¶ 165; (2) has high entry barriers, DPP ¶ 6; EPP ¶¶ 240-243; ADP ¶¶ 165-167; (3) is characterized by inelastic demand, DPP ¶ 6; EPP ¶¶ 244-248; ADP ¶¶ 168-172; and (4) is characterized by high interchangeability, DPP ¶¶ 158-160; EPP ¶¶ 249-251; ADP ¶ 173.  But these allegations are so generic that they could apply to many different industries.  Each of these factors is just another way of stating that the market is an oligopoly prone to *lawful* parallel behavior.  *See Erie Cnty.*, 702 F.3d at 869-70 (finding allegations of "stable market shares," "high incumbency," and "high prices and profits" were "simply descriptions of the market, not allegations of anything that the defendants did . . . and do not give rise to an inference of an unlawful agreement"); *Williamson Oil*, 346 F.3d at 1317 ("The problem with [arguing that high concentration, inelastic demand, high barriers to entry, and a fungible product, among other things, constitute a plus factor], is that the majority of the[se] market characteristics . . . are simply indicia that the . . . industry is an oligopoly, which is perfectly legal.").

Plaintiffs allege there are "significant entry and exit barriers, a characteristic that leads to further market concentration."  DPP ¶ 149; EPP ¶ 240; ADP ¶ 165.  But a high standard for products that "creates barriers to entry . . . illustrates only that [the company] has elected to sell products in a market that places high regard on the safety and warranty of its products, not that the market is rife with tortious interference."  *Hobart-Mayfield*, 48 F.4th at 669-70.

Plaintiffs also ignore the reality of multiple emergent competitors in the U.S. market, and their own sources highlight the number of competitive options available to consumers—all of

which are competitors ready to capture market share if Defendants attempted to raise prices to a supracompetitive level.[28]   And, of course, such competition includes the previous, but now dismissed, non-defendants Giti, Hankook, Kumho, Sumitomo, Toyo and Yokohama.   The existence of these competitors, who could undercut artificially high prices, is inconsistent with Plaintiffs' allegation that Defendants' collective market share remained stable throughout the conspiracy.  DPP ¶ 119; EPP ¶ 243; ADP ¶ 151; *see* DPP ¶ 121 (predicting that "'non-colluding' competitors" would "seize the opportunity to gain market share" "in a competitive market").  Plaintiffs' picture of a market allegedly "susceptible to collusion" does not make their Complaints more plausible.  The Sixth Circuit is clear:  "Being ripe for collusion, or having a market where collusion is simply possible, is not evidence of collusion."  *Hobart-Mayfield*, 48 F.4th at 668.

### d.    The Mere Fact of an EC Investigation Is Not a Basis to Infer a Violation of U.S. Antitrust Law

The Court should also give "no weight" to the opening of an investigation outside of the U.S. and under different legal standards.  *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.* ("*OTC Hotel Booking*"), 997 F. Supp. 2d 526, 540 (N.D. Tex. 2014) (dismissing complaint alleging antitrust conspiracy despite allegations of European investigation into defendants).  Courts reject antitrust complaints relying on foreign investigations absent facts providing a

---

[28]  The ProPublica article, Ex. 14 (cited at DPP ¶ 156 n.204; EPP ¶ 138 n.4) lists budget tire options such as non-defendant manufacturers Milestar and Casumina, and highlights the way in which one dealer carved out a niche in the discount market by selling Asian imports, which is viewed as a "better value for his cost-conscious customers" in need of quick tire replacement.  The Modern Tire Dealer article, Ex. 17 (cited at DPP ¶ 129 n.181; ADP ¶ 105 n.128) describes fierce competition from "Prinx Chengshan Tire North America, a tiremaker that builds its truck and bus tires in Thailand to serve the U.S. market," flooding it with tires at "below-market prices."  Yet another article, Ex. 18 (cited at DPP ¶ 159 n.207; ADP ¶ 174 n.146) lists non-defendants Accelera, Fullway, Venom Power, Forceum, Joyroad, Haida, Transeagle, Premiorri, and JK Tyre as tire manufacturers to look into "to replace your current tires."

plausible "linkage between such foreign conduct and conduct" in the U.S. *Elevators*, 502 F.3d at 52. This is true even where actual "anticompetitive wrongdoing in Europe" is alleged by a U.S. plaintiff—that is, a finding of illegal activity in a foreign jurisdiction—as opposed to the mere existence of a preliminary investigation, as is the case here. *Id.* at 51-52, 52 n.6 (affirming dismissal of complaint where plaintiffs alleged that "fines have been levied by the European Commission against defendants and their affiliates for various antitrust violations"); *see also In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 976-77 (N.D. Cal. 2020) (dismissing class complaint by car buyers who alleged that the EC had issued a "Statement of Objections" against defendants, which the court assumed was "comparable to an indictment").

This is because a complaint raises no plausible inference of conspiracy by merely speculating "that 'if it happened there, it could have happened here.'" *Elevators*, 502 F.3d at 52; *see also Am. Copper & Brass, Inc. v. Halcor S.A.*, 494 F. Supp. 2d 873, 875-76 (W.D. Tenn. 2007) (EC investigation was irrelevant where plaintiff did "not connect this action directly to the violations or injuries alleged" in U.S.); *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481, 2014 WL 4277510, at \*13, \*34 (S.D.N.Y. Aug. 29, 2014) (dismissing conspiracy claim based on allegations of EC and DOJ Antitrust Division investigations); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1316 (S.D. Fla. 2010) (dismissing complaint where "Plaintiffs do not allege any connection between the international investigations and Defendants' conduct alleged" and existence of antitrust investigation by Florida Attorney General did "not make the conspiracy alleged in this case more plausible").

Additionally, Plaintiffs fail to explain how an investigation by the EC into whether there was a violation of European law related to "[goods] sold in Europe . . . plausibly support[s] the existence of a conspiracy [in] . . . the American market." *In re German Auto. Mfrs. Antitrust Litig.*,

41

497 F. Supp. 3d 745, 751-52 (N.D. Cal. 2020), *aff'd*, 2021 WL 4958987, at *2 (9th Cir. Oct. 26, 2021). In fact, the press release Plaintiffs reference clarifies that the European investigation focuses on replacement tyres "sold in the *European Economic Area*."[29] DPPs make only a generalized claim that Defendants' "public price increase announcements" in the U.S. are somehow "consistent" with the EC's investigation. DPP ¶ 75. But, as discussed, public price announcements are commonplace and entirely consistent with a competitive market. *See supra* Section V.B.1. EPPs also include a chart (Figure 6) purporting to show that prices increased faster in Europe and the U.S. than in Japan, and leap to the conclusion that the purported difference must be due to a conspiracy. EPP ¶ 180. But EPPs' chart is flawed and misleading, and their conclusions do not follow. EPPs' chart does not account for the many non-collusive factors that could affect prices differently in different geographic markets; it also measures the *Producer* Price Index for Europe and the U.S. versus the *Consumer* Price Index for Japan, which are different measurements and not always correlated.[30] ADPs also make no attempt to link the EC investigation to the U.S. market—not even the illusory connections that DPPs and EPPs try—rendering their allegations insufficient as well. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582 n.6 (1986) (holding that the Sherman Act only reaches conduct outside U.S. borders "when the conduct has an effect on American commerce").

Plaintiffs' allegations are further undermined by stark differences between European competition law and U.S. antitrust law. And it would be a mistake to assume that potential

---

[29] EC Press Release, *supra* n.1.

[30] *See* Dep't of Labor Statistics, *How Does the Producer Price Index Differ from the Consumer Price Index? Comparing the Personal Consumption PPI with the CPI* (Mar. 10, 2023), https://www.bls.gov/ppi/methodology-reports/comparing-the-producer-price-index-for-personal-consumption-with-the-us-all-items-cpi-for-all-urban-consumers.htm.

wrongdoing in Europe also violates U.S. law.  *See OTC Hotel Booking*, 997 F. Supp. 2d at 540 ("[T]he government investigations cited in the Complaint involve European laws, which may prohibit conduct that is *lawful* under § 1." (emphasis added)); *In re German Automotive Mfrs. Antitrust Litig.*, 497 F. Supp. 3d at 759-61 (granting motion to dismiss despite EC investigation and allegations of wrongdoing in Europe).  For example, Plaintiffs allege Defendants may have shared price-related information at industry conferences and through consultants.  *See, e.g.*, DPP ¶¶ 102-112, 133-148.  The sharing of certain types of information among competitors is typically considered unlawful "by object" (*i.e.*, *per se* unlawful without regard to anticompetitive effect) under European competition law.  *See, e.g.*, Official J. of the E.U. 259/88 (July 21, 2023).  However, the Supreme Court has consistently held that price information exchange under U.S. antitrust law is not, in itself, unlawful.  *See U.S. Gypsum*, 438 U.S. at 441; *Citizens & S. Nat'l Bank*, 422 U.S. at 113 ("[D]issemination of price information is not itself a *per se* violation of the Sherman Act.").

Finally, Plaintiffs' allegations concerning a foreign investigation fail to move the needle for the additional reason that the EC's investigation is in a very early stage.  There have been no findings, "enforcement proceedings, charges, guilty pleas, settlements, or fines or disgorgement." *BNP Paribas Sec. Corp.*, 92 F.4th at 393.  Courts have routinely dismissed antitrust conspiracy claims that are based on a government investigation (even a U.S. government investigation) that has not uncovered evidence of wrongdoing.  *See, e.g.*, *id.*; *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d at 1316 (granting motion to dismiss conspiracy claim; allegations about foreign and state AG investigations were irrelevant because the "outcome of the investigation cannot be predicted").

Plaintiffs' conclusory assertions aside, the existence of a European competition law investigation does not make Plaintiffs' U.S. antitrust claims more plausible.

### e. Prior Unrelated Legal Violations Do Not Make Plaintiffs' Claims More Plausible

Plaintiffs' allegations of "recidivism" as a plus factor also do not supply any of the "factual matter" needed to infer a price-fixing conspiracy. *Twombly*, 550 U.S. at 556. *First*, the Sixth Circuit has not recognized "recidivism" as a plus factor. *See Hobart-Mayfield*, 48 F.4th at 665-66 (listing four "plus factors" which do not include recidivism). *Second*, even if the Court were to recognize such a plus factor, Plaintiffs' allegations must still satisfy *Twombly*, which they do not. With the exception of one allegation about tires in South Africa from 16 years ago where there has been no final decision, Plaintiffs' allegations about "recidivism" exclusively relate to products other than replacement tires. Likewise, there are no past conspiracy allegations *at all* with respect to any companies within the Nokian Tyres, Pirelli, or Michelin corporate families.[31] As numerous courts have recognized, recidivist conduct cannot be a plus factor unless there is a "palpable tie" between the other antitrust conduct and the conduct alleged in this case. *Williamson Oil*, 346 F.3d at 1317; *Elevators*, 502 F.3d at 52 (affirming dismissal where plaintiffs alleged no linkage and instead relied on mere assertions that "if it happened there, it could have happened here"). Plaintiffs cannot allege any such connection here. Instead, they point only to long-ago unrelated investigations, guilty pleas, and fines—almost exclusively on non-tire products—and mostly involving companies that are not Defendants here.

Plaintiffs' recidivism allegations are irrelevant and cannot save their claims.

---

[31] Plaintiffs reference a 2001 EC fine on "Michelin," but this was not a conspiracy case. *See* DPP ¶ 164 ("[T]he EC found that Michelin had abused its dominant position in the French markets . . . through its use of various types of rebates."); ADP ¶ 190.

### 4. The Totality of Plaintiffs' Allegations Do Not Support a Conspiracy Claim

Plaintiffs' allegations, even when considered "together, not in isolation," point to nothing more than conjecture, rumors, character evidence, and overall speculation. *Erie Cnty.*, 702 F.3d at 870. That is not enough to survive dismissal. *See Delta/Airtran*, 245 F. Supp. at 1381 (dismissing complaint after "analyz[ing] each of Plaintiff's would-be plus factors sequentially," and concluding that "the outcome is the same when they are considered cumulatively"); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1260-61 (W.D. Wash. 2009) (finding that "the whole is not more than the sum of the parts"); *BNP Paribas Sec. Corp.*, 92 F.4th at 415 ("When taken together, the [antitrust] allegations are even weaker than when taken in series.").

## VI. PLAINTIFFS FAIL TO ALLEGE FACTS TYING EACH INDIVIDUAL DEFENDANT TO THE ALLEGED CONSPIRACY

Even if Plaintiffs had adequately pled a plausible conspiracy, which they have not, their Complaints still fail by lumping Defendants together and making sweeping generalizations about all "Defendants." Describing a conspiracy in "general terms without any specification of any particular activities by any particular defendant" is "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." *Elevators*, 502 F.3d at 50-51; *Robertson v. Univ. of Akron Sch. of Law*, No. 5:20-cv-1907, 2021 WL 3709915, at *8 n.9 (N.D. Ohio Aug. 20, 2021) (Lioi, J.) ("[G]roup pleading . . . does [not] satisfy the degree of specificity required for pleading a federal conspiracy.").

These Complaints "furnish[] no clue as to which of the . . . [Defendants] (much less which of their employees) supposedly agreed . . . ." *Twombly*, 550 U.S. at 565 n.10. Instead, Plaintiffs refer generically, and improperly, to "Defendants" and "manufacturers" and do not identify who

45

allegedly agreed on what, how, and where. *See Travel Agent*, 583 F.3d at 905 (plaintiffs' reliance on "several vague allegations . . . that refer to 'defendants' or 'defendants' executives'" was "misplaced because they represent precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*"); *see also Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (dismissing complaint because plaintiff "lump[ed] all the defendants together in each claim and provid[ed] no factual basis to distinguish their conduct"); *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 163 (D.D.C. 2004) (holding plaintiffs "cannot escape their burden of alleging that each defendant participated in or agreed to join the conspiracy by using the term 'defendants' to apply to numerous parties without any specific allegations as to" individual defendants). "Post-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the specific defendants named in the complaint fails to state a claim." *MGB*, 412 F. Supp. 3d at 388. As a matter of well-settled common law, "the mere fact that there exists a parent-subsidiary relationship between two corporations does not make the one liable for the torts of its affiliates." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 341 n.44 (alterations and citation omitted); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (refusing to consider a subsidiary and sister subsidiary as one entity when there was no "specific evidence of coordinated activity").

## VII.    PLAINTIFFS ALLEGE NO FUTURE INJURY ENTITLING THEM TO INJUNCTIVE RELIEF

EPPs' and ADPs' Section 1 claims, and DPPs' request for injunctive relief, should be dismissed. Plaintiffs have not pleaded facts plausibly suggesting a continued risk of threatened injury, which is the predicate for such relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. Plaintiffs must "demonstrate that they face a threat of injury that is both real and immediate, not conjectural or hypothetical." *In re Nexium (Esomeprazole) Antitrust Litig.*, 845 F.3d 470, 474-75

(1st Cir. 2017) (citation omitted).  Plaintiffs have not pleaded that the alleged conspiracy is ongoing or likely to resume in the future.  In fact, their allegations of parallel conduct *end* in the first quarter of 2023—nearly one year before the first complaint was filed in February 2024.  *See* DPP ¶ 76; EPP ¶ 139; ADP ¶ 66.  This, coupled with the EC's highly publicized investigation in the European market, undermines any claim that the alleged conspiracy could be ongoing or recurring. Plaintiffs' claims and request for injunctive relief should be dismissed.

## VIII.   THERE ARE ADDITIONAL INDEPENDENT GROUNDS TO DISMISS THE STATE LAW CLAIMS

Indirect purchasers have no standing to sue for money damages under the Sherman Act, *see Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977), so EPPs and ADPs sue only for injunctive relief under the Sherman Act.  EPPs also bring damages claims under the laws of 37 states, while ADPs bring damages claims under the laws of 36 states.  Both EPPs and ADPs also bring a claim for "unjust enrichment."  As discussed above, all of these state-law claims fail for the same reasons as the Sherman Act antitrust claims.  Their state law claims fail for seven additional reasons:

1.      EPPs and ADPs lack standing to bring claims under the laws of many states where no named plaintiff resides or was injured.

2.      All of ADPs' claims fail for the additional reason that they have not even alleged, let alone substantiated with well-pleaded facts, any of the elements of their state law claims.

3.      EPPs and ADPs fail to plead required elements of state antitrust claims in Mississippi, North Carolina, Tennessee, West Virginia, Wisconsin, and Colorado.

4.      Many of EPPs' and ADPs' consumer protection claims are also defective.

5.      EPPs and ADPs assert consumer protection claims that cannot be brought as a class action under certain state laws.

6.     EPPs and ADPs each resort to a single, nationwide "unjust enrichment" claim.  But there is no legal basis for such a claim.

7.     Many of EPPs' and ADPs' claims are time-barred.

As explained below, the Court should also dismiss EPPs' and ADPs' state law claims.

### A.     EPPs and ADPs Lack Standing Under the Laws of States Where No Named Plaintiff Was Injured

EPPs and ADPs lack Article III standing to sue under the laws of states where none of the named Plaintiffs reside or were injured.  Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Plaintiffs bear the burden of demonstrating Article III standing "at the outset of litigation" and "cannot predicate standing on injuries suffered by members of the class but which they themselves have not or will not suffer." *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 928 (6th Cir. 2002); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (Article III prohibits federal courts from "order[ing] relief to any uninjured plaintiff, class action or not").  To have standing, a plaintiff must "claim to have suffered an injury that the defendant caused and the court can remedy." *TransUnion*, 594 U.S. at 423.  And standing is "not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431.  Class actions are no different. *Fox v. Saginaw Cnty., Mich.*, 67 F.4th 284, 294 (6th Cir. 2023) ("[A] decision to assert class allegations in a complaint 'adds nothing to the question of standing . . . .'" (citation omitted)).  It is also "well-settled that 'named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.'" *Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 291 (N.D. Ohio 2020) (citation omitted).

EPPs bring claims under Hawaii law, but no named plaintiff resides or made purchases in Hawaii.  EPP ¶¶ 12-89, 578-582, 638-645.  ADPs bring claims under the laws of 36 states, but their named plaintiffs reside and made purchases in only three states:  Arkansas, New York, and Wisconsin.  ADP ¶¶ 5-8, 228, 235.[32]  As one court explained in like circumstances: "a plaintiff whose injuries have no causal relation to [Hawaii], or for whom the laws of [Hawaii] cannot provide redress, has no standing to assert a claim under [Hawaiian] law, although it may have standing under the law of another state." *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 152 (E.D. Pa. 2009).  Although certain courts in other circuits have permitted plaintiffs to address class certification prior to Article III standing, "[n]one of these cases is from the Sixth Circuit" and "the better-reasoned opinions on this issue which recognize and refuse to abandon the fundamental prudential standing requirements of Article III." *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 656-57 (E.D. Mich. 2011) (citing cases); *see also Szep*, 491 F. Supp. at 290; *Withrow v. FCA US LLC*, No. 19-13214, 2021 WL 2529847, at *8 (E.D. Mich. June 21, 2021), *amended by* No. 19-13214, 2021 WL 9629458 (E.D. Mich. July 21, 2021).

For this reason, the Court should dismiss EPPs' claims under Hawaii law and every ADP claim except for those under Arkansas, New York, and Wisconsin law.

> **B.**     **ADPs' Threadbare Allegations Fail to State a Claim**

ADPs sue under 29 state antitrust statutes and 16 state consumer protection statutes, but they make no attempt to identify or plead the elements of those claims.  Instead, ADPs provide a list of statutes coupled with conclusory, catch-all allegations that Defendants violated them. *See*

---

[32] ADPs' Complaint appears to have a numbering error.  Following paragraph 230, the Complaint begins again at paragraph 1.  To prevent confusion, Defendants have continued numbering from paragraph 230 here, but this is technically paragraph 5 on page 87.

ADP ¶¶ 227-230 (asserting a single count of "Violation of State Antitrust Laws" and listing 29 statutes); *id*. Count III (asserting a single count of "Violation of State Unfair and Trade Practices Laws" and listing 16 statutes).  ADPs lack even the "formulaic recitation of the elements of a cause of action" that the Supreme Court rejected in *Twombly*.  550 U.S. at 555.

Courts routinely dismiss attempts to plead indirect purchaser claims by simply reciting a list of statutes and making no meaningful attempt to identify the elements of each distinct cause of action or plead facts that satisfy those elements.  *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (affirming dismissal of all state consumer protection and antitrust claims where plaintiffs merely "list[ed] a couple dozen state statutes in alphabetical order by state, without pleading any of their elements," and "fail[ed] to explain adequately how the defendants' conduct violated any of the state consumer protection and unfair trade statutes"); *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 994 (W.D. Wash. 2022) ("A cursory listing of the other states' [antitrust and consumer protection] statutes is insufficient to satisfy *Twombly* and *Iqbal*'s pleading requirements."); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015) ("The indirect purchasers . . . have *listed* claims under very many state laws, but they have not truly *pleaded* claims under those laws sufficient to show their entitlement to recovery under them, as required by Rule 8." (emphasis in original)).  This Court should do the same.

### C.    EPPs and ADPs Fail to Plead Required Elements of Many State Antitrust Claims

#### 1.    Failure to Plead Intrastate Commerce or "Substantial Effect" on Commerce (MS, NC, TN, WV, and WI)

EPPs make boilerplate allegations that Defendants' conduct "occurred within the flow of *interstate* commerce," EPP ¶ 10 (emphasis added), and that the alleged conspiracy "substantially

affected" each state's commerce, *see, e.g.*, *id.* ¶ 436(ii). But EPPs do not allege this was *intrastate* commerce. ADPs similarly allege Defendants' conduct "occurred within the flow of interstate commerce." ADP ¶ 34. ADPs make no allegations about state or intrastate commerce, and they have no named plaintiffs claiming purchases in Mississippi, North Carolina, Tennessee, West Virginia, or Wisconsin. EPPs and ADPs fail to allege the effect on intrastate commerce required by those same five states, and they additionally fail to allege the "substantial effect" on commerce required by North Carolina, Tennessee, and Wisconsin.

The **Mississippi** Antitrust Act extends only to conduct "accomplished in part at least by transactions which are . . . wholly intrastate." *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1188 (Miss. 2020). "Vague, conclusory statements of intrastate transactions" do not suffice. *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 779 (D. Minn. 2020). The **North Carolina** antitrust statute "reaches only conduct causing a '"substantial" in-state injury.'" *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 549 (N.D. Ill. 2019) (citations omitted). Allegations "that indirect purchasers [paid] inflated prices are not sufficient," *id.*, and ADPs have not even pleaded that much. *See Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996) (dismissing North Carolina claim because plaintiffs "failed to allege a substantial effect on any in-state business operations" and "[a]ny injury plaintiffs may suffer in North Carolina will be incidental").

The **Tennessee** antitrust statute "applies to transactions which are predominantly intrastate in character." *Lynch Display Corp. v. Nat'l Souvenir Ctr., Inc.*, 640 S.W.2d 837, 840 (Tenn. Ct. App. 1982) (emphasis omitted); *see also Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9CV, 2003 WL 21780975, at *21 (Tenn. Ct. App. July 31, 2003). Conclusory allegations that "conduct had significant, substantial, and 'predominant' effects on trade and commerce inside the

state of Tennessee cannot suffice for the absence of even one factual allegation that the effects in Tennessee are predominant over the effects nationwide." *Id.* at \*19 n.23.  Tennessee also requires that the alleged anticompetitive conduct affect Tennessee trade or commerce to a "substantial degree." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522-24 (Tenn. 2005) ("[W]e do not believe that th[ese] bare allegation[s] without more [are] sufficient to establish that Tennessee commerce was substantially affected."); *see also In re Cast Iron Soil Pipe & Fittings Antitrust Litig.* ("*CISP*"), No. 1:14-md-2508, 2015 WL 5166014, at \*26 (E.D. Tenn. June 24, 2015) (dismissing claims that have not "made any attempt to meaningfully address intrastate commerce").

The **West Virginia** antitrust claims fail for the same reasons.  *See Audiology Distrib., LLC v. Hawkins*, No. 5:13CV154, 2014 WL 3548833, at \*5-6 (N.D.W. Va. July 17, 2014) (dismissing claim under the West Virginia Antitrust Act because claimant's allegation "that a restraint on trade or commerce existed in [] West Virginia" was a "conclusory allegation . . . insufficient to state a claim"); *see also CISP*, 2015 WL 5166014, at \*25 ("[A] plaintiff must show that the wrongful conduct occurred in West Virginia or was felt in West Virginia to assert a violation of the West Virginia Antitrust Act.").

Similarly, the **Wisconsin** Supreme Court holds that a Wisconsin antitrust claim must allege either (1) actionable conduct within the state or (2) that the conduct complained of "substantially affects" the state.  *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 141 (Wis. 2005); *see also Emergency One, Inc. v. Waterous Co., Inc.*, 23 F. Supp. 2d 959, 969, 971 (E.D. Wis. 1998) (dismissing claim under Wisconsin antitrust statute for failure to "allege significant and adverse effects on economic competition in Wisconsin"); *In re Photochromic Lens Antitrust Litig.*, No. 8:10-CV-1158-T-27EAJ, 2011 WL 13141933, at \*5 & n.12 (M.D. Fla. Oct. 26, 2011) (similar).

EPPs' and ADPs' Wisconsin antitrust claims should be dismissed because their "factual allegations do not demonstrate a substantial effect on Wisconsin commerce generally." *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1084 (D. Kan. 2009) (emphasis omitted).

These five state antitrust claims should be dismissed.

### 2.    A Recent Amendment to Create an Indirect Purchaser Cause of Action Has No Retroactive Effect (CO)

EPPs and ADPs assert damages from early 2020 until the alleged anticompetitive effects of Defendants' conduct cease. However, as indirect purchasers, they may not assert claims for the period pre-dating June 7, 2023 because Colorado followed *Illinois Brick*'s indirect-purchaser rule until that date.[33]  *See* Colo. Rev. Stat. § 6-4-115, *amended by* 2023 Colo. Ch. 427 (HB 1192); *Pomerantz v. Microsoft Corp.*, 50 P.3d 929, 934 (Colo. App. 2002) (explaining that Colorado antitrust law applied *Illinois Brick*). The Colorado State Antitrust Act of 2023, permitting antitrust actions by Indirect Purchaser Plaintiffs, took effect on June 7, 2023, and is prospective in nature. *See Van Sickle v. Boyes*, 797 P.2d 1267, 1270-71 (Colo. 1990) (en banc) ("[T]he Colorado Constitution provides '[n]o . . . law . . . retrospective in operation . . . shall be passed by the general assembly.' A law is retrospective in operation when it . . . creates a new obligation [or] imposes a new duty . . . with respect to transactions or considerations already past." (citations omitted)). Accordingly, the Act does not save EPPs' and ADPs' Colorado claims based on pre-amendment purchases.[34]

---

[33]  "Under the indirect-purchaser rule, 'indirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue.'" *Fenner v. Gen. Motors, LLC*, --- F.4th ---, No. 23-1648, 2024 WL 3886692, at *12 (6th Cir. Aug. 21, 2024) (citation omitted).

[34]  Despite their class period allegations, EPPs and ADPs do not allege any price increases on or after January 15, 2023.

**D.      Many of EPPs' and ADPs' Consumer Protection Claims Are Also Defective**

   **1.      Indirect Purchasers Cannot Sue under Consumer Protection Laws (AR, CT, MA, NY, and SC)**

Arkansas, Connecticut, Massachusetts, New York, and South Carolina bar indirect purchasers from suing under their consumer protection statutes. ADPs' consumer protection claims under **Connecticut** and **Massachusetts** law fail for this reason. *See Vacco v. Microsoft Corp.*, 260 Conn. 59, 91-92 (Conn. 2002) (concluding indirect purchasers lack standing to sue for alleged overcharge under the Connecticut Unfair Trade Practices Act); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 373 (D.R.I. 2019) (holding that a business (as opposed to a consumer) may only bring a claim under section 11 of Massachusetts' consumer protection statute (G.L. c. 93A), and "Massachusetts courts apply the *Illinois Brick* indirect-purchaser rule to Section 11" claims). The same is true for EPPs' and ADPs' **Arkansas**, **New York**, and **South Carolina** consumer protection claims. *See Indep. Cnty. v. Pfizer, Inc.*, 534 F. Supp. 2d 882, 888-89 (E.D. Ark. 2008), *aff'd sub nom. Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009) (explaining that Arkansas' consumer protection statute incorporates the "remoteness doctrine," which requires a "direct link in between Defendants' products and Plaintiffs' damages"); *Wellbutrin*, 260 F.R.D. at 164 (dismissing indirect purchaser claim under New York Gen. Bus. Law § 349 because "indirect injuries are not cognizable"); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 763 (E.D. Pa. 2014) (indirect purchaser plaintiffs could not bring antitrust or consumer protection claims under South Carolina law).

   **2.      Price-Fixing Is Not a Consumer Protection Violation (AR, ID, and RI)**

EPPs' Arkansas and Rhode Island and ADPs' Arkansas, Idaho, and Rhode Island consumer protection claims should be dismissed because those states do not authorize consumer protection claims based on price-fixing conduct.

The **Arkansas** consumer protection statute does not extend to price-fixing claims. *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1166 (N.D. Cal. 2015) (holding that "in absence of authority from Arkansas courts that the ADTPA extends to price fixing claims, those claims should be dismissed"). Similarly, the **Idaho** Supreme Court has interpreted Idaho's Consumer Protection Act to "define[] what constitutes an unfair method of competition" in an exhaustive list of "nineteen types of conduct," which does not include price-fixing. *State v. Daicel Chem. Indus., Ltd.*, 106 P.3d 428, 433-35 (Idaho 2005) (affirming dismissal of Idaho Consumer Protection Act claim based on alleged price-fixing conduct); *see also In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 786 (N.D. Ohio 2011) ("Plaintiffs may not employ the Idaho Consumer Protection Act . . . to pursue a claim premised on allegations of price-fixing."). The **Rhode Island** consumer protection statute also does not include price-fixing in the enumerated list of conduct prohibited by the statute and, thus, does not authorize price-fixing claims. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1115-16, 1118-19 (N.D. Cal. 2007) ("Preliminarily, the court does not find that plaintiffs' allegations of price-fixing and conspiracy fall within the enumerated list of conduct and activity that the UTPCPA defines as 'unfair methods of competition and unfair or deceptive acts or practices.'") (quoting R.I. Gen. Laws Ann. § 6-13.1-1(6)).

### 3. EPPs and ADPs Fail to Plead Unconscionable Conduct or Other Aggravating Circumstances (CO, NM, and UT)

Neither EPPs nor ADPs have pleaded "unconscionable" conduct by Defendants, as the **Colorado**, **New Mexico**, and **Utah** consumer protection statutes require. *See* Colo. Rev. Stat. Ann. § 6-1-105; N.M. Stat. Ann. § 57-12-2(D); Utah Code Ann. §§ 13-11-4, 13-11-5. Likewise, in each of these states, pleading unconscionability requires something more than merely alleging that the price of a product was unfairly high. *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp.

2d 1011, 1029-30 (N.D. Cal. 2007) (explaining that allegations of price fixing do not amount to unconscionability under New Mexico law); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 406-08 (E.D. Pa. 2010) (finding that the Colorado statute only reaches "deceptive" business practices, not merely "unfair" ones); *Cotte & Mercedes Hidalgo v. CVI SGP Acquisition Tr.*, No. 2:21-cv-00299, 2022 WL 464307, at *10 (D. Utah Feb. 15, 2022) (considering Utah law and finding that "Plaintiffs have failed to allege any facts specifically demonstrating unconscionability, much less any facts that would rise to the level of 'extreme unfairness' required to constitute unconscionability" (citation omitted)).

Here, EPPs and ADPs make only (conclusory) allegations that Defendants conspired to fix prices. This is insufficient, and these claims should be dismissed.

> ### 4. ADPs Allege Purchases for Resale and, Thus, Cannot Allege Their Purchases Were for Household, Personal, or Family Purposes (DC, MO, MT, RI, UT, and VT)

ADPs allege they purchased tires "for resale." ADP ¶ 208. This means their purchases were not for household, personal, or family purposes, as required by the consumer protection statutes of the District of Columbia, Missouri, Montana, Rhode Island, Utah, and Vermont.

The **District of Columbia** consumer protection statute limits the class of plaintiffs who may pursue private actions to those who purchased or leased goods or services "normally use[d] for personal, family, or household purposes." D.C. Code § 28-3901(a)(2)(B)(i); *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 850 (N.D. Ill. 2020) (holding that the D.C. consumer protection act protects only the "ultimate retail transaction between the final distributor and the individual member of the consuming public") (quoting *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989)), *aff'd sub nom. Mayor & City Council of Balt. v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022). Similarly, **Missouri** only provides relief to

"person[s] who purchase[] or lease[] merchandise primarily for personal, family or household purposes."  Mo. Ann. Stat. § 407.025; *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 773-74 (Mo. 2007) (en banc) (explaining that a purchase "primarily for personal, family or household purposes" is a required element of a claim under Section 407).  The **Montana** Unfair Trade Practices and Consumer Protection Act provides a cause of action only for a "consumer," defined as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes."  Mont. Code Ann. § 30-14-102(1).  Purchases for business purposes do "not come within the statutory definition of a purchase or lease of goods primarily for personal, family or household purposes."  *Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 234 (W.D.N.Y. 2021) (citing *Doll v. Major Muffler Ctrs., Inc.*, 687 P.2d 48, 52 (Mont. 1984)).  **Rhode Island** does the same.  *See* R.I. Gen. Laws Ann. § 6-13.1-5.2 ("Any person who purchases or leases goods or services primarily for personal, family, or household purposes . . . may bring an action . . . ."); *see also Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, No. 15-cv-6549, 2018 WL 7197233, at *49 (S.D.N.Y. Dec. 26, 2018) (indirect purchaser welfare fund "fails to state a claim under the RIDTPA because it did not purchase [the good at issue] 'primarily for personal, family, or household purposes'" (citation omitted)).  **Utah** similarly limits recovery to consumer transactions for "primarily personal, family, or household purposes."  Utah Code Ann. § 13-11-3(2)(a)(i); *see also Icon Health & Fitness, Inc. v. ConsumerAffairs.com*, No. 1:16-cv-00168, 2018 WL 1183372, at *5 (D. Utah Mar. 6, 2018) (dismissing Utah claim because "[T]he [Utah statute] clearly sets forth a cause of action for a consumer, but affords no such relief for a supplier, particularly against another supplier.").  As does **Vermont**.  *See* Vt. Stat. Ann. tit. 9, § 2451a (defining "consumer" as "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not

for resale in the ordinary course of the person's trade or business"); *see also RSD Leasing, Inc. v. Navistar Int'l Corp.*, 319 A.3d 734, 737 (Vt. 2024) (defining "consumer" to exclude resellers).

ADPs and their putative class are, by definition, resellers.  They purchased tires for commercial purposes, and not personal, family, or household purposes.  Their D.C., Missouri, Montana, Rhode Island, Utah, and Vermont consumer protection claims fail as a matter of law.

### 5.     EPPs and ADPs Fail to Plead the Requisite Fraud, Deception, and Reliance with Particularity (MN, NY, SC)

EPPs' and ADPs' **New York** and **South Carolina** consumer protection claims, and EPPs' **Minnesota** claim, are also deficient because Plaintiffs fail to plead with particularity that Defendants engaged in fraud or deceptive conduct that Plaintiffs reasonably relied upon.  *See In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 909 (E.D. Pa. 2012) (dismissing New York consumer protection claim where plaintiffs did "not plausibly suggest that the purported pretextual explanations for the rising egg prices are the actual cause of the Plaintiffs' alleged harm of paying artificially-inflated prices for eggs"); *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 797 (C.D. Cal. 2022) (dismissing South Carolina claim for failure to plead fraud with particularity); *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 474 (Minn. 1999) ("[A] plaintiff must demonstrate that the defendant made a false promise or misrepresentation with the intent that others rely thereon . . . ."); *see also In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, No. 20-1076-CFC, 2022 WL 2438934, at *22 (D. Del. July 5, 2022) ("Minnesota's Consumer Fraud Act also requires deception").  Conclusory assertions that Defendants "engaged in . . . deceptive or fraudulent acts or practices," EPP ¶¶ 589, 605, 622, and "concealed the anticompetitive and unlawful nature of their combination, conspiracy, or agreement," ADP ¶ 233 (p. 87 ¶ 3), are insufficient to comply with Federal Rule of Civil Procedure 9(b).

E.     **EPPs' and ADPs' Claims Cannot Be Brought as a Class Action (IL, MT, SC, and UT)**

Both EPPs and ADPs bring Illinois antitrust claims and Montana and South Carolina consumer protection claims, and ADPs also bring a Utah consumer protection claim, that are defective as putative class claims.  **Illinois** antitrust law expressly prohibits private plaintiffs from bringing antitrust class actions and reserves that right for the Illinois Attorney General.  *See* 740 Ill. Comp. Stat. § 10/7(2); *In re Humira*, 465 F. Supp. at 850 (explaining that while Illinois "permits Indirect Purchaser Plaintiffs to sue for antitrust money damages, . . . [it] prohibits class action antitrust claims brought by Indirect Purchaser Plaintiffs" (internal citation omitted)).

The same is true for the **Montana** Consumer Protection Act, which expressly allows only consumers to "bring an individual but not a class action."  Mont. Code Ann. § 30-14-133(1); *see also Est. of Pilgrim v. Gen. Motors LLC*, 344 F.R.D. 381, 406 (E.D. Mich. 2023) (finding that "that the class-action prohibition [like the one contained in the Montana Consumer Protection Act] is a substantive limitation and not merely a procedural one").  Similarly, the **South Carolina** Unfair Trade Practice Act provides that a person damaged by violation of the statute "may bring an action individually, but not in a representative capacity."  S.C. Code Ann. § 39-5-140(a); *see, e.g.*, *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 150 F. Supp. 3d 593, 635 (D.S.C. 2015) ("[C]lass actions are not permissible under SCUTPA.").  ADPs' class claims under the **Utah** Consumer Sales Practices Act fail for the same reason.  Utah Stat. § 13-11-19(2); *see also Johnson v. Blendtec, Inc.*, 500 F. Supp. 3d 1271, 1282 (D. Utah 2020) ("In short, class actions seeking money damages are available only when a [defendant's] actions violate an existing administrative rule, court order, or consent decree.").

59

**F.**    **EPPs' and ADPs' Unjust Enrichment Claims Are Defective**

EPPs and ADPs both assert "unjust enrichment claims," but do not identify the unjust enrichment laws of any particular jurisdiction that they seek to invoke.  *See* EPP ¶¶ 646-51; ADP Count IV ¶¶ 6-11.  The failure to identify "any particular jurisdiction to which the allegations should apply . . . is fatal." *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1088 (S.D. Cal. 2017).  Courts consistently dismiss unjust enrichment claims for "failure to specify the particular state law under which plaintiffs intend to proceed." *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, No. CIV. 12-169, 2013 WL 5503308 at *8 (D.N.J. Oct. 2, 2013) (collecting cases); *see also In re Wellbutrin XL*, 260 F.R.D. at 149 ("[B]ecause the plaintiffs' . . . count for unjust enrichment refers to no law or jurisdiction, the Court will dismiss the plaintiffs' claims under that count.").  EPPs' and ADPs' generic and unexplained claims for "unjust enrichment" should be dismissed.

**G.**    **Many of EPPs' and ADPs' State Law Claims Are Partly Time-Barred**

Dismissal is appropriate when the allegations in a complaint "affirmatively show that the claim is time-barred." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).  A plaintiff "cannot 'escape the statute [of limitations] by saying nothing'" and should instead "come forward with allegations explaining why the statute of limitations should be tolled." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744-45 (6th Cir. 1992)).

Many of EPPs' and ADPs' state law claims are facially time-barred.  The first EPP complaint was filed on February 8, 2024.  *See* Compl., *Purcell et al. v. Continental Aktiengesellschaft et al.*, 1:24-cv-00938 (S.D.N.Y Feb. 8, 2024) (ECF No. 1).  Now, EPPs assert claims dating back to "at least January 1, 2020." EPP ¶ 1.  ADPs filed their first complaint on

February 9, 2024, *see* Compl., *Wilkerson Farms ET, LLC v. Continental Aktiengesellschaft et al.*, No. 1:24-cv-00970 (S.D.N.Y Feb. 9, 2024) (ECF No. 1), and assert claims dating back to February 8, 2020.  ADP ¶ 208.  In many instances, however, the applicable statutes of limitations are only two[35] or three[36] years and do not reach back to the start-dates alleged in the Complaints.  The state law claims with statutes of limitations shorter than four years are therefore partly time-barred.[37]

Resisting this conclusion, EPPs and ADPs contend that Defendants' alleged fraudulent concealment saves their untimely claims.  *See* EPP ¶¶ 307-310; ADP ¶¶ 205-207.  However, a plaintiff "must plead the factual allegations underlying a claim of fraudulent concealment with particularity."  *Guy v. Mercantile Bank Mortg. Co.*, 711 F. App'x 250, 253 (6th Cir. 2017).  Here, Plaintiffs fall short of pleading with specificity that:  "(1) the defendant concealed the conduct constituting the cause of action; (2) the defendant's concealment prevented the plaintiff from discovering the cause of action within the limitations period; and (3) the plaintiff exercised due diligence in discovering the cause of action."  *Precious Creation, Inc. v. Mercantile Bank Mortg. Co., LLC*, 731 F. App'x 498, 501 (6th Cir. 2018).

---

[35]  A two-year statute of limitations applies to consumer protection claims in Idaho, Montana, and Virginia.  *See* Idaho Code § 48-619; Mont. Code Ann. § 27-2-211; Va. Code Ann. § 59.1-204.1.

[36]  A three-year statute of limitations applies to antitrust claims in Kansas, Mississippi, and Tennessee.  *See* Kan. Stat. Ann. § 60-512; Miss. Code § 15-1-49(1); Tenn. Code Ann. § 28-3-105.  And a three-year statute of limitations applies to consumer protection claims in Colorado, Connecticut, the District of Columbia, New York, and South Carolina.  *See* Colo. Rev. Stat. Ann. § 6-1-115; Conn. Gen. Stat. Ann. § 42-110g(f); D.C. Code § 28–3905(d)(1); N.Y. C.P.L.R. 214; S.C. Code Ann. § 39-5-150.

[37]  ADPs and EPPs contend that their claims with a four-year statute of limitations are timely.  *See* EPP ¶ 306; ADP ¶ 204.  Defendants do not agree and do not concede that any claims with a four-year statute of limitations are timely.  Defendants reserve the right to challenge the timeliness of these claims at a later date.

EPPs and ADPs are not entitled to tolling because they have not adequately alleged wrongful concealment or due diligence.  *See* EPP ¶¶ 307-310; ADP ¶¶ 205-207.  The first element, which requires Defendants to have concealed the conduct constituting the cause of action, is especially implausible given that Plaintiffs' entire case is based on allegations of *public* signaling. Nevertheless, Plaintiffs claim Defendants' publicly-announced price increases did not reveal the alleged conspiracy.  But as the Sixth Circuit has made clear, an "unwillingness to divulge wrongful activities is not sufficient."  *Browning v. Levy*, 283 F.3d 761, 770 (6th Cir. 2002).  Instead, there must be some "'trick or contrivance intended to exclude suspicion and prevent inquiry.'"  *Id.*

As to the third element, EPPs and ADPs also were not diligent in uncovering their claims. As one court explained in like circumstances:

> [W]here the claimed harm in a given case is a divergence between market prices and the price actually charged (or paid), the plaintiff must allege at the pleading stage facts regarding their efforts to compare the price charged (or paid) to market prices, or alternatively, plead facts showing why that comparison would not have revealed the harm.

*Solis v. Emery Fed. Credit Union*, 459 F. Supp. 3d 981, 996 (S.D. Ohio 2020) (granting motion to dismiss antitrust claims as time-barred because plaintiffs' "attempt at using fraudulent concealment to toll the statute of limitations fails as a matter of law").  Neither EPPs nor ADPs have pleaded any efforts they made to compare the prices they paid for tires to the market prices, much less particularized allegations of such efforts—thus falling short of the pleading requirements for fraudulent concealment.  To the extent EPPs and ADPs seek to assert claims that fall outside of the statute of limitations, their claims should be dismissed.

## IX.  <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants respectfully request dismissal of the Complaints in their entirety with prejudice.

Dated:  September 20, 2024

Respectfully submitted,

LATHAM & WATKINS LLP

By: *s/* Belinda S Lee

Christopher S. Yates
Belinda S Lee
Ashley M. Bauer
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: Chris.Yates@lw.com
Belinda.Lee@lw.com
Ashley.Bauer@lw.com

Elizabeth B. Wright (0018456)
Robert F. Ware (0055515)
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: 216.566.5500
Facsimile:  216.566.5800
Elizabeth.Wright@ThompsonHine.com
Robert F.Ware@ThompsonHine.com

*Attorneys for Defendants Compagnie*
*Générale des Etablissements Michelin and*
*Michelin North America, Inc.*

s/ David J. Lender (consent)
David J. Lender
Adam C. Hemlock
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Phone: (212) 310-8000
Fax: (212) 310-8007
Email: david.lender@weil.com
adam.hemlock@weil.com

James M. Lyons, Jr. (0023500)
W. Bradford Longbrake (0065576)
R. Brian Borla (0077322)
**HANNA, CAMPBELL & POWELL, LLP**
3737 Embassy Parkway, Suite 100
Akron, OH 44333
Phone: (330) 670-7319
Fax: (330) 670-7449
Phone: (330) 670-7303
Fax: (330) 670-7446
Phone: (330) 670-7339
Fax: (330) 670-7453
Email: jlyons@hcplaw.net
blongbrake@hcplaw.net
bborla@hcplaw.net

*Attorneys for Defendants Bridgestone Americas, Inc. and Bridgestone Corporation*


s/ Jeffrey C. Bank (consent)
Jeffrey C. Bank
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
1700 K Street NW, Fifth Floor
Washington, DC 20006
Phone: (202) 973-8800
Fax: (866) 974-7329
Email: jbank@wsgr.com

Kenneth J. Rubin
Alycia N. Broz
**VORYS, SATER, SEYMOUR AND PEASE LLP**
52 East Gay Street
Columbus, Ohio 43215
Phone: (614) 464-5692
Email: kjrubin@vorys.com
anbroz@vorys.com

*Attorneys for Defendants Continental Aktiengesellschaft and Continental Tire the Americas, LLC*

64

s/ B. Parker Miller (consent)
B. Parker Miller
Meredith Jones Kingsley
Laura Komarek
Grace Assaye
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
Email: Parker.Miller@alston.com
Meredith.Kingsley@alston.com
Laura.Komarek@alston.com
Grace.Assaye@alston.com

Michael H. Carpenter
**CARPENTER LIPPS LLP**
280 Plaza, Suite 1300
280 North High Street
Columbus, OH 43215
Phone: (614) 365-4100
Fax: (614) 365-9145
Email: carpenter@carpenterlipps.com

*Attorneys for Defendants Nokian Tyres U.S.
Operations LLC, Nokian Tyres Inc. and
Nokian Tyres plc*

s/ J. Mark Gidley (consent)
J. Mark Gidley
**WHITE & CASE LLP**
701 Thirteenth Street NW
Washington, DC 20005-3807
Telephone: (202) 626-3600
Email: mgidley@whitecase.com

Robert Milne
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020-1095
Phone: (212) 819-8200
Email: rmilne@whitecase.com

Dan Medici
**WHITE & CASE LLP**
75 State Street
Boston, MA 02109-1814
Phone: (617) 979-9300
Email: dan.medici@whitecase.com

*Attorneys for Defendants Pirelli Tire LLC*
*and Pirelli & C. S.p.A.*

s/ E. Kate Patchen (consent)
E. Kate Patchen
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission St., Ste. 5400
San Francisco, CA 94105
Phone: (415) 591-6000
Fax: (415) 955-6091
Email: kpatchen@cov.com

Robert D. Wick
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth St., NW
Washington, DC 20001
Phone: (202) 662-6000
Fax: (202) 662-6291
Email: rwick@cov.com

David H. Wallace
**TAFT STETTINIUS & HOLLISTER**
200 Public Square, Ste. 3500
Cleveland, OH 44114
Phone: (216) 241-2838
Fax: (216) 241-3707
Email: dwallace@taftlaw.com

*Attorneys for Defendant The Goodyear Tire*
*& Rubber Company*

## LOCAL RULE 7.1(f) CERTIFICATION

This case has not been assigned to a track pursuant to Local Rule 16.3.  However, this is a complex case.  As set forth in the Court's August 19, 2024 Order Allowing Consolidated Briefing on Defendants' Forthcoming Motions to Dismiss, the Court set a page limit of 90 pages for Defendants' total opening briefing in support of their Rule 12(b) Motions to Dismiss.  This Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaints adheres to those page limitations.

By: *s/* Belinda S Lee

Christopher S. Yates
Belinda S Lee
Ashley M. Bauer
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 396-8095
Email: Chris.Yates@lw.com
Belinda.Lee@lw.com
Ashley.Bauer@lw.com

Elizabeth B. Wright (0018456)
Robert F. Ware (0055515)
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: 216.566.5500
Facsimile: 216.566.5800
Elizabeth.Wright@ThompsonHine.com
Robert F.Ware@ThompsonHine.com

*Attorneys for Defendants Compagnie Générale des Etablissements Michelin and Michelin North America, Inc.*

s/ David J. Lender (consent)
David J. Lender
Adam C. Hemlock
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Phone: (212) 310-8000
Fax: (212) 310-8007
Email: david.lender@weil.com
adam.hemlock@weil.com

James M. Lyons, Jr. (0023500)
W. Bradford Longbrake (0065576)
R. Brian Borla (0077322)
**HANNA, CAMPBELL & POWELL, LLP**
3737 Embassy Parkway, Suite 100
Akron, OH 44333
Phone: (330) 670-7319
Fax: (330) 670-7449
Phone: (330) 670-7303
Fax: (330) 670-7446
Phone: (330) 670-7339
Fax: (330) 670-7453
Email: jlyons@hcplaw.net
blongbrake@hcplaw.net
bborla@hcplaw.net

*Attorneys for Defendants Bridgestone Americas, Inc. and Bridgestone Corporation*


s/ Jeffrey C. Bank (consent)
Jeffrey C. Bank
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
1700 K Street NW, Fifth Floor
Washington, DC 20006
Phone: (202) 973-8800
Fax: (866) 974-7329
Email: jbank@wsgr.com

Kenneth J. Rubin
Alycia N. Broz
**VORYS, SATER, SEYMOUR
AND PEASE LLP**
52 East Gay Street
Columbus, Ohio 43215
Phone: (614) 464-5692
Email: kjrubin@vorys.com
anbroz@vorys.com

*Attorneys for Defendants Continental
Aktiengesellschaft and Continental Tire the
Americas, LLC*


s/ B. Parker Miller (consent)
B. Parker Miller
Meredith Jones Kingsley
Laura Komarek
Grace Assaye
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
Email: Parker.Miller@alston.com
Meredith.Kingsley@alston.com
Laura.Komarek@alston.com
Grace.Assaye@alston.com

Michael H. Carpenter
**CARPENTER LIPPS LLP**
280 Plaza, Suite 1300
280 North High Street
Columbus, OH 43215
Phone: (614) 365-4100
Fax: (614) 365-9145
Email: carpenter@carpenterlipps.com

*Attorneys for Defendants Nokian Tyres U.S.
Operations LLC, Nokian Tyres Inc. and
Nokian Tyres plc*

s/ J. Mark Gidley (consent)
J. Mark Gidley
**WHITE & CASE LLP**
701 Thirteenth Street NW
Washington, DC 20005-3807
Telephone: (202) 626-3600
Email: mgidley@whitecase.com

Robert Milne
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020-1095
Phone: (212) 819-8200
Email: rmilne@whitecase.com

Dan Medici
**WHITE & CASE LLP**
75 State Street
Boston, MA 02109-1814
Phone: (617) 979-9300
Email: dan.medici@whitecase.com

*Attorneys for Defendants Pirelli Tire LLC
and Pirelli & C. S.p.A.*

s/ E. Kate Patchen (consent)
E. Kate Patchen
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission St., Ste. 5400
San Francisco, CA 94105
Phone: (415) 591-6000
Fax: (415) 955-6091
Email: kpatchen@cov.com

Robert D. Wick
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth St., NW
Washington, DC 20001
Phone: (202) 662-6000
Fax: (202) 662-6291
Email: rwick@cov.com

David H. Wallace
**TAFT STETTINIUS & HOLLISTER**
200 Public Square, Ste. 3500
Cleveland, OH 44114
Phone: (216) 241-2838
Fax: (216) 241-3707
Email: dwallace@taftlaw.com

*Attorneys for Defendant The Goodyear Tire
& Rubber Company*