**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: PASSENGER VEHICLE | ) | Case No. 5:24-md-3107 |
| REPLACEMENT TIRES ANTITRUST | ) | |
| LITIGATION | ) | MDL No. 3107 |
| | ) | |
| This Document Applies to: | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| ALL CASES | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |

These consolidated putative class actions allege a conspiracy between defendants, who are among the largest tire manufacturers in the world, to fix prices on replacement tires sold in the United States during and after the COVID-19 pandemic. Defendants are alleged to have unlawfully agreed to coordinate a series of price increases between 2020 and 2023 and to have maintained those artificially inflated prices from 2023 through the present.[1]

There are three sets of putative classes: Direct Purchaser Plaintiffs ("DPPs"), who purchased replacement tires directly from defendants (*see* Doc. No. 174 ("DPP Complaint")); End Payor Plaintiffs ("EPPs"), who purchased replacement tires from persons or entities other than defendants for their own use and not for resale (*see* Doc. No. 175 ("EPP Complaint")); and Automobile Dealership and Other Reseller Plaintiffs ("ADPs"), who purchased replacement tires from persons or entities other than defendants for resale and not for their own use (*see* Doc. No. 177 ("ADP Complaint")). DPPs, EPPs, and ADPs are collectively referred to herein as "plaintiffs."

---

[1] There are 12 named defendants in this case. That said, the consolidated complaints and the parties' briefing frequently refer to defendants by reference to their corporate family. Specifically, the "Bridgestone" defendants include Bridgestone Corporation and Bridgestone Americas, Inc. The "Continental" defendants include Continental Aktiengesellschaft and Continental Tire the Americas, LLC. The "Michelin" defendants include Compagnie Générale des Établissements Michelin and Michelin North America, Inc. The "Nokian" defendants include Nokian Tyres plc, Nokian Tyres Inc., and Nokian Tyres U.S. Operations LLC. The "Pirelli" defendants include Pirelli & C.S.p.A. and Pirelli Tire LLC. And the only "Goodyear" defendant is The Goodyear Tire & Rubber Company. For purposes of this order, the Court will also refer to the corporate family except when necessary.

Plaintiffs seek relief under Section 1 of the Sherman Act. (DPP ¶¶ 185–90; EPP ¶¶ 325–36; ADP ¶¶ 216–26.) The indirect purchaser classes (i.e., EPPs and ADPs) also assert related state-law claims that overlap with the federal antitrust claims. (EPP ¶¶ 337–651; ADP ¶¶ 227–41.)[2]

Before the Court is a motion to dismiss for failure to state a claim jointly filed by all defendants and applying to all claims. (Doc. No. 247.) The Nokian and Continental defendants also each filed supplemental motions to dismiss for failure to state a claim, advancing arguments specific to them (*see* Doc. Nos. 245 (Nokian), 246 (Continental)), and defendant Pirelli & C. S.p.A. ("P&C") moved to dismiss the claims against it for lack of personal jurisdiction. (Doc. No. 243.) Plaintiffs responded directly to P&C's motion (Doc. No. 265) and filed a single opposition brief to the three Rule 12(b)(6) motions. (Doc. No. 266.) A reply brief in support of each motion to dismiss was filed. (Doc. Nos. 273 (P&C Reply), 274 (Continental Reply), 275 (Nokian Reply), 276 (Joint Reply).) The Court held a hearing on the motions on January 10, 2025 (Doc. No. 295 (Transcript)), and they are now ripe for disposition.

For the reasons that follow, the joint motion to dismiss is **GRANTED**, the individual motions to dismiss of P&C, Continental, and Nokian are **DENIED AS MOOT**, and the consolidated complaints are **DISMISSED WITHOUT PREJUDICE**.

## I.  SUMMARY OF PLAINTIFFS' ALLEGATIONS

To begin, plaintiffs allege that the U.S. market for replacement tires in general is "susceptible to collusion" based on several market characteristics. First and foremost is that the industry "is oligopolistic and highly concentrated," with Bridgestone, Michelin, and Goodyear controlling "almost 64 percent of the entire" market. (EPP ¶ 183; *see also* DPP ¶ 69; ADP ¶ 42.)

---

[2] The ADP Complaint incorrectly labels paragraphs 231–242 as paragraphs 1–11. To avoid confusion, this Order refers to the ADP Complaint's second set of paragraphs 1–11 as paragraphs 231–242.

Furthermore, the replacement tire market features "high barriers to entry and exit," "price inelasticity," and "standardized products with a high degree of interchangeability," all market characteristics that plaintiffs allege make price-fixing conspiracies more likely. (DPP ¶¶ 149–60; EPP ¶¶ 240–51; ADP ¶¶ 165–75.)

Against that backdrop, plaintiffs allege that "[f]or most of the 2010s, the price level of tires remained relatively stable, changing slowly within a narrow band." (DPP ¶ 74; *see also* EPP ¶ 137; ADP ¶ 91.) According to plaintiffs, "several of the [d]efendants struggled to increase prices" prior to the alleged conspiracy period, and "sometimes announced price increases that they could not successfully implement, were unable to raise prices enough to cover cost increases, or suffered from declining volumes or market share due to competitive pressures following a price increase." (DPP ¶ 115; *see also* EPP ¶ 144.) Certain defendants announced price increases in 2017 (prior to the alleged conspiracy), but their attempts allegedly "failed" because "consumers simply turned to lower-priced alternatives[.]" (EPP ¶ 144; *see also* DPP ¶¶ 115–18.)

But "[f]ollowing the onset of the COVID-19 pandemic, profit and revenue in many industries decreased while the input costs increased." (DPP ¶ 128.) More specifically, the "pandemic had a global impact on the tire industry and its material suppliers" (EPP ¶ 142) because, as "measures were put into place to combat the spread of the virus, domestic travel stopped and then slowed, reducing demand for tires." (ADP ¶ 102; *see also* EPP ¶ 142.) "To remain profitable, [d]efendants needed to pass on costs" to consumers by raising prices. (ADP ¶ 104.) According to plaintiffs, these market conditions—the failed attempts to raise prices in 2017, and the desire "to offset the downward pricing pressure from soft demand"—motivated defendants to conspire to raise prices under the pretextual cover provided by the pandemic. (Doc. No. 266, at 52; *see also* DPP ¶¶ 128–29; EPP ¶¶ 142–45; ADP ¶¶ 102–04.)

Turning to the actual conspiracy alleged, plaintiffs assert that defendants collectively announced approximately 41 price increases between 2020 and 2023. (DPP ¶ 76; EPP ¶ 139; ADP ¶ 66.) During the alleged conspiracy period, "the average price of replacement tires increased by 21.4%," which is "70% more than core inflation during that period." (DPP ¶ 4; *see also* EPP ¶ 138; ADP ¶ 220.) Defendants publicly blamed the price increases on rising input costs, "changing market conditions," "market dynamics," and the like. (*See, e.g.*, DPP ¶¶ 113, 172; EPP ¶¶ 177, 308; ADP ¶¶ 152, 206.) But according to plaintiffs, the "price increases far exceeded the rise in input costs that drive replacement tire pricing." (Doc. No. 266, at 24 (citing DPP ¶ 120; EPP ¶ 178).) Moreover, defendants have maintained what plaintiffs have described as "artificially" inflated prices through the present even though the inflationary effects of the pandemic have eased. (DPP ¶¶ 129–30; *see also* EPP ¶¶ 138, 333(ii); ADP ¶¶ 105–06.)

Plaintiffs allege that defendants facilitated their price-fixing conspiracy through indirect communications with each other during public earnings calls. (DPP ¶ 75; EPP ¶ 141; ADP ¶¶ 1, 52.) These earnings calls are alleged to have provided defendants an "opportunity to reinforce and signal their intent to increase prices" by "publicly announcing future price increases a month to two months in advance of the effective date." (DPP ¶ 75; *see also* EPP ¶¶ 141, 163; ADP ¶ 52.) The consolidated complaints identify a number of defendants' statements made during earnings calls that plaintiffs contend were unlawful price signaling in furtherance of the conspiracy. (DPP ¶¶ 77–100; EPP ¶¶ 141–76; ADP ¶¶ 52–65.) According to plaintiffs, defendants "did not simply discuss earlier price increases" on these calls, but rather "publicly discussed future price increases and pricing strategies," thereby "revealing competitively sensitive information." (Doc. No. 266, at 25 (citing DPP ¶ 88; EPP ¶ 253; ADP ¶ 53).) Further, plaintiffs allege that defendants often increased prices "shortly after their co-conspirators' public statements on pricing," which plaintiffs

describe as a "pattern [that] makes clear that the public announcements signaled prices [*sic*] increases to other [d]efendants to maintain supracompetitive prices for replacement tires." (*Id.* at 25–28.) Defendants are also alleged to have used revenue management software and a certain third-party consultant "to police and 'monitor'" their co-conspirators' compliance with the alleged price-fixing agreement. (*Id.* at 28–29.)

As further evidence of the alleged conspiracy, plaintiffs point to unannounced inspections of defendants' European facilities by the European Commission ("EC") in early 2024 (DPP ¶ 161; EPP ¶ 186; ADP ¶ 95), and a second inspection of an undisclosed consultancy firm in June 2024. (DPP ¶ 102; EPP ¶ 190; ADP ¶ 98.) In a press release accompanying the initial raids, the EC explained its "'concerns that the inspected companies may have violated EU [i.e., European Union] antitrust rules that prohibit cartels and restrictive business practices'" under "'Article 101 of the Treaty on the Functioning of the European Union.'" (DPP ¶ 161; EPP ¶ 187; ADP ¶ 96 (citations omitted).) The EC stated that the inspections were related to "'new replacement tyres for passenger [vehicles] sold in the European Economic Area,'" and were the result of the EC's "'concern[] that price coordination took place amongst the inspected companies, including via public communications.'" (DPP ¶ 161; EPP ¶ 187; ADP ¶ 96 (citations omitted).)

In moving to dismiss, defendants argue that the consolidated complaints do not plausibly allege a price-fixing conspiracy. Defendants primarily challenge the sufficiency of plaintiffs' parallel conduct and plus factor allegations and argue that the economic impact of the COVID-19 pandemic is an "obvious alternative explanation" for the price increases. (*See* Doc. No. 247-1, at 17–22.)

## II.      MOTION TO DISMISS

### A.      Standard of Review

The Federal Rules of Civil Procedure provide that all pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). While Rule 8(a) does not require plaintiffs to set forth detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). At a minimum, Rule 8(a) requires that a plaintiff "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"—that is, Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 555 n.3, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The reviewing court must determine not whether the plaintiff will ultimately prevail, but whether the facts demonstrate "more than a sheer possibility that a defendant has acted unlawfully," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 678–79; *Twombly*, 550 U.S. at 570 (holding that a complaint is subject to dismissal where plaintiffs failed to "nudge[] their claims across the line from conceivable to plausible"). Although the Court must take all the factual allegations in the complaint as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and legal conclusions couched as factual allegations need not be accepted as true. *Iqbal*, 556 U.S. at 678; *see also Fritz v. Charter*

6

*Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). Therefore, to survive a motion to dismiss under Rule 12(b)(6), the "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

### B.  Judicial Notice

Before turning to the merits, the Court must first define the universe of relevant materials. In ruling on a motion to dismiss, a court may consider: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion to dismiss that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice. *Whittiker v. Deutsche Bank Nat'l Tr. Co.*, 605 F. Supp. 2d 914, 924–25 (N.D. Ohio 2009); *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Commercial Money Ctr., Inc. v. Ill. Union Ins.*, 508 F.3d 327, 335–36 (6th Cir. 2007) (explaining that courts may consider a document that is "referred to in the pleadings and is integral to the claims . . . without converting a motion to dismiss into one for summary judgment"); *Metz v. Unizan Bank*, No. 5:05-cv-1510, 2007 WL 3232431, at *1 (N.D. Ohio Oct. 31, 2007) ("Despite the general rule, a court may consider a document outside the pleadings if the pleadings refer to it.").

Defendants request that the Court take judicial notice of several categories of documents. First, defendants ask the Court to take judicial notice of two EC press releases. The first release, offered as Exhibit 1 to defendants' joint motion to dismiss, is titled "Commission Carries Out Unannounced Antitrust Inspections in the Tyres Sector," and is dated January 30, 2024. (Doc. No. 247-2 ¶ 3; *see also* Doc. No. 247-3 ("First EC Press Release").) The release is quoted and referenced throughout the consolidated complaints, as the EC investigation is offered as circumstantial evidence of the alleged conspiracy. (*See, e.g.*, DPP ¶¶ 2 n.1, 161 n.210; EPP ¶¶ 2 n.1, 186–87, 187 n.8; ADP ¶¶ 2 n.1, 95–96, 96 n.119.) The second release, offered as Exhibit 5 to defendants' joint reply brief, is titled "Commission carries out further unannounced antitrust inspections in tyres sector cartel investigation," and is dated June 18, 2024. (Doc. No. 276-1 ¶ 7; *see also* Doc. No. 276-6 ("Second EC Press Release").) This second release is also cited in the consolidated complaints. (DPP ¶ 102; EPP ¶ 191 n.15; ADP ¶ 99.) Plaintiffs do not challenge the authenticity of either release or object to the Court's consideration of them. (*See, e.g.*, Doc. No. 295, at 124.) The Court will therefore consider the EC press releases as incorporated by reference in the pleadings.

Second, defendants ask the Court to consider the full transcripts of five earnings calls cited in the consolidated complaints, offered as Exhibits 8–12. (Doc. No. 247-2 ¶¶ 10–14.) (One of the exhibits, Doc. No. 247-12, is Nokian's "Q1 Interim Report 2020," but it follows a question-and-answer format similar to an earnings call.) Plaintiffs do not challenge the authenticity of the transcripts, which are quoted extensively in the consolidated complaints as evidence of the alleged conspiracy. (*See, e.g.*, DPP ¶¶ 77, 79, 92, 99 n.145; EPP ¶ 146; ADP ¶ 55.) Because the alleged public signaling that occurred during earnings calls are integral to plaintiffs' conspiracy allegations, the Court may consider Exhibits 8–12 as necessary and appropriate to place the

statements in context. *See Twombly*, 550 U.S. at 568 n.13 ("This was only part of what [the CEO] reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn."); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 592 (N.D. Cal. 2019) (taking judicial notice of "transcripts of earnings calls . . . [b]ecause these documents form the basis" of the complaint).

Next, defendants ask the Court to take judicial notice of several published price increase announcements cited in the consolidated complaints, offered by defendants as Exhibits 2–7 of their joint motion to dismiss. (*See* Doc. No. 247-2 ¶¶ 4–9.) Defendants seek to introduce these announcements to show that they "did not say that the price adjustments would apply to *all* replacement tires in [the announcing defendant's] product line." (Doc. No. 247-1, at 26–27 (emphasis in original).) But plaintiffs allege a price-fixing conspiracy as to replacement passenger tires in general. While these distinctions may have significance at later stages of the proceedings, at the pleading stage, the plausibility of plaintiffs' claims do not depend on the particular subsets of passenger replacement tires to which each price increase announcement applied. Thus, the Court declines to consider Exhibits 2–7.

Next, defendants ask the Court to consider several published articles cited in the consolidated complaints. (Doc. No. 247-2 ¶¶ 16–20.) The full articles are offered by defendants as Exhibits 14–18 to their joint motion to dismiss, for the purpose of rebutting plaintiffs' assertion that the price increases are not explained by the inflationary impacts of the COVID-19 pandemic and other such market forces. (Doc. No. 247-1, at 52.) There is some merit to defendants' contention that plaintiffs' selective citations to portions of the articles (that support their claims) constitute incorporation by reference thereby permitting the Court to consider other information

9

contained in the articles that puts plaintiffs' cited information in context. (*See* Section III.B.6 n.19, *infra*.) But the Court's analysis of the lack of plausibility of plaintiffs' conspiracy allegations, as detailed below, obviates the need for the Court to consider the additional contextual information. Thus, the Court will not rely on these materials.

Defendants also submit copies of the public websites of third parties Lizeo, Smithers, and Torqata. (Doc. No. 247-2 ¶ 15; Doc. No. 276-1 ¶¶ 5–6.) Defendants seek to use these materials to show that those third-party companies do not facilitate the exchange of defendants' confidential data. (Doc. No. 247-2 ¶ 15; *see also* Doc. No. 247-1, at 46–47; Doc. No. 276, at 26–27.) Again, while it is understandable why defendants seek to use these materials to challenge plaintiffs' representations about the services offered by these third parties, the Court need not rely on these materials. As explained below, plaintiffs fail to allege what confidential information they believe defendants exchanged or how the ability to exchange such information would further the conspiracy alleged here. As such, the Court will not consider the information contained on the public websites of Lizeo, Smithers, and Torqata.

Next, as Exhibit 1 to their joint reply brief, defendants offer a graph from the "Singapore Commodity Exchange, Rubber Price, Index Mundi," depicting rubber prices from October 2019 to April 2024. (Doc. No. 276-1 ¶ 3.) The DPP Complaint provides a hyperlink directly to the graph contained in Exhibit 1. (DPP ¶ 120.) Defendants offer the graph for the sole purpose of demonstrating that, although the "price of rubber fell more than 16% in 2021 and a further 22% in 2022," as DPPs allege (*see* DPP ¶ 120 (citing the graph reproduced in Doc. No. 276-1)), rubber prices were highly volatile during that period and did not follow a simple downward trend as DPPs suggest. (Doc. No. 276, at 18.) That is a legitimate and proper analysis of a graph specifically

10

chosen and provided by DPPs. As such, the Court will consider Exhibit 1 to defendants' reply brief.

Finally, defendants offer a graph from the "Federal Reserve Bank of St. Louis's Producer Price Index by Industry: Tire Manufacturing[.]" (Doc. No. 276-1 ¶ 4.) Defendants offer the graph to demonstrate that the U.S. Producer Price Index, which EPPs cite in paragraphs 138 and 180 of their consolidated complaint, includes data regarding tires that are not at issue in this litigation— specifically, "trucks, bus, tractor, industrial, and other [non-passenger] tires." (Doc. No. 276, at 24.) Contrary to defendants' representation (Doc. No. 276-1 ¶ 4), however, Exhibit 2 is not cited in the consolidated complaints and so the incorporation by reference doctrine does not apply. Exhibit 2 reflects "Producer Price Index by Industry," not the "Producer Price Index by Commodity" that EPPs allege. (EPP ¶ 138.) As such, Exhibit 2 does not prove that EPPs' graphs reflecting the Producer Price Index by Commodity include non-passenger tires. The Court will not consider Exhibit 2 to defendants' joint reply brief.

### C.    Sherman Act Conspiracy Pleading Standards

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "To establish a violation of § 1 of the Sherman Act a plaintiff must demonstrate that there is: 1) an agreement, which may be in the form of a contract, combination, or conspiracy; 2) affecting interstate commerce; 3) that imposes an unreasonable restraint on trade." *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 663 (6th Cir. 2022) (citing *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir. 1983) (further citation omitted)). Defendants challenge only the first element.

11

An agreement to conspire means "the conspirators have a unity of purpose, common understanding, or a meeting of minds in an unlawful arrangement." *Hyland v. HomeServices of America, Inc.*, 771 F.3d 310, 318 (6th Cir. 2014) (citation and quotation marks omitted). An agreement to conspire can be alleged through either direct or circumstantial evidence. Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* (citation and internal quotation marks omitted). Direct evidence of antitrust conspiracies is rare, and the "element of agreement . . . is nearly always established by circumstantial evidence, as conspirators seldom make records of their illegal agreements." *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 714 (E.D. Tenn. 2011) (quoting *United States v. Short*, 671 F.2d 178, 182 (6th Cir. 1982)). Plaintiffs do not claim to have any direct evidence of collusion, but they argue they have presented sufficient circumstantial evidence from which the Court may infer conspiracy.

In *Twombly*, the United States Supreme Court specifically addressed the requisite level of detail for a Section 1 claim. 550 U.S. at 556. To state a plausible claim for conspiracy, a plaintiff must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* Absent direct evidence of unlawful agreement, a plaintiff must allege both parallel business conduct between the co-conspirators, and additional facts placing the parallel conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Factual allegations must be "suggestive enough to render a § 1 conspiracy plausible" and "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

Relevant here is the distinction between a conspiracy and an economic concept known as conscious parallelism. The difference is subtle, but significant. Conscious parallelism is "a

common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (cleaned up). Although conscious parallelism "is admissible circumstantial evidence from which the fact finder may infer agreement," it "is not itself unlawful." *Twombly*, 550 U.S. at 553–54 (cleaned up). That is because conscious parallelism is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.*; *see Travel Agent*, 583 F.3d at 907; *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 460 (9th Cir. 2018) ("With a market comprised of a few dominant players and publicly available pricing information, it is no surprise that [prices] remain relatively uniform across the industry."). In other words, the Sherman Act "does not require sellers to compete; it just forbids their agreeing or conspiring not to compete." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010). The "crucial question" for a Section 1 claim, then, "is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (cleaned up).

When analyzing circumstantial evidence at the motion to dismiss stage, the Court must decide whether "the factual allegations point to nothing more than parallel conduct of the sort that is the product of independent action, or [whether] they plausibly raise an inference of unlawful agreement[.]" *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012). Parallel conduct "gets the complaint close to stating a claim," but it is not sufficient on its own and a plaintiff must provide further "factual enhancement" to survive a motion to dismiss. *Twombly*, 550 U.S. at 557; *see also Erie Cnty.*, 702 F.3d at 868 ("[T]he bare fact that defendants engaged in parallel conduct is not sufficient to establish a Sherman Act violation."). This is especially true

when alleging a conspiracy against defendants operating in an oligopoly. *Prosterman*, 747 F.

App'x at 460 ("[I]n an interdependent oligopoly . . . , [a Section 1 plaintiff] must plead more than

conscious parallelism to survive a motion to dismiss.").

To provide the requisite "factual enhancement," a plaintiff lacking direct evidence of a

conspiracy "must provide 'plus factors' to support [an] allegation that the actions of the Defendants

[were] not independent." *Hobart-Mayfield*, 48 F.4th at 664–65 (citing *Travel Agent*, 583 F.3d at

907); *see also Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d

Cir. 2013) (explaining that conspiracy "may be inferred on the basis of conscious parallelism,

when such interdependent conduct is accompanied by circumstantial evidence and plus factors"

(citation and quotation marks omitted)). "The term 'plus factors' refers to circumstances

demonstrating that the wrongful conduct 'was conscious and not the result of independent business

decisions of the competitors.'" *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 91 (3d Cir.

2016) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999)).

The Sixth Circuit has identified the following "plus factors" for a district court to consider:

"(1) whether the defendants' actions, if taken independently, would be contrary to their economic

self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants

have exchanged or have had the opportunity to exchange information relative to the alleged

conspiracy; and (4) whether defendants have a common motive to conspire." *Hobart-Mayfield*, 48

F.4th at 666 (quoting *Travel Agent*, 583 F.3d at 907). This list of factors, however, is "neither

exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when

combined with parallel behavior, might permit a jury to infer the existence of an agreement."

*Citigroup*, 709 F.3d at 136 n.6 (2d Cir. 2013) (discussing similar factors); *see also In re

Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017) ("There

is no finite list of potential plus factors."), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018). "Any fact that tends to exclude the possibility of independent action may qualify." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1259–60 (S.D. Fla. 2021).

Conversely, courts may infer from the factual allegations "'obvious alternative explanations'" that suggest lawful behavior rather than the illicit conspiracy plaintiffs ask the court to infer. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567) (alteration omitted). "Following *Twombly*, courts dismiss Section 1 complaints when there is an independent business justification for the observed conduct and no basis for rejecting it as the explanation for the conduct." *In re McCormick & Co.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016) (collecting cases and finding the "common theme . . . is that if the most natural explanation for defendants' conduct is not collusion, merely alleging that the conduct was collusive does not make it plausible"), *amended on reconsideration sub nom. In re McCormick & Co., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 275 F. Supp. 3d 218 (D.D.C. 2017) (allowing plaintiffs to amend).

## III.   ANALYSIS

In moving to dismiss, defendants argue that plaintiffs failed to plead facts plausibly suggesting a conspiracy. Specifically, defendants challenge the sufficiency of plaintiffs' allegations regarding parallel conduct and plus factors and argue that the economic impact of the COVID-19 pandemic is an "obvious alternative explanation" for the price increases. (*See* Doc. No. 247-1, at 17–22.) Additionally, defendants contend that EPPs' and ADPs' state-law claims should be dismissed for a number of other, independent reasons. (*Id.* at 22.) Finally, the Nokian and Continental defendants have each filed separate motions to dismiss for failure to state a claim against them (Doc. Nos. 245, 246), and P&C moved to dismiss for lack of personal jurisdiction. (Doc. No. 243.) The Court begins its discussion with defendants' primary argument (failure to

15

plead facts plausibly suggesting a conspiracy under Section 1 of the Sherman Act) because a negative finding on this issue would be dispositive.

### A.    Parallel Conduct

"A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted similarly." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) (quotation marks and citations omitted); *see also Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915 (N.D. Cal. 2019) ("Parallel conduct occurs when competitors act similarly or follow the same course of action — for example, adopting similar policies at or around the same time in response to similar market conditions." (citations omitted)); *Bitmain*, 530 F. Supp. 3d at 1259 ("Other Circuits have defined parallel conduct as similar action." (collecting cases)).

Here, plaintiffs allege that defendants implemented a "series of coordinated and parallel price increases . . . beginning in late 2020 through early 2023." (DPP ¶¶ 4, 76; *see also* EPP ¶¶ 4, 139; ADP ¶¶ 3, 66.) DPPs provide the following chart summarizing the price increases:

| Defendant | Announcement Date | Effective Date | Price Increase |
|---|---|---|---|
| **2020** | | | |
| Michelin | February 14, 2020 | March 16, 2020 | up to 7% |
| Goodyear | March 3, 2020 | April 1, 2020 | up to 5% |
| Pirelli | March 12, 2020 | April 6, 2020 | up to 5% |
| Goodyear | November 13, 2020 | December 1, 2020 | up to 5% |
| **2021** | | | |
| Bridgestone | December 1, 2020 | January 1, 2021 | undisclosed |
| Pirelli | December 3, 2020 | January 1, 2021 | undisclosed |
| Michelin | December 19, 2020 | February 1, 2021 | up to 5% |
| Continental | January 6, 2021 | March 1, 2021 | undisclosed |
| Michelin | March 1, 2021 | April 1, 2021 | up to 8% |
| Goodyear | March 3, 2021 | April 1, 2021 | up to 8% |
| Pirelli | March 9, 2021 | April 15, 2021 | up to 7% |
| Bridgestone | March 24, 2021 | May 1, 2021 | up to 8% |
| Goodyear | May 3, 2021 | June 1, 2021 | up to 8% |

| Continental | May 5, 2021 | July 1, 2021 | undisclosed |
|---|---|---|---|
| Michelin | May 17, 2021 | July 1, 2021 | up to 6% |
| Pirelli | May 18, 2021 | July 1, 2021 | up to 6% |
| Bridgestone | May 27, 2021 | July 1, 2021 | up to 8% |
| Michelin | August 3, 2021 | September 1, 2021 | up to 8% |
| Goodyear | August 6, 2021 | September 1, 2021 | up to 8% |
| Continental | August 30, 2021 | October 1, 2021 | undisclosed |
| Pirelli | August 31, 2021 | October 1, 2021 | up to 8% |
| Bridgestone | September 1, 2021 | October 1, 2021 | up to 8% |
| **2022** | | | |
| Bridgestone | December 1, 2021 | January 1, 2022 | undisclosed |
| Michelin | December 1, 2021 | January 1, 2022 | up to 12% |
| Goodyear | unknown | January 1, 2022 | up to 12% |
| Continental | November 9, 2021 | January 3, 2022 | undisclosed |
| Pirelli | January 3, 2022 | January 17, 2022 | up to 10% |
| Michelin | February 7, 2022 | April 1, 2022 | up to 5% |
| Continental | March 1, 2022 | April 1, 2022 | undisclosed |
| Bridgestone | March 2, 2022 | April 1, 2022 | up to 10% |
| Pirelli | March 23, 2022 | April 11, 2022 | up to 10% |
| Continental | April 19, 2022 | June 1, 2022 | undisclosed |
| Michelin | May 2, 2022 | June 1, 2022 | 5–12% |
| Pirelli | May 17, 2022 | June 15, 2022 | up to 10% |
| Bridgestone | June 6, 2022 | July 1, 2022 | up to 10% |
| Goodyear | June 15, 2022 | July 1, 2022 | up to 10% |
| Continental | August 26, 2022 | October 1, 2022 | undisclosed |
| Bridgestone | September 8, 2022 | October 1, 2022 | up to 9% |
| **2023** | | | |
| Michelin | December 1, 2022 | January 1, 2023 | up to 9% |
| Bridgestone | December 2, 2022 | January 1, 2023 | undisclosed |
| Pirelli | December 2, 2022 | January 15, 2023 | up to 10% |

(DPP ¶ 76; *see also* EPP ¶ 139; ADP ¶ 66 (both providing similar tables).)[3]

---

[3] The tables in each consolidated complaint are largely the same, but there are a few minor inconsistencies. For example, the first entry in the DPP Complaint's table alleges that Michelin announced a price increase on February 14, 2020, whereas the ADP Complaint's table alleges the announcement was made on February 17, 2020, and the EPP

Defendants argue that plaintiffs have insufficiently pleaded parallel conduct, raising several criticisms of the pleadings. First, defendants argue that plaintiffs "do not allege that price increases were, in fact, implemented by each [d]efendant afterwards and consistent with each announcement." (Doc. No. 247-1, at 37.) But the Court is unconvinced that the distinction between price increases and announcements of price increases is relevant here; both are commercial conduct, and congruence in either constitutes parallel conduct. *See Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 162 (W.D.N.Y. 2020) ("[W]hether the price announcements consistently resulted in price increases in the same amount as the announcements is not dispositive of parallel conduct[.]" (collecting cases)).

Second, defendants object to the lack of specificity in the allegations of price increase announcements, pointing out that the price increase announcements were only "'up to' maximum percentages," and applied only to "certain unspecified tires, and explicitly not all tires." (Doc. No. 247-1, at 36–37 (citing DPP ¶ 76; EPP ¶ 139; ADP ¶ 66).) But again, at the pleadings stage, plaintiffs need not allege that defendants acted uniformly to establish parallel conduct—rather, they need only show that defendants acted similarly. *Miami Prods.*, 449 F. Supp. 3d at 162; *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 447 (E.D. Pa. 2018) ("While more detailed timing and price value information may be necessary to support their claims on summary judgment, [defendants' attacks on plaintiffs'] pricing allegations as being insufficiently parallel are unavailing at this stage of the litigation." (citation omitted)); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) ("Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel

---

Complaint's table omits the 2020 increases and the announcement dates. (DPP ¶ 76; EPP ¶ 139; ADP ¶ 66.) With that said, defendants do not raise these discrepancies in their motion, nor do they strike the Court as meaningful at this stage of the proceedings.

conduct. Nor are they required to plead with specificity the price by which each [product] was increased at a particular time." (internal citation omitted)).

Some variation in the timing or amount of defendants' price increases, or the particular subset of tires to which they apply, does not preclude a finding of parallel conduct. After all, it "is more than plausible that conspirators would leave the precise means of [carrying out the conspiracy] up to each conspirator, where multiple options would accomplish the intended goal." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 792 (N.D. Ill. 2017). "Permitting flexibility, where possible, in the means of effectuating price increases, would enable a greater number of producers to participate in the conspiracy, and might help to conceal the collusive nature of their conduct." *Id.* (citing *SD3*, 801 F.3d at 428 ("[I]f the defendants employed different courses of action, then their conspiracy might better avoid detection.")).

Third, defendants jointly argue (and Nokian argues in its separate motion to dismiss) that the Nokian defendants "are entirely absent from the tables purporting to show" parallel price increases, "and are not alleged to have sent any 'signals' via public pricing announcements." (Doc. No. 247-1, at 36 (citing DPP ¶ 76; EPP ¶ 139; ADP ¶ 66); *see also* Doc. No. 245.) But Nokian is alleged to have participated in the public signaling. (*See* DPP ¶¶ 88–89, 91, 93, 97; EPP ¶¶ 146–47, 160; ADP ¶¶ 50, 63.) Nokian is also alleged to be a subject of the EC investigation. (DPP ¶ 163; EPP ¶ 189(d); ADP ¶ 97(d).) When viewed within the full context of the consolidated complaints, these allegations are sufficient to link Nokian to the alleged conspiracy. *See United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) ("Once the existence of a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight." (alterations omitted)); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 732 (E.D.

19

Pa. 2011) ("Plaintiffs are not obliged to have the same quality or quantity of allegations as to one defendant as unto another." (collecting cases)).

Fourth, defendants argue that plaintiffs' "allegations about changing prices give rise, at most, to an inference of conscious parallelism, which does not suffice to allege a conspiracy claim." (Doc. No. 247-1, at 38.) In other words, defendants argue that "parallel pricing does not suggest an agreement because it is an expected result of lawful interdependent conduct in a consolidated industry." *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1078 (N.D. Ill. 2011). That argument, however, does "not refute the obvious plausibility of [p]laintiffs' threshold showing of conscious parallelism for Rule 12(b)(6) purposes." *Id.*

Accordingly, the Court finds that plaintiffs have adequately alleged parallel conduct. *Miami Prods.*, 449 F. Supp. 3d at 161 ("[I]t is adequate at the motion to dismiss stage to plead parallelism through a pattern of frequent price increases in similar intervals and amounts."); *In re Cedar Shakes & Shingles Antitrust Litig.*, No. C19-288, 2020 WL 832324, at *7 (W.D. Wash. Feb. 20, 2020); *Micron Tech.*, 400 F. Supp. 3d at 916; *Kleen*, 775 F. Supp. 2d at 1078.

### B.    Plus Factors

As explained above, parallel conduct—even conscious parallelism—is not enough for antitrust liability. *Travel Agent*, 583 F.3d at 902–03 ("In the wake of *Twombly*, allegations of parallel conduct and bare assertions of conspiracy no longer supply an adequate foundation to support a plausible § 1 claim."). To survive a motion to dismiss, plaintiffs lacking direct evidence of an antitrust conspiracy must not only plausibly allege parallel conduct, but also additional contextual factors to "demonstrate 'some setting suggesting the agreement necessary to make out a § 1 claim' under the Sherman Act." *Hobart-Mayfield*, 48 F.4th at 665–66 (quoting *Twombly*, 550 U.S. at 557).

20

"To illustrate such circumstances, a plaintiff must provide 'plus factors' to support [an] allegation that the actions of the Defendants are not independent." *Id.* (quoting *Travel Agent*, 583 F.3d at 907). "Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (citing *Twombly*, 550 U.S. at 556 n.4). (*See also* DPP ¶ 126; EPP ¶ 203 (both similar) (citations omitted).) Plus factors, when considered in the aggregate, must suggest that the parallel conduct alleged "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4 (citation omitted).

Plaintiffs rely on the following alleged plus factors: (1) the EC investigation; (2) defendants' common motive to conspire; (3) defendants' opportunities to conspire; (4) the U.S. replacement tire market's susceptibility to collusion; (5) defendants' public price signaling; (6) defendants' pretextual explanations for the price increases; and (7) certain defendants' or their affiliates' previous violations of antitrust laws. Mindful that the Court must evaluate allegations of a conspiracy as a whole, rather than simply "dismembering it and viewing its separate parts," *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S. Ct. 1404, 8 L. Ed. 2d 777 (1962) (citation omitted), the Court now examines plaintiffs' alleged plus factors, individually and collectively, to determine whether they place the price increases "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

1.      *EC Investigation*

Plaintiffs allege, and defendants do not dispute, that on January 30, 2024, the EC announced that it had carried out unannounced inspections—also known as "dawn raids"—at several of defendants' non-U.S. premises. (DPP ¶ 161; EPP ¶ 186; ADP ¶ 95.) According to plaintiffs, "the EC must have 'reasonable grounds for suspecting an infringement of the competition rules,'" to justify unannounced inspections. (DPP ¶ 162; EPP ¶ 188 (citations omitted).) Plaintiffs further allege that the EC conducts such inspections "'to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information.'" (DPP ¶ 162; EPP ¶ 188 (citations omitted).)

In a press release accompanying the raids, the EC explained that it conducted the raids due to its "'concern[] that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices'" under "'Article 101 of the Treaty on the Functioning of the European Union.'" (DPP ¶ 161; EPP ¶ 187; ADP ¶ 96 (citations omitted).) The EC stated that the inspections were related to "'new replacement tyres for passenger [vehicles] sold in the European Economic Area,'" and were the result of the EC's "'concern[] that price coordination took place amongst the inspected companies, including via public communications.'" (DPP ¶ 161; EPP ¶ 187; ADP ¶ 96 (citations omitted).)

Six months later, "on June 18, 2024, the EC carried out unannounced antitrust inspections at the premises of a consultancy firm in two EU countries." (EPP ¶ 190; ADP ¶ 98; *see also* DPP ¶ 102.) In another accompanying press release, the EC explained that this second inspection was "'conducted in the context of'" the January 2024 raids of defendants' European facilities, and that the consultancy firm "'may have facilitated or instigated the suspected price coordination amongst

[tire] manufacturers, which allegedly also used public communications channels to collude.'" (EPP ¶ 191; ADP ¶ 99; *see also* DPP ¶ 102 (citations omitted) (alterations in complaints).) Neither DPPs nor ADPs purport to know the identity of the consultancy firm or how it was involved in the conspiracy. Likewise, plaintiffs' (jointly filed) opposition brief simply notes that "the EC raided an undisclosed consultancy firm[.]" (Doc. No. 266, at 54.) The EPP Complaint, however, alleges based on "information and belief" that the subject of the EC's raid was an Ohio-based international "tire technical consulting" company called Smithers. (EPP ¶¶ 194–95.) According to the EPP Complaint, Smithers publishes "reports about the global tire industry for global tire industry participants," has longstanding business relationships with defendants, and hosts an annual "multi-day Traction Summit," which defendants attend. (*Id.* ¶¶ 194–202.) EPPs further allege that Smithers's "various publications and tools, which include data by tire type, end use, country, and raw material and by dollar, volume, and market share, facilitated price coordination by its clients, including [d]efendants." (*Id.* ¶ 200.)

Presumably, the EC's investigation is ongoing and, to date, is not alleged to have resulted in any fines, leniency requests, criminal charges, or any other such indications of wrongdoing by defendants, in Europe or elsewhere. Nevertheless, plaintiffs claim the EC investigation is a "plus factor[] that supports the existence of a conspiracy[.]" (DPP ¶ 127; *see also* EPP ¶ 4; ADP ¶ 3; Doc. No. 266, at 59.)

In moving to dismiss, defendants urge the Court to "give 'no weight' to the opening of an investigation outside of the U.S. and under different legal standards." (Doc. No. 247-1, at 56 (quoting *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 540 (N.D. Tex. 2014)).) In particular, defendants argue the EC investigation should not be considered a plus factor because (1) plaintiffs fail to sufficiently link the European and U.S. markets for

replacement tires, (2) there are "stark differences between European competition law and U.S. antitrust law," and (3) the investigation "is in a very early stage" and "[t]here have been no findings, 'enforcement proceedings, charges, guilty pleas, settlements, or fines or disgorgement.'" (*Id.* at 56–59 (citations omitted).)

Plaintiffs respond that the EC is investigating "the same conduct at issue in this case," and that the EC "must have 'reasonable grounds for suspecting an infringement of the competition rules.'" (Doc. No. 266, at 60–61 (citations omitted).) Plaintiffs further argue they have pleaded "the necessary 'linkage' to demonstrate an integrated global market" such that "the existence of the EC investigation . . . supports the plausibility of a conspiracy in the United States." (*Id.* (citations omitted).)

Most courts do not consider preliminary investigations to bolster the plausibility of an alleged conspiracy. *See, e.g.*, *Oklahoma Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft*, No. 23-cv-5095, 2024 WL 4202680, at *9 (S.D.N.Y. Sept. 13, 2024) ("The mere fact that regulatory entities are investigating the possibility of misconduct is not a plus factor." (alterations omitted) (collecting cases)); *Cedar Shakes*, 2020 WL 832324, at *10 (rejecting ongoing government investigation as a plus factor because defendants "are certainly entitled to the same 'presumption of innocence' accorded any accused person"); *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 842 n.16 (N.D. Ill. 2018) ("The mere fact that an investigation is being conducted says nothing about whether unlawful conduct has occurred."); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (ongoing investigation by antitrust division of DOJ "carries no weight in pleading an antitrust conspiracy claim" because "[i]t is unknown whether the investigation will result in indictments or nothing at all").

Indeed, "the purpose of an investigation is to determine *whether* there is evidence of unlawful conduct; its existence does not therefore signal that there must be such conduct." *Washington Cnty.*, 328 F. Supp. 3d at 842 n.16 (emphasis in original); *see also Micron Tech.*, 400 F. Supp. 3d at 921 ("Allegations concerning past or ongoing investigations are . . . not particularly helpful to suggest a contemporary conspiracy: the scope of an investigation is not always evident to the public or to the Court, and investigations that do not result in a finding of fact or admission suggest only that a government body believed a circumstance *appeared* suspicious." (emphasis in original)). So too here with the EC raids, which, as plaintiffs acknowledge, "'are intended to enable [the EC] to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information.'" (DPP ¶ 162 (citation omitted); EPP ¶ 188 (citation omitted).)

The courts that do consider an ongoing investigation to be a plus factor generally do so based on the evidence uncovered by the investigation, not on the mere fact that an investigation is taking place. *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011) (relying on "specific admissions" made during the investigation, not the fact that an investigation had occurred); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) ("Plaintiffs here allege not only that government investigations are pending, but also that those investigations have actually turned up 'evidence of criminal behavior[.]'"); *In re Loc. TV Advert. Antitrust Litig.*, No. 18-cv-6785, 2020 WL 6557665, at *8 (N.D. Ill. Nov. 6, 2020) ("A DOJ investigation alone is not enough to support an inference of antitrust conspiracy, but the allegations here are that the investigations produced results, namely consent decrees and settlements."); *see also Cedar Shakes*, 2020 WL 832324, at *10 ("[T]he case which Plaintiffs cite in support of their position that it is permissible to consider the fact of a government investigation

25

in evaluating the sufficiency of antitrust allegations [*In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033 (S.D. Cal. 2017)] is distinguishable: in that matter, a grand jury had been empaneled, a criminal complaint filed, subpoenas issued, and DOJ had issued a press release reflecting their concerns. None of those are true here.").

Here, the EC's investigation is ongoing and is not alleged to have produced any findings of fact, guilty pleas, leniency agreements, settlements, fines, or any other such indication of wrongdoing. As the EC made clear, its inspection of defendants' European facilities was only "a preliminary investigatory step into suspected anticompetitive practices," and the "fact that the Commission carries out such inspections does not mean that the companies are guilty of anti-competitive behaviour, nor does it prejudge the outcome of the investigation itself." (Doc. No. 247-3.) And while plaintiffs speculate that the "fruits of the EC's dawn raid of [d]efendants led to the dawn raid of the tire industry consultancy firm only six months later" (Doc. No. 266, at 60; *see also* Doc. No. 295, at 78), plaintiffs offer no facts supporting the notion that the second raid was triggered by evidence uncovered by the first raid (other than the timing of the raids, which is a classic *post hoc ergo propter hoc* logical fallacy).[4] In any event, the Court finds the preliminary nature of the investigation significantly limits, if not eliminates entirely, its utility as a plus factor here.

Any probative value of the EC investigation is further diminished because its sole purpose is to determine whether defendants "violated EU antitrust rules," and its scope is expressly limited to tires "sold in the European Economic Area." (Doc. No. 247-3.) The narrow scope of the EC investigation undercuts its significance to the present litigation in at least two respects.

---

[4] *Post hoc ergo propter hoc*, translated as "after therefore resulting from it," refers to "the logical fallacy of assuming that a causal relationship exists when acts or events are merely sequential." Black's Law Dictionary (12th ed. 2024).

First, as defendants point out (and plaintiffs do not meaningfully refute), conduct that is illegal under European competition law may be lawful under the Sherman Act. (*See* Doc. No. 247-1, at 58–59.) *See Oklahoma Firefighters*, 2024 WL 4202680, at *6 n.3 (noting plaintiff's counsel's concession at oral argument that "United Kingdom competition law is 'broader'—that is, renders illegal a wider range of conduct—than section 1 of the Sherman Act"); *OTC Hotel Booking*, 997 F. Supp. 2d at 540 ("[T]he government investigations cited in the Complaint involve European laws, which may prohibit conduct that is lawful under § 1."); *Micron Tech.*, 400 F. Supp. 3d at 921 ("[A]llegations of investigations or cases outside of the United States are fully unpersuasive: foreign laws may prohibit behavior that is lawful under § 1.").

Plaintiffs' brief did not address the breadth of EU antitrust law as compared to the Sherman Act, but their counsel insisted at oral argument that any difference between the two laws should not be dispositive because "price-fixing is illegal" in both jurisdictions. (Doc. No. 295, at 53–55, 110–11.) Plaintiffs' counsel conceded, however, that he is "not sure" whether there could be "instances of price coordination [under European law] that would not result in a price-fixing case here" in the U.S. (*Id.*) Plaintiffs' counsel further admitted that "the laws are different," and then vaguely and unhelpfully claimed that "they're close enough in the area of price-fixing," and that "the particular types of conduct[]" that the EC looks for in price-coordination cases "overlap more than they don't overlap in terms of U.S. enforcement actions" of price-fixing conspiracies. (*Id.* at 53–55.) Defendants' counsel responded that "EU law is broader than Section 1 [of the Sherman Act]" in that EU law only requires a "concerted practice," which "is a form of coordination between undertakings in which they have not reached an agreement," whereas the Sherman Act requires an agreement. (*Id.* at 121–23.)

Plaintiffs' attempt to sidestep the substantive differences between European and American antitrust law falters under their counsel's concession that at least some price coordination that is actionable under European law is legal under the Sherman Act. (*Id.* at 53–55, 110–11.) Plaintiffs do not allege any facts that substantiate their speculation that the EC investigation here does not concern the type of "price coordination" (Doc. No. 247-3) that European law prohibits but the Sherman Act permits.

Second, the Court agrees with defendants that the consolidated complaints do not sufficiently link defendants' European conduct to their conduct here. Citing to several jurisdictional allegations that defendants "manufactured and sold tires throughout the U.S.," plaintiffs claim they pleaded "the necessary 'linkage' to demonstrate an integrated global market." (Doc. No. 266, at 61 (citing DPP ¶¶ 22–23, 28, 37, 40, 42, 44; EPP ¶¶ 90–106; ADP ¶¶ 138–39).) Those cited paragraphs establish the undisputed fact that defendants sell tires all over the world (including but not limited to the U.S. and Europe), but they do not meaningfully connect the U.S. and European markets such that a European price-fixing conspiracy should be expected to have carried over into the United States. *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (allegations of anticompetitive wrongdoing in Europe carried no weight because there were no factual allegations "linking transactions in Europe to transactions and effects here").

If anything, plaintiffs' cited paragraphs suggest that defendants typically separate their European and North American businesses. (*See, e.g.*, DPP ¶¶ 21–23 (noting defendant Bridgestone Americas, Inc. is separate from the non-party Bridgestone entity covering Europe), ¶ 40 (Nokian built new $360 million plant "to serve customers across the United States and Canada"), ¶ 40 (Nokian reports North American sales separate from European sales), ¶ 44 (same for Pirelli); EPP ¶ 91 (Continental Tire the Americas, LLC "sells its tires . . . across North America"), ¶ 94 (similar

28

for Michelin North America, Inc.).) Other of plaintiffs' allegations, particularly those involving price increase announcements, similarly undermine the notion that defendants' U.S. pricing decisions were tethered to their pricing decisions in Europe, or vice versa. (*See, e.g.*, *id.* ¶ 78 (Michelin, Goodyear, and Pirelli announced price increases in the United States); ADP ¶ 53 (similar); EPP ¶ 155 (Bridgestone raising prices "in the United States and Canada").) There are no allegations regarding specific price increases by defendants (or their foreign counterparts/subsidiaries) in Europe, or in any market other than the United States.

Plaintiffs next attempt to link the European and American markets by highlighting allegations that Bridgestone claimed to have "'[c]aptured demand recovery in U.S. & Europe with supply from Japanese and Asian plants,'" and that Nokian "imports hundreds of shipments each year into the United States." (Doc. No. 266, at 61 (citing DPP ¶¶ 23, 42).) But those allegations still do nothing to suggest that if certain defendants (or other entities within their corporate families) had entered into a price-fixing agreement in Europe, their U.S. "counterparts" (DPP ¶ 23) are likely to have done the same. *See Elevator*, 502 F.3d at 52 (2d Cir. 2007) (rejecting argument that "if it happened there, it could have happened here"); *Oklahoma Firefighters*, 2024 WL 4202680, at *6 ("A foreign-government investigation cannot by itself 'support an allegation of a plausible conspiracy.'" (quoting *In re European Gov't Bonds Antitrust Litig.*, No. 19-cv-2601, 2022 WL 768680, at *21 (S.D.N.Y. Mar. 14, 2022)); *Am. Copper & Brass, Inc. v. Halcor S.A.*, 494 F. Supp. 2d 873, 876–78 (W.D. Tenn. 2007) (rejecting use of facts from a European Commission decision to enhance allegations of a domestic conspiracy).

In short, the EC investigation has not produced any evidence of wrongdoing by defendants (in Europe or elsewhere), and in any event is explicitly limited in scope to potential violations of

European law regarding tires sold in Europe. As such, the mere existence of the EC investigation adds nothing to the plausibility of the conspiracy alleged here and is not a plus factor.

### 2. *Common Motive to Conspire*

Setting forth a series of contentions, plaintiffs next allege that the onset of the COVID-19 pandemic motivated defendants to fix prices in the U.S. (DPP ¶¶ 128–30; EPP ¶¶ 142–45; ADP ¶¶ 102–04.) "[A]s measures were put into place to combat the spread of the virus, domestic travel stopped and then slowed, reducing demand for tires." (ADP ¶ 102.) "Due to shelter-in-place and other public safety guidelines limiting travel imposed by many states, [d]efendants faced shrinking profit margins." (Doc. No. 266, at 52 (citing DPP ¶¶ 129–30; EPP ¶ 142–44; ADP ¶ 88).) "To remain profitable, [d]efendants needed to pass on costs" to consumers (ADP ¶ 104), but "[i]n a competitive market, a manufacturer typically cannot [do so] because if prices increase too much, customers will turn to rival competitors." (DPP ¶ 115; *see also* ADP ¶ 106.) "Each [d]efendant was therefore motivated to offset the downward pricing pressure from soft demand and the difficulty of increasing prices in a commodity market where competition is largely based on price." (Doc. No. 266, at 52.)

Plaintiffs further assert that defendants' independent price increases were restrained prior to the alleged conspiracy period, which plaintiffs contend demonstrates that the price increases at issue here could not have occurred in a competitive market. In support, plaintiffs allege that several defendants announced price increases in 2017 (before the alleged conspiracy), and that the increases ultimately "failed" because "consumers simply turned to lower-priced alternatives[.]" (EPP ¶ 144; *see also* DPP ¶¶ 115–18.) So, when the pandemic struck in early 2020, plaintiffs allege that defendants "avoided [the] predicament" they faced in 2017 "by agreeing on coordinated price increases." (DPP ¶ 128; *see also* EPP ¶¶ 144–45; Doc. No. 266, at 52.)

30

In rebuttal, defendants argue that plaintiffs are simply describing a motive to increase profit, which cannot be suggestive of collusion; otherwise, "'every company in every industry could be accused of conspiring because they would all have such a motive.'" (Doc. No. 247-1, at 53 (quoting *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014)).) Defendants also argue that plaintiffs' motive-to-conspire allegations "'simply restate[] that a market is interdependent (*i.e.*, that the profitability of a firm's decisions regarding pricing depends on competitors' reactions).'" (*Id.* (quoting *Musical Instruments*, 798 F.3d at 1194–95, 1194 n.8).)

The Court agrees with defendants. While defendants may have been motived to increase profits, plaintiffs fall short of plausibly alleging that defendants were motivated to conspire as a means of doing so.

"[T]here are (at least) two ways for firms to increase profit." *Musical Instruments*, 798 F.3d at 1194 n.8. They can either "compete to capture greater market share, carving out a bigger piece of the existing pie," or "they can keep their market share the same while increasing prices." *Id.* "If all firms increase prices, they have managed to grow the pie, though their individual slices remain proportionally the same." *Id.*

Accepting plaintiffs' well-pleaded factual allegations as true, each defendant was clearly motivated to "grow the pie" during the pandemic and did so by raising their prices. Plaintiffs do not contend that defendants were legally required to undercut their competitors' prices in the hopes of capturing additional market share. (Doc. No. 266, at 33.) Nor could they. *See Abbott Lab. v. Adelphia Supply USA*, No. 15-cv-5826, 2017 WL 5992355, at *11 (E.D.N.Y. Aug. 10, 2017) ("[M]erely alleging that a firm should lower prices to increase market share, without more, cannot be sufficient to serve as a plus factor that raises an inference of collusion." (citing *In re Citric Acid*

31

*Litig.*, 191 F.3d 1090, 1101 (9th Cir. 1999) ("[I]t is not reasonable to infer that a firm is engaging in illegal activities merely from the fact that it failed to continue to increase market share."))).

Nevertheless, plaintiffs argue that the failed 2017 price increases confirm that, "[a]bsent the conspiracy, [d]efendants would be forced to compete on prices, driving them lower to beat out competitors and capture market share." (Doc. No. 266, at 33.) In other words, plaintiffs' theory is that the outcome that occurred in 2017—namely, that when a few firms tried to raise their prices, the other firms "beat" those prices to "capture market share"—should have repeated itself in 2020. The fact that it did not, according to plaintiffs, indicates prior agreement. (*Id.* (arguing that the "price increases would have been against each [d]efendants' [*sic*] economic interest absent an agreement with the other [d]efendants").)

Plaintiffs' reasoning "fail[s] to account for conscious parallelism and the pressures of an interdependent market." *Musical Instruments*, 798 F.3d at 1195. It is well understood that "interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement." *Id.* Therefore, "two firms may arrive at identical decisions independently, as they are cognizant of—and reacting to—similar market pressures." *Id.* at 1193. Furthermore, "each firm in an interdependent market expects that a widely unfollowed price increase will be rescinded." *Id.* at 1195. "But so long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices, confident that if its price *is* followed, all firms will benefit." *Id.* (emphasis in original). Accordingly, only "individual action [that] would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement" is entitled to an inference of conspiracy. *Id.*

But, again, plaintiffs explicitly allege that defendants *did* try to raise prices in 2017 without a prior agreement (DPP ¶¶ 115–18; EPP ¶ 144), thereby demonstrating that doing so was not so perilous as to be irrational. And when other tire manufacturers chose not to "follow the leader" in 2017, the defendants pushing the increases were able to adjust their prices back to market rate "without persistent negative consequences." *Musical Instruments*, 798 F.3d at 1195. Therefore, because the failed attempt to raise prices in 2017 was easily reversed, it was neither irrational nor suggestive of conspiracy that certain defendants tried again in 2020—particularly in the wake of an unprecedented global inflationary event. *See Travel Agent*, 583 F.3d at 908 ("Defendants also assert that it was simple and inexpensive for a leader airline to innovate and then wait and see, with the hope and expectation that its competitors would institute similar [commission] cuts. If the industry did not follow, the leader airline could simply retract the cut. Thus, defendants have offered a reasonable, alternative explanation for their parallel pricing behavior.").

Nor is it suspicious that the other defendants decided to "follow the leader" under the unique circumstances of 2020, even though they declined to do so in 2017. Although plaintiffs claim that rising input costs did not actually justify the 2020–2022 price increases, they nevertheless acknowledge that, "'generally speaking, inflationary environments are more favorable for tiremakers, as they provide the industry cover and force discipline to raise prices.'" (ADP ¶ 164 (citation omitted).) Defendants were faced with that "favorable" "inflationary environment[]" (*id.*) in 2020, but not in 2017.

Thus, the pleadings themselves provide an "obvious alternative explanation" for why the price increases failed in 2017 but stuck in 2020. And under *Twombly*, dismissal is warranted where there is "a natural explanation for the noncompetition alleged[.]" 550 U.S. at 567–68. *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1266 (11th Cir. 2019)

(en banc) (affirming dismissal where plaintiffs' "own allegations explain why there is uniformity in price" and that reason "is a rational and legitimate business strategy and one which involves clearly legal price leadership"); *Bookends & Beginnings LLC v. Amazon.com, Inc.*, No. 21-cv-2584, 2022 WL 18144916, at *9 (S.D.N.Y. Aug. 24, 2022) (rejecting common motive to increase profits as a plus factor because that interest is "universally shared by all businesses" and because "the [complaint] itself demonstrates that the Publishers could have achieved their interest . . . without a preceding agreement" (internal citation omitted)), *report and recommendation adopted*, No. 1:21-cv-2584, 2022 WL 4586213 (S.D.N.Y. Sept. 29, 2022); *Washington Cnty.*, 328 F. Supp. 3d at 843 (finding fact that defendants "raised prices in the face of falling costs does little to suggest that they engaged in actual collusion, which is illegal, as opposed to 'tacit collusion,' which is not" (citing *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 874–75 (7th Cir. 2015) (describing several rationales that may lead "firms [in an oligopoly]—without any communication with the [price] leader—to raise their prices"))).

In arguing that plaintiffs have, at most, merely demonstrated conscious parallelism, defendants rely heavily on *Travel Agent*, 583 F.3d 896 (6th Cir. 2009). In rebuttal, plaintiffs contend that *Travel Agent* is "clearly distinguishable" from the present case on three grounds. (Doc. No. 266, at 44–45.) First, plaintiffs claim that "while technically a motion to dismiss decision," *Travel Agent* "arose under unique procedural circumstances that are not present in this case." (*Id.* at 44.) Specifically, *Travel Agent* involved plaintiffs "who had opted out of a class action brought in the Fourth Circuit, against defendants for which summary judgment had already been granted," which gave the parties and the court "the benefit of a developed factual record." (*Id.* at 44–45.) But there is no indication in the Sixth Circuit's opinion that this somewhat unique procedural posture altered the court's plausibility analysis, or that the court intended to curb the

34

precedential impact of its (published) opinion on that basis. In fact, the Sixth Circuit has since repeatedly cited *Travel Agent* as precedent at the motion to dismiss stage, including for Section 1 cases. *See, e.g.*, *Watson Carpet*, 648 F.3d 452 (6th Cir. 2011); *Hobart-Mayfield*, 48 F.4th 656 (6th Cir. 2022).

Second, plaintiffs assert that *Travel Agent* "involved ***only bare assertions*** of parallel conduct and 'an opportunity to conspire.'" (Doc. No. 266, at 45 (emphasis in original) (citing *Travel Agent*, 583 F.3d at 905).) But in addition to parallel conduct and opportunities to conspire, the plaintiffs in *Travel Agent* also offered many of the same factual enhancements as plaintiffs allege here, including: (i) that defendants operated in a concentrated market; (ii) that the parallel conduct alleged, "if taken independently, was contrary to the individual defendant's economic self-interest"; (iii) that two of the defendants' prior "unsuccessful attempt[s] to cut base commission rates" constituted "evidence of collusion in the present case"; and (iv) "evidence of defendants' common motive to conspire." *See generally Travel Agent*, 583 F.3d 896. The Sixth Circuit affirmed dismissal not because these allegations were absent from the complaint, as plaintiffs suggest, but because the court found them insufficient to establish plausibility. *Id.*

Third, plaintiffs argue that "the Sixth Circuit found the plausibility of the conspiracy was negated" by a fundamental structural change to the airline ticket marketplace that provided a lawful explanation for the parallel conduct alleged. (Doc. No. 266, at 45.) Plaintiffs claim that "[n]o such fundamental structural change" is present here. (*Id.*) But plaintiffs' own allegations make plain that "the [COVID-19] pandemic had a global impact on the tire industry and its material suppliers," brought substantial "uncertainty" to the industry, and "provide[d] the industry cover and force[d] discipline to raise prices." (EPP ¶¶ 142–44; ADP ¶¶ 88, 102–05, 164; *see also* DPP ¶ 128.) Plaintiffs have not offered any compelling reason why the COVID-19 pandemic should not be

considered a fundamental structural change and treated as an obvious alternative and lawful explanation here. (*See* Doc. No. 295, at 59–61; *see also* Section III.B.6, *infra*.)

As demonstrated by their own allegations, plaintiffs have not plausibly alleged that the price increases were irrational or against defendants' economic self-interest absent prior agreement. And courts have repeatedly found that "[f]ollowing the example set by a competitor, without agreeing to do so in advance, is textbook 'price leadership'"—a practice that has repeatedly been found to be "insufficient to establish the existence of an agreement." *Quality Auto Painting*, 917 F.3d at 1264 (collecting cases).

Without a showing that independent price increases would have been against their self-interest, defendants' 2020–2022 price increases were "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"—here, a market being impacted by the COVID-19 pandemic. *Twombly*, 550 U.S. at 554; *OTC Hotel Booking*, 997 F. Supp. 2d at 539 ("Just because Defendants' rational business interests can be recast in a suspicious light does not mean the allegations actually suggest a conspiracy was formed." (collecting cases)); *Advanced Tech. Corp. v. Instron, Inc.*, 925 F. Supp. 2d 170, 180 (D. Mass. 2013) (finding defendants had no motive to conspire "when they could effectively accomplish [their] objective on their own"). As articulated by two leading antitrust experts, "motivation in the sense of a reasonable prospect of increasing profits through collective action is a logical corollary of interdependence. . . . Motivation is thus synonymous with interdependence and therefore adds nothing to it." 6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1434, at 269 (3d ed. 2010).

3.      *Opportunities to Collude*

a.      *Trade Associations*

Next, plaintiffs allege that "throughout the Class Period, [d]efendants had numerous opportunities to collude and fix the prices of replacement tires through industry association meetings, events, and public communications." (DPP ¶ 132; *see also* EPP ¶ 205; ADP ¶¶ 107, 143.) The consolidated complaints detail numerous trade organizations to which defendants belong, often alleging dates and locations of certain meetings and which of defendants' executives were in attendance. (DPP ¶¶ 133–47; EPP ¶¶ 206–39; ADP ¶¶ 108–46.) Defendants argue these allegations do not suggest collusion because they "are devoid of any facts about what [d]efendants supposedly discussed or agreed on," and are simply "unremarkable allegations that [d]efendants participate in trade associations and industry events." (Doc. No. 247-1, at 53–54 (citations omitted).)

Many courts, including the Sixth Circuit, have held that "a mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior." *Travel Agent*, 583 F.3d at 911 (citing *Twombly*, 550 U.S. at 567 n.12; *Iqbal*, 556 U.S. at 679–80); *Hobart-Mayfield*, 48 F.4th at 667–68 (declining to consider mere "shared membership in trade associations" as suggestive of conspiracy); *Tera Grp., Inc. v. Citigroup, Inc.*, No. 24-cv-135, 2024 WL 4501967, at *4 (2d Cir. Oct. 16, 2024) ("'[T]he law is clear that the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred.'" (quoting *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 466 (2d Cir. 2019)); *Prosterman*, 747 F. App'x at 462 ("We have long been skeptical that participation in a trade organization is suggestive of collusion, and that skepticism has only hardened since *Twombly* and

its progeny." (internal citation omitted)); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) ("[I]t was well-settled before *Twombly* that participation in trade organizations provides no indication of conspiracy.").

Trade associations "serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services." *Musical Instruments*, 798 F.3d at 1196. Because of those valid purposes, courts consistently reject an inference that attendance at trade events, without more, implies an anticompetitive agreement; holding otherwise would discourage legitimate market behavior, which courts are loath to do. *See, e.g.*, *Micron Tech.*, 400 F. Supp. 3d at 918 ("It is well-settled that trade associations often serve legitimate functions, such as providing industry information to members, conducting research to further industry goals, and promoting demand and that, because of these valid purposes, attendance at trade events does not imply an anticompetitive agreement."); *Washington Cnty.*, 328 F. Supp. 3d at 843 ("[T]rade organizations are ubiquitous and serve numerous legitimate and pro-competitive purposes." (citations omitted)); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 834 (N.D. Ill. 2017) ("In particular, when the opportunities to conspire coincide with regular means of conducting legitimate businesses, the Court is mindful not to deter the one in its effort to root out the other." (collecting cases)), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018); *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 444 (S.D.N.Y. 2014) ("While meetings among competitors undoubtedly provide opportunities to conspire, deeming those opportunities as proof of a conspiracy would condemn independent professional associations." (citation omitted)), *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015), *as corrected* (Nov. 24, 2015).

The consolidated complaints collectively devote over 80 paragraphs to identifying various industry events that provided defendants opportunities to conspire. (DPP ¶¶ 133–47; EPP ¶¶ 206–39; ADP ¶¶ 108–46.) But that is as far as they go. At no point do plaintiffs even speculate—much less plausibly allege—that defendants actually conspired or exchanged confidential information at any of these events.[5] Accordingly, the Court follows the well-trodden path of other courts in concluding that defendants' mere attendance at these trade association meetings contributes little, if anything, to the plausibility of the alleged conspiracy.[6]

---

[5] *Cf. Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015) ("But the Plaintiffs here have done much more than allege 'mere membership.' They have alleged that the member banks *used* the bankcard associations to adopt and enforce a supracompetitive pricing regime for ATM access fees." (emphasis in original)); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 47–48 (1st Cir. 2013) (finding plus factor where complaint alleged that defendants attended an industry meeting where two dominant defendants publicly "put forward their position that [adopting a certain policy] was not an option," and the court "could infer that their prominent place in the organization would place some pressure on other producer defendants to conform with their position"); *Loc. TV Advert.*, 2020 WL 6557665, at *10 (counting trade association allegations as a plus factor where plaintiffs alleged "numerous instances in which Defendants' executives made express public statements [in trade association meetings] regarding cooperation among Defendants"); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 897 (N.D. Ill. 2009) ("Proof of Defendants' opportunity to conspire does not alone suggest that there was an agreement to curtail production. But Plaintiffs' allegations go further than pointing to opportunity alone. Plaintiffs have alleged the specific content of statements made in public by Defendants' executives which endorsed an industry strategy to reduce the output of steel." (internal citation omitted)).

[6] *See, e.g.*, *In re Crop Inputs Antitrust Litig.*, No. 4:21-md-2993, 2024 WL 4188654, at *12 (E.D. Mo. Sept. 13, 2024) ("[C]ommon membership on a board or participation in a trade association is not indicative of an illegal conspiracy."); *In re Jan. 2021 Short Squeeze Trading Litig.*, No. 21-2989-MDL, 2022 WL 1522054, at *19 (S.D. Fla. May 13, 2022) ("Plaintiffs have only alleged an *opportunity* to conspire; they have not connected that opportunity to a plausible inference of an actual antitrust conspiracy. (emphasis in original)), *aff'd*, 105 F.4th 1346 (11th Cir. 2024); *In re ICE LIBOR Antitrust Litig.*, No. 19-cv-439, 2020 WL 1467354, at *6 (S.D.N.Y. Mar. 26, 2020) ("[S]imply alleging an opportunity to conspire without providing any evidence whatsoever that any such discussions actually took place is insufficient to survive a motion to dismiss."); *Evanston Police*, 411 F. Supp. 3d at 597 ("Without specific allegations of what [defendant] agreed to at the trade organizations, [plaintiff] has alleged 'mere participation in trade organization meetings,' which is not enough to constitute a meaningful plus factor supporting a finding of an antitrust conspiracy." (citation omitted)); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 391 (S.D.N.Y. 2019) ("'[T]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred.'" (citation omitted)); *Washington Cnty.*, 328 F. Supp. 3d at 843 ("Absent additional facts addressing the content of defendants' discussions at or the (nefarious) subjects of trade organization meetings, allegations that defendants were members of the same trade organizations are unspectacular and fail to move the needle."); *OTC Hotel Booking*, 997 F. Supp. 2d at 541 ("The attendance of these executives [at trade association meetings] merely presents an opportunity to conspire, but the surrounding allegations fail to suggest they actually did conspire. In fact, the presence of non-defendants . . . belies the suggestion that a secretive price fixing agreement came out of these meetings."); *Schuylkill Health Sys. v. Cardinal Health 200, LLC*, No. 12-7065, 2014 WL 3746817, at *7 (E.D. Pa. July 30, 2014) ("The fact that the Defendants are members of a trade association that hosts annual conferences does not transform Defendants' parallel conduct into a conspiracy."); *Advanced Tech.*, 925 F. Supp. 2d at 182 ("At most, this allegation indicates an opportunity to conspire, not that Defendants actually did so."); *In re Hawaiian &*

      *b.     Third-Party Revenue Management Software and Consultancy Firm*

Plaintiffs next argue that defendants' use of third-party revenue management software and pricing consultants "is an additional plus-factor supporting the inference of a conspiracy here." (Doc. No. 266, at 56.) For example, plaintiffs allege that Lizeo Group ("Lizeo"), founded by a former Michelin executive, "is one revenue management software company that [d]efendants . . . use to monitor each other's prices." (*Id.* at 28–29 (citing DPP ¶ 106; EPP ¶¶ 258–59; ADP ¶¶ 75–76).) Lizeo allegedly "leverages data from '1,000+ top websites and marketplaces globally' and 'collects more than 11 million prices daily.'" (*Id.* at 29 (quoting DPP ¶ 106); *see also* EPP ¶ 258; ADP ¶ 77.) Additionally, plaintiffs allege that Lizeo offers products that, if purchased, would permit defendants "to have access to the same data and filter hundreds of lines of pricing data by part number, brand, product, size, and speed and accordingly set up a pricing strategy based on its competitor's data," in real-time. (Doc. No. 266, at 29 (citing DPP ¶ 108; EPP ¶ 258; ADP ¶ 77).)

Torqata is another revenue management software that plaintiffs claim defendants may have used to price-fix. "Torqata, like Lizeo, allowed [d]efendants to compare competitor prices through a Pricing Insights tool and assisted [d]efendants in revenue and inventory management by analyzing confidential pricing information." (*Id.* (citing DPP ¶¶ 110–11; EPP ¶¶ 256–57; ADP ¶ 77).)

Finally, defendants are also alleged to have used a certain third-party consultant (which EPPs allege is Smithers (EPP ¶ 194)) "to police and 'monitor'" their co-conspirators. (Doc. No. 266, at 28–29.) Plaintiffs are unable to offer specifics on this point, except that the EC "raided a

---

*Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1257 (W.D. Wash. 2009) ("[T]he Court does not view plaintiffs' general allegations of membership in trade organizations as adding anything to the mix."); *Graphics Processing*, 527 F. Supp. 2d at 1023 (dismissing complaint with allegations that parallel price increases followed trade association meetings that defendants attended, reasoning that the complaint was "[m]issing . . . any specific allegation that defendants representatives actually met to fix prices" and noting that "[a]ttendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more").

consultancy firm as part of its investigation" upon suspicion that the consultancy firm "'may have facilitated or instigated the suspected price coordination amongst tyre manufacturers.'" (Doc. No. 266, at 28 (quoting DPP ¶ 102) (alteration omitted); *see also* DPP ¶¶ 102–03; EPP ¶¶ 190–93; ADP ¶¶ 98–100.)

Additionally, according to plaintiffs, Torqata and Smithers (but not Lizeo) permit defendants to exchange confidential, non-public information. (*See* Doc. No. 266, at 55 (noting that Smithers's website claims it is a "'third-party, independent source for confidential data,'" and that Torqata "maintains it analyzes competitors' private information" (citing EPP ¶¶ 195, 256–57)).) But even if only public information was exchanged, plaintiffs argue that defendants' shared use of any revenue management software still supports an inference of conspiracy because such "tools enable [d]efendants to monitor competitor prices in real time and maintain supracompetitive prices." (*Id.* (citing EPP ¶ 260); *see also* DPP ¶ 103; ADP ¶ 79.)

Defendants argue these third-party-related allegations are "entirely conclusory" because they "provide no allegations as to which [d]efendants allegedly used" Torqata, nor do they "specify when [d]efendants used either software [i.e., Lizeo or Torqata], whether the data that the software analyzes pertains to retail or wholesale pricing, what features or services of either software were used, or how [d]efendants utilized each software or any resulting data." (Doc. No. 247-1, at 46.) Similarly, defendants contend that the allegation that software enabled them "to share 'private' information is not supported by any well-pleaded facts." (*Id.*) But "even if the software did use private data to formulate recommendations," defendants argue that such allegations "still would not nudge the alleged conspiracy over the threshold of plausibility" because plaintiffs "do not allege [d]efendants all used the same software, received the same price recommendations, or accepted those recommendations—let alone agreed in advance to do so." (*Id.* at 47 (citing *Gibson*

*v. Cendyn Grp., LLC*, No. 2:23-cv-140, 2024 WL 2060260, at *6 (D. Nev. May 8, 2024) (further citation omitted)).)

The Court finds that plaintiffs' software allegations suffer from the same deficiency as their trade association allegations. At most, they establish only a possibility of unlawful collusion and therefore do little to move the needle from possible to plausible. *See, e.g.*, *Prosterman*, 747 F. App'x at 462 (finding revenue management software comparable to a "trade organization," which is not "suggestive of collusion").

As with their other allegations, plaintiffs allege lawful and ordinary business practices from which they hurriedly infer collusion. Here, plaintiffs allege that defendants use revenue management software to monitor their competitors' prices—or, in plaintiffs' words, to "monitor the conduct of the co-conspirators" to ensure "compliance with their price fixing agreement." (EPP ¶¶ 252–53; *see also* DPP ¶¶ 102–04; ADP ¶ 71.) In support of their allegation that defendants use revenue management software, plaintiffs highlight, among other things, a statement by Goodyear's president during an earnings call in 2022 that Goodyear's "data analytics enable us to evaluate day-to-day movement in end-market pricing for ourselves and our competitors, giving us a clear picture of where we are relative to the market and maximizing our ability to capture value for our business." (EPP ¶ 255; ADP ¶ 72; *see also* DPP ¶ 105.)

All parties appear to agree, however, that there is nothing inherently illegal or suspicious about the use of revenue management software for those purposes. (Doc. No. 266, at 57; Doc. No. 247-1, at 45.) And courts agree that "[t]here is nothing unreasonable about consulting public sources to determine how to price your product." *Gibson*, 2024 WL 2060260, at *5 (citing *Prosterman*, 747 F. App'x at 462). In fact, courts often note that "information-seeking [about competitors] is common in concentrated markets, and such behavior is consistent with conscious

42

parallelism rather than collusion," *Ross*, 35 F. Supp. 3d at 447, and courts have repeatedly acknowledged that "oligopolists watch each other like haws." *See, e.g.*, *In re Dynamic Random Access Memory Indirect Purchaser Litig.*, No. 4:18-cv-2518, 2020 WL 8459279, at *8 (N.D. Cal. Nov. 24, 2020) (citation omitted), *aff'd sub nom. In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42 (9th Cir. 2022).

Nevertheless, plaintiffs argue that the use of revenue management software provided defendants with "opportunities to collude," because such programs "enabled [d]efendants to effectively monitor competitors to make sure that each of them acted in accordance with the [alleged] agreement to increase prices." (Doc. No. 266, at 28–29; *see also* DPP ¶ 103; EPP ¶ 260; ADP ¶ 79.) But in making the leap from legitimate to conspiracy, plaintiffs rely on conjecture, not well-pleaded facts. For example, the indirect purchaser classes allege that defendants' use of these programs to track each other's prices is "consistent with the existence of [d]efendants' unlawful agreement to fix prices." (EPP ¶ 254; ADP ¶ 47.) That may be so, but *Twombly* made clear the "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement[.]" 550 U.S. at 557. And DPPs' speculation that defendants "may have" used the software to further a price-fixing conspiracy fares no better, as "the merely possible does not rise to the level of the plausible." *Washington Cnty.*, 328 F. Supp. 3d at 838. Plaintiffs do not plausibly allege that defendants did, in fact, use the software for anything other than the legitimate and common purpose of monitoring competitors' prices.

Plaintiffs have asserted a few conclusory allegations as to whether and how defendants used revenue management software. (*See, e.g.*, EPP ¶ 253 ("Defendants had and used multiple tools to monitor compliance with their price fixing agreement.").) But "legal conclusions masquerading as factual allegations will not suffice." *Travel Agent*, 583 F.3d at 903 (citation

omitted). At most, plaintiffs have alleged that it was possible for defendants to use a licit tool for illicit means, a possibility which exists for any tool, used by any company, in any industry. On that logic, other federal courts have concluded that they "cannot infer a plausible price-fixing agreement between [defendants] from the mere fact that they all use the same pricing software." *Cornish-Adebiyi v. Caesars Ent., Inc.*, No. 1:23-cv-2536, 2024 WL 4356188, at *7 (D.N.J. Sept. 30, 2024), *appeal filed*, No. 24-3006 (3rd Cir. Oct. 25, 2024); *see also Gibson*, 2024 WL 2060260, at *6 ("[M]ere use of algorithmic pricing based on artificial intelligence by a commercial entity, without any allegations about any agreement between competitors . . . to accept the prices that the algorithm recommends does not plausibly allege an illegal agreement."). The Court finds those cases persuasive and applicable here, particularly given that plaintiffs do not even allege that defendants "all use the same pricing software." *Cornish-Adebiyi*, 2024 WL 4356188, at *7. (*See, e.g.*, EPP ¶ 260 ("While [d]efendants may use different revenue management software, all such programs allow [d]efendants to . . . monitor the conspiracy by ensuring prices remain at supracompetitive levels."); ADP ¶ 79 (same).)

Finally, the parties dispute whether plaintiffs have adequately pleaded that Torqata and Smithers facilitated the exchange of defendants' non-public information. Although the parties' debate focuses on whether plaintiffs are drawing reasonable inferences from statements on Torqata's and Smithers's public websites (*see, e.g.*, Doc. No. 276, at 27), the Court finds these allegations are not well-pleaded for a more fundamental reason: plaintiffs do not explain what non-public information was supposedly exchanged or how it was, or even how it *could* have been, used "to make sure that each [defendant] acted in accordance with the agreement to increase prices." (Doc. No. 266, at 29.) Without allegations as to what confidential information was or could have

been exchanged and what purpose it could have served within the framework of the alleged conspiracy, a hypothetical ability to do so does not bolster the plausibility analysis.

To be clear, the Court acknowledges that the exchange of non-public information can be relevant to the plausibility of horizontal price-fixing conspiracies in certain circumstances. For example, in a recent case, which plaintiffs cite throughout their opposition brief, the court denied a motion to dismiss where defendants were alleged to have all provided their "sensitive pricing and supply data" to the same revenue management software. *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 510 (M.D. Tenn. 2023). The defendants allegedly handed over their confidential information "knowing that [the software] would require the same from its horizontal competitors and use all of that data to recommend rental prices to its competitors," which price recommendations the defendants had agreed ahead of time to adopt. *Id.* The ability to exchange "sensitive pricing and supply data" has obvious relevance given the framework of that alleged conspiracy, but the conspiracy plaintiffs allege here is fundamentally different from the one alleged in *RealPage*.[7] According to plaintiffs' consolidated complaints, the software simply served as a tool for defendants to "monitor and police each other's prices," which would logically occur *after* the prices were already raised. (DPP ¶ 103; *see also* EPP ¶ 79; ADP ¶¶ 252–53; Doc. No. 266, at 56–57.)

Accordingly, because plaintiffs do not offer any explanation of how the exchange of unspecified non-public information could be useful in policing co-conspirators' presumably public prices, the bare allegation that defendants may have been able to do so does not bolster the

---

[7] *RealPage* also found the exchange of non-public information to be suggestive of conspiracy for another reason: "the contribution of sensitive pricing and supply data for use by [the revenue management software] to recommend prices for competitor units [was] in Defendants' economic self-interest if and only if Defendants [knew they were] receiving in return the benefit of their competitors' data in pricing their own units." 709 F. Supp. 3d at 510. Plaintiffs do not make similar allegations here.

plausibility of the alleged conspiracy. *Cornish-Adebiyi*, 2024 WL 4356188, at *5 ("As to how this [non-public] data is used once it is handed over, Plaintiffs do not say. But that is precisely what appears to be missing. Without it, their antitrust theory is factually and legally incomplete.").

### 4. U.S. Replacement Tire Market Characteristics

As another factual enhancement, plaintiffs allege that the U.S. replacement tire industry as a whole "is susceptible to collusion due to high barriers to entry and exit, price inelasticity, and standardized products with a high degree of interchangeability." (Doc. No. 266, at 58 (citing DPP ¶¶ 149–60; EPP ¶¶ 182–85, 240–51; ADP ¶¶ 165).) This conclusion is premised on several factors. First, plaintiffs allege that the U.S. replacement tire market is oligopolistic, meaning there is a high concentration of market power among a few firms. (DPP ¶ 72; EPP ¶ 183; ADP ¶ 42.) According to plaintiffs, defendants Bridgestone, Michelin, and Goodyear collectively control nearly 64% of the U.S. replacement tire market. (DPP ¶ 69; EPP ¶ 183; ADP ¶ 42.) "The other defendants—Continental, Pirelli, and Nokian—account for a significant portion of the remaining 36% of the market." (Doc. No. 266, at 23 (citing DPP ¶ 69).) This degree of market concentration allegedly "renders a market more susceptible to collusion" because it "is easier to coordinate and agree on prices, ensure the conspiracy remains concealed, and to police adherence to the conspiracy by identifying and punishing defectors when there are fewer participants." (DPP ¶ 72; *see also* EPP ¶ 185; ADP ¶ 43.)

Second, plaintiffs allege that the tire industry has high barriers to entry and exit, "a characteristic that leads to further market concentration." (DPP ¶¶ 149–53; *see also* EPP ¶¶ 240–43; ADP ¶¶ 165–67.) Establishing a new tire manufacturing plant is alleged to require hundreds of millions of dollars, sophisticated machinery, and access to a large labor force. (DPP ¶¶ 149–50; EPP ¶ 240; ADP ¶ 165.) Plaintiffs further allege that tire manufacturing plants must be strategically

located near consumer markets to mitigate shipping costs, and that stringent safety and performance regulations further complicate the entry of new competitors. (DPP ¶¶ 150–51; EPP ¶ 240; ADP ¶ 165.) And, because of these high entry barriers, plaintiffs claim that "it is extremely difficult to exit from the tire industry," which makes consolidation "more likely than companies going out of business." (DPP ¶ 152; EPP ¶ 241; ADP ¶ 166.)

Third, plaintiffs allege that demand for replacement tires is "highly inelastic," meaning "consumers will purchase as much as they need . . . regardless of price[.]" (DPP ¶¶ 154–55; *see also* EPP ¶¶ 244–48; ADP ¶¶ 168–72.) This alleged inelasticity stems from the fact that tires are essential for vehicle operation, and a driver therefore "cannot put off replacing a tire for long once a replacement is needed." (DPP ¶ 155; *see also* EPP ¶ 246; ADP ¶ 170.) And because "no reasonable substitutes for replacement tires exist," plaintiffs allege that "buyers will not be induced to buy more or fewer tires through price changes." (DPP ¶ 156; *see also* EPP ¶ 247; ADP ¶ 171.) According to plaintiffs, a "market with inelastic demand is more susceptible to collusion and price-fixing because competitors can raise their prices without suffering a significant decrease in sales or profit." (DPP ¶ 154; *see also* EPP ¶ 245; ADP ¶ 169.)

Fourth, plaintiffs allege that replacement tires are largely "interchangeable," meaning they are standardized products with little differentiation between brands. (DPP ¶¶ 158–59; EPP ¶ 249; ADP ¶¶ 173–74.) According to plaintiffs, interchangeability makes price the primary competitive factor (DPP ¶ 160; EPP ¶ 251; ADP ¶ 175), and price-fixing conspiracies "are more likely when the participants sell interchangeable products" because "avoidance of price-based competition is the primary motivation for forming a cartel." (DPP ¶ 160; EPP ¶ 251; ADP ¶ 175.)

In moving to dismiss, defendants first criticize these allegations as being "so generic that they could apply to many different industries," and are "just another way of stating that the market

is an oligopoly prone to *lawful* parallel behavior." (Doc. No. 247-1, at 55 (emphasis in original) (citations omitted).) Defendants next accuse plaintiffs of "ignor[ing] the reality of multiple emergent competitors in the U.S. market" and the number of "competitors ready to capture market share if [d]efendants attempted to raise prices to a supracompetitive level." (*Id.* at 55–56; *see also* Doc. No. 276, at 31–32.)

Defendants' second argument relies on information outside the pleadings and not subject to judicial notice. (*See, e.g.*, Doc. No. 247-1, at 55–56, 56 n.28.) Thus, the matter may not be considered at the motion to dismiss stage.[8]

Defendants' first argument, however, has more traction. The Sixth Circuit, like others, has held that "[b]eing ripe for collusion, or having a market where collusion is simply possible, is not evidence of collusion." *Hobart-Mayfield*, 48 F.4th at 668 (citing *White v. R.M. Packer Co.*, 635 F.3d 571, 580 (1st Cir. 2011) and *Rsrv. Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 50, 53 (7th Cir. 1992) ("[I]t is well-established . . . that the mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws.")); *see also DRAM*, 28 F.4th at 52 ("Extreme market concentration may suggest conspiracy . . . [but it] also makes conscious parallel behavior more likely[.]"); *Citigroup*, 709 F.3d at 139 ("As our sister circuit has helpfully explained, 'evidence . . . that the defendants operate in an oligopolistic market . . . may simply

---

[8] In any event, to accept defendants' theory that "multiple emergent competitors" stood "ready to capture market share" from defendants, the Court would be required, at the pleadings stage, to speculate not only as to these smaller competitors' *ability* to keep their prices below market during a period of severe economic uncertainty, but also their *willingness* to do so. The latter assumption is particularly unwarranted, given that those hypothetical smaller competitors could just as easily—and legally—raise their prices with the competition to reap the same financial benefit. *See Musical Instruments*, 798 F.3d at 1195 n.8 (explaining that a firm can increase profit either by "compet[ing] to capture greater market share," or "keep[ing] their market share the same while increasing prices").

restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism.'" (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)).

Courts generally discount the probative value of similar ripe-for-collusion allegations because they "are simply descriptions of the market, not allegations of anything that the defendants did." *Erie Cnty.*, 702 F.3d at 870. As such, plaintiffs' allegations that the U.S. replacement tires market is susceptible to collusion, "like the ambiguous facts discussed before, merely indicate[] that a conspiracy *could* have formed," but do little to demonstrate the actual existence of the alleged conspiracy. *OTC Hotel Booking*, 997 F. Supp. 2d at 543 (emphasis in original)).

Additionally, market evidence is particularly unhelpful in concentrated industries, such as is alleged here, because "as the number of firms in a market declines, it . . . becomes increasingly likely that lawful conscious parallel behavior or interdependent pricing (following each other's pricing decisions) will occur without prior agreement." *Micron Tech.*, 400 F. Supp. 3d at 917 (collecting cases). "Plaintiffs' allegations concerning market characteristics are, therefore, just as likely to be consistent with innocent as unlawful behavior," and as such, are generally treated as "neutral facts." *Id.*; *see also Cedar Shakes*, 2020 WL 832324, at *10 ("The market that Plaintiffs describe as 'conducive to collusion' is also nothing more than an 'oligopoly' . . . . Such a market may find itself raising prices *en masse* in ways that are not illegal."); *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 983 (N.D. Cal. 2020) ("[A]llegations that the market was susceptible to collusion or gave Defendants a motive to conspire reduce to allegations that the market is interdependent, and are therefore of little help in pleading an antitrust conspiracy."), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021), *cert. denied*, 142 S. Ct. 2852 (2022).

Nevertheless, plaintiffs are correct that operating in a market that is ripe for collusion is a "well-established plus factor" (Doc. No. 266, at 57–58 (collecting cases)), and defendants overplay their hand in arguing it "does not constitute a plus factor" at all. (Doc. No. 247-1, at 55.) In general, courts treat market structure allegations as "relevant but far from dispositive[.]" *Kleen*, 276 F. Supp. 3d at 823 (collecting cases); *see also Blood Reagents*, 756 F. Supp. 2d at 631 ("The salient features of the blood reagents market—described in the Complaint as one that is highly concentrated, contains high barriers to entry, has inelastic demand, lacks reasonable substitutes, and is based on a standardized product—are each conducive to transforming that motive [to conspire] into action."). As one court explained:

> If the complaint's allegations must render it more than merely possible that the defendants entered into an illegal agreement, it cannot be the case that allegations that a market is oligopolistic and a product is homogeneous are sufficient to survive a motion to dismiss. If that were so, an antitrust complaint targeting any industry with those features would survive a motion to dismiss regardless of whether there were any additional facts suggesting an agreement. Hence, while market structure can provide some evidence of an unlawful agreement, it (even combined with parallel conduct) cannot sustain plaintiffs' complaint all on its own.

*Washington Cnty.*, 328 F. Supp. 3d at 841 (citation omitted)). As the Sixth Circuit acknowledged, "[b]eing ripe for collusion, or having a market where collusion is simply possible, is not evidence of collusion." *Hobart-Mayfield*, 48 F.4th at 668. Accordingly, in this case, while parallel conduct exists, the fact that the replacement tire industry is susceptible to collusion does little to the render the alleged conspiracy plausible.

### 5. *Public Signaling*

Plaintiffs contend that defendants utilized public earnings calls as a "mechanism . . . to effectuate their conspiracy" in "signal[ing] their intent to increase prices by publicly announcing future price increases a month to two months in advance of the effective date." (DPP ¶ 75; EPP ¶¶ 141, 145; ADP ¶ 52.) In their complaints, plaintiffs identify several of defendants' public

statements that ostensibly were covert messages to the other defendants in furtherance of the alleged price-fixing conspiracy. (DPP ¶¶ 77–100; EPP ¶¶ 141–76; ADP ¶¶ 52–65.)

For example, during an earnings call held on May 5, 2020, Nokian's CEO said that "[i]f everybody's sensible in this industry, it means that the prices would not be going down as much as the raw material would imply." (EPP ¶ 146.) In July 2020, a Michelin executive expressed on a call that it was "not a period where you play on prices." (DPP ¶ 79; ADP ¶ 54.) And in October 2020, Goodyear's CEO was asked whether the current environment was favorable for price increases; he responded that Goodyear "do[es] see a favorable pricing environment," and that it "is a pretty good environment" for producer pricing. (EPP ¶ 148 (alteration in complaint).)

Plaintiffs contend that the alleged signaling was often followed by a "wave" of price increases. (Doc. No. 266, at 27–28.) During a March 2021 earnings call, Pirelli executives noted the "movement in the market on the direction of the price increase," forecasted a "positive" "outlook for prices," and stated that "we expect in the coming weeks and months that something positive can happen in the market." (DPP ¶ 83 (alterations omitted); *see also* EPP ¶ 147.) The next month, April 2021, Goodyear's CFO said on a call that Goodyear saw a "bigger pricing impact or bigger pricing benefit in the U.S.," explaining: "In the US and we realize that . . . the pricing we've announced to date isn't sufficient to get us through the second half. Probably what we've announced so far, it gets us a little more than halfway there, but we've got some time to work with and got some pretty good momentum." (DPP ¶ 85; EPP ¶ 159.) Defendants announced "another round of price hikes" during this time. (DPP ¶¶ 84–86; *see also* EPP ¶ 159.)

In August 2021, a Bridgestone executive stated that he was "certain that [Bridgestone] will raise prices in the second half of the year," and remarked that other tire manufacturers were "feeling this same wind" to increase prices and were "firmly working with these winds." (DPP ¶

88; *see also* EPP ¶ 163; ADP ¶ 60.) Continental, Pirelli, and Bridgestone announced price increases effective October 2021. (DPP ¶ 89; EPP ¶ 165; ADP ¶ 60.) During a November 2021 call, Goodyear's CEO noted the "momentum" regarding price increases: "So we monitor all those tire manufacturers that are out there. And what we've seen [is] that they've all announced at least three price increases this year." (ADP ¶ 44; *see also* DPP ¶ 90.) Defendants announced more price increases during this period (December 2021 to January 2022). (DPP ¶¶ 91–92; ADP ¶ 61.)

In February 2022, Goodyear's CEO praised the "constructive pricing environment" that was "probably the best in recent memory," and observed that "coming into 2022," "all [the main] tire manufacturers out there essentially announc[ed] double-digit price increases." (DPP ¶ 92 (alterations in complaint); ADP ¶ 45.)[9] He further indicated that if Goodyear "could make more, we can actually even sell more in the environment that we're seeing." (ADP ¶ 46.) Later that month (February 2022), Pirelli's General Manager of Operations stated on an earnings call that Pirelli was "ready to . . . announce further price increase [*sic*] where and when necessary[.]" (DPP ¶ 92.) Defendants announced more price increases in the following weeks and months. (DPP ¶ 93; EPP ¶¶ 169–70; ADP ¶¶ 62–63.)

In May 2022, a Goodyear executive observed that Goodyear's "average real market prices [had] increased significantly more than our major competitors, irrespective of announced price increases," stating: "[W]e've got to acknowledge that we've got major competitors who have announced 2 or 3 price increases" already in 2022. (DPP ¶ 96; ADP ¶ 51.) Also in May 2022, Bridgestone's General Manager for Investor Relations was asked whether more price increases could be forthcoming, to which he responded: "You asked if the price increases were at its limit

---

[9] The ADP Complaint alleges this call occurred in February 2021, not February 2022. The Court assumes this is a typographical error, given DPPs' allegations and the fact that ADPs identify the call as "the Q4 2021" earnings call.

now. Our response is, we do not see it that way." (DPP ¶ 96.) That same day, during its own earnings call, Continental's CFO "referred to sustainable pricing several times, including: "'[t]o mitigate the broad inflationary headwinds, implementation of sustainable pricing is mandatory.'" (ADP ¶ 49 (alteration in complaint).) In November 2022, Bridgestone's Global CEO observed that "the industry as a whole has been trying to raise prices quite fast," and stated later in the call that "going forward, it's very critical for the price increase to take hold, especially in the United States[.]" (DPP ¶ 99.) And in March 2023, Continental's CEO stated that Continental "will not hesitate to increase prices as well where necessary and possible." (*Id.* ¶ 100.) Defendants' price increases continued during this time. (DPP ¶¶ 97–100; EPP ¶¶ 171–76; ADP ¶¶ 63–65.)

Plaintiffs claim these cited statements "go well beyond 'mere observations of market trends'" (Doc. No. 266, at 49 (quoting Doc. No. 247-1, at 26)), and that "they conveyed what should have been confidential information (like planned future price increases)." (*Id.* at 28.) Plaintiffs further contend that "the repeated pattern of public calls for price increases followed by actual increases by the [d]efendants" demonstrates that "the public announcements signaled price increases to other [d]efendants to maintain supracompetitive prices[.]" (*Id.*) Plaintiffs do not contend that the statements are unlawful in and of themselves, but when "viewed as part of the totality of [the] allegations," plaintiffs argue that the "public statements support the plausibility of the price-fixing conspiracy." (*Id.* at 49.)

Defendants raise several issues with this aspect of the pleadings. First, they argue the cited statements in the complaints are misquoted, misleadingly truncated, or cherry-picked and taken out of context. (*Id.* at 39–42.) Second, defendants assert that the statements were routine, lawful, and (even for some of the statements) legally required communications with investors, and that none rise above general observations of market trends, comments on their own company's past

behavior, predictions of competitors' future behavior, or "especially vague and generic" indications of their own company's future behavior. (*Id.* at 42–44.) Finally, defendants contend that the timing of the statements and price increases is not "indicative of conspiratorial behavior," because "what [p]laintiffs describe as a 'call and response' simply points to the quarterly nature of business." (*Id.* at 44–45 (citations omitted).)

In response, plaintiffs simply disagree with defendants' characterization of the cited statements, and insist that the statements "go well beyond 'mere[] observations of market trends.'" (Doc. No. 266, at 49 (alteration in original) (quoting Doc. No. 247-1, at 27, 42).) Plaintiffs further argue that their call-and-response theory is "consistent with the EC's investigation, which involves [d]efendants' coordinated price increases 'via public communications channels.'" (DPP ¶ 6 (quoting First EC Press Release).) Accordingly, plaintiffs argue, "[w]hen viewed as part of the totality of [the] allegations, [d]efendants' public statements support the plausibility of the price-fixing conspiracy." (Doc. No. 266, at 49.)

As an initial matter, nearly all of plaintiffs' factual allegations regarding defendants' public statements also include legal conclusions or unsupported speculation as to the meaning of the statements and their intended audience. (*See, e.g.*, DPP ¶ 92 ("On an earnings call in February 2022, [a Goodyear executive] . . . lauded the 'constructive pricing environment' that was 'probably the best in recent memory' *to signal to [d]efendants another wave of price increases*. That same month, [a Pirelli executive] *signaled to [d]efendants* that Pirelli was 'ready to increase – to announce further price increase [*sic*] where and when necessary' during an earnings call." (emphasis added)); *see also* Doc. No. 266, at 49 (similar).)

As another representative example, paragraphs 79–81 of the DPP Complaint (and paragraphs 54–56 of the ADP Complaint) allege the following, with the bolded portions

representing legal conclusions, unwarranted inferences, or unsupported speculation that the Court

need not accept as true:

> 79. In July 2020, Michelin **instructed its competitors** that it was "not a period
> where you play on prices" (***i.e., lowering price***).
>
> 80. **Heeding this call to continue coordinated action**, in November 2020,
> Goodyear announced price hikes up to 5% on its Goodyear and Dunlop-brand
> consumer tires in the United States effective December 1, 2020. During its fourth
> quarter earnings call, Goodyear's Chairman, President, and CEO remarked that
> after "9 of 10 of [] consumer tire manufacturers" "announced price increases since
> November [2020] of about 5% to 8%," Goodyear "announce[d] up to 5% on our
> consumer replacement business . . . ."
>
> 81. **To ensure that Defendants continued to increase prices in 2021**, on
> December 1, 2020, Bridgestone announced that it would increase prices for
> Bridgestone and Firestone passenger and light truck replacement tires in the United
> States effective January 1, 2021. Less than a week later, Pirelli announced price
> increases for car and light truck tires in the United States effective January 1, 2021,
> purportedly due to "changing market conditions." On or around December 19,
> 2020, Michelin announced plans to raise prices by up to 5% in Michelin and
> BFGoodrich brand passenger and light truck tires in the United States effective
> February 1, 2021. Michelin cited to purported "changing business dynamics" as the
> driving factor of change.

(DPP ¶¶ 79–81; ADP ¶¶ 54–56 (bolding added, all other alterations in complaints) (citations

omitted).)

Such gesturing is, of course, permitted in pleadings, and the Court takes no issue with

plaintiffs doing so here. Nevertheless, it bears repeating that only plaintiffs' well-pleaded factual

allegations are entitled to a presumption of truth. *Iqbal*, 556 U.S. at 679 ("While legal conclusions

can provide the framework of a complaint, they must be supported by factual allegations.");

*Hobart-Mayfield*, 48 F.4th at 663 ("Although factual allegations are accepted as true, a plaintiff's

legal conclusions stemming from those factual allegations are open to scrutiny."). And to be clear,

the Court is not rejecting the above-bolded legal conclusions "on the ground that they are

unrealistic or nonsensical." *Iqbal*, 556 U.S. at 681. "It is the conclusory nature of [the] allegations,

rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Id.* "Although the complaint must be liberally construed in favor of the party opposing the motion to dismiss, the Court should not accept conclusions of law or unwarranted inferences of fact cast in form of factual allegations." *Sam Han v. Univ. of Dayton*, 541 F. App'x 622, 625 (6th Cir. 2013); *Hobart-Mayfield*, 48 F.4th at 663. Rather, the Court's task is to examine the well-pleaded factual allegations and determine whether they suggest "more than the mere possibility of misconduct[.]" *Iqbal*, 556 U.S. at 679–80.

With that clarification in place, the Court turns to the question of whether defendants' public statements indicate more than the mere possibility of conspiracy. They do not.

First, as EPPs acknowledge (and DPPs and ADPs do not dispute), Goodyear, Pirelli, Nokian, and Bridgestone are all "publicly traded companies" and are therefore required by law to "hold conference calls with securities analysts on a quarterly basis to discuss their financial results for the previous recording period." (EPP ¶ 141.) And, as defendants correctly point out, earnings calls are not restricted to discussions of past events, and regulations require public companies to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." (*See* Doc. No. 247-1, at 43 (citing 17 C.F.R. § 229.303(b)(2)(ii)).) Indeed, if a public company "knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed." 17 C.F.R. § 229.303(b)(2)(ii). Additionally, defendants point out that Michelin is publicly traded in France and Continental Aktiengesellschaft is publicly traded in Germany,

subjecting both to similar legal requirements under French and German law, respectively. (*See* Doc. No. 247-1, at 43 (citing applicable international laws).)

Plaintiffs do not dispute any of the above. They argue, however, that there is no "immunity from antitrust law when the violation is committed in plain sight." (Doc. No. 266, at 50 (citing *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016)).) While that is true, defendants are not claiming immunity. Rather, they are simply providing context for the statements to show that, with or without the existence of a conspiracy, they "'would likely make the same public statements about their observations, predictions, and strategies for the future, particularly in response to investor and analyst questions.'" (Doc. No. 247-1, 41–42 (quoting *DRAM*, 28 F.4th at 50).) *See also Washington Cnty.*, 328 F. Supp. 3d at 839 ("The problem with the complaint is not that legally-required public notices are inherently implausible signaling mechanisms, it's that the complaint contains paltry factual support for—and indeed undermines— the proposition that the shortage letters at issue in this case actually functioned as a signaling mechanism.").

The Court finds the context in which the statements were made (public earnings calls) to be relevant. After all, determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663–64 (citing *Twombly*, 550 U.S. at 556). It strikes the Court as common sense that a "direct and secret price discussion between competitors is more probative of a conspiracy than are indirect and public communications, ostensibly undertaken by the conspiring competitors to 'signal' to one another." *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 984 (N.D. Ohio 2015) (citing *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1306 (11th Cir. 2003)). That consideration is particularly acute here, as defendants had a legal obligation

to publicly discuss their financial position on these calls, and "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway[.]" *Twombly*, 550 U.S. at 566.[10]

That said, the Court emphasizes that context can cut both ways, when supported by facts, and "the Court is not suggesting that public statements can never constitute circumstantial evidence of a conspiracy." *Micron Tech.*, 400 F. Supp. 3d at 920. But to infer conspiracy from the public statements cited by plaintiffs here would be to create an antitrust minefield for publicly traded companies, chilling speech on issues of interest to investors, analysts, and the public. As noted in *Delta/Airtran*, "courts have refused to construe corporate communications as invitations to collude where the communications contain 'the type of information companies legitimately convey to their shareholders,' instead restricting such findings to cases involving 'far more detailed communications with no public purpose.'" 245 F. Supp. 3d at 1372 (citation omitted).[11] Thus, consistent with plaintiffs' no-immunity argument, the Court "concludes only that the public

---

[10] EPPs make a conclusory allegation that "[c]ompanies are well aware, and have been advised by their attorneys, not to discuss future pricing plans. Despite being advised against making such statements, the [d]efendants nevertheless discussed their price increase plans publicly, during earnings calls." (EPP ¶ 163.) The Court declines to credit such speculation as true. Plaintiffs' counsel made similar arguments at the hearing (Doc. No. 295, at 72, 103–04, 107–09), but the Court is tasked with testing the sufficiency of the pleadings.

[11] The Court acknowledges that the decision in *Delta/Airtran* granted defendants' motion for summary judgment and therefore analyzed the plaintiffs' evidence under a more rigorous standard than plaintiffs face here. Nevertheless, the Court finds the cited statement of law and subsequent discussion to be accurate, persuasive, and instructive. Further, having reviewed the history of that case, including the pleadings and the court's earlier order denying the defendants' motion to dismiss, the Court finds its facts—and the public statements in particular—to be far more indicative of conspiracy than those alleged here. As only one of many examples, Airtran publicly indicated that it wanted to implement a first-bag fee, and had invested in the capability to quickly implement the fee, but had not done so "primarily" because Delta had not done so. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1356 (N.D. Ga. 2010). The Airtran executive then stated: "So I'm not saying we won't do it. But at this point, I think we prefer to be a follower in a situation rather than a leader right now," and indicated that Airtran would "strongly consider" implementing the fee if Delta did so. *Id.* Less than two weeks later, Delta announced that it would implement a $15 fee, effective December 5, 2008. *Id.* A week later, Airtran announced that it would also implement a $15 fee, effective December 5, 2008. *Id.* The public statements alleged here are not nearly as suggestive of conspiracy, nor are the alleged actions following the statements (price increases) nearly as uniform.

statements at issue *here* do not suggest unlawful restraint of trade." *Micron Tech.*, 400 F. Supp. 3d at 920 (emphasis added).

As a second, related point, defendants argue that "[m]any of the statements [p]laintiffs quote were made in response to investor and analyst queries, which further undermines any inference of collusion." (Doc. No. 247-1, at 44 (citing DPP ¶¶ 79, 83, 99; ADP ¶¶ 48, 54).) *See also Micron Tech.*, 400 F. Supp. 3d at 920 ("That a comment is made in public, of course, does not inoculate any underlying illegality. Yet, the fact that a number of these comments were made [] in response to investor questions, addressing topics about which investors would be concerned . . . weighs against their illegality." (internal citation omitted)). It appears that many of the cited comments were made in response to unprompted questions from investors and analysts, but plaintiffs again dismiss that context as irrelevant. Citing *Broiler*, plaintiffs argue that "'what is important to the Court's analysis is not so much the immediate context in which the statements were made, but the larger context of the market and industry actions.'" (Doc. No. 266, at 50 (quoting 290 F. Supp. 3d 772).)

For the reasons just stated, however, the Court disagrees that the immediate context in which the statements were made is immaterial. That conclusion is not inconsistent with *Broiler*. In fact, *Broiler* explicitly acknowledged the "concern with a court potentially finding that communications that are otherwise beneficial to consumers (such as communication of retail prices) to be an aspect of a conspiracy." 290 F. Supp. 3d at 798–99. *Broiler* simply found that no such threat existed under its facts, because the public communications at issue were "statements of intent to cut production," which do not benefit the public. *Id.* at 783. Here, however, defendants' public statements relate to retail prices—i.e., the exact subject matter that *Broiler* acknowledged could be problematic if used as evidence of unlawful collusion. *Id.* at 799 (citing *In re Coordinated*

*Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 448 n.14 (9th Cir. 1990) ("[P]ermitting an inference of conspiracy from such evidence would make it more difficult for retail consumers to get the information they need to make efficient market decisions.")). As defendants correctly observed in their briefing and during oral arguments, advanced announcements allow consumers to "actually take advantage of the lower price before the price increase goes into effect." (Doc. No. 295, at 14.)

In a separate but related point, *Broiler* found it made "little economic sense" for defendants to publicly announce production cuts ahead of time absent a conspiracy. 290 F. Supp. 3d at 798. That is because implementing the cuts involved corporate action that would have been difficult to walk back if the rest of the industry had declined to follow suit. *Id.* ("'The risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely.'" (citations omitted)); *see also id.* at 803 (collecting allegations in complaint of defendants' plant closures and employee layoffs resulting from the productions cuts). In other words, it was strange for defendants to publicly discuss potential supply cuts *at all*, so the context in which the statements were made (earnings calls) did not matter.

*Broiler*'s logic is sound, but it does not apply here. Defendants' price increases were easy to reverse if necessary, mitigating the risk to announcing them ahead of time. (*See* Section III.B.2, *supra* (citing *Travel Agent*, 583 F.3d at 908; *Musical Instruments*, 798 F.3d at 1195).) And it was perfectly reasonable for defendants to discuss their pricing strategy on earnings calls, "particularly in response to investor and analyst questions" directly addressing that topic. *DRAM*, 28 F.4th at 50.

With this context in mind, the Court has reviewed the dozens of defendants' public statements that plaintiffs claim were covert price signaling in furtherance of a conspiracy. (*See*

DPP ¶¶ 77–100; EPP ¶¶ 141–76; ADP ¶¶ 52–65.) Despite plaintiffs' nefarious interpretations of them, the Court finds that the cited statements are all descriptions of current market trends,[12] observations of competitors' behavior,[13] comments on past events,[14] general indications of the defendant's own pricing strategy moving forward,[15] or responses to investors' or analysts' questions.[16] For example, DPPs allege:

> 96. During an earnings call in May 2022, Goodyear's CFO, Darren R. Wells, remarked that Goodyear's "average real market prices [had] increased significantly more than our major competitors, irrespective of announced price increases," **signaling to other Defendants that they could price higher**. Bridgestone's General Manager of Investor Relations **reinforced Goodyear's call for collective action a few days later,** stating: "You asked if the price increases were at its limit now. Our response is, we do not see it that way."

(DPP ¶ 96 (bolding added to indicate unsupported legal conclusions or unwarranted inferences; all other alterations in complaint).) Additionally, certain of the statements were misquoted or taken out of context.[17] Shorn of plaintiffs' legal conclusions, the actual statements by defendants

---

[12] (DPP ¶¶ 79, 83, 85, 88, 90, 91–92, 96, 99; EPP ¶¶ 146–149, 159; ADP ¶¶ 44–45, 47–49, 51, 54, 60.)

[13] (DPP ¶¶ 80, 88, 90, 92, 96, 99; ADP ¶ 55.)

[14] (DPP ¶¶ 80, 88, 90, 92; ADP ¶¶ 44, 47, 50, 51, 55.)

[15] (DPP ¶¶ 80, 88, 91, 92, 96, 97, 99, 100; EPP ¶¶ 148, 149, 159, 160, 163, 164; ADP ¶¶ 45, 49, 55, 60, 63.)

[16] (DPP ¶¶ 77, 79, 92, 96, 99; EPP ¶ 146; ADP ¶ 54.)

[17] For example, the Court finds only one allegation in the pleadings that describes a forward-looking statement about competitors, but that statement turns out to have been misquoted. Specifically, DPPs alleged that Bridgestone's CEO stated on an earnings call that "Bridgestone would 'continu[e] to execute price management, including price increase[s]' and that 'all other competitors . . . have to do the same.'" (DPP ¶ 99 (alterations in complaint).) In their joint motion to dismiss, defendants claimed DPPs misquoted the earnings call transcript, and that the quote is actually: "all other competitors . . . have <u>had</u> to do the same." (*See* Doc. No. 247-1, at 39 (emphasis added).) Thus, defendants claim, DPPs "replac[ed] a past tense with a present tense to make the quote sound forward looking, when it was not." (*Id.*) Plaintiffs did not respond to that point in their briefing, but conceded at oral argument that the misquote was a "typographical error" in the pleadings. (Doc. No. 295, at 106–07.) But even if DPPs had used the correct quote, defendants still convincingly argue that the two quotes contained in the last sentence of paragraph 99 of the DPP Complaint were misleadingly spliced together. (Doc. No. 247-1, at 39 ("Bridgestone's CEO's statement about 'strategic price management' appears on page 3 of the earnings call transcript, and the quoted language about competitors appears *fifteen pages later*, as part of a discussion about an entirely different topic (production, not pricing)." (emphasis in original) (citing Doc. No. 247-10)).) *See, e.g.*, *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1275 (N.D. Ga. 2002) ("In sum, the court finds Plaintiffs' theory of signaling among the companies to be based on a combination of statements taken out of context, as well as ominous readings of typical industry reporting on strategy."), *aff'd sub nom. Williamson Oil*, 346 F.3d 1287.

contained in these allegations (and the others) are the type of routine investor communications one would expect on an earnings call. It is not suspicious at all, for example, that Goodyear compared its current prices to those of its major competitors, or that Bridgestone expressed general optimism for future price increases during a massive inflationary period. And the Court rejects plaintiffs' unwarranted inference that Goodyear's comment that it had increased prices "significantly more than [its] major competitors" was intended as a "signal[] to other [d]efendants that they could price higher." (*Id.*) If anything, that comment suggests that defendants made their pricing decisions *independent* of each other and were thus not increasing prices in "lockstep," as plaintiffs allege. (*See, e.g.*, DPP ¶¶ 6, 73, 74, 94; EPP ¶¶ 138, 149, ADP ¶¶ 91, 101, 160–62.)

This pattern repeats itself throughout plaintiffs' price-signaling allegations: once separated from plaintiffs' legal conclusions and their speculation as to secret second meanings, intended audiences, and nefarious motives for the statements, none raise more than the mere possibility of unlawful conduct. While all reasonable inferences must be drawn in plaintiffs' favor, *Twombly* makes clear that factual allegations that are "merely consistent with" prior agreement are insufficient, even at the pleadings stage. 550 U.S. at 557.

The cited statements here are, at best, merely consistent with conspiracy. For instance, in *Micron Tech.*, 400 F. Supp. 3d at 918–19, the court declined to consider the defendants' public statements as suggestive of unlawful collusion where the statements, "all of which [were] made during earnings calls or at industry conferences, constitute individual Defendants' indications of their own future behavior and descriptions of their past behavior, predictions of industry trends, and observations about competitor behavior." Similarly, in *In re Pork Antitrust Litig.*, No. 18-cv-1776, 2019 WL 3752497, at *9 (D. Minn. Aug. 8, 2019), the court found that defendants' public statements did not suggest conspiracy where "the statements cited generally refer to the industry

as a whole, and are largely vague." And in *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011), while the court denied the defendants' motion to dismiss under facts distinguishable from the within case, it observed that "[s]ome of plaintiffs' suggested 'plus factors' are less convincing than others. For example, many of the public statements, which plaintiffs contend are part of a 'signaling' strategy meant to keep the conspiracy going, are very general statements to investors or regulators about the trajectory of the plasma therapies industry." The court held that it "is difficult to imagine how these generic statements render the conspiracy allegation more plausible." *Id.*[18] *See also Williamson Oil*, 346 F.3d at 1308– 10 (rejecting ambiguous public statements as probative of conspiracy at summary judgment stage, finding plaintiffs' proffered interpretation of them to be unreasonable as a matter of law; "None of the actions . . . that appellants label 'signals' tend to exclude the possibility that [defendants] were engaged in rational, lawful, parallel pricing behavior that is typical of an oligopoly. Nor, conversely, do they tend to establish that a price fixing conspiracy was afoot. Notably, this conclusion does not change when we consider these actions cumulatively.").

Finally, any temporal correlation between the public statements and the price increases suggests conscious parallelism, not prior agreement. As has been discussed throughout this opinion, it is neither unlawful nor irrational for firms in an interdependent market to engage in follow-the-leader pricing. The Sixth Circuit's decision in *Travel Agent* expounded on this issue:

> When one oligopolist raises its price, each of its rivals must decide whether to follow. Continuing the previous price would allow each of the others to increase its sales if the leader persists in charging a higher price. But each knows that the leader

---

[18] One of several distinguishing aspects of *Plasma-Derivative* is that the alleged conspiracy—similar to *Broiler*, *supra*—dealt with "decisions to cut back production and reduce capacity." 764 F. Supp. 2d at 1001. As *Plasma-Derivative* makes clear, publicly pre-announcing those types of corporate actions is referred to as "perilous leading" because it involves "business decisions [that] would be impossible to reverse quickly" if the rest of industry declines to follow suit. *Id.* Such "perilous leading" is significantly more suggestive of conspiracy than price leadership because "[w]here prices or supplies can be quickly adjusted . . . , firms face little risk in waiting to see how competitors price their products." *Id.*

is likely to retract an increase that is not followed. Accordingly, each rival asks itself whether it is better off at the lower price when it is charged by all or at the higher price when charged by all. If the latter, as will often be the case, the leader's price increase is likely to be followed.

*** 

The price leader may assume that others have made a similar calculation about which price will maximize profits. Or the leader may simply proceed by trial and error: raise the price and see what happens, especially where reversing an unfollowed price rise is not very costly.

*Travel Agent*, 583 F.3d at 910 (alteration in original) (quoting 6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1410b (2d ed. 2003)). Furthermore, defendants' decision to follow the leader is not "necessarily indicative of prior agreement," because:

[a] firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader. After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-than-leader's price might simply lead competitors to match the lower price, reducing profits for all. One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.

*Id.* (alteration in original) (quoting *Reserve Supply*, 971 F.2d at 53).

It is not suggestive of conspiracy, then, that one defendant announced a price increase (or expressed general optimism about the market) and others followed suit within a reasonably short period of time. Such a pattern simply reflects parallel conduct in an interdependent market, which is not unlawful, and thus defendants have offered a reasonable alternative explanation for their parallel pricing behavior. *See id.* at 908 ("[I]t was simple and inexpensive for a leader airline to innovate and then wait and see, with the hope and expectation that its competitors would institute similar [commission] cuts. If the industry did not follow, the leader airline could simply retract the cut. Thus, defendants have offered a reasonable, alternative explanation for their parallel pricing behavior.").

64

"In short, the instant case bears none of the traditional hallmarks of a situation in which uniform pricing is present in an industry where we would otherwise not expect it . . . . And without an expectation of divergent pricing, all that remains is an allegation of uniform pricing, which is indicative only of parallel conduct." *Quality Auto Painting*, 917 F.3d at 1266. As has been observed in many other price-fixing cases, "[c]onscious parallelism . . . is not in itself prohibited under § 1 of the Sherman Act," *Travel Agent*, 583 F.3d at 903 (citing *Twombly*, 550 U.S. at 554)), and the Court "must be careful . . . not to regard activity that may just as easily turn out to have been rational business behavior as a plus factor." *In re ICE LIBOR Antitrust Litig.*, No. 19-cv-439, 2020 WL 1467354, at *5 (S.D.N.Y. Mar. 26, 2020) (citation and quotation marks omitted)). *See Musical Instruments*, 798 F.3d at 1195 ("[I]nterdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement."); *German Auto.*, 612 F. Supp. 3d at 986 ("This suggests not an agreement to raise prices, but various firms watching their competitors' pricing decisions and adjusting their own prices in response. This type of 'follow the leader' pricing . . . is a well-recognized form of lawful conscious parallelism."); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1259–60 (W.D. Wash. 2009) (dismissing complaint where plaintiffs failed "to link the lockstep [price adjustments] to anything other than the type of parallel conduct generally present in a homogeneous market" (collecting cases)); *Schuylkill Health Sys. v. Cardinal Health 200, LLC*, No. 12-cv-7065, 2014 WL 3746817, at *5 (E.D. Pa. July 30, 2014) ("In a highly concentrated market, any single firm's price and output decisions will have a noticeable impact on the market and on its rivals, such that when any firm in that market is deciding on a course of action, any rational decision must take into account the anticipated reaction of the other firms." (cleaned up)).

In the end, plaintiffs' interpretation of defendants' public statements relies on conjecture rather than fact, and the statements themselves do not suggest there was a preceding agreement among the defendants to fix the prices of replacement tires. Nor do plaintiffs allege any facts contextualizing the statements to show they were out of the norm for defendants. Without facially suspicious statements (as in *Delta/AirTran*, 733 F. Supp. 2d 1348), or context suggesting the statements would not have been made absent a conspiracy (as in *Broiler*, 290 F. Supp. 3d 772), there is no basis to treat defendants' public comments here, which were made in appropriate forums and served a public purpose, as circumstantial evidence of an unlawful conspiracy.

### 6.    *Pretextual Explanations for Price Increases*

"Courts have recognized that pretextual explanations for price increases can support an inference that defendants were not acting independently." *Miami Prods.*, 449 F. Supp. 3d at 160 (W.D.N.Y. 2020) (collecting cases); *see also In re Jan. 2021 Short Squeeze Trading Litig.*, No. 21-2989-MDL, 2022 WL 1522054, at *21 (S.D. Fla. May 13, 2022) ("Pretextual statements may constitute circumstantial evidence of a conspiracy." (citation omitted)), *aff'd*, 105 F.4th 1346 (11th Cir. 2024).

While not specifically presented as a plus factor, plaintiffs assert that defendants' public explanations for their price increases were pretextual. Defendants' justifications included various forms of "rising input costs" and "changing market dynamics." (*See, e.g.*, DPP ¶¶ 81, 82, 89, 93, 100, 113, 120, 122; EPP ¶¶ 151, 153–56, 159, 161, 165, 177; ADP ¶¶ 56, 58, 60, 70, 152, 206.) Plaintiffs rely on two categories of support for their argument that defendants' "pretextual justifications do not account for the significant increases in prices over the Class Period." (DPP ¶ 113; *see also* EPP ¶ 178; ADP ¶¶ 152–64.) First, plaintiffs cite several statements by defendants— most notably, a statement in early 2022 by Goodyear's CEO that the "increase in the replacement

tire prices[] more than offset costs." (DPP ¶¶ 5, 101, 114, 119; EPP ¶ 178; ADP ¶¶ 69, 93; Doc. No. 266, at 45–46.) Second, plaintiffs present economic arguments, including: (1) DPPs' "preliminary regression analysis" that plaintiffs contend "specifically rebuts the argument that economic factors could have explained the price increases" (DPP ¶¶ 123–25; *see also* Doc. No. 266, at 30, 47–48); (2) EPPs' comparisons of (a) defendants' U.S. and Europe prices against their prices in Japan (where no conspiracy is alleged), and (b) defendants' U.S. prices against non-defendants' U.S. prices (EPP ¶¶ 178–81); and (3) ADPs' explanation of how defendants' conduct diverged from what one would expect in a competitive environment. (ADP ¶¶ 152–64.)

Defendants challenge both the premise of the pretext allegations and the acceptability of plaintiffs' proffered economic evidence in support. (*See* Doc. No. 247-1, at 50–53; *see also* Doc. No. 276, at 17 (arguing that plaintiffs' allegation that the price increases cannot be explained by legitimate market forces is "neither plausible nor supported in the Complaints").) Defendants argue that their "decisions to increase prices on certain products were in line with industry- and economy-wide conditions" during the pandemic, and their stated justifications for the increases were therefore legitimate, not pretextual. (Doc. No. 247-1, at 51.) Defendants cite the inflationary impact of "'the global Covid-19 pandemic'" as an "'obvious alternative explanation'" for their pricing decisions, claiming that plaintiffs "acknowledge these market conditions, but then ignore them altogether in crafting their conspiracy claims." (*Id.* at 50–53 (quoting *D'Augusta v. Am. Petroleum Inst.*, No. 23-15878, 2024 WL 4195329, at *7 (9th Cir. Sept. 16, 2024) (further citation omitted)).) The Court agrees.

At the outset, a significant portion of defendants' argument on this point relies on materials that are outside the pleadings. (*See, e.g.*, *id.* at 50–51, 51 n.23.)[19] But even disregarding the extraneous materials, defendants convincingly dispute the plausibility of the pretext allegations by pointing out several material inconsistencies within, and critical omissions from, the consolidated complaints. For example, plaintiffs specifically acknowledge that the COVID-19 "pandemic had a global impact on the tire industry and its material suppliers" (EPP ¶ 142), and that, from the "onset" of the pandemic, "profit and revenue in many industries decreased while the input costs increased." (DPP ¶ 128.) Plaintiffs further allege that "[b]y 2023, inflation eased [and] supply chain logistics were substantially improving," unmistakably implying high levels of inflation and supply chain disruptions during the period 2020–2022—i.e., the period during which defendants

---

[19] In fairness to defendants, several of the published articles that plaintiffs cite in their consolidated complaints appear to directly undermine the plausibility of the alleged conspiracy. For example, one article by the publication *Tire Business* (cited by plaintiffs as the source for a quote by a Bridgestone Executive) is titled *Rising Tire Prices Affected by Several Factors*. (Doc. No. 247-18 (cited at DPP ¶ 157 n.206; ADP ¶ 172 n.145).) The first sentence of the article explains that "[t]he supply chain continues to struggle in the wake of the COVID-19 pandemic, and the cost related to logistics and raw materials is at a historic high. Additionally, inflation is causing rising prices in most aspects of business. In the tire industry, manufacturers have raised prices multiple times in response." (Doc. No. 247-18, at 2.)

And a ProPublica article—titled *Overinflated: The Journey of a Humble Tire Reveals Why Prices Are Still So High*—goes even further in reporting on the many economic, non-conspiratorial factors affecting the high price of replacement tires during the relevant time-period. (Doc. No. 247-16 (cited at DPP ¶¶ 4 n.5, 156 nn.204–05; EPP ¶ 138 n.4).) Yet, citing the ProPublica article, DPPs allege the following: "Due to defendants' conspiracy, the average price of replacement tires increased by 21.4% in the United States between 2021 and 2023, increasing 70% more than core inflation during that period." (DPP ¶ 4; *see also* Doc. No. 266, at 24, 40, 46 (all similar, all citing DPP ¶ 4).) The ProPublica article contains the economic data for which plaintiffs cite it, but it draws a materially different conclusion as to the cause. Plaintiffs insist the "increases are not explained by market forces" (DPP ¶ 5), but their own source reports otherwise: "Tires have been buffeted by nearly every force driving inflation since the pandemic began – from border shutdowns that prevented migrant workers overseas from reaching rubber plantations to the war in Ukraine's toll on an obscure but essential ingredient in tires called carbon black." (Doc. No. 247-16, at 3.) The article continues for over a dozen pages, explaining how a multitude of economic factors converged on the tire industry during the pandemic, thus offering an obvious alternative explanation for why tire prices rose faster than core inflation. In other words, the reporting contained in these articles, if accepted as true, would cast serious doubt on plaintiffs' allegations.

Defendants argue that the Court "can, and should, consider materials cited in the Complaints when deciding this Motion to dismiss." (Doc. No. 247-1, at 17 n.1 (collecting cases on the incorporation by reference doctrine).) Plaintiffs do not specifically object to the Court's consideration of these articles, although they note in passing that defendants "rely[] on information outside the pleadings" when responding to defendants' arguments that mention the articles. (Doc. No. 266, at 46, 47 n.7.) Because the Court finds that the consolidated complaints, on their face, do not plausibly allege a price-fixing conspiracy, the Court need not determine whether it could, or should, consider these materials.

raised their prices. (*See* DPP ¶¶ 128–29; *see also* EPP ¶ 138 (the year 2023 saw "easing inflation, [] dissipating effects of the COVID-19 pandemic, and a stabilization of input costs").)

Plaintiffs make no meaningful attempt to square those allegations with their competing allegations that "[n]o market force can explain" the price increases. (Doc. No. 266, at 19; *see also, e.g.*, DPP ¶ 5; EPP ¶ 178; ADP ¶¶ 92–93.) Instead, plaintiffs simply point to DPPs' conclusory preliminary regression analysis, assuring the Court that their "expert controlled for all those factors," including any impact from the pandemic. (*See, e.g.*, Doc. No. 295, at 61, 68.) For reasons explained below, the Court gives no weight to plaintiffs' unsupported conclusion that the price increases cannot be explained by the effects of the COVID-19 pandemic on the U.S. replacement tire market. But more fundamentally, the fact that defendants raised their prices while inflation and supply chain logistics were worsening suggests rational pricing behavior in an interdependent market, not conspiracy. (*See, e.g.*, EPP ¶ 288 ("When a firm's costs rise due to an overcharge or increasing raw materials costs, it typically raises its prices to cover higher costs. Otherwise, it would lose money on each sale and be driven out of business.").)

In one of the few substantive differences between the consolidated complaints, ADPs argue pretext from a different angle than DPPs and EPPs. They argue that the "strategic differences" between defendants' hedging strategies should "alter tire manufacturers' need and ability to raise prices immediately in response to rising input prices," such that "when and if prices rose among [d]efendants, those increases would not be expected to occur in lockstep and/or the correlation between raw material inputs and tire prices would be less perfect." (ADP ¶¶ 152–64.) In other words, ADPs argue that fluctuations in input costs should not, and historically had not, uniformly impacted defendants' prices. (*See id.* ¶ 160 ("So, while tire manufacturers would be expected to

alter prices with raw materials price fluctuations, they would not all be expected to do so at the same time.").)

ADPs' logic may have academic appeal, but defendants are not actually alleged to have increased their prices at the same time (or by the same amount). Although defendants' price adjustments were similar enough to clear the relatively low bar of parallel conduct, the increases often arose weeks or even months apart, and sometimes varied in amount by several percentage points. (*See id.* ¶ 66; *see also id.* ¶¶ 54–55 ("call to continued coordinated action" occurred in "July 2020," and alleged response occurred "in November 2020"), ¶ 57 (alleged response occurred "[a] month later" than the alleged call), ¶ 61 (lumping together four price increase announcements that occurred on November 9, 2021, two on December 1, 2021, and June 15, 2022).) Other factual ambiguities in the pleadings further undermine ADPs' reliance on uniformity. For example, there are no allegations regarding which tire model each price increase applied to, whether each increase was ultimately implemented, or whether Nokian or Continental's undisclosed price increases were even more divergent than the other defendants' increases. Plaintiffs correctly argued that this degree of "[u]niformity is not required" for parallel conduct (Doc. No. 266, at 42), but it *is* required under ADPs' pretext analysis. (*See* ADP ¶ 160 (relying on premise that, "while tire manufacturers would be expected to alter prices with raw materials price fluctuations, they would not all be expected to do so at the same time").)

Moreover, even if there were near-total uniformity in defendants' responses to fluctuating input costs in 2020–2022, any deviation from their responses to the same in 2017 would do little to suggest prior agreement. In 2020–2022, defendants were reacting in real-time to an unprecedented global pandemic. In 2017, they were not. And ADPs appear to acknowledge, at least indirectly, that the potential impact of the pandemic was unpredictable in scope, degree, and

duration, but was projected to be severe. (*Id.* ¶¶ 88, 102–04 (describing the impacts of the pandemic on the tire industry).) In fact, ADPs allege that defendants' "input prices . . . rose significantly, on net," in 2021 and 2022. (*Id.* ¶ 155.) Specifically, ADPs allege that tire input costs rose by 32% from 2020 to 2021, and another 12.7% from 2021 to 2022. (*Id.*) By ADPs' own allegations, these increases in input costs were "significant[]" and historically anomalous (*id.*), so it makes sense that defendants' reactions were also significant and historically anomalous. ADPs have not provided facts plausibly suggesting that it was conspiracy, not interdependent reactions to a "common stimuli"—the "effects of the COVID-19 pandemic" (*id.* ¶ 92), that compelled each defendant to respond to the 2020–2022 rise in input costs differently than they did in 2017. *Twombly*, 550 U.S. at 556 n.4.

Defendants point out another issue in plaintiffs' pretext argument. Even though plaintiffs allege that the "price of rubber fell more than 16% in 2021 and a further 22% in 2022" (DPP ¶¶ 5, 120; *see also* EPP ¶ 143), their own source reveals that rubber prices were not steadily dropping, but rather were extremely volatile during this period—reaching low lows, as the pleadings emphasize, but also high highs, which the pleadings do not confront. (*See* DPP ¶ 120 n.175; Doc. No. 276-2; *see also* Doc. No. 295, at 69 ("The Court: . . . So [the price of rubber during this time] wasn't this just dramatic dropping, dropping, dropping, dropping, correct? [Plaintiffs' counsel]: Correct, it went up and down.").) Plaintiffs rely heavily on the oddity of a firm raising prices in the face of falling input costs as an indicator that a conspiracy was afoot. (*See, e.g.*, DPP ¶ 130; EPP ¶ 178; ADP ¶ 93; Doc. No. 266, at 27, 45–46; Doc. No. 295, at 51, 68, 86.) But the reality— at least, according to the pleadings and their sources—is that defendants raised prices in the face of extreme volatility as to the cost for tires' main ingredient (rubber). There is nothing odd or irrational about that.

And even if the price of rubber had followed a more stable downward trend, as plaintiffs would like the Court to believe, plaintiffs have still failed to confront the numerous inferential steps necessary to support their much broader conclusion, which is that input costs *in general* could not have justified defendants' price increases. For example, the pleadings make clear that "[t]ires are made up of dozens of raw ingredients," including, for example, steel cord and carbon black. (EPP ¶¶ 112–20.) Neither DPPs nor EPPs discuss the price of either ingredient at all, and ADPs actually allege that those prices "rose ~55%" and "~65%" respectively, from 2020–2023. (ADP ¶¶ 154–55.) Thus, as counsel for defendants correctly pointed out at the hearing, "the idea that maybe one input is going down while the rest of the prices are going up, that's not inconsistent with the idea that there is still an obvious alterative explanation out there." (Doc. No. 295, at 16.) Furthermore, any changes to labor and shipping costs would also need to be addressed before concluding that rising costs generally could not have justified the price increases. (*See, e.g.*, DPP ¶ 150 (alleging that, even without supply chain disruptions, "shipping costs can be prohibitively expensive" because "tires are large and heavy products").)

Turning to the evidence supporting pretext, plaintiffs exaggerate in arguing that "statements from [d]efendants confirmed [that the] price increases far exceeded the rise in input costs that drive replacement tire pricing." (Doc. No. 266, at 24 (citing DPP ¶ 120; EPP ¶ 178).) Plaintiffs rely heavily on Goodyear's comment in 2022 that its "increase in the replacement tire prices more than offset [its] costs" (DPP ¶¶ 5, 101, 114, 119; EPP ¶ 178; ADP ¶¶ 69, 93; *see also* Doc. No. 266, at 45–46), but that comment simply restates the basic formula for profit: revenue must exceed costs. (*See, e.g.*, EPP ¶ 288.) The mere fact that Goodyear sought to (and did) offset its increased costs by raising prices does not suggest collusion. Nor is it suspicious that other tire manufacturers also raised their prices, given that they all faced the same rising costs.

72

Plaintiffs also allege that Bridgestone "reported in May 2022 that the company has not experienced any production disruptions" (DPP ¶ 101; ADP ¶ 70), but the quote from which they draw that conclusion does not support their interpretation. What the Bridgestone executive said was: "We monitor all critical raw materials and global logistics closely and do not foresee any impacts to our supply at this time." (DPP ¶ 101; ADP ¶ 70.) The term "foresee" is unmistakably forward-looking, and the statement therefore cannot reasonably be interpreted as implying that Bridgestone had not *previously* experienced disruptions, as plaintiffs claim. Put simply, plaintiffs do not plead facts to support their conclusion that the price increases "far exceeded" the rise in input costs during the relevant period.

Nor do plaintiffs' economic allegations carry the day. To begin, the Court gives no credence to DPPs' preliminary regression analysis, which purports to "compare[] actual prices to prices buyers would have paid in a collusion free market (the but-for prices)." (DPP ¶ 123.) The graph depicts a blue line of "Actual" prices from December 2011 until February 2020, at which point the blue line continues and a red line (representing "But-For" prices) abruptly emerges below the blue line. (*Id.*) The slope of the red line largely tracks that of the blue line from February 2020 through the present, but slightly lower on the Y-axis throughout. (*Id.*) Thus, under either scenario, the graph reflects rising prices that eventually level off. (*Id.*)



(*Id.*) Plaintiffs claim their regression analysis, reproduced above, demonstrates that defendants'
"agreement to fix prices caused the 21.4% price increase during the conspiracy, and that other
macroeconomic variables and factors such as raw material costs do not explain the increased
prices." (Doc. No. 266, at 29 (citing DPP ¶¶ 4, 120).)

Defendants correctly point out, however, that the chart "only purports to present a bottom-
line conclusion, not a statistical analysis." (Doc. No. 276, at 22.) For example, DPPs' purported
analysis does not offer any indication as to what companies' prices were analyzed, what type(s) of
tires were considered, or even what geographic area the "analysis" is supposed to represent. Rather,
DPPs disclose only that the graph measures "Actual and But-For Tire Prices." (DPP ¶ 123.)
Providing such minimal context permits the graph to represent almost any conceivable dataset; for
example, the graph could represent all defendants' prices for replacement tires in the United States,

but it could just as easily represent only non-defendants' prices for industrial tires sold in Japan, or anything in between. Without knowing what the graph purports to represent, the Court cannot conclude that it adequately dispels the "obvious alternative explanation" for defendants' price increases.

Nor do DPPs reveal the source of the data, or the specifics of the methodology used. As to the input data, DPPs simply allege that the graph is "based on publicly available data[.]" (*Id.* ¶ 123.) The Court is "sensitive to the fact that [p]laintiffs are undoubtedly working from an informational disadvantage at this early point in the proceedings. But that does not mean that they are free to rely on conclusory statistical inferences to force their way into discovery." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 212 (2d. Cir. 2020). Plaintiffs make no attempt to explain what their input data is, where it came from, or why it can reasonably be expected to be representative of defendants' prices for passenger replacement tires in the United States. *See City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 399 (2d Cir. 2024) (affirming dismissal of antitrust complaint where plaintiffs' "statistics are fundamentally flawed because they do not focus on . . . Defendants in particular," and explaining that a "conspiracy is characterized by an agreement among its members; it cannot be alleged solely by reference to some (much) broader group of which they are a subset" (citation omitted)).

And as to the methodology, DPPs disclose only that their "expert applied the well-known and widely accepted dummy variable multiple regression methodology, . . . in that it relies on comparing 'prices in the impact period to available prices before and/or after the alleged period of impact,' while controlling for other factors that affect prices." (DPP ¶ 124 (citation omitted).) DPPs allege, without explanation, that the analysis "controls for supply and demand by including variables for (1) automobile production that accounts for downstream demand for tires, (2)

inflation measured by CPI, (3) an indicator variable for COVID-19, (4) a raw material cost index that weigh [*sic*] the cost of synthetic rubber, steel wire, rubber, carbon black, and textile cord based on their cost shares, (5) labor cost, and (6) calendar month fixed effects, which accounts for seasonality in prices." (*Id.* ¶ 125.) These are all reasonable controls in the abstract, but plaintiffs give no indication whatsoever as to *how* the expert purportedly controlled for any of the identified factors. Instead, they disclose only the expert's ultimate conclusion "that prices of replacement tires were inflated above competitive levels during the damages period, accounting for major non-conspiracy factors that affect tire product prices." (*Id.*) As such, there is no statistical analysis for the Court to consider—only a conclusion. "In short, there are no statistics from which to evaluate a statistical argument." *Sumbak v. Eaton Corp.*, No. 1:19-cv-1286, 2021 WL 1521988, at *7 (N.D. Ga. Jan. 12, 2021).

Plaintiffs insist that these non-disclosures are permissible at the pleading stage, citing cases for the proposition that the Court "'need not . . . engage in a *Daubert*-like analysis of [p]laintiffs' statistical pleadings' and 'must[] accept as true [p]laintiffs' factual assertions regarding pricing and other data.'" (Doc. No. 266, at 47–48 (alterations in original) (citations omitted).) Plaintiffs do not, however, cite any cases in which a court has accepted as true an unsupported legal conclusion simply because it was alleged to be the end-result of an undisclosed statistical analysis.[20] This Court is not inclined to be the first. Conclusory allegations are never entitled to an

---

[20] Plaintiffs rely on three cases, which they contend credited "the same type of economic evidence" as DPPs present here. (Doc. No. 295, at 62, 77; Doc. No. 266, at 47–48.) The statistical allegations in those cases are easily distinguishable, however, in that they explained the sources of their data, provided details of their methodologies, and explained why the inferences they were asking to be drawn in their favor were reasonable. *See* Second Am. Compl. at ¶¶ 334–36, 351–65, *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 3:23-md-3071 (M.D. Tenn. 2023) (ECF No. 728); Third Am. Compl. at ¶¶ 161–96, *In re European Gov't Bonds Antitrust Litig.*, 1:19-cv-2601 (S.D.N.Y. Dec. 3, 2019) (ECF No. 87); Am. Compl. at ¶¶ 179–221, *In re GSE Bonds Antitrust Litig.*, 1:19-cv-1704 (S.D.N.Y. May 23, 2019) (ECF No. 171). Here, DPPs simply insist that the Court "must accept as true" their conclusion (Doc. No. 266, at 47–48 (alterations omitted)), which is not the law. *Twombly*, 550 U.S. at 555 (sufficient pleading "requires more than labels and conclusions").

inference of truth, regardless of whether the conclusion has been converted into a graph. *See Mitchell v. City of LaFayette*, 504 F. App'x 867, 870 (11th Cir. 2013) ("Absent any analytical foundation, statistical evidence is virtually meaningless, and thus, cannot have any probative value." (citations omitted)); *Wolfe v. Aspenbio Pharma, Inc.*, No. 11-cv-165, 2012 WL 4040344, at *7 (D. Colo. Sept. 13, 2012) (rejecting statistical conclusion at the pleadings stage because the opinion was "wholly conclusory and unsupported by any actual facts"), *aff'd*, 587 F. App'x 493 (10th Cir. 2014); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1155–56 (C.D. Cal. 2007) (declining to draw an inference from conclusory statistical pleadings, noting that plaintiff's "'empirical and statistical analysis' is no analysis at all, but simply a series of charts and graphs"); *Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1102 (C.D. Cal. 2002) ("It is inappropriate, to put it simply, for a party to make a conclusory statistical inference as the foundation for its claim, and not provide the Court with any indication of the basis for that inference.").

The regression's lack of transparency is particularly troubling given plaintiffs' near-exclusive reliance on it to rebut defendants' argument that the COVID-19 pandemic is an "obvious alternative explanation" for the price increases. (*See* Doc. No. 247-1, at 18, 50–53; Doc. No. 276, at 14, 17–20.) "To be sure, the mere existence of more likely alternative explanations does not automatically entitle a defendant to dismissal." *16630 Southfield Ltd. v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013) (collecting cases). "But you can't assess the plausibility of an inference in a vacuum. The reasonableness of one explanation for an incident depends, in part, on the strength of competing explanations." *Id.* "Where, as here, the complaint alleges facts that are merely consistent with liability . . . , the existence of obvious alternative explanations simply illustrates the unreasonableness of the inference sought and the implausibility of the claims made." *Id.*

The following exchange at the hearing is representative of plaintiffs' overreliance on their undisclosed statistical analysis to overcome defendants' "obvious alternative explanation" argument:

> **Plaintiffs' counsel**: Now, what's curious, and I hate to keep repeating myself, but we're looking at softening demand, at times dropping input costs and increasing inventory. During that time period, [defendants are] raising prices.
>
> **The Court**: But nothing else was happening that might have caused the market to require it?
>
> **Plaintiffs' counsel**: But we control for that. We did an economic study. We took into account the COVID-19 factors.
>
> **The Court**: And that's the regression?
>
> **Plaintiffs' counsel**: That's the regression, Your Honor. And again, we're here on a motion to dismiss. You have to credit those allegations as true.

(Doc. No. 295, at 68.) As indicated by this exchange, and many others,[21] plaintiffs seem to concede that the COVID-19 pandemic is an "obvious alternative explanation" worthy of consideration. But rather than alleging facts and presenting an argument as to why the pandemic cannot explain the price increases, plaintiffs attempt to remove the issue from the Court's consideration entirely, relying exclusively on "conclusory allegations [and] legal conclusions masquerading as factual allegations[.]" *Travel Agent*, 583 F.3d at 903. The *ipse dixit* of plaintiffs' counsel cannot suffice to explain away the proverbial 'elephant in the room,' given *Twombly*'s directive for courts—not plaintiffs' counsel—to consider whether an "obvious alternative explanation" exists to justify the

---

[21] (*See* Doc. No. 295, at 51 ("Now, and we will get to this more, but our econometric analysis controls for the effects of COVID-19, input costs, labor costs, price seasonality, automobile production, all the factors that able defense counsel suggest supply an alternative explanation."); *id.* at 61 ("But our expert controlled for all those factors. . . . So we would argue our economic evidence dispenses with the obvious alternative explanation."); *id.* at 70 ("And going back to the regression, we control for input costs, including carbon black, including rubber."); *id.* at 72 ("[W]e've controlled for the obvious economic alternatives . . . ."); *id.* at 77 ("And controlling for all those factors, controlling for, let's call them the COVID-19 bucket, that doesn't explain . . . the rate of increase in tire prices."); *id.* at 84 ("We've controlled for the obvious economic alternative, which is the COVID-19 bucket."); *id.* at 87 ("But, Your Honor, we do know – we do know we control for the economic forces . . . .").)

alleged parallel conduct. *See D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024) ("[A]llegations of parallel conduct alone are not enough to raise an inference of an agreement when an 'obvious alternative explanation' accounts for that same conduct. The 'obvious alternative explanation' was the outbreak of the global Covid-19 pandemic." (internal citation omitted)); *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358 (S.D.N.Y. 2018) ("[A] plaintiff's complaint can be dismissed where there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants."). Assurances from plaintiffs' counsel that an obvious alternative explanation should not be considered dispositive is not an adequate substitution for well-pleaded facts.

EPPs' two economic arguments fare no better. First, EPPs provide a graph purporting to show that "tire prices increased quicker in the United States and in Europe (*i.e.* in markets where [d]efendants have significant collective market share) than they did during the same period in Japan (*i.e.* a market where [d]efendants have a much smaller market share)." (EPP ¶ 180; *see also* Doc. No. 266, at 30.) Without any explanation or analysis, however, EPPs' chart compares the consumer price index ("CPI") for Japan against the producer price index ("PPI") for the U.S. and Europe (EPP ¶ 180), which could easily explain any perceived discrepancy between the data sets.[22] And even if the Court were to overlook the CPI versus PPI distinction, the graph does not depict nearly as clean a divide between conspiracy-induced prices and competitive prices as plaintiffs suggest. Prices in all three geographic regions were almost identical during the first third of the alleged conspiracy period (March 2020 through approximately March 2021), and tire prices in Europe were closer to prices in Japan than in the U.S. from March 2021 until early 2022. (*Id.*) As

---

[22] According to EPPs, "PPI measures the average change over time in the selling prices received by domestic producers for their output," and "CPI measures the average change over time in the prices paid by consumers for goods or services." (EPP ¶ 180.)

such, it appears, from this graph at least, that European and American (producer) tire prices did not substantially diverge from Japanese (consumer) prices until approximately February 2022— two full years into the alleged conspiracy period, and only eight months before the last of the alleged price increases in the U.S. That hardly gives rise to a plausible inference of conspiracy.

EPPs' next price comparison relies on a chart showing 2022 and 2023 prices for a specific tire size by four defendants (Goodyear, Continental, Michelin, and Bridgestone) and two non-defendants (Hankook and Falken). (*Id.* ¶ 181.) EPPs use this chart to claim that "[p]rices for tires manufactured by [d]efendants are significantly higher than those manufactured by companies outside the conspiracy." (*Id.*)

This statistical snapshot does not suggest conspiracy any more than a single dot can establish a line. The necessary-but-absent second dot to EPPs' analysis is how Hankook and Falken's prices compared to defendants' prices *before* the alleged conspiracy. Although a sudden divergence between defendants' and non-defendants' pricing could indicate conspiracy, EPPs' chart depicts a price disparity that may well have already been present. "[P]ricing behaviors do not function as 'plus factors' when they are stable over time, because that factual context undermines any inference that the pricing behavior represents a sudden shift marking the beginning of a price-fixing conspiracy." *White*, 635 F.3d at 581. Because EPPs fail to provide such context, the Court cannot infer conspiracy from what may have been the status quo. *RealPage*, 709 F. Supp. 3d at 509 (reviewing graphs contained in the complaint and noting that "[t]he Court can discern no difference between the 2013 to 2016 pre-conspiracy period and the 2016 to 2023 period after the alleged conspiracy began"); *Hawaiian & Guamanian Cabotage*, 647 F. Supp. 2d at 1259–60 (dismissing complaint where "plaintiffs supply no data concerning pricing practices predating the alleged anticompetitive agreement"); *In re California Title Ins. Antitrust Litig.*, No. 08-cv-1341,

2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009) ("Plaintiffs, however, do not [set] forth facts regarding the Defendants' pricing behavior prior to the alleged conspiracy . . . . Thus, there are no allegations suggesting an 'unprecedented change' in the Defendants' behavior."); *Graphics Processing*, 527 F. Supp. 2d at 1024 ("Although the complaints are replete with allegations about defendants' pricing behavior *after* the conspiracy allegedly began, they say next to nothing about defendants' pricing behavior *before* the conspiracy began. Plaintiffs' conclusory allegation that the changes in pricing were unprecedented is insufficient because on these facts, no before-and-after comparison of pricing behavior can take place." (emphasis in original)).

Finally, the Court notes that even if "rising [input] costs may not have been the full or even real reason for increasing prices," that would "not show whether the real reason was interdependence or a conspiracy." *In re Blood Reagents*, 266 F. Supp. 3d 750, 775 (E.D. Pa. 2017) (quoting *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 411 (3d Cir. 2015)). Plaintiffs seem to imply, albeit indirectly, that defendants' price increases did not "'simply mirror[] the higher costs [defendants] faced, but actually may [have been] reflective of higher profits[.]'" (DPP ¶ 114 (alterations added) (citing a statement by the FTC Commissioner thanking the Office of Policy Planning for their work on a report regarding grocery prices).) But even if that notion were supported by well-pleaded factual allegations (it is not), it would still only suggest rational business decisions in an interdependent market—not prior agreement. *See, e.g.*, *Washington Cnty.*, 328 F. Supp. 3d at 843 (dismissing complaint and finding fact that defendants "raised prices in the face of falling costs does little to suggest that they engaged in actual collusion, which is illegal, as opposed to 'tacit collusion,' which is not"); *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-md-1895, 2009 WL 323219, at *18 (N.D. Ga. Jan. 28, 2009) ("The Defendants are entitled to generate profits on fuel surcharges by charging more than their incremental increase in fuel costs,

81

so long as the Defendants do not illegally conspire to do so. In a homogeneous industry each major player has the same incentive to charge the same surcharge and realize the same improved profit margin. These circumstances do not indicate anticompetitiveness, they indicate a close and competitive industry.").

In summary, the consolidated complaints do not provide factual allegations to support the notion that defendants' public justifications for the price increases were pretextual. Quite relatedly, plaintiffs have failed to adequately address the market effects of the COVID-19 pandemic, which even they concede could constitute an obvious alternative explanation for the price increases. Plaintiffs' conclusion that this obvious alternative explanation should not stand in their way to discovery is not supported by facts and is therefore not entitled to an inference of truth. Accordingly, because plaintiffs have not plausibly alleged that defendants' justifications for the price increases were pretextual, the justifications do not make the alleged conspiracy any more or less plausible.

### 7.  Recidivism

Finally, plaintiffs allege that defendants are recidivist antitrust violators. The consolidated complaints detail a global "history of antitrust violations" by replacement tire manufacturers since at least 2001. (DPP ¶¶ 164–69; EPP ¶¶ 261–84; ADP ¶¶ 176–99.) For example, plaintiffs allege that in 2014, "Bridgestone Corporation pleaded guilty and paid a $425 million criminal fine for its role in a conspiracy to fix prices of anti-vibration rubber parts, which are automotive parts, installed in automobiles sold in the U.S. and elsewhere from January 2001 through December 2008." (Doc. No. 266, at 62 (citing DPP ¶ 168; EPP ¶ 262; ADP ¶¶ 177, 179).) Also in 2014, two subsidiaries of Continental AG "pleaded guilty and paid a $4 million criminal fine for their role in a conspiracy to fix prices of instrument panel clusters," which are also automotive parts. (*Id.* at 63

(citing EPP ¶ 272).) And in 2008, South African subsidiaries of Goodyear, Continental, and Bridgestone were involved in an alleged price-fixing conspiracy in the tire industry. (DPP ¶¶ 165–66; EPP ¶¶ 282–284; ADP ¶¶ 197–99.) The Goodyear and Continental subsidiaries were fined by the South African Competition Authority, and the Bridgestone subsidiary "escaped a fine after admitting to price fixing and receiving conditional immunity after filing a leniency application with the regulator." (DPP ¶¶ 165–66; *see also* EPP ¶¶ 282–284; ADP ¶¶ 197–99.) "These are only a few of the enforcement activities implicating [d]efendants in connection with price-fixing." (Doc. No. 266, at 63 (citing DPP ¶¶ 164–69; EPP ¶¶ 261–84; ADP ¶ 43).)

Defendants claim these allegations are "irrelevant" for several reasons. (Doc. No. 247-1, at 60.) First, defendants point out that "the Sixth Circuit has not recognized 'recidivism' as a plus factor," suggesting the Court should decline to do so here. (*Id.* (citing *Hobart-Mayfield*, 48 F.4th at 665–66).) Plaintiffs respond that the Sixth Circuit's list of possible plus factors was not meant to be exhaustive, and that "courts may recognize new plus factors as the facts of future cases dictate." (Doc. No. 266, at 63 (citing *Delta/Airtran*, 245 F. Supp. 3d at 1371).) Plaintiffs have the better argument on this point. "Any fact that tends to exclude the possibility of independent action" can be considered as a plus factor. *Bitmain*, 530 F. Supp. 3d at 1259–60.

That is not to say, however, that all accusations of prior misconduct qualify. For example, allegations "describing settlements are not helpful because parties may wish to settle civil suits for any number of reasons, including the cost of litigation, and settlements often come about prior to any findings of fact." *Micron Tech.*, 400 F. Supp. 3d at 921; *see also Washington Cnty.*, 328 F. Supp. 3d at 841 ("[A]t the motion to dismiss stage, evidence that [defendant] settled a prior price-fixing claim adds nothing to the plausibility of the claim in this case."). Accordingly, the Court gives no weight to allegations of settlements. (EPP ¶ 274; ADP ¶ 189.) For similar reasons, and

for the reasons already explained in Section III.B.1, *supra*, the Court also gives no weight to ongoing foreign proceedings that have not resulted in findings of wrongdoing. (DPP ¶ 169; EPP ¶ 280; ADP ¶ 195.) *See Micron Tech.*, 400 F. Supp. 3d at 921.

As to the other misconduct allegations, defendants claim the prior violations are too attenuated to suggest conspiracy here because the prior violations all occurred years ago and were related "almost exclusively [to] non-tire products." (Doc. No. 247-1, at 60.) Further, defendants point out that "there are no past conspiracy allegations *at all*" regarding Nokian, Pirelli, or Michelin, and the allegations as to Bridgestone, Continental, and Goodyear "mostly" involve certain of their affiliates that are not defendants in this case. (*Id.* (emphasis in original).)

Plaintiffs' opposition to those arguments consists of two short sentences. First, plaintiffs argue there is an "undeniable link between tires and automotive parts[.]" (Doc. No. 266, at 64.) Second, plaintiffs assert that Nokian's, Pirelli's and Michelin's lack of prior violations "does not wipe the slate clean for serial violators Bridgestone, Continental, and Goodyear." (*Id.*)

Even assuming that automotive parts are sufficiently related to tires, that is not enough to suggest there was a conspiracy here. To use former antitrust violations as evidence of a current Section 1 conspiracy, a plaintiff must establish a "'direct, logical relationship' between the collateral conspirac[ies] and the instant conspiracy." (Doc. No. 266, at 64 (citation omitted).) *See, e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (finding guilty pleas in separate-but-related DRAM market "support[ed] an inference of a conspiracy in the SRAM industry" because plaintiffs alleged "that the same actors associated with certain Defendants were responsible for marketing both SRAM and DRAM").

Meaningful overlap can take many forms—for example, the prior and current conspiracies might involve the same executives, the same conspiratorial method, or the same third-party

intermediaries facilitating the conspiracy—but no such overlap is alleged here. Only two of the alleged prior conspiracies involved defendants in this lawsuit. The other conspiracies were committed by certain of defendants' subsidiaries or corporate family members, almost all of which were based in jurisdictions that are unrelated to the present alleged conspiracy (e.g., "Continental Automotive Korea Ltd.," "Continental Brasil Indústria Automotiva," and "Bridgestone South Africa (Pty) Ltd."). Plaintiffs do not allege any meaningful connection between those entities and the ones alleged to have conspired here. And the two prior conspiracies that did involve a defendant in this case (Bridgestone Corporation) were both facially dissimilar to the type of conspiracy alleged here, involved conduct that occurred no later than 2008, and were orchestrated by executives who are not alleged to still be affiliated with Bridgestone in any capacity.

Furthermore, plaintiffs make no attempt to explain how the prior misconduct allegations are in any way probative of defendants' "intent, motive [or] method" in carrying out the conspiracy alleged here. (Doc. No. 266, at 62 (quoting *Ross*, 35 F. Supp. 3d at 449 (further citation omitted)).) As to method, none of the past violations involving price-fixing conspiracies are alleged to have been carried out via public price signaling or third-party revenue management software. Nor do plaintiffs allege any overlap between the former executives involved in the prior conspiracies and the executives in place during the conspiracy alleged here. There is no factual overlap as to motive, either. Plaintiffs allege that defendants "had a common motive to conspire beginning in 2020 following the onset of the COVID-19 pandemic," because the pandemic-induced inflation provided cover for the price increases. (*Id.* at 31 (citing EPP ¶ 142).) But the alleged previous misconduct all occurred prior to the pandemic, and there is no indication that any of the prior misconduct was a similarly opportunistic reaction to unstable market conditions.

Moreover, plaintiffs do not sufficiently allege a common intent between the prior misconduct and the instant alleged conspiracy. Citing *Ross*, plaintiffs claim that "[p]rior price collusion demonstrates the [d]efendants are motivated to engage in price-fixing and willing to violate antitrust laws." (*Id.* at 62 (citing *Ross*, 35 F. Supp. 3d at 449 (further citation omitted)).) The Court disagrees that *Ross* supports the notion for which plaintiffs cite it here. If plaintiffs' interpretation were correct, *all* prior violations of antitrust laws would automatically be relevant to any alleged conspiracy, regardless of context. That is not the law. *See, e.g.*, *Hawaiian & Guamanian Cabotage*, 647 F. Supp. 2d at 1258 (rejecting as a plus factor that certain executives pleaded guilty to anticompetitive conduct in Puerto Rico because plaintiffs "provide[d] no link" between the Puerto Rican market and the relevant markets); *cf. In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1011 (E.D. Mich. 2010) (finding "guilty pleas in one market [were] suggestive of the plausibility of a conspiracy to commit the same illegal acts in another market" where "the corporate actors [were] the same" and the claims were "based upon the same anticompetitive conduct").

Finally, the Court is not persuaded by plaintiffs' argument that "the lack of prior antitrust violations by Nokian, Pirelli, or Michelin . . . does not wipe the slate clean for serial violators Bridgestone, Continental, and Goodyear." (Doc. No. 266, at 64.) First, plaintiffs' rhetoric outpaces their facts in labeling the Bridgestone, Continental, and Goodyear defendants as "serial violators." As discussed above, none of the three Continental or Goodyear entities named as defendants in this litigation are alleged to have previously violated *any* antitrust laws, and the Bridgestone defendant is only alleged to have committed two prior antitrust violations. Second, although plaintiffs, citing *Ross*, pay lip service to the legitimate use of prior misconduct to establish intent, method, or motive, they make no effort to show how defendants' alleged prior misconduct relates

to the intent, method, or motives alleged here. Rather, plaintiffs clearly seek to use prior misconduct only to show that defendants have a propensity for future wrongdoing. (*See, e.g.*, Doc. No. 266, at 62 ("Thus, one of the best indicators of whether firms in a particular market will engage in illegal collusion is whether they have fixed prices in the past.").) This is an impermissible use under plaintiffs' own cited case. *Ross*, 35 F. Supp. 3d at 449.

In short, the price-fixing conspiracy that plaintiffs allege here is not made any more plausible by the existence of unrelated conspiracies involving long-departed executives and/or unconnected corporate entities in foreign jurisdictions. *See, e.g.*, *Oklahoma Firefighters*, 2024 WL 4202680, at \*10 (surveying cases and finding that courts that "considered other conspiracies as a plus factor" did so "because they were linked closely in time, geographic area, and involved several of the same entities, or they involved the same employees alleged to have conspired" (cleaned up)).

### 8.  *The Collective Weight of Plaintiffs' Allegations*

Viewing all the well-pleaded allegations together, the Court finds that the consolidated complaints do not plausibly allege a price-fixing conspiracy. Plaintiffs acknowledge that several of their plus factors are not enough on their own, but at the end of each sub-section discussing an alleged plus factor, plaintiffs remind the Court that their collusion allegations do "not stand alone and must be viewed in the context of the entirety" of the consolidated complaints. (Doc. No. 266, at 54; *see also id.* at 51–54, 57, 59, 61, 64.) In arguing that a holistic view renders their alleged conspiracy plausible, plaintiffs correctly point out that "'[a]ctions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances.'" (*Id.* at 51–52 (quoting *SD3*, 801 F.3d at 425).) True enough, but to avail themselves of a holistic view, plaintiffs must first present one. This requires more than listing

alleged plus factors in isolation, as plaintiffs have done here; it demands a clear explanation of how those factors interrelate to plausibly allege collusion. The pleadings fail to provide this connective narrative.

Here, as in many of the cases cited throughout this opinion, plaintiffs' allegations are all equally consistent with conscious parallelism (parallel pricing, motive to increase profit, and market characteristics that make price-fixing feasible), to be expected regardless of whether the defendants unlawfully colluded (attendance at trade shows, use of revenue management software, and financial discussions on public earnings calls), or irrelevant (the preliminary and ongoing EC investigation, and unrelated prior antitrust violations). Taking together each of plaintiffs' identified plus factors, the Court is wholly unpersuaded that plaintiffs have plausibly alleged a conspiracy. *See, e.g.*, *Washington Cnty.*, 328 F. Supp. 3d at 844 ("Taking together each of the identified plus factors—market structure, Baxter's history [of alleged antitrust violations], the price of raw materials, and membership in trade organizations—the Court is unpersuaded that plaintiff's allegations of conspiracy rise to the level of plausibility.").

The holistic approach is a tool to discern meaning from the collective weight of otherwise unremarkable allegations, not to transform common business practices that are consistent with innocent conscious parallelism into the nefarious trappings of conspiracy. In other words, plaintiffs "cannot state an antitrust claim by merely showing parallel conduct and from it divine that an agreement must be the source from which the parallel conduct arose." *LTL Shipping Servs.*, 2009 WL 323219, at *8. That is all plaintiffs have done here because, whether viewed individually or collectively, all of plaintiffs' well-pleaded plus factors simply "amount to a 'restatement of the conscious parallelism endemic to an oligopoly.'" *Micron Tech.*, 400 F. Supp. 3d at 922 (quoting *Prosterman*, 747 F. App'x at 461–62).

9.      *Conclusion*

As the Supreme Court made clear in *Twombly*, "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." 550 U.S. at 557. Applying that mandate, courts have consistently held—as this Court holds today—that a complaint "merely alleging several common and obvious industry practices should not proceed directly past a motion to dismiss and into the expensive and settlement-inducing quagmire of antitrust discovery." *Quality Auto Painting*, 917 F.3d at 1267; *see also Travel Agent*, 583 F.3d at 908 (affirming dismissal where plaintiffs "failed to allege sufficient facts plausibly suggesting (not merely consistent with) an agreement . . . because defendants' conduct 'was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior'" (quoting *Iqbal*, 556 U.S. at 680; *Twombly*, 550 U.S. at 557–59)). "Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a § 1 violation." *Musical Instruments*, 798 F.3d at 1194 (citations omitted). Rather, a plaintiff "must plead *facts* plausibly suggesting that parallel conduct was caused by an agreement, not merely that parallel conduct could just as well have been caused by independent action." *LTL Shipping Servs.*, 2009 WL 323219, at *10 (emphasis in original).

Here, as in *Hobart-Mayfield*, plaintiffs assert a large number of alleged plus factors, but for each, they simply draw "the court's attention to a scenario, theory, or occurrence and ask the court to make sweeping conclusions about the motives and actions of [d]efendants." 48 F.4th at 668. But at bottom, plaintiffs' "factual allegations—public statements and respons[es], membership in trade associations, market conditions—are just as consistent with innocent

behavior as unlawful behavior, and therefore do not 'nudge' the conspiracy from conceivable to plausible." *Micron Tech.*, 400 F. Supp. 3d at 922 (quoting *Twombly*, 550 U.S. at 570).

To be clear, the Court does not deny the metaphysical possibility that a public-signaling conspiracy such as plaintiffs have alleged here could exist. Nevertheless, the plausibility standard "asks for more than a sheer possibility" of unlawful conduct, *Iqbal*, 556 U.S. at 678, which in turn requires factual allegations "suggesting (not merely consistent with) agreement[.]" *Twombly*, 550 U.S. at 557. Here, plaintiffs have alleged parallel conduct and circumstances and public statements that are, at best, merely consistent with conspiracy. But, as plaintiffs acknowledge, to plausibly allege a Section 1 price-fixing conspiracy, a pleading relying on circumstantial evidence must allege "'economic actions and outcomes, *above and beyond parallel conduct by oligopolistic firms*, that are *largely inconsistent with unilateral conduct* but largely consistent with explicitly coordinated action,' and support an inference of conspiracy." (DPP ¶ 126 (emphasis added) (citation omitted); *see also* EPP ¶ 203.) None of plaintiffs' well-pleaded plus factors meet this standard.

At oral argument, plaintiffs correctly articulated that it is improper to weigh competing plausible explanations for the challenged conduct on a motion to dismiss. (Doc. No. 295, at 16, 60, 100–01, 126.) This order, however, is not premised on a finding that plaintiffs' proffered explanation (conspiracy) is less plausible than defendants' explanation (interdependent responses to the pandemic). Rather, the Court finds that dismissal is warranted because the pleadings—taking all well-pleaded factual allegations as true, drawing all reasonable inferences in plaintiffs' favor, and viewing everything holistically—fail to meaningfully address the "obvious alternative explanation" for the price increases, and merely allege conduct that is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally

prompted by common perceptions of the market." *Twombly*, 550 U.S. at 567, 554. Accordingly, plaintiffs have not plausibly alleged a price-fixing conspiracy among defendants.[23]

### C.    State-Law Claims

Along with the federal Sherman Act claims brought by each putative class, the EPP and the ADP plaintiffs also brought a variety of consumer protection, antitrust state law, and unjust enrichment claims. Defendants move to dismiss these claims on several grounds. Their primary argument is that each of the state-law claims requires plaintiffs to allege a conspiracy to fix the prices of replacement tires sold in the United States and that, because plaintiffs failed to do so, the state-law claims also fail. At oral argument, plaintiffs conceded that if their Sherman Act Section 1 claims failed, then their state-law claims would also be subject to dismissal. (Doc. No. 295, at 126.)

---

[23] The Court also acknowledges that ADPs, in three paragraphs, present an additional theory that defendants "also began colluding on the supply of Tires in 2020." (ADP ¶¶ 88–90.) This additional theory fails for several reasons. First, unlike the price-announcement allegations supporting the alleged price-fixing conspiracy, there are shockingly few details about supply reductions in the ADP Complaint. (*Compare* ADP ¶¶ 44–70 *with* ADP ¶¶ 88–90.) There is nothing even approaching defendant-specific allegations as to who participated in supply reductions, how supply reductions were achieved, how large the reductions were, or when the reductions took place. Absent this context, ADPs fail to provide "each of the [d]efendants with notice of what they did" regarding supply reductions, and therefore fail to satisfy the pleading standard required by Rule 8. (Doc. No. 266, at 65.) *See also Musical Instruments*, 798 F.3d at 1194 (9th Cir. 2015) ("[P]laintiffs must plead evidentiary facts: 'who, did what, to whom (or with whom), where, and when.'" (citation omitted)). Second, for similar reasons, ADPs fail to plausibly suggest parallel conduct regarding supply reductions. The lone factual support ADPs provide for their theory are two statements by Goodyear executives. (ADP ¶¶ 89–90.) But those statements were made by one defendant and concern Goodyear's *own* past supply reductions (*see* ADP ¶ 89 (Goodyear stated "we reduced production in" Q1 2022)), and a broad observation of industry supply trends. (*Id.* ¶ 90 (Goodyear executive noting that "there's a lot of manufacturing capacity in the industry. And like we did with Cooper, we need to think about how we can use that capacity more wisely as we move ahead.").) These statements do not support an inference that all defendants reduced their supply of tires, let alone did so in parallel. *See In re Pork*, 2019 WL 3752497, at *8 ("Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of pork. And that type of information is vital to pleading parallel conduct."). Third, plaintiffs' alleged plus factors do not suggest a plausible supply-reduction conspiracy for the same reasons they do not plausibly suggest a price-fixing conspiracy. Fourth, despite the fact that defendants challenged ADPs' supply-reduction allegations in their motion to dismiss (*see* Doc. No. 247-1, at 45 n.19), plaintiffs did not respond in their opposition brief, nor did they raise the issue at the hearing. It is unclear whether ADPs intend to pursue this separate supply-reduction theory, but if so, they have a long way to go before reaching plausibility.

Because the Court finds that plaintiffs have failed to adequately plead a conspiracy, the Court also grants defendants' motion to dismiss as to the state-law claims. *See Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, No. 6:21-cv-6507, 2022 WL 4017895, at *7 (W.D.N.Y. Sept. 2, 2022) ("Plaintiffs' state antitrust claims thus fail for the same reason as their Sherman Act § 1 claim—they have not plausibly alleged the existence of a conspiracy."); *German Auto.*, 612 F. Supp. 3d at 986 ("Because the Sherman Act claims were not well pled, the state law claims were dismissed as well."); *In re Cattle Antitrust Litig.*, No. CV 19-1129, 2020 WL 5884676, at *6 (D. Minn. Sept. 29, 2020) ("In addition to their Sherman Act claims, the Indirect Plaintiffs . . . allege a variety of state-law antitrust, consumer-protection, and unjust-enrichment claims. Because these claims all rely on the same alleged price-fixing conspiracy creating the Sherman Act claim, which the Court finds deficient, the Court will grant Defendants' Motion to Dismiss these state claims as well."); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 392 (S.D.N.Y. 2019) ("Dismissal of the Sherman Act claims compels dismissal of the unjust enrichment claims as well."); *OTC Hotel Booking*, 997 F. Supp. 2d at 544 ("[E]ach state law requires the same sort of concerted action § 1 requires. Therefore, since the Court already found the price-fixing conspiracy allegations implausible, it must conclude that the Complaint's state antitrust law claim is also inadequately pled."); *Graphics Processing*, 527 F. Supp. 2d at 1025 ("Since plaintiffs' federal and state-law antitrust claims are predicated on the same allegations of conspiracy, they likewise are insufficient to state a claim for conspiracy.").

### D.        Pirelli & C.S.P.A.'s Motion to Dismiss for Lack of Personal Jurisdiction

Defendant Pirelli & C. S.p.A. ("P&C") moved to dismiss the claims against it for lack of personal jurisdiction. (*See generally* Doc. No. 243-1.) The Pirelli defendants do not dispute that the other Pirelli entity named in this suit—Pirelli Tire LLC ("PTL")—is subject to personal

jurisdiction. (*Id.* at 5.) P&C argues, however, that even though it is an indirect owner of PTL, there is no personal jurisdiction here because P&C is an Italian company that "does not manufacture, market, sell, or set prices for tires in the United States," and plaintiffs "do not allege facts supporting an alter-ego doctrine" that would confer jurisdiction on P&C on the basis of its indirect ownership of PTL. (*See generally id.*) Plaintiffs opposed the motion, attaching 39 exhibits to its brief. (Doc. No. 265.) And to the extent the Court found personal jurisdiction was not adequately pleaded, plaintiffs requested "leave to conduct targeted jurisdictional discovery" because the specific data concerning P&C's volume of commerce in the United States is not public." (*Id.* at 8.) P&C replied, mostly contesting the accuracy of plaintiffs' exhibits and the conclusions that plaintiffs drew from them. (*See generally* Doc. No. 273.) The motion was also discussed at the January 10, 2025 hearing. (Doc. No. 295, at 128–38.)

Ordinarily, courts address challenges to personal jurisdiction and other threshold matters before addressing the merits of a claim. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431–32, 127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the . . . parties (personal jurisdiction)."). But "in cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012). Since the Court has dismissed plaintiffs' Section 1 Sherman Act claims and the state-law claims in their entirety, it declines to address P&C's personal jurisdiction challenge.

Bypassing the question of personal jurisdiction is especially appropriate when, as here, "the personal jurisdictional challenges are based on factual allegations that are . . . still under development." *Id.*; *see also Oklahoma Firefighters*, 2024 WL 4202680, at *5 (bypassing personal jurisdiction inquiry and collecting cases); *Mexican Gov't Bonds*, 412 F. Supp. 3d at 387 n.12 (same); *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d 277, 329 (W.D. Pa. 2010) ("To streamline the decision making, courts, in situations where complex issues of personal jurisdiction exist and there is a pending motion which would be dispositive in favor of the party over whom jurisdiction is disputed, may . . . proceed to resolve the dispositive motion."), *aff'd on other grounds*, 683 F.3d 462 (3d Cir. 2012); *see also* 4 Charles Alan Wright et al., *Federal Practice and Procedure* § 1067.6 (4th ed. 2020) ("[A] court simply may avoid the [personal jurisdiction] issue by resolving the suit on the merits when they clearly must be decided in favor of the party challenging jurisdiction, thereby obviating any need to decide the question; that approach is possible even when the jurisdictional issue lacks complexity.").

## IV.    CONCLUSION

For the foregoing reasons, the joint motion to dismiss is **GRANTED**, the individual motions to dismiss of Pirelli & C. S.p.A., Continental, and Nokian are **DENIED AS MOOT**, and the consolidated complaints are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs may seek leave to file amended consolidated complaints no later than March 25, 2025.

**IT IS SO ORDERED.**

Dated: February 25, 2025

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**