**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: PASSENGER VEHICLE REPLACEMENT TIRES ANTITRUST LITIGATION | ) ) ) ) | Case No. 5:24-md-3107 |
| | | MDL No. 3107 |
| This Document Applies to: | ) ) | CHIEF JUDGE SARA LIOI |
| ALL CASES | ) ) ) | **MEMORANDUM OPINION AND ORDER** |

The Court finds itself in a *déjà vu* of sorts. Plaintiffs seek leave to amend their consolidated complaints against U.S. tire manufacturers for the alleged price fixing of passenger vehicle replacement tires in violation of the Sherman Act and several state statutes. Plaintiffs' original consolidated complaints were dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure. They now propose amended consolidated complaints that primarily add factual allegations. But the proposed complaints are more of the same in that they suffer from pleading deficiencies identical to those of the original consolidated complaints.

Amendment as plaintiffs propose would be entirely futile because the pleadings would once again not survive an inevitable Rule 12(b)(6) motion by defendants. For that reason, the three motions for leave to amend are **DENIED**.

## I.     BACKGROUND

### A.      Factual Background

Plaintiffs allege that defendant tire manufacturers entered into an unlawful conspiracy to raise and maintain supracompetitive prices for passenger vehicle replacement tires sold in the United States. Plaintiffs plead a *per se* violation of § 1 of the Sherman Act. They also plead dozens of state antitrust and consumer protection claims.

Plaintiffs collectively represent three putative classes:

- **Automobile Dealership and Other Reseller Plaintiffs** ("ADPs"), who purchased replacement tires from persons or entities other than defendants for resale and not for their own use (*see* Doc. No. 323-3 (ADP Proposed Amended Complaint ("ADP PAC")));

- **End Payor Plaintiffs** ("EPPs"), who purchased replacement tires from persons or entities other than defendants for their own use and not for resale (*see* Doc. No. 324-3 (EPP Proposed Amended Complaint ("EPP PAC"))); and

- **Direct Purchaser Plaintiffs** ("DPPs"), who purchased replacement tires directly from defendants (*see* Doc. No. 325-3 (DPP Proposed Amended Complaint ("DPP PAC"))).

There are twelve named defendants, but all PACs refer to the defendants by general reference to their corporate family names. (ADP PAC ¶¶ 23–52; EPP PAC ¶¶ 91–133; DPP PAC ¶¶ 24–60.) The relevant corporate defendants are: **Bridgestone**, **Continental**, **Michelin**, **Nokian**, **Pirelli**, and **Goodyear**.[1] The Court will also refer to the corporate families but will distinguish between individual defendants where necessary.

The factual background that follows is taken from plaintiffs' proposed amended complaints ("PACs"). (Doc. Nos. 323; 324; and 325.) As discussed *infra,* the Court acknowledges that the PACs supersede the prior consolidated complaints, but later in the opinion, to give context to the Court's ruling, the Court references the prior consolidated complaints. (Doc. Nos. 174 ("DPP Compl."); 175 ("EPP Compl."); and 176 ("ADP Compl.").) This is necessary because plaintiffs,

---

[1] "**Bridgestone**" includes Bridgestone Corporation and Bridgestone Americas, Inc. "**Continental**" includes Continental Aktiengesellschaft and Continental Tire the Americas, LLC. "**Michelin**" includes Compagnie Générale des Établissements Michelin and Michelin North America, Inc. "**Nokian**" includes Nokian Tyres plc, Nokian Tyres Inc., and Nokian Tyres U.S. Operations LLC. "**Pirelli**" includes Pirelli & C.S.p.A. and Pirelli Tire LLC. The only "**Goodyear**" defendant is The Goodyear Tire & Rubber Company.

2

for the most part, simply add additional facts to some of their prior allegations or reorganize their allegations from the prior consolidated complaints.

Turning to the allegations, defendants are leading tire manufacturers in the United States. They operate in what may be considered an oligopolistic tire market. (*See* ADP PAC ¶ 78 ("The U.S. Tires market is oligopolistic."); DPP PAC ¶¶ 74–78.) The peculiar market structure of replacement tire sales market makes this industry "more susceptible to cartelization" because "a smaller group of competitors is better able to solve the coordination and trust problems that can prevent cartel formation." (ADP PAC ¶ 79; *see* EPP PAC ¶¶ 211–12; DPP PAC ¶ 77.)

Throughout the decade of the 2010s, sales prices of passenger vehicle replacement tires remained relatively stable. (ADP PAC ¶ 8; EPP PAC ¶ 152; DPP PAC ¶ 79.) Many defendants individually attempted to raise tire prices, only to later reverse due to countervailing economic forces. (ADP PAC ¶ 111; DPP PAC ¶¶ 100–08.) These price reversals took place despite cost pressures, like rising prices of raw materials used to manufacture tires. (ADP PAC ¶¶ 114–15; EPP PAC ¶ 228; DPP PAC ¶ 100.)

Beginning in early 2020, defendants introduced successive price increases for their tires. (ADP PAC ¶ 88; EPP PAC ¶ 154; DPP PAC ¶¶ 79–80.) The increases followed a sustained pace from 2020 to 2023. (*See* ADP PAC ¶ 105; EPP PAC ¶ 154; DPP PAC ¶ 81.) Consumers saw double-digit percentage price hikes at a rate exceeding core inflation. (*See* EPP PAC ¶ 153.)

Plaintiffs contend that there can be but one possible explanation for this: defendants must have entered into a conspiracy to artificially raise prices on replacement tires. (*See, e.g.*, EPP PAC ¶ 155 ("These price increases . . . were not the result of healthy competition. Instead, as alleged herein, they were the result of an unlawful price-fixing conspiracy.").) Plaintiffs assert that "[t]his drastic increase in the price index [for tires] cannot be explained by COVID-19 nor is it an

historical trend" and "price increases are disproportionate to [defendants'] increased costs during the pandemic." (ADP PAC ¶¶ 9–10.) According to plaintiffs, non-collusive factors cannot fully explain the increase because "after accounting for demand and cost factors that may affect tire prices, Plaintiffs' economic consultants found that Defendants' alleged conspiracy increased tire prices by 5.4%." (DPP PAC ¶ 178.)[2]

Plaintiffs first became aware of defendants' alleged conspiracy in the U.S. from events in the European Union ("EU"). In January 2024, the European Commission ("EC") conducted unannounced inspections (called "dawn raids") on each defendant's European affiliate for suspected anticompetitive activity within the EU. (ADP PAC ¶ 81; EPP PAC ¶ 255; DPP PAC ¶ 6.) Six months later, the EC raided a European consultancy firm "suspected of facilitating cartel behavior." (DPP PAC ¶ 8.) Plaintiffs aver that this indicates that defendants must have also done something illicit in the U.S. (*See* ADP PAC ¶ 6; EPP PAC ¶ 274; DPP PAC ¶ 9.)

Plaintiffs provide indirect evidence to support their price fixing conspiracy allegations. They do so by pleading parallel conduct and "plus factors" that they believe indicate collusive

---

[2] This allegation is markedly different from plaintiffs' original allegations regarding price increases. Their original complaints state: "Due to [d]efendants' conspiracy, the average price of replacement tires increased by 21.4%[.]" (DPP Compl. ¶ 4; *see* EPP Compl. ¶ 138; ADP Compl. ¶ 220.) Moreover, in plaintiffs' statements in opposition to defendants' joint motion to dismiss (*see* Doc. No. 247), they repeatedly represented to the Court that they believed the alleged conspiracy caused an over 20% increase in tire prices. (*See, e.g.*, Doc. No. 266, at 6 (Plaintiffs' Joint Opposition to Defendants' Motion to Dismiss) ("As a result of [d]efendants' conspiracy, the average price of replacement tires increased by 21.4%[.]").) At the motion to dismiss hearing, counsel for DPPs stated that "[n]o economic force can explain defendants' coordinated price increases, which outpaced inflation by 70 percent." (Doc. No. 295, at 51; *see also id.* at 90 (DPP counsel representing to the Court that price increases had "no other plausible explanation for a variety of reasons[.]").) Counsel later stated that "in the conspiracy period, [tire price] takes off . . . we know these price increases took place, because between 2021 and 2023, prices did increase by 21.4 percent[.]" (*Id.* at 56.)

The Court will only consider the plausibility of plaintiffs' allegations as they are pleaded in the PACs, which allege only about a 5% increase in prices due to the alleged cartel after accounting for non-conspiratorial factors. Notwithstanding this, the stark difference between the two complaints in the alleged price increase attributable to the conspiracy is truly remarkable. Plaintiffs now appear to concede that most of the increases in tire prices since 2020 are due to non-collusive factors. That is quite a change in their theory of the case.

4

conduct.

The parallel conduct allegations in the PACs are unchanged from the prior complaints. Plaintiffs (again) allege "lock-step price[] increases from the major U.S. tire manufacturers." (ADP PAC ¶ 8; *see* EPP PAC ¶ 153; DPP PAC ¶ 80.) All PACs have a table listing known announced price increases by defendants and a graph showing the producer price index of tires. (ADP PAC ¶¶ 8, 105–06; EPP PAC ¶¶ 153–55; DPP PAC ¶¶ 79–82.) Plaintiffs' amendments include minor additions for a few new price increase announcements. (*See* EPP PAC ¶ 154.) The data show each defendant enacted a sequential pattern of price increases throughout the 2020–2023 period.

As with the prior consolidated complaints, plaintiffs' PACs allege the following "plus factors" as their underlying factual support for conspiracy (ADP PAC ¶¶ 194–95; EPP PAC ¶¶ 316–17; DPP PAC ¶¶ 139–40):

(1) Foreign jurisdiction antitrust investigations strongly suggest antitrust malfeasance (ADP PAC ¶ 195; DPP PAC ¶ 140);

(2) Each defendant acted against its unilateral self-interest by increasing prices (ADP PAC ¶ 195; DPP PAC ¶ 140);

(3) Plaintiffs' econometric analysis shows that price increases were due to collusion and not entirely explainable by material costs, labor costs, COVID-19 impacts, or other non-collusive factors (ADP PAC ¶ 195; DPP PAC ¶ 140);

(4) There were several opportunities to conspire through public signaling in publications and earnings calls (ADP PAC ¶ 195; EPP PAC ¶ 317; DPP PAC ¶ 140);

(5) Defendants shared confidential sales information through use of revenue management software, attendance at trade association meetings, collaboration through the Market Data Program, or participation in "joint ventures" (ADP PAC ¶ 195; EPP PAC ¶ 317; DPP PAC

5

¶¶ 140, 208);

(6) The tire market is characterized by high barriers to entry (ADP PAC ¶ 195; EPP PAC ¶ 317; DPP PAC ¶ 140);

(7) Price inelasticity of replacement tires (ADP PAC ¶ 195; EPP PAC ¶ 317; DPP PAC ¶ 140);

(8) Tires are interchangeable products (ADP PAC ¶ 195; EPP PAC ¶ 317; DPP PAC ¶ 140); and

(9) Defendants are recidivist antitrust violators. (ADP PAC ¶ 195; EPP PAC ¶ 317.)

Compared with the prior complaints, the PACs add factual allegations with respect to five of the plus factors, as follows:

*(1) Foreign Jurisdiction Antitrust Investigations*

Plaintiffs aver that antitrust inquiries into defendants in other countries strongly suggest they were also engaged in a conspiracy within the United States. Their amended complaints add several new facts to their foreign jurisdiction antitrust investigations plus factor in an apparent attempt to relate it to U.S. conduct.

First, they add allegations attempting to link the pricing practices of defendants' European affiliates with the U.S.-based companies, either through direct control or coordinated strategy within each parent company. (*See, e.g.*, ADP PAC ¶¶ 25, 27 ("Continental AG's executives are closely connected to the company's U.S.-based operations" and "Continental AG's public statements concerning price increases on its tire products evidence its involvement in the pricing decisions of its U.S. subsidiaries"); EPP PAC ¶ 129 ("Pirelli & C. S.p.A. directly or indirectly control some companies based in countries which do not belong to the European Community, including Pirelli Tire LLC (USA).") (internal quotation marks omitted); DPP PAC ¶ 231 ("Although the EC investigation primarily focuses on Defendants' price-fixing conduct in

6

European regions, the pricing of Defendants' tires sold in the United States is closely linked to their European pricing strategies.").) Plaintiffs attempt to bolster these allegations with statements from anonymous witnesses claiming that U.S. pricing was influenced by the pricing practices in the EU. (*See, e.g.*, EPP PAC ¶ 274 ("A former Michelin employee, who was responsible for pricing intermediate and budget replacement tires, noted that in 2016 Michelin underwent a 'consolidation of budgets.' Afterward, she became responsible for pricing . . . for both EMEA and the Americas, including the United States."); DPP PAC ¶ 232 ("A former Pirelli employee who worked in the U.S. for nearly a year stated that 'everything emanated from Milan,' including pricing.").)

Second, they add information on the EC's motive for investigating the European tire companies. (EPP PAC ¶¶ 263–70.) EC Senior Enforcer Maria Jaspers stated that "Defendants' comments on earnings calls and their reaction to rivals' disclosures were important factors in their decision to move forward with the investigation." (*Id.* ¶ 264.)

Third, their supplemental allegations add further details on subsequent court proceedings in Europe related to the EC investigation and a leniency petition by Goodyear as to the EC investigation. (*See generally* Doc. No. 333-1.)

Fourth and finally, plaintiffs add allegations that Turkey's competition authority launched a "preliminary inquiry" in December 2024 into the pricing practices of several defendants' Turkish operations. (ADP PAC ¶ 87; *see* EPP PAC ¶ 271; DPP PAC ¶ 233.)

*(2) Actions Against Unilateral Economic Self-Interest*

ADP and DPP plaintiffs again argue that defendants acted against their unilateral self-interest in increasing tire prices but now repackage this as a separate plus factor. "Defendants' price increases significantly exceeded any rise in raw material costs." (DPP PAC ¶ 143.) Prices rose even though "tire demand significantly softened during . . . the COVID-19 pandemic" because

consumers were driving less and thus replacing tires less often. (ADP PAC ¶ 200.) Plaintiffs believe this to be irrational because "a firm would typically lower its prices to gain market share if competitors set prices above marginal cost." (*Id.* ¶ 198.) Plaintiffs conclude that "[d]efendants' pricing behavior would only be rational if they understand that they were engaging in coordinated actions regarding pricing." (DPP PAC ¶ 147.)

*(3) Econometric Evidence*

Plaintiffs expanded on the plus factor previously identified as "pretextual explanations for price increases." (*See* Doc. No. 317 (Memorandum Opinion and Order), at 66.)[3] They proffer econometric analysis purporting to explain how tire price increases were caused, at least in part, by the conspiracy. This purports to show that the price increases are not fully explainable by non-collusive factors such as material costs, labor costs, or demand for tires. (ADP PAC ¶¶ 146–85; EPP PAC ¶¶ 276–315; DPP PAC ¶¶ 149–88.) Plaintiffs add explanations about how their multiple regression model controls for non-collusive factors (materials, demand, labor, etc.) in an attempt to isolate the alleged conspiracy's effect on tire prices. (*Id.*)

The multiple regression is alleged to plausibly show what plaintiffs believe to be particularly damning evidence: "[A]fter accounting for demand and cost factors that may affect tire prices, Defendants' alleged conspiracy increased tire prices by 5.4%[.]" (APP PAC ¶ 175.) In other words, plaintiffs contend that there was a 21.4% increase in tire prices over a two year period, of which the alleged conspiracy accounts for roughly one quarter of the tire price increase (around 5.4%). (*Cf.* EPP PAC ¶ 153.) In sum, plaintiffs claim that "cost increases alone during the Class Period cannot be exclusively used to justify any increases in tire prices." (DPP PAC ¶ 187.)

---

[3] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

*(4) Price Signaling*

Plaintiffs add additional information regarding price signaling via public statements. Combined with the price signaling allegations carried over from the prior complaint, these are meant to show how defendants facilitated their conspiracy through indirect communications. The price signaling allegations fall into four categories of allegations.

First, plaintiffs allege that several confidential witnesses "understood" that price increase announcements were "signals" to competitors. (ADP PAC ¶¶ 89–91; EPP PAC ¶¶ 272–75; DPP PAC ¶¶ 123–31.)

Second, they add additional public statements made from 2020 to the present wherein defendants allegedly signaled price increases. (ADP PAC ¶¶ 120–26, 137–45; EPP PAC ¶¶ 242–50; DPP PAC ¶¶ 109–38.) These statements are similar in character to the original price signaling statements.

Third, plaintiffs add allegations regarding public statements on pricing prior to 2020. (ADP PAC ¶¶ 111–19; EPP PAC ¶¶ 228–33; DPP PAC ¶¶ 100–31.) The allegations describe announcements by defendants to raise tire prices which are later scaled back due to competitive pressures. (ADP PAC ¶ 111; *see* DPP PAC ¶ 105 ("[N]obody in the industry implemented the 6% price increase that was announced[.]") (internal quotation marks omitted).) These attempted price increases between 2016 and 2020 failed despite "historically low prices" and input cost pressures from raw materials. (ADP PAC ¶ 111; *see* DPP PAC ¶ 108 ("Defendants had to balance rising costs against remaining competitive on price[.]").) Defendants were allegedly reluctant to announce future price increases pre-2020. (ADP PAC ¶ 129; EPP PAC ¶ 229.) Contrast that with post-COVID-19 class period pricing statements, where defendants kept announcing price increases and made forward-looking statements to communicate "veiled invitations to collude."

(EPP PAC ¶ 250.) Plaintiffs believe this contrast shows that "competitive restraint on prices was absent." (DPP PAC ¶ 108.)

Fourth, plaintiffs argue defendants' pricing statements were not legally or economically justifiable. (ADP PAC ¶¶ 143–45; EPP PAC ¶¶ 157–66, 211–27, 234–39; DPP PAC ¶¶ 97–99, 117–22.) One reason, they claim, is that the public did not demand or need this information. (EPP PAC ¶¶ 237–38 ("Customers typically do not make purchasing decisions regarding [tires] as far in advance as Defendants' price increase announcements.".) Another is that publicly releasing competitively sensitive information like future pricing plans would undermine the business unless it furthered a conspiracy. (*See* ADP PAC ¶¶ 143–44.) A final reason is that defendants knew price signaling would invite antitrust scrutiny yet proceeded because they expected significant benefits from the conspiracy. (*See* EPP PAC ¶¶ 211–27.)

*(5) Opportunities to Conspire (Market Data Program and Joint Venture)*

Finally, DPPs make new allegations related to the opportunities to conspire plus factor. DPPs allege that defendants participated in the United States Tire Manufacturer's Association (USTMA) Market Data Program, where they "shared real-time sales data with each other." (DPP PAC ¶ 213.) This included "granular real-time data that was not publicly available." (*Id*.) DPPs further allege Bridgestone and Goodyear entered a joint venture, where "[i]nstead of remaining competitors for the sale of tires, Goodyear and Bridgestone combined Goodyear's company-owned wholesale distribution network with Bridgestone's Tire Wholesale Warehouse chain to form TireHub." (DPP PAC ¶ 209.)

\*\*\*

The remaining plus factors, numbered (6)–(9)—other opportunities to conspire (trade association meetings and revenue management software), characteristics of the tire market that

would facilitate a conspiracy (price inelasticity, barriers to entry, and product interchangeability), and antitrust recidivism—remain substantively unchanged from the prior consolidated complaints.

## B.     Procedural Background

Plaintiffs brought their consolidated Sherman Act and state law claims against defendants in August 2024. (*See generally* ADP Compl.; EPP Compl.; DPP Compl.) Defendants filed a joint motion to dismiss each consolidated complaint. (Doc. No. 247.) Several defendants also filed individual motions: Nokian and Continental filed individual motions to dismiss for failure to state a claim (Doc. Nos. 245 (Nokian); 246 (Continental)), and Pirelli & C. S.p.A.'s ("P&C") moved to dismiss for lack of personal jurisdiction. (Doc. No. 243.)

A meticulous review of the prior complaints revealed that plaintiffs failed to plausibly allege the existence of an anticompetitive conspiracy among defendants. (Doc. No. 317, at 89–90.) Although plaintiffs' factual allegations plausibly showed parallel conduct (*id.* at 20), their plus factors failed to nudge the conduct toward plausibly showing an actual agreement (*id.* at 89–90). The parallel conduct was "as consistent with independent action as with conspiracy[.]" *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 n.4, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Without a plausible conspiracy, plaintiffs could not establish their § 1 claim. (Doc. No. 317, at 89–91); *see Twombly*, 550 U.S. 544, 548 ("Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a 'contract, combination . . . , or conspiracy, in restraint of trade or commerce.'"). Plaintiffs' Sherman Act claims were dismissed without prejudice. (*Id.* at 93.)

The Court also dismissed the state law claims on the same grounds and denied as moot each individual motion to dismiss filed by Nokian, Continental, and P&C. (Doc. No. 317, at 92.) Finally, the Court declined to analyze the personal jurisdiction issues brought by P&C's motion

11

by reason of dismissal of all claims against all defendants. (*Id.* at 93.)[4]

Plaintiffs timely filed their respective motions for leave to file amended complaints (Doc. Nos. 323; 324; 325), appending to the motions their proposed amended complaints. (Doc. Nos. 323-3; 324-3; 325-3.) Defendants oppose each motion for leave on grounds of undue delay and futility of amendment. (Doc. No. 327.) Defendants request that the Court deny leave and enter final judgment in defendants' favor. (*Id.*)

## II.     STANDARD OF REVIEW

### A.     Amending a Complaint

Under Rule 15(a), leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) (quoting Fed. R. Civ. P. 15(a)).

A court need not grant leave to amend under Rule 15 if there was undue delay in requesting leave. Showing undue delay requires defendants to point to something more serious than the fact that plaintiffs *could* have sought amendment earlier than when they did. "[D]elay alone, regardless

---

[4] *See generally Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012) ("[I]n cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdiction claims made by some defendants."); *In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 735 F. Supp. 2d 277, 329 (W.D. Pa. 2010) ("To streamline the decision making, courts, in situations where complex issues of personal jurisdiction exist and there is a pending motion which would be dispositive in favor of the party over whom jurisdiction is disputed, may . . . proceed to resolve the dispositive motion."); 4 Charles Alan Wright et al., *Federal Practice and Procedure* § 1067.6 (4th ed. 2020) ("[A] court simply may avoid the [personal jurisdiction] issue by resolving the suit on the merits when they clearly must be decided in favor of the party challenging jurisdiction, thereby obviating any need to decide the question[.]").

of its length[,] is not enough to bar [amendment] if the other party is not prejudiced." *Duggins v. Steak N' Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (cleaned up) (citation omitted).

A court need not grant leave to amend under Rule 15 if the amendment would be futile. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 (6th Cir. 2005); *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst.*, 601 F.3d at 520 (quoting *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)). "The party opposing a motion to amend the complaint bears the burden of establishing that the proposed amendments would be futile." *Donahue v. Travelers Cos., Inc.*, No. 5:24-cv-1141, 2024 WL 4534250, at *2 (N.D. Ohio Oct. 21, 2024).

As with a Rule 12(b)(6) motion, a court reviewing the proposed amended complaint must construe the pleading in the light most favorable to the plaintiff. *See id.* (citing *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 561 (6th Cir. 1998)). And as with a Rule 12(b)(6) motion, a court evaluating whether an amendment would be futile may only look at those materials which are proper to consider under a motion to dismiss. *See Rose*, 203 F.3d at 420 (finding that a district court erred in considering matters outside the pleading when deciding whether a motion for leave to amend a complaint would be futile). What a court may properly consider in a Rule 12(b)(6) motion are: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion to dismiss that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice. *Whittiker v. Deutsche Bank Nat'l Tr. Co.*, 605 F. Supp. 2d 914, 924–25 (N.D. Ohio 2009).

Furthermore, if a plaintiff amends their complaint, "the new complaint 'supersedes' the old

13

one: The original pleading no longer performs any function in the case." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35, 145 S. Ct. 41, 220 L. Ed. 2d 289 (2025) (quoting 6 C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1476, pp. 636–637 (3d ed. 2010)); *see also William Powell Co. v. Nat'l Indem. Co.*, 18 F.4th 856, 870 n.6 (6th Cir. 2021) ("An amended complaint supersedes and replaces the original complaint."). Accordingly, the Court's review of the PACs for futility will ignore any inconsistencies or contradictions with the prior complaint, which after amendment would be "in effect withdrawn as to all matters not restated in the amended pleading and become[] functus officio." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) (citing *Nisbet v. Van Tuyl*, 224 F.2d 66, 71 (7th Cir. 1955)).

Futility under *Foman* is analyzed under the same standard as a Rule 12(b)(6) motion. Under that standard, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing *Twombly*, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Here, the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (citations omitted). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and legal conclusions couched as factual allegations need not be accepted as true. *Iqbal*, 556 U.S. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).

14

### B. Antitrust Pleading Standard

To establish a violation of § 1 of the Sherman Act, a plaintiff must first "demonstrate that there is . . . an agreement, which may be in the form of a contract, combination, or conspiracy[.]" *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 663 (6th Cir. 2022) (citing *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir. 1983) (further citation omitted)). An agreement to conspire means "the conspirators have a unity of purpose, common understanding, or a meeting of minds in an unlawful arrangement." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014) (citation and quotation marks omitted).

A plaintiff, such as the plaintiffs here, alleging indirect, circumstantial evidence of conspiracy may proceed by pleading both parallel business conduct between co-conspirators and plus factors. *See In re Polyurethane Foam Antitrust Litig. (In re Polyurethane Foam III)*, 152 F. Supp. 3d 968, 976 (N.D. Ohio 2015); *Havens v. Mobex Network Servs., LLC.*, 820 F.3d 80, 91 (3d Cir. 2016) (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)). "The term 'plus factors' refers to circumstances demonstrating that the wrongful conduct 'was conscious and not the result of independent business decisions of the competitors.'" *Havens*, 820 F.3d at 91 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999)). The plus factors must place the parallel conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

Plausible plus factors are critical for complaints implicating defendants in consolidated markets because otherwise the circumstantial evidence can be equally consistent with conscious parallelism. Conscious parallelism is "a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and

15

output decisions." *In re Travel Agent Comm'n Antitrust Litig. (In re Travel Agent II)*, 583 F.3d 896, 903 (6th Cir. 2009) (cleaned up). Although conscious parallelism may appear consistent with conspiracy, it is also "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 553–54 (cleaned up); *see also Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 460 (9th Cir. 2018) ("With a market comprised of a few dominant players and publicly available pricing information, it is no surprise that [prices] remain relatively uniform across the industry."). Conscious parallelism is not illegal under U.S. antitrust doctrine. *Twombly*, 550 U.S. at 553–54. The Sherman Act "does not require sellers to compete; it just forbids their agreeing or conspiring not to compete." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010).

The Sixth Circuit has identified the following "plus factors" for a district court to consider: "(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to conspire." *Hobart-Mayfield*, 48 F.4th at 666 (quoting *In re Travel Agent II*, 583 F.3d at 907). This list is "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 n.6 (2d Cir. 2013).

Conversely, courts may infer from the factual allegations "'obvious alternative explanations'" that suggest lawful behavior rather than an anticompetitive conspiracy. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567) (alteration omitted). "Following *Twombly*, courts dismiss Section 1 complaints when there is an independent business justification for the observed

conduct and no basis for rejecting it as the explanation for the conduct." *In re McCormick & Co.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016) (collecting cases and finding the "common theme . . . is that if the most natural explanation for defendants' conduct is not collusion, merely alleging that the conduct was collusive does not make it plausible"), *amended on reconsideration sub nom. In re McCormick & Co., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 275 F. Supp. 3d 218 (D.D.C. 2017) (allowing plaintiffs to amend).

The Court must evaluate the allegations of the alleged conspiracy as a whole, rather than simply "dismembering it and viewing its separate parts." *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S. Ct. 1404, 8 L. Ed. 2d 777 (1962) (citation omitted).

## III.     ANALYSIS

Plaintiffs request leave under Rule 15 to file their PACs. (Doc. Nos. 323; 324; 325.) Defendants oppose on grounds of (1) undue delay in seeking leave to amend and (2) futility of amendment. (Doc. No. 327.) The Court first examines the undue delay argument and concludes there was neither delay on the part of plaintiffs nor prejudice to defendants.

The Court next examines defendants' futility arguments and concludes that the PACs would indeed be futile because they fall short of *Twombly*'s pleading standard. On that basis, granting leave would be improper.

### A.     Undue Delay

Plaintiffs' request to amend each of the consolidated complaints is neither untimely nor prejudicial to defendants. *See Duggins*, 195 F. 3d at 934 (stating that delay is not enough to bar amendment "if the other party is not prejudiced").

The motions were timely submitted. ADP's, EPP's, and DPP's motions were submitted six weeks after the Court dismissed their claims without prejudice and at the Court's invitation. (*See*

Doc. No. 317, at 94 ("Plaintiffs may seek leave to file amended consolidated complaints no later than March 25, 2025.").) Their request for an extension of the original 30-day deadline to seek leave was reasonable and *jointly stipulated* to by defendants. (*See* Doc. Nos. 319 (Stipulation to Extend the Deadline for Plaintiffs to Seek Leave to Amend Their Consolidated Complaints); 321 (Order Granting Extension of Time to Seek Leave).)

Defendants are not prejudiced by the motions.[5] Plaintiffs seek to cure pleading deficiencies highlighted by the prior dismissal memorandum opinion and order. These kinds of motions are commonplace, especially in complex disputes. *See Morris v. Resurgent Cap. Servs.*, No. 1:23-cv-751, 2023 WL 6931114, at *5 (W.D. Mich. Sept. 25, 2023) (recommending plaintiff be allowed to amend complaint so he may cure pleading deficiencies identified in a motion to dismiss), *report and recommendation adopted*, 2023 WL 6929639 (W.D. Mich. Oct. 19, 2023). And the case is at an early stage of the litigation before any substantive discovery and before any dispositive motion deadlines have passed. *See Sims v. Atrium Med. Corp.*, 349 F. Supp. 3d 628, 636 (W.D. Ky. 2018) ("Courts typically find undue delay in cases that are post judgment . . . and in cases where discovery has closed and dispositive motions deadlines have passed."). Plaintiffs' motions do not

---

[5] Although the Court finds there is no prejudice here, defendants' frustration with plaintiffs' second attempt to bring forth valid complaints is certainly not unfounded. During oral argument, plaintiffs led the Court to believe they had discovered new information that would significantly bolster the plausibility of their claims. (*See* Doc. No. 295, at 84:20–24.) But the vast majority of the amendments contain information which existed before the initial complaints were filed and they are more of the same. Plaintiffs have simply amplified, repackaged, and reorganized their prior allegations, adding little meaningful facts, in an attempt to address deficiencies that the Court identified in its opinion dismissing the case. That has required the Court expend time and effort to consider and analyze two separate rounds of pleadings, both of which contain essentially the same allegations.

"Rule 15's permissive amendment policy should not permit plaintiffs to use the court as a sounding board to discover holes in their arguments, then reopen the case by amending their complaint to take account of the court's decision." *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 445 (6th Cir. 2014) (internal quotation marks and citation omitted). Plaintiffs are "not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies," particularly after motions to dismiss have been fully briefed and argued. *Winget v. JP Morgan Chase Bank, N.A.,* 537 F.3d 565, 573 (6th Cir. 2008) (internal quotation marks and citations omitted). Although this appears to be what has transpired here, the Court finds no prejudice to defendants.

18

present any intent to prejudice defendants, either through protracted litigation or strategic obstruction of the necessary facts for defendants' case.

No unusual tardiness or prejudice to defendants exists here. Accordingly, the Court rejects defendants' invitation to deny the motions on undue delay grounds.

### B.    Futility of Amendment

Denying leave to amend a complaint by reason of futility is appropriate where the proposed complaint fails to meet the pleading standard. *Riverview Health Inst.*, 601 F.3d at 520. Here, the PACs reassert the antitrust conspiracy pleading tandem of parallel conduct and plus factors. They seek to cure prior pleading deficiencies by bolstering their plus factors with additional facts. They assert that this shows the parallel conduct can plausibly be tied to a prior illicit agreement among defendants. Upon review, however, the pleading tandem falls short of *Twombly*'s standard.

#### 1.    *Parallel Conduct*

"A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted similarly." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) (quotation marks and citations omitted); *see also Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915 (N.D. Cal. 2019) ("Parallel conduct occurs when competitors act similarly or follow the same course of action—for example, adopting similar policies at or around the same time in response to similar market conditions." (citations omitted)); *Hyland*, 771 F.3d at 320 (considering whether defendants' actions were "uniform").

The PACs allege parallel conduct. (*See* ADP PAC ¶¶ 88–110; EPP PAC ¶¶ 152–55; DPP PAC ¶¶ 79–96.) There are no substantive additions to the alleged parallel conduct compared to the prior consolidated complaints. (*See* Doc. No. 317, at 16 ("Here, plaintiffs allege that defendants implemented a 'series of coordinated and parallel price increases . . . beginning in late 2020

19

through early 2023.'" (citing DPP Compl. ¶¶ 4, 76; EPP Compl. ¶¶ 4, 139; ADP Compl. ¶¶ 3, 66).) Once again, plaintiffs allege parallel price increases not in perfect lockstep, but in a gradual succession over several months and following an upward trajectory. (*See* ADP PAC ¶ 105; EPP PAC ¶ 154; DPP PAC ¶ 81.) The parallel conduct allegations are substantively unchanged from the prior complaints, which the Court held "adequately alleged parallel conduct." (Doc. No. 317, at 20.) Plaintiffs have once again sufficiently pleaded parallel conduct as to all defendants.[6]

### 2.    Plus Factors

Plaintiffs assert the same plus factors as those in their prior consolidated complaints. (*See id.* at 21.) In their PACs, they bring new facts for five of the plus factors. The Court analyzes these plus factors for plausibility in light of the supplemented allegations below. The Court also incorporates into this memorandum opinion the prior analysis of those unchanged plus factors from the original complaint, as detailed below.

Though the plus factors in each PAC now contain many more pages of allegations, they do not cure the foundational issues that doomed the prior complaints. This is so because these plus factors fail to show that the parallel conduct "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 557 n.4 (citation omitted). The Court turns to each plus factor in turn.

---

[6] Although plaintiffs allege that the price increases were in "lock-step," their further description of the price increases and accompanying price increase tables appear consistent with what is known as sequential parallelism. "Sequential parallelism differs from simultaneous action in that one firm's price rise . . . becomes known to its rivals, who can then choose whether to imitate the move. The information or tacit invitation issued by the leader becomes known in the ordinary course of business in the marketplace. *No additional fact, such as an advance agreement, is needed to explain that process*." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1425d (2022) (emphasis added); *see also Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 440 (S.D.N.Y. 2014) (describing parallel price increases where "one or more firms engage in an action that becomes known to its rivals, who can then choose whether to imitate the move"), *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015), *as corrected* (Nov. 24, 2015) (citation omitted).

a)      *Foreign Jurisdiction Antitrust Investigations*

The prior consolidated complaints alleged that, in January of 2024, the EC announced that it had carried out unannounced inspections at several of the defendants' European offices to investigate suspected infringement of EU competition law. (*See* Doc. No. 317, at 22.) The EC later carried out inspections of two consultancy firms as part of the same investigation. (*Id.*) Plaintiffs stated that the EC must have "reasonable grounds for suspecting infringement of the competition rules" in order to have authority to conduct such an inspection. (*Id.* at 23 (quoting Doc. No. 266 (Plaintiffs' Opposition to Defendant's Motion to Dismiss), at 60–61).) They alleged linkage evidence purporting to show the defendants operated an integrated global market for replacement tires. (*Id.*) Because of this, plaintiffs believed that "the existence of the EC investigation . . . supports the plausibility of a conspiracy in the United States." (*Id.* (quotation marks and citation omitted).)

The Court previously found that these allegations fell short of plausibility on several grounds. First, the prior complaints merely alleged a preliminary investigation by the EC. (*Id.* at 24.) The preliminary investigation had not been shown to uncover any probative evidence. (*Id.* at 25.) The Court found that the "preliminary nature of the investigation significantly limits, if not eliminates entirely, its utility as a plus factor[.]" (*Id.* at 26.) Second, the EC investigation merely focused on whether defendants violated EU competition law. (*Id.*) The Court concluded that "[t]he narrow scope of the EC investigation undercuts its significance to the present litigation[.]" (*Id.*) This was the case because "conduct that is illegal under European competition law may be lawful under the Sherman Act" (*id.* at 27), and "the consolidated complaints [did] not sufficiently link defendants' European conduct to their conduct [in the U.S.]" (*id.* at 28).

Plaintiffs now supplement their foreign jurisdiction antitrust investigation allegations by

21

introducing additional facts that purport to: link pricing practices between defendants' EU-based and U.S.-based entities; expand on the EC's motive for its antitrust investigation; describe Goodyear's leniency petition before the EC as evidence of wrongdoing; and connect a preliminary inquiry by Turkey's competition authority into several defendants' unrelated pricing practices in Turkey to U.S. business conduct. But the additional allegations do not bolster plausibility because, once again, they fail to effectively address three foundational issues: (1) that conduct which is illegal in the foreign jurisdictions may not be illegal in the U.S.; (2) that the nature of the investigation is too preliminary to be of sufficient probative value; and (3) that there is insufficient linkage between foreign business entities and U.S. affiliates such that possible antitrust malfeasance abroad can support an inference of conspiracy here.

> i. *Substantive Differences Between U.S., EU, and Turkish Antitrust Laws*

Plaintiffs again fail to substantively address the differences between U.S. antitrust law and the competition law of the foreign jurisdictions where defendants are being investigated. Differences between U.S., EU, and Turkish antitrust laws undermine the inference of antitrust infringement plaintiffs ask the Court to make. This is because "foreign laws may prohibit behavior that is lawful under § 1." *Micron Tech.*, 400 F. Supp. 3d at 921 (finding allegations of investigations outside the U.S. to be "fully unpersuasive").

The EC investigation allegations are unconvincing because—even assuming EU defendant entities had sufficient direct control over U.S. defendants' pricing or U.S. defendants otherwise orchestrated identical pricing conduct as in the EU (a big assumption)—the conduct that the EC is investigating as possibly violative of EU competition law may be legal under the Sherman Act. Section 1 always requires an actual agreement between defendants. *Hyland*, 771 F.3d at 318. EU competition law, in contrast, does not. Whatever conduct triggered the EU investigation is not

necessarily violative of the Sherman Act. This fact undermines plaintiffs' inference that the EU investigation plausibly shows that defendants violated the Sherman Act.

EU competition law bars a broader swath of business conduct that includes "concerted practices." Consolidated Version of the Treaty on the Functioning of the European Union art. 101, para. 1, Sept. 5, 2008, 2008 O.J. (C 115) 88. "Concerted practice" is defined as "a form of coordination between undertakings which, *without having reached the stage where an agreement properly so-called has been concluded*, knowingly substitutes practical cooperation between them for the risks of competition." Case 48/69, Imperial Chem. Indus. Ltd. v. Comm'n, 1972 E.C.R. 619, 655 (emphasis added). Plaintiffs' own cited authority in their reply brief confirms this. (*See* Doc. No. 328, at 59–61 (citing N.A. Passaro, *Exploring if Differences in US and EU Antitrust Law Are Substantive or Superficial by Re-Trying US Cases in the EU*, Global Competition Litig. Rev. 72, 74 (2018) ("The Court of Justice has defined 'concerted practice' as a form of coordination between undertakings by which, *without concluding a proper agreement*, practical cooperation between them is knowingly substituted for the risks of competition." (emphasis added)); Imperial Chem. Indus. Ltd., 1972 E.C.R. at 655 (defining "concerted practice")).)[7]

Plaintiffs' reliance on a Turkish antitrust investigation into defendants is similarly unavailing. Like EU competition law, and unlike § 1 of the Sherman Act, Turkey's competition law does not invariably predicate antitrust liability on the existence of an actual agreement among competitors. Turkish law provides that "agreements *and concerted practices* between undertakings, and decisions and practices of associations of undertakings which have as their

---

[7] *See also* EU L. Blog, *Concerted Practices, Oligopoly, Restriction by Object: Case C-8/08* (Oct. 3, 2009), https://eulaw.typepad.com/eulawblog/2009/10/concerted-practices-oligopoly-restriction-by-object-case-c-808.html (discussing the European Court's definition of "concerted practice" and noting that "[a]n exchange of information between competitors is tainted with an anti-competitive object if the exchange is capable of removing uncertainties concerning the intended conduct of the participating undertakings").

23

object or effect or likely effect the prevention, distortion or restriction of competition directly or indirectly in a particular market for goods or services are illegal and prohibited." Turkish Civil Code, Law No.: 4054 Official Gazette [Resmi Gazette = R.G.], 13 December 1994 No. 22140, enacted 7 December 1994 (emphasis added). "In cases where the existence of an agreement cannot be proved, a similarity of price changes in the market, or the balance of demand and supply, or the operational regions of undertakings to those markets where competition is prevented, distorted or restricted, constitutes a presumption that the undertakings are engaged in concerted practice." *Id.*

Perhaps more importantly, the investigation in Turkey involves retail price maintenance. (*See* ADP PAC ¶ 87; EPP PAC ¶ 271; DPP PAC ¶ 233.) That is a different business practice than the price fixing conspiracy plaintiffs allege. Retail price maintenance (also known as resale price maintenance) is a business practice defined as an arrangement "for a manufacturer to agree with its distributor to set the minimum price the distributor can charge for the manufacturer's goods." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 881, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007). Retail price maintenance is not a *per se* Sherman Act violation. *Id.* at 900.

Plaintiffs' PACs and briefing do not meaningfully confront these legal distinctions. As to the EU investigations, plaintiffs still assert that "any purported differences in the law are irrelevant" because "the [EU] inquiry and this litigation focus on price coordination." (Doc. No. 328, at 60.) Such a view is sorely misguided. The pleaded facts make it unclear whether the basis for the EC probe is an actual agreement or concerted practices. Plausibility is diminished by the potential that defendants' EU conduct is legal in the U.S. Indeed, this distinction is significant. If plaintiffs' factual support for antitrust infringement is that defendants adopted business conduct identical to that under EC investigation, but the EC investigation is predicated on only concerted

24

practices, then plaintiffs have pleaded allegations insufficient to allege a violation of U.S. law.[8]

*Cf. In re Travel Agent II*, 583 F.3d at 903 ("Allegations of concerted action by competitors are frequently based on a pattern of uniform business conduct, which courts often refer to as 'conscious parallelism.' Conscious parallelism, however, is not in itself prohibited under § 1 of the Sherman Act."). The same could be said for the investigation in Turkey. These substantive differences in each jurisdiction's laws, as well as the dissimilar business practice being investigated in Turkey, undermine the plausibility of the alleged misconduct.

### ii. Preliminary Nature of Foreign Antitrust Investigations

The EC and Turkish investigations are unconvincing because they are too preliminary to be probative of an antitrust conspiracy. "The mere fact that regulatory entities are investigating the possibility of misconduct is not a plus factor." *See Okla. Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft*, No. 23-cv-5095, 2024 WL 4202680, at *9 (S.D.N.Y. Sept. 13, 2024) (alterations omitted) (collecting cases). As plaintiffs' own citations point out (ADP PAC ¶ 82, n.89; EPP PAC ¶ 2, n.1; DPP PAC ¶ 6, n.1), an unannounced EC investigation is "a preliminary investigatory step[,]" and "[t]he fact that the [EC] carries out such inspections does not mean that the companies are guilty of anti-competitive behaviour[.]" European Commission Press Release IP/24/561, *Commission carries out unannounced antitrust inspections in the tyres sector* (Jan. 30, 2024). Plaintiffs' new allegations regarding the consultancy firm dawn raids do not alter this analysis because those too are part of the same "preliminary investigatory step" which "does not mean that the companies are guilty of anti-competitive behaviour[.]" European Commission Press Release IP/24/3365, *Commission carries out further unannounced antitrust inspections in the tyres*

---

[8] To be clear, the EC investigation notices cited by plaintiffs do not explicitly distinguish whether the EU defendants are suspected of having entered into an actual agreement or engaged in a concerted practice. But the fact that both forms of anticompetitive conduct are prohibited in the EU, while only the former is illegal under the antitrust laws of the United States, undermines this plus factor.

*sector* (June 18, 2024).

Plaintiffs never allege that the EC has concluded its investigation. Plaintiffs also never allege any indictment or other more concrete indication of white-collar delinquency. There is still no finding of wrongdoing in the EU. This makes the EC allegations too preliminary to show plausibility. *Cf. In re Eur. Gov't Bonds Antitrust Litig.*, No. 19-cv-2601, 2022 WL 768680, at *20– 21 (S.D.N.Y. Mar. 14, 2022) (taking judicial notice of an EC *decision* where "[t]he European Commission's investigation and the subsequent EC Decision provide non-speculative support for the inference of a conspiracy" (internal quotation marks and citations omitted)).

Although plaintiffs' supplemented allegations allege the General Court of the EU concluded that the EC had sufficient cause to conduct the dawn raids (Doc. No. 333, at 1), the Court does not find this to be probative. That ruling merely confirms the EC met a minimum evidentiary threshold to conduct a search. *See* Case T-188/24, Compagnie générale des établissements Michelin v. Comm'n, ECLI:EU:T:2025:686 (July 9, 2025). It was not a finding of wrongdoing, nor did it uncover new evidence relevant to this case. Thus, it "carries no weight in pleading an antitrust conspiracy" because it is unclear whether "the investigation will result in indictments or nothing at all." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007). Indeed, as the Court previously observed, "the purpose of an investigation is to determine *whether* there is evidence of unlawful conduct; its existence does not therefore signal that there must be such conduct." (Doc. No. 317, at 25 (quoting *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 842 n.16 (N.D. Ill. 2018) (emphasis in original).)

The closest plaintiffs get to showing any finding or admission of wrongdoing is that a single defendant—Goodyear—is applying for leniency before the EC. (Doc. No. 333, at 3.) Plaintiffs

26

allege this plausibly shows culpability because requests for leniency under EU law apply to companies that are or have been party to secret cartels, with "cartel" being defined as "agreements or *concerted practices* aimed at coordinating competitive behavior or influencing competition[.]" (Doc. No. 33, at 3 (emphasis added).) But, once again, the request is equally consistent with conduct that falls short of the necessary "contract, combination in the form of trust or otherwise, or conspiracy" under the Sherman Act. 15 U.S.C. § 1.

Moreover, the leniency allegations are speculative. It is unknown why Goodyear is applying for leniency or what information they know at this early stage; it is unknown what Goodyear or any other defendant will confess, if they do at all; and it is unknown if they will admit to any conduct that would violate U.S. antitrust law. All that is known is they are cooperating with the EC. The allegations regarding Goodyear's leniency petition fall far short of admissions to investigative authorities that other courts have credited with showing a plausible conspiracy. By contrast, in *In re Polyurethane Foam Antitrust Litig. (In re Polyurethane Foam I)*, 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011), the court found that specific admissions from defendant employees to U.S. Department of Justice ("DOJ") officials that directly supported a conspiracy to be "the kind of 'smoking gun' that make Plaintiffs' Complaints plausible in alleging antitrust violations." There is no such "smoking gun" here, and it is improper to infer a U.S. conspiracy from this EU leniency application.

The Turkish investigation allegations are likewise only preliminary, not to mention based on a different legal theory. (*See* DPP PAC ¶ 233 ("Turkey's antitrust authority initiated a *preliminary inquiry* into the tire industry.") (emphasis added).) Because of this, they are not relevant and likewise fail to provide "non-speculative support for the inference of a conspiracy." *In re Eur. Gov't Bonds Antitrust Litig.*, 2022 WL 768680, at *20–21 (internal quotation marks and

citation omitted).

The supplemented allegations do not alter the preliminary nature of the EC or Turkish investigations nor uncover previously unknown inculpatory evidence. And none of the allegations in the PACs point to any U.S. antitrust investigation by domestic authorities, which would at least be more probative. At such an early stage in the EC and Turkish investigations, defendants are entitled to "the same presumption of innocence accorded to any accused person." *In re Cedar Shakes and Shingles Antitrust Litig.*, No. C19-288, 2020 WL 832324, at *10 (W.D. Wash. Feb. 20, 2020) (internal quotation marks omitted).

### iii. Foreign Actions and U.S. Conduct too Attenuated

Finally, the foreign jurisdiction investigations are unconvincing because the connections between foreign and U.S. pricing are too attenuated. Plaintiffs again ask the Court to infer U.S.-based malfeasance by virtue of each defendant's foreign conduct. The Court will not accept plaintiffs' "if it happened there, it could have happened here" reasoning. *See Okla. Firefighters Pension & Ret. Sys.*, 2024 WL 4202680, at *10 (noting that the Second Circuit has rejected inferences of antitrust wrongdoing based on alleged wrongdoing in other markets) (citations omitted); *accord In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402–07 (3d Cir. 2015); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1316–17 (11th Cir. 2003).

As to the antitrust investigations in Turkey, plaintiffs fail to make any meaningful connection between defendants' alleged conduct in Turkey and their conduct in the U.S. They do little more than point out that some defendants belong to the same corporate families as those business entities under investigation in Turkey. Plaintiffs do not allege any guilty plea in Turkey, finding of wrongdoing, evidence uncovering illicit conduct in the U.S., or even coordination in

28

business strategy between U.S. and Turkish entities.

As for the EC investigation, plaintiffs assert new linkage allegations claiming that the EU companies either directly controlled U.S. pricing or otherwise coordinated identical pricing strategies in the U.S. (*See, e.g.*, ADP PAC ¶ 26 ("Continental AG [the European entity] acknowledges in its annual reports that it maintains control over the revenue-related activities of its subsidiaries."); DPP PAC ¶ 48 ("Pirelli C. & S.p.A. serves as a revolving door to upper management in the U.S., with many of Pirelli Tire L.L.C.'s officers and directors previously serving executive functions at Pirelli C. & S.p.A[.]").)

The parties dispute the nature of the parent-subsidiary relationship of defendant business entities in the context of inferring a U.S. conspiracy. Plaintiffs argue that the parent EU companies exerted significant control such that it is reasonable to infer that (so far unproven) anticompetitive conduct in the EU was also done here.[9] They allude to some form of alter ego liability or similar connection. Defendants rebut this, relying on many authorities discussing parent-subsidiary liability under several theories in other legal contexts. (*See* Doc. No. 327, at 33–35.)

The case most on-point is *In re Chocolate Confectionary Antitrust Litig.*, which held that "a conspiracy elsewhere, without more, generally does not tend to prove a domestic conspiracy[.]" 801 F.3d at 403. In that case, the court reasoned that "[a] subsidiary is a distinct legal entity and is not liable for the actions of its parents or sister corporations simply by dint of the corporate relationship." *Id.* at 404 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.44 (3d Cir. 2010)).

The reverse is also true. "Generally, a parent corporation is not liable for the acts of its

---

[9] Plaintiffs' argument here cannot negate the EC investigation attenuation issue as to all defendants. Not all defendants have their parent companies in the EU: Goodyear's parent company is in the U.S., and Bridgestone's parent company is in Japan. For those defendants, the entity subject to EC scrutiny is a subsidiary.

subsidiary[.]" *Nottingham-Spirk Design Assocs., Inc. v. Halo Innovations, Inc.*, 603 F. Supp. 3d 561, 569 (N.D. Ohio 2022). Indeed, only "[i]n extraordinary cases" will a court "disregard the corporate entity[.]" *Id.* Upon review of plaintiffs' linkage allegations, the Court does not see an extraordinary case. Defendants appear to be engaged in what are typical trans-national business engagements between business entities. On this ground, it would be improper to presume domestic misconduct of U.S. defendants by virtue of their EU counterparts' foreign conduct, particularly since the alleged conduct has yet to be found to violate the antitrust laws of any jurisdiction.

Issues of how entwined the corporate relationship between the U.S. and EU defendants are also strike the Court as ancillary to the main issue for the Court's consideration at this time of whether this plus factor points to any conspiracy in the United States. This is so because even if the foreign parent exerts total control and ignores all corporate formalities, plaintiffs must point to something indicating the defendants engaged in conduct violating the Sherman Act, and they have not done so. As the court in *In re Chocolate Confectionary* concluded, it may be reasonable to infer conspiracy based on foreign conduct "if two markets are sufficiently similar or adjacent and the relevant activities therein are sufficiently linked or tied in some way, e.g., the people involved in the conspiracies are the same or overlapping[.]" 801 F.3d at 403.

Even though there are some general allegations of overlap of involved personnel for some of the defendants, the U.S. and EU markets are separate and have distinct bodies of governing competition law. And the EC investigation is still preliminary, with no finding of wrongdoing or actual admission of guilt by any defendant. For these reasons, the parent-subsidiary coordination

issue does not support this plus factor in any way.[10]

Setting aside the differences in law and preliminary nature of the EC investigations, the allegations of coordination between the EU and U.S. entities do not plausibly point to a conspiracy. Plaintiffs offer new allegations from anonymous former employees in an attempt to plausibly show coordinated price fixing between the EC-scrutinized entities and their U.S. counterpart defendants. (*See* ADP PAC ¶¶ 7, 91; EPP PAC ¶¶ 272–75; DPP PAC ¶¶ 231–32.) But these allegations are all either not sufficiently detailed, describe what appears to be innocuous business conduct, or do not adequately explain the witness's background enough to show why that witness has knowledge of the conclusions they are making. They do not nudge the complaint toward plausibility.

To be sure, the Court notes that, at the pleading stage, allegations regarding confidential or anonymous witnesses are to be taken as true and construed in favor of the plaintiff. *See In re Cattle Antitrust Litig. (In re Cattle II)*, No. 19-cv-1129, 2021 WL 7757881, at *5 n.6 (D. Minn. Sept. 14, 2021) ("Defendants suggest that Plaintiffs' direct evidence [involving confidential witnesses] is based on hearsay and speculation, so the Court should not credit it. However, at the motion to dismiss stage, all allegations are taken as true and construed in Plaintiffs' favor."); *Hinds County,*

---

[10] Although not factoring into the legal analysis for this plus factor, a letter from the Directorate-General for Competition ("DG Competition") of the EC further underscores this point. In response to press articles and ongoing U.S. litigation involving defendants, DG Competition circulated a letter "to clarify the scope of the ongoing investigation of the Commission and to safeguard the interests of the Commission investigation." (Doc. No. 334-2, at 2.) The letter highlights that:

> The Commission is investigating the conduct of the leading tyre manufacturers that concerns the EEA. The Commission's jurisdiction for finding an infringement of Article 101 TFEU is strictly limited to the EEA territory. No conclusions for other territories than the EEA can therefore be drawn from this Commission investigation or its developments. Please note that DG Competition has no objection to the disclosure of this letter to US Courts in any pending litigation.

(Doc. No. 334-2, at 5.)

Judicial notice of the substance of this letter is unsuitable at this stage. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) ("Generally, at the motion-to-dismiss stage, a federal court may consider only the plaintiff's complaint."). It is also unnecessary, as it does not change the Court's analysis as to this plus factor. However, it is notable because it reiterates the point that the EC investigation does not pertain to any conduct in the U.S.

*Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 396 n.5 (S.D.N.Y. 2010) ("[T]he Court, taking Named Plaintiffs' averments regarding the Confidential Witness as true, accepts that the Confidential Witness would possess the information alleged for the purposes of this motion to dismiss."). And allegations regarding confidential or anonymous witnesses need only be "sufficiently detailed" at the pleading stage to show plausibility. *In re Cattle Antitrust Litig. (In re Cattle I)*, No. 19-cv-129, 2020 WL 5884676, at *5 (D. Minn. Sept. 29, 2020) (citing *In re Ins. Brokerage*, 618 F.3d at 323).

But this leniency does not mean the Court must accept as true all of a witness's conclusions. *See City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 396–97 (2d Cir. 2024) (rejecting an anonymous executive's claim that defendants were in a conspiracy because "Plaintiffs fail[ed] to allege that the executive was in a position to know whether a conspiracy existed," their account consisted of "chiefly generic descriptions," and the "hazy, unmoored contentions are [not] compelling[.]"); *In re Everyware Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 872–73 (S.D. Ohio 2016) (finding confidential witness statements to not be plausible factual allegations of defendants' wrongdoing in part because complaint did not indicate how the witnesses "would have been in a position to know" about company-wide problems). A confidential witness's allegations must at least be (1) sufficiently detailed and (2) explain how the witness's job or interaction with defendants placed them in a position to know whether a conspiracy existed. That would allow the Court a sufficient factual basis to infer a plausible conspiracy. *Compare In re Cattle I*, 2020 WL 5884676, at *5 (finding allegations regarding confidential witnesses were not sufficiently detailed to survive a motion to dismiss because of "lack of detail," the "mismatched nature" of their statements, and plaintiffs did "not adequately explain their jobs and how their interactions in those jobs would lead to them acquiring the knowledge they allegedly possess")

32

*with In re Cattle II*, 2021 WL 7757881, at *4 (denying motion to dismiss after finding the allegations "adequately explain the confidential witnesses' jobs," as well as how they would "acquire knowledge of Defendants' alleged agreement" and finding the allegations "are not mismatched").

Plaintiffs allege a former Pirelli employee stated that "everything emanated from Milan[.]" (ADP PAC ¶ 7; EPP PAC ¶ 275; DPP PAC ¶ 232.) This is used to support plaintiffs' claim that "upon information and belief, Defendants' European entities provided guidance including price margin guidance to their U.S. affiliates." *Id.* These factual allegations fail to show any foul play. For one, they provide almost no detail. They are far too vague to show the sort of direct control or coordination over pricing from abroad that would suggest what happened in the EU (if anything illegal happened at all) also transpired in the U.S. For another, they describe—albeit vaguely and generally—business conduct that appears facially innocuous under U.S. antitrust law. *Cf. City of Pontiac*, 92 F.4th at 396–97 (finding that innocent "market chatter" did not allow for the court "to infer the existence of a conspiracy"). Finally, there is almost no factual background about this employee. The Court has no information whatsoever on when this witness was employed at Pirelli, or even the approximate dates for when they observed the conduct in the allegations they now bring forth. Their background is summarized in a single sentence. This precludes examination of whether the witness's "job[] would lead to them acquiring the knowledge they allegedly possess[.]" *In re Cattle I*, 2020 WL 5884676, at *5.

Another former employee—this one from Michelin—is described as having been responsible for "pricing intermediate and budget replacement tires," and claims that "in 2016 Michelin underwent a 'consolidation of budgets.'" (EPP PAC ¶ 274.) Thereafter, she became "responsible for pricing intermediate and budget replacement tires for both EMEA and the . . .

United States." (*Id.*) Meanwhile, ADPs allege that the former Michelin employee "confirmed that account managers in Europe also sometimes exchanged pricing information directly." (ADP PAC ¶ 91.) These allegations fail to meet plausibility for the same reasons as those of the Pirelli employee. It is unclear what "consolidation of budgets" means. The complaints lack any information on the dates when this former employee was employed at Michelin or the time frame for when they observed what they are alleging, other than vaguely stating there was a "consolidation of budgets" in 2016. And it is also unclear what the "exchanged pricing information" contained, and between which parties, if any, pricing information was shared. Unless the pricing information was clearly commercially sensitive and specifically shared between the named competitors, this information does not plausibly show an antitrust conspiracy among defendants.[11] The Court cannot infer foul play based on this limited, vague, and facially innocuous conduct.

***

The foreign jurisdiction investigations fail to show a plausible conspiracy. Plaintiffs attempt to argue to the contrary by citing cases accepting foreign investigations as plus factors. But all the cited authorities are distinguishable.

*In re Eur. Gov't Bonds Antitrust Litig.* endorsed an EC investigation as a convincing plus factor. 2022 WL 768680, at \*21. The critical difference there was that, in the time between the first and third amended complaints, "the European Commission's actions transformed from mere investigation to *final decision*." *Id.* at \*20 (emphasis added). "With that change, 'both the scope and outcome of [that] investigation[] [were] known.'" *Id.* (quoting *In re Foreign Exch. Benchmark*

---

[11] The Court notes that plaintiffs allege that some U.S. subsidiaries are wholly owned by foreign corporation parents. For other defendants, it is not specifically alleged that the subsidiary is wholly owned by the parent. And plaintiffs do not specifically allege a conspiracy between subsidiaries and parents, but between competitor group entities.

34

*Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015)). This made the findings "no longer speculative" and "transformed the allegations regarding the [EC] from general to specific." *Id.* at *20–21. The court even took judicial notice of the EC decision. *Id.* at *21.

This case presents no similar finality nor certainty of violative conduct. And there is no other strong circumstantial evidence for plaintiffs' EC allegations to bolster. At this stage, plaintiffs' allegations are still "mere investigation," "speculative," and "insufficient to support an allegation of a plausible conspiracy." *Id.* at *20–21; *see also* European Commission Press Release IP/24/561, *Commission carries out unannounced antitrust inspections in the tyres sector* (Jan. 30, 2024) (stating that the investigation was preliminary and not a finding of guilt).

In *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, the court accepted as plus factors several investigations into defendant's conduct. No. 05-md-1720, 2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019). But those investigations involved U.S. law enforcement. *Id.* at *32. And several defendants had entered a consent decree with the DOJ and settled several class action suits. *Id.* at *5–6. Here, there are no allegations that any U.S. law enforcement agency has investigated defendants for their tire pricing and no allegations that defendants have entered into any consent decrees or settlement agreements. *In re Fragrance Direct Purchaser Antitrust Litig.* is similarly distinguishable due to DOJ involvement in that case. No. 2:23-2174, 2025 WL 579639, at *2 (D.N.J. Feb. 21, 2025) (finding plausible conspiracy where EC investigated "anticompetitive business practices in consultation with Swiss, U.K., and U.S. law enforcement" and this was followed by a DOJ investigation).

Finally, in *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272 (M.D. Fla. 2016), the court primarily relied on plus factors other than foreign jurisdiction investigations to

35

hold that there was a plausible conspiracy.[12] In fact, *In re Disposable Contact Lens* merely mentions the foreign investigations but did not discuss them substantively or detail how persuasive that factor was in its analysis. *Id.* at 1295–96.

Case law on this plus factor strongly supports the Court's skepticism. *See, e.g., In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (affirming dismissal and rejecting as a plus factor allegations of European misconduct—including EC fines against defendants and their affiliates for antitrust violations—due to "absen[ce of] any evidence of linkage between such foreign conduct and conduct [in the U.S.]"); *In re Chocolate Confectionary*, 801 F.3d at 403 ("[T]he Plaintiffs have not adequately linked the Canadian conspiracy to the purported U.S. conspiracy to justify using the former to support an inference of the latter."); *In re Fragrance*, 2025 WL 579639, at *9 (stating that "the existence of the Government Investigations" were "not independently sufficient to support [antitrust] allegations"); *In re Eur. Gov't Bonds*, 2022 WL 768680, at *21 ("[T]he European Commission's investigations alone would be insufficient to support an allegation of a plausible conspiracy[.]").The amended allegations regarding this plus factor suffer from the same pleading insufficiencies as the prior consolidated complaints. The PACs fail to show how these specific foreign antitrust investigations—which are still at a preliminary stage—lead to an inference of a plausible conspiracy in the U.S. The Court rejects this plus factor.

---

[12] A major consideration that favored plausibility of a conspiracy in *In re Disposable Contact Lens* was that the alleged business conduct was against each individual entity's economic self-interest. "No single reasonable [contact lens] manufacturer would drastically raise its prices and restrict its available sales without assurances that others would follow suit" because "a single contact lens [unilateral pricing policy prohibiting retailers from offering discounts on covered products] would be difficult to reverse" and "could lead to product suicide if consumer patients insisted on a more economic contact lens[] alternative to the single [price restricted] product." 215 F. Supp. 3d at 1297. Here, each tire manufacturer could more readily reverse a steep price hike if competitors failed to copy it or if there were significant consumer backlash, distinguishing this set of facts from those in *In re Disposable Contact Lens*.

b)      *Acting Against Economic Self-Interest*

ADP and DPP plaintiffs try to repackage and put a new spin on a previously asserted plus factor alleging that defendants acted against their economic self-interest. (ADP PAC ¶¶ 196–204; DPP PAC ¶¶ 141–48.) Their prior consolidated complaints made cursory allegations that "sudden and dramatic parallel price increases" were "contrary to their economic interests" absent a conspiracy to fix prices. (EPP Compl. ¶ 4; ADP Compl. ¶ 3; *see also* DPP Compl. ¶ 6 (referring to the sudden price increases as "economically unexplained" and "inconsistent with unilateral conduct").) Plaintiffs' briefing opposing the prior motion to dismiss also generally asserted that the plus factors, taken together, were "contrary to each [d]efendant's individual self-interest[.]" (Doc. No. 266, at 21.) The Court found that plaintiffs had not plausibly alleged that the price increases were irrational absent a prior agreement. (Doc. No. 317, at 36.) Given the oligopolistic market dynamics, the impacts of COVID-19, other market factors, and case law on point, the Court concluded that the parallel price increases were not necessarily irrational, were consistent with conscious parallelism, and were not plausibly pointing to a conspiracy. (*See* Doc. No. 317, at 35–36.)

Now, the amended pleadings attempt to articulate why plaintiffs believe the parallel price increases would be totally irrational if pursued independently: because the unilateral act of raising prices so dramatically would risk a loss each competitor's market share, plaintiffs believe their act of doing so despite that economic peril plausibly shows they had a prior agreement to raise prices.

"A showing that the defendants' actions, taken independently, would be contrary to their economic self-interest will ordinarily tend to exclude the likelihood of independent action." *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 475 (6th Cir. 2005) (citation omitted). This analysis requires reviewing whether "defendants' behavior would

37

not be reasonable or explicable . . . if they were not conspiring to fix prices[.]" *In re Polyurethane Foam III*, 152 F. Supp. 3d at 989 (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 572 (11th Cir. 1998)).[13] But "if a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor." *Id.* (citing *Williamson Oil Co.*, 346 F.3d at 1310 (further citation omitted)). As before, a more plausible benign explanation exists for this plus factor. Therefore, once again, it cannot plausibly show conspiracy.

The crux of this plus factor is that raising prices of replacement tires in a competitive market was against each defendant's economic self-interest. (ADP PAC ¶ 197; DPP PAC ¶ 142.) Defendants' price increases "significantly exceeded any rise in raw material costs" or any other input costs. (ADP PAC ¶ 198.) This strikes plaintiffs as suspect because "manufacturers typically cannot fully transfer these costs to customers without risking market share." (ADP PAC ¶ 198.) In a competitive market, "a firm would typically lower its prices to gain market share if competitors set prices above marginal cost." (DPP PAC ¶ 143.) Raising prices would risk "causing a loss of market share" since customers would gravitate toward the lower-priced tires.[14] (ADP PAC ¶ 197.)

But according to plaintiffs, all defendants raised prices significantly over the class period. (ADP PAC ¶ 316; EPP PAC ¶ 153.) Yet, defendants appear to have maintained their respective market shares throughout the volatile post-COVID-19 period. (*See* ADP PAC ¶¶ 78, 80; *cf.* EPP

---

[13] Stated another way, a business action is against self-interest where individual action would be so perilous in the absence of advance agreement with competitors that no reasonable firm would make the challenged move without such an agreement in place. Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1434c1 (2022).

[14] ADPs also allege that a former Bridgestone employee who served as European country manager and worked for several defendants "confirmed that these Defendants directed their account managers to instruct their distributors and retailer customers on how to price tires with an objective of 'mapping' the Defendants' 'price position in the market'— that is, price tires to maintain, not increase, Defendants' respective market share." (ADP PAC ¶ 199.) This alleged fact, which does not indicate a time frame for when the conduct allegedly occurred or when the individual was employed at Bridgestone, is too vague and conclusory to support the contention that defendants acted against their own self-interest. *Cf. In re Dynamic Random Access Memory Indirect Purchaser Litig.* ("*DRAM*"), No. 4:18-cv-2518, 2020 WL 8459279, at *10 (N.D. Cal. Nov. 24, 2020) (finding conclusory confidential witness claims that failed to allege "who, did what, to whom (or with whom), where, and when"). Moreover, the business practice plaintiffs are vaguely stating do not appear nefarious.

PAC ¶ 252; DPP PAC ¶¶ 74–75.) To plaintiffs, the price hikes were a "textbook example" of acting against economic self-interest (ADP PAC ¶ 196) and would only be rational for each defendant to pursue if each was expecting its competitors to participate in the price fixing scheme. (ADP PAC ¶ 198; DPP PAC ¶ 147.)

Plaintiffs' PACs, however, plead that the replacement tires market is *oligopolistic*. (*See* ADP PAC ¶ 78 ("The U.S. Tires market is oligopolistic, with three of Defendants controlling nearly all the market[.]"); *see also* DPP PAC ¶ 74 ("Bridgestone, Michelin, and Goodyear comprised almost 64% of the U.S. replacement tire market" and "[t]he remaining 36% of the U.S. market includes manufacturers such as Defendants Continental, Pirelli, and Nokian.").) And although plaintiffs plead "lock-step" price increases in a conclusory manner, their price increase descriptions and accompanying charts plausibly reflect sequential parallelism.

In this specific market context, the act of each defendant independently raising prices in the sequential manner in which they are alleged to have acted is consistent with conscious parallelism or independent conduct. Here, it is plausible that each firm could have "engage[d] in an action that bec[ame] known to its rivals, who [could] then choose whether to imitate the move." *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 440 (S.D.N.Y. 2014). As explained below, a single defendant's attempt to raise its prices in this specific context would not incur so perilous an economic risk that it would be absurd or foolish to pursue independently. Plaintiffs' claim that defendants could only have raised their prices sequentially as part of a prior agreement, because absent such agreement the risk of loss of market share would be too great and certain, is belied by the obvious alternative explanation of sequential parallelism. Taking into account the oligopoly wherein they operate, the manner in which defendants are alleged to have raised prices is consistent with *furthering* each firm's economic self-interest.

39

Indeed, oligopolies pose "a special problem under § 1 because rational, independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing." *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017). In contrast to typical competitive markets where "the effects of any single firm's price and output decisions 'would be so diffused among its numerous competitors that they would not be aware of any change[,]'" oligopolies are characterized by an innate interdependence "where any price movement 'will have a noticeable impact on the market and on its rivals.'" *Id.* (quoting Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 206–07 (2d ed. 2000)). Consequently, "[c]ompetitors in concentrated markets watch each other like hawks." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 875 (7th Cir. 2015). And this is consistent with plaintiffs' allegations that each defendant was hypervigilant of competitor pricing. (*See, e.g.*, EPP PAC ¶ 156 ("[C]ompetitors typically monitor these earnings calls" and "the publicly traded Defendants know that their competitors are listening to the announcements made during earnings calls.").)

In light of this oligopolistic market structure, the Court is unconvinced that defendants' sequential price increases constitute "action against self-interest" that suggest the existence of a prior agreement. Many other courts have recognized that this same pricing dynamic is also equally consistent with independent conduct in an oligopolistic, interdependent market.

For one, the parallel conduct of defendants can just as easily be explained by "shared but independent reaction to the myriad market considerations" that they all collectively faced. *United Wholesale Mortg., LLC v. Am.'s Moneyline, Inc.*, No. 22-10228, 2025 WL 502743, at *10 (E.D. Mich. Feb 14, 2025) (concluding there was no act against economic self-interest where defendant brokers, when confronted with wholesale mortgage lender's condition that for the wholesale lender to offer loans the brokers could not deal with competitor lenders, had acceptable economic

40

considerations for either accepting or denying the conditions). One plainly obvious market consideration, even acknowledged by plaintiffs, is the sudden increase in input costs and other inflationary pressures beginning with the COVID-19 pandemic. Defendants each faced identical pricing pressures that, even plaintiffs concede, caused about a 16% price increase, accounting for roughly three-fourths of the observed replacement tire price increase of 21% over the class period. (*Cf.* ADP PAC ¶¶ 175 ("[A]fter accounting for demand and cost factors that may affect tire prices, Defendants' alleged conspiracy increased tire prices by 5.4%."), 316 ("[T]he prices for new replacement tires have increased 21.4 %.").) Indeed, it is odd for plaintiffs to concede that most of the price increases are attributable to non-collusive factors while also asserting they were against each defendant's economic self-interest if done independently. If so much of the dramatic price increase can be explained by non-collusive factors, then the idea of each defendant independently raising prices is not nearly as far-fetched as plaintiffs present it to be.

Setting aside the three-quarters increase attributable to non-collusive factors, defendants are left with explaining the approximately 5% price increase. But this too is equally consistent with conscious parallelism. The oligopoly in which defendants operate makes these allegations, at best, equally consistent with both conscious parallelism and collusion. *See Twombly*, 550 U.S. at 554 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").

The consolidated nature of the replacement tire industry facilitates "follow the leader" price increases, which are common in oligopolies. The Sixth Circuit recognized this phenomenon in *In re Travel Agent II*, where the court stated:

"When one oligopolist raises its price, each of its rivals must decide whether to follow. Continuing the previous price would allow each of the others to increase its sales if the leader persists in charging a higher price. But each knows that the leader is likely to retract an increase that is not followed. Accordingly, each rival asks itself whether it is better off at the lower price when it is charged by all or at the higher price when charged by all. If the latter, as will often be the case, the leader's price increase is likely to be followed.

\*\*\*

The price leader may assume that others have made a similar calculation about which price will maximize profits. Or the leader may simply proceed by trial and error: raise the price and see what happens, especially where reversing an unfollowed price rise is not very costly."

583 F.3d at 910 (quoting 6 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1410b (2d ed. 2003)).[15]

Similarly, in *In re Musical Instruments*, the court observed that "so long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices, confident that if its price *is* followed, all firms will benefit. By that process ('follow the leader'), supracompetitive prices and other anticompetitive practices, once initiated, can spread through a market without any prior agreement." 798 F.3d at 1195. The court in *Valspar Corp. v. E.I. Du Pont de Nemours and Co.,* made the same observation and noted that "if a firm announces a price increase, other market participants will know that if they do not increase their prices to the

---

[15] Indeed, the most recent edition of the Areeda & Hovenkamp treatise confirms this business dynamic. Defendants' sequential parallelism in price increases mirrors the below description:

No advance agreement is necessary to explain leading or following the bulk of business parallelism. In deciding whether to follow a rival's price increase, each firm knows that a widely unfollowed price increase will be rescinded. Accordingly, each rival will consider whether it is better off when everyone charges the same high or low price.
\*\*\*
Initiating a price increase . . . can also be explained without any advance agreement. The initiator and the early followers can always reverse the move if most rivals do not follow. Not much business or goodwill would be lost if the retraction was reasonably prompt, and perhaps none would be lost if the original announcement had a future effective date that was never reached.

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1425d (2022).

42

first-mover's level, the first-mover may be forced to reduce its price to their level. Because each of the other firms know this, each will consider whether it is better off when all are charging the old price or the new one. They will obviously choose the new price when they believe that it will maximize industry profits." 873 F.3d 185, 191 (3d Cir. 2017) (citing *In re Flat Glass*, 385 F.3d at 359 (cleaned up)).

This "follow-the-leader" economic phenomenon can be a rational consideration for a firm. *See id.* (acknowledging that "oligopolistic rationality" may cause supracompetitive prices by discouraging price reductions while encouraging price increases). And by virtue of its independent nature, it is not proscribed by § 1 of the Sherman Act. *See In re Text Messaging Antitrust Litig.*, 782 F.3d at 872 ("Express collusion violates antitrust law; tacit collusion does not.").

As plaintiffs admit, there was already significant upward pricing momentum in the tire market due to COVID-19, the war in Ukraine, and other non-collusive factors. "Follow-the-leader" pricing that is often seen in oligopolies is an additional reasonable expectation and obvious alternative explanation for the price increases in this context.[16] For one defendant to independently "try" pushing tire pricing even further than input pressures required, and see if competitors would follow, is a relatively safe wager. If they succeed in leading the rest of the industry to copy them, then all are financially rewarded. If competitors fail to follow suit, the leading manufacturer can simply reverse the price increase to avoid losing market share. Defendants might have done just that in the pre-COVID-19 period when they implemented and quickly rolled back several price increases. (*See, e.g.*, DPP PAC ¶ 98 ("Prior to 2020, Defendants struggled to implement price

---

[16] Here, the Court notes that although the pleading stage requires all reasonable inferences to be construed in plaintiffs' favor, the Court must also follow *Twombly*'s holding that conspiracy allegations which are equally consistent with conscious parallelism fail to state a claim. *See Twombly*, 550 U.S. at 554. Accordingly, the Court considers the obvious alternative explanation that defendants may have been engaging in conscious parallelism through pricing dynamics which other courts and economic experts have concluded are common in oligopolies.

increases," "discussed abandoning or withdrawing price increases," and "expressed concern that the benefits of increasing price would be offset by the corresponding reduction in their sales volume").) The fact that defendant firms may have decided to follow the first price mover to match prices this time around does not necessarily imply the existence of an illegal price fixing scheme.[17] To the contrary, "[o]ne would ordinarily expect parallel pricing in [highly concentrated markets], particularly if it is sequential—that is, if each firm is able to observe the prices of others before settings its own price." Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, § 4.5, at 176 (3rd ed. 2005); *see also In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-md-1895, 2009 WL 323219, at *18 (N.D. Ga. Jan. 28, 2009) ("In a homogenous industry each major player has the same incentive to charge the same surcharge and realize the same improved profit margin."). Here, the oligopolistic tire market and the sequential nature of the price increases, "although consistent with conspiracy, [are] more indicative of consciously parallel follow-the-leader pricing." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1310 (S.D. Fla. 2010).

Contrary to what plaintiffs claim, the parallel conduct is not inconsistent with each individual defendant's economic self-interest. Quite the opposite. Defendants' actions, from the perspective of the time in which they were conducting business, would have incurred minor and reversible risk and could have easily advance each firm's individual economic self-interest. This is especially true where there are market factors at play requiring price increases. (*See, e.g.*, ADP

---

[17] Game-theoretic models can illustrate the incentive for competitor firms in repeated games to tacitly collude to charge the supracompetitive monopoly price without "getting together to agree on prices (*i.e.*, overtly colluding) – which would be illegal under antitrust laws." Benjamin E. Hermalin, *Games in Extensive Form and Repeated Games* § 5.1 (2003), accessible at https://faculty.haas.berkeley.edu/hermalin/repeated_game.pdf. "[E]ven without an explicit agreement, [competitors] understand they have an incentive not to undercut the monopoly price due to the threat of profit-eroding price competition were they to undercut; that is, the start of a *price war* if they undercut." *Id*. (emphasis in original). The factors that facilitate tacit collusion coincide with the characteristics of oligopoly (*e.g.*, a small number of firms, repeat players, monitoring capabilities to detect cheating, *etc.*). *See generally id*.

PAC ¶ 167 ("[T]he effect of COVID-19 on tire prices through its effect on material costs will be captured by [the price index of raw materials] variable."); EPP PAC ¶ 302 ("COVID-19 may affect tire prices through its effects on product cost for tires and demand for tires."); DPP PAC ¶ 132 ("Despite headwinds from the COVID-19 pandemic and the war in Ukraine that led to inflation and fluctuating input costs . . .").) Price increases may have been particularly rational in the context of this case. As plaintiffs point out, for years the market did not support the various price increases that certain defendants attempted. But COVID-19 and other market factors gave each defendant an opportunity to increase prices and observe the market's reaction.

"[I]n an oligopolistic market" such as this one, the observed parallel behavior "can be a necessary fact of life." *Valspar Corp.*, 873 F.3d at 193; *accord In re Baby Food*, 166 F.3d at 122. A "benign explanation" for this parallel conduct "is equally or more plausible" than a conspiracy. *In re Polyurethan Foam III*, 152 F. Supp. 3d at 989 (citation omitted). The allegations here show actions consistent with, rather than contrary to, each defendant's economic self-interest. The Court therefore concludes this plus factor does not plausibly show conspiracy.

c)      *Econometric Analysis Showing Collusion*

The plaintiffs plead as a plus factor an econometric analysis purporting to plausibly allege that a conspiracy in restraint of trade caused at least some of the price increases in replacement tires. (ADP PAC ¶¶ 146–85; EPP PAC ¶¶ 276–315; DPP PAC ¶¶ 149–88.) This plus factor relates to and is similar to the prior consolidated complaints' plus factor for pretextual explanations for price increases. (*See* Doc. No. 317, at 66–82.) Plaintiffs previously alleged "that defendants' public explanations for their price increases were pretextual" and "do not account for the significant increases in prices over the Class Period." (*Id.* at 66.) They asked the Court to not take seriously defendants' justifications for the price hikes, which were blamed on "rising input costs" and

45

"changing market dynamics." (*Id.* (citing DPP Compl. ¶¶ 81–82, 89, 93, 100, 113, 120, 122; EPP Compl. ¶¶ 151, 153–56, 159, 161, 165, 177; ADP Compl. ¶¶ 56, 58, 60, 70, 152, 206).)

The plaintiffs offered two bases to support their argument that the Court disregard defendants' justifications as merely pretextual. First, they asked the Court to credit several statements by defendants suggesting that their input cost explanation was merely pretextual, including one by Goodyear's CEO stating that "increase[s] in the replacement tire prices[] more than offset costs." (*Id.* at 66–67 (citations omitted).) Second, they presented economic arguments showing the price increases could not be explained solely by non-collusive factors. (*Id.* at 67.) The economic arguments included: (1) DPP's regression model, (2) EPP's comparisons of U.S. and European tire prices with prices in Japan and comparison of defendant and non-defendant tire prices, and (3) ADP's explanation of how tire prices diverged from what would be expected in a competitive market. (*Id.*)

The Court previously concluded that, as a preliminary matter, the global impacts of the COVID-19 pandemic, inflation, supply chain disruptions, and rising input costs were obvious alternative explanations for the price increases. (*See id.* at 68–69.) These alternative causes suggested "rational pricing behavior in an interdependent market, not conspiracy." (*Id.* at 69.) Plaintiffs made "no meaningful attempt to square those allegations with their competing allegations that '[n]o market forces can explain' the price increases." (*Id.* (quoting Doc. No. 266, at 19; DPP Compl. ¶ 5; EPP Compl. ¶ 178; ADP Compl. ¶¶ 92–93).)

Upon review of the first main basis, the Court further concluded that plaintiffs "exaggerate[d] in arguing that statements from [d]efendants confirmed [that the] price increases far exceeded the rise in input costs[.]" (*Id.* at 72 (quotation marks and citations omitted).) For instance, plaintiffs argued that Goodyear's comment that its "increase in the replacement tire prices

more than offset [its] costs" evidenced pretextual explanations for price increases. (*Id.* (quoting DPP Compl. ¶¶ 5, 101, 114, 119; EPP Compl. ¶ 178; ADP Compl. ¶¶ 69, 93).) But the Court was unconvinced by plaintiffs' argument because this statement merely "restate[d] the basic formula for profit: revenue must exceed costs." (*Id.*) The Court also found that it was not "suspicious that other tire manufacturers also raised prices, given that they all faced the same rising costs." (*Id.*)

On the second main basis, the Court's prior memorandum opinion considered and rejected each of DPP's, EPP's, and ADP's allegations in support of a plausible conspiracy. DPP's prior consolidated complaint included a regression analysis that purported to compare actual prices to prices buyers would have paid in a conspiracy-free market. (*Id.* at 73 (citing DPP Compl. ¶ 123).) DPP's regression graph consisted of a blue line—representing actual tire prices—maintaining a relatively stable price level until it increased significantly beginning in February 2020, after which prices leveled off beginning around January 2023. (*See id.* at 73–74.) The graph also included a red line representing "but for" prices. This line also sloped upward but was lower than the blue line, implying that tire prices would have been significantly lower had no price fixing transpired. (*Id.*)

The Court declined to accept plaintiffs' claim that this regression model plausibly indicated a price fixing conspiracy. The chart merely presented a "bottom-line conclusion" and not an actual statistical analysis. (*Id.* at 74 (quoting Doc. No. 276, at 22).) The Court declined to credit that conclusion on several grounds. For one, the graph provided minimal context, thus permitting it to "represent almost any conceivable dataset[.]" (*Id.*) For another, DPPs "ma[de] no attempt to explain what their input data [was], where it came from, or why it [could] reasonably be expected to be representative of defendants' prices for passenger replacement tires in the United States." (*Id.* at 75 (citing *City of Pontiac*, 92 F.4th at 399).) Finally, DPPs did not give specific information

about the methodology used in their model. They merely disclosed that their expert applied "the well-known and widely accepted dummy variable multiple regression methodology[.]" (*Id.* (quoting DPP Compl. ¶ 124).) They also simply stated that the regression controlled for six different variables. (*See id.* at 75–76.) But the Court was troubled by that minimal factual context and found that the "lack of transparency [was] particularly troubling given plaintiffs' near-exclusive reliance on it to rebut defendants' argument that the COVID-19 pandemic is an obvious alternative explanation[.]" (*Id.* at 77 (internal quotations and citations omitted).)

EPP's two economic arguments in their prior consolidated complaint fared no better. EPP's first chart showed that tire prices in the U.S. and Europe increased faster than in Japan. The charts compared two distinct indexes: Japan's *consumer* price index and the *producer* price indexes of the U.S. and Europe. (*Id.* at 79 (citing EPP Compl. ¶ 180; Doc. No. 266, at 30).) The Court had issue with the differences between these two indexes and EPP's failure to explain why any perceived price discrepancy might not be attributable to comparing different indexes. (*Id.*) Moreover, the index graph did "not depict nearly as clean a divide between conspiracy-induced prices and competitive prices[.]" (*Id.*) For these reasons, the Court declined to find the index graph plausibly pointed to a conspiracy. (*Id.* at 80.)

EPP's second chart comparing 2022 and 2023 prices for a specific tire size between four defendants and two non-defendants[18] was also rejected. (*See id.*) The Court found that this did not show plausibility because the chart did not include pre-conspiracy period pricing comparisons. (*Id.*) Without the pre-2020 data, the observed price discrepancies could have been the status quo rather than arising after a conspiracy began.

---

[18] The four defendants were Goodyear, Continental, Michelin, and Bridgestone. (*See* EPP ¶ 181.) EPPs compared their tire prices to those of non-defendants Hankook and Falken. (*Id.*)

48

ADP's explanations in their prior consolidated complaint were also rejected. ADPs alleged that defendants' pricing actions diverged from what one would expect in a competitive market. They argued that "fluctuations in input costs should not, and historically had not, uniformly impacted defendants' prices." (*Id.* at 69 (citing ADP Compl. ¶ 160).) Per ADPs, one would expect price increases to be non-uniform rather than in lockstep. The Court, however, did not find this argument to be particularly relevant. "[D]efendants [were] not actually alleged to have increased their prices at the same time (or by the same amount)." (*Id.* at 70.) Indeed, "the increases often arose weeks or even months apart, and sometimes varied in amount by several percentage points." (*Id.* (citing ADP Compl. ¶¶ 54–55, 66).) Moreover, the difference between the 2017 pricing conduct and the 2020–2022 actions had the obvious alternative explanation of the impacts of the COVID-19 pandemic and "historically anomalous" input cost volatility, which ADPs conceded in their consolidated complaint. (*See id.* at 71 (citing ADP Compl. ¶ 155).)

The Court concluded its analysis of the pretextual explanations plus factor by noting that even if "rising [input] costs may not have been the full or even real reason for increasing prices, that would not show whether the real reason was interdependence or a conspiracy." (*Id.* at 81 (internal quotations omitted) (citing *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 775 (E.D. Pa. 2017)).) And even if the price increases reflected seeking higher profits on the part of defendants, and not simply a reflection of increases in input costs, such an explanation "would still only suggest rational business decisions in an interdependent market—not a prior agreement." (*Id.* (citing *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018)) (further citations omitted).)

In their proposed amendments, plaintiffs make significant revisions to the prior pretextual explanations plus factor. They no longer discuss public statements by defendants allegedly

49

suggesting the price increases far exceeded any increases required by input costs (*see* Doc. No. 317, at 72) in this plus factor. Instead, those allegations are addressed in the price signaling and actions against economic self-interest plus factors. Additionally, EPP's prior allegations comparing price indexes from Japan, the U.S., and Europe, and comparing prices from four defendants and two non-defendants, have been removed from their PAC. (*See* Doc. No. 324-2, at 66–68.) Finally, ADP's prior allegations regarding the unexpected "lockstep" price increases— which the Court previously pointed out was not something defendants were alleged to have done— have also been omitted. (*See* Doc. No. 323-2, at 135–36.)

In their PAC, DPP's allegations regarding the multiple regression model have been expanded. Now, all three PACs include detailed allegations on the multiple regression model. (*See* ADP PAC ¶¶ 146–85; EPP PAC ¶¶ 276–315; DPP PAC ¶¶ 149–88.) Plaintiffs use a multivariate regression model to estimate what they call an "overcharge" on the price of tires during the damages period of February 2020 to present (the "damages period").[19] Plaintiffs interpret this estimation as evidence of collusion because "non-conspiratorial market demand and supply forces cannot explain the drastic price increases on Replacement Tires during the Class Period." (EPP PAC ¶ 276; *see* ADP PAC ¶ 147; DPP PAC ¶ 149.)

A multiple regression analysis "attempts to reveal relationships between explanatory variables and a dependent variable." *Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 466 (8th Cir. 2004) (citing Daniel L. Rubinfeld, *Reference Guide on Multiple Regression, in* Federal Judicial Center*, Reference Manual on Scientific Evidence*, 181 (2d ed. 2000)). "Even the best regression equation cannot prove causation" but it can show "a correlation that can give rise to an inference that causation exists." *In re Polyurethane Foam Antitrust Litig. (In re Polyurethane*

---

[19] Plaintiffs use the terms "class period" and "damages period" interchangeably. The Court will do so as well.

*Foam II)*, 314 F.R.D. 226, 260 (N.D. Ohio 2014) (quoting *Schumacher v. Tyson Fresh Meats, Inc.*, No. 02-cv-1027, 2006 WL 47504, at *7 (D.S.D. Jan. 5, 2006)). "Ideally, a multiple regression analysis builds on a theory that describes the variables to be included in the study." Daniel L. Rubinfeld, *Reference Guide on Multiple Regression, in* Federal Judicial Center, *Reference Manual on Scientific Evidence* 303, 311 (3d ed. 2011). It can be used to "isolate the effect of an alleged conspiracy on price, taking into consideration other factors that might also influence price, like cost and demand." *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, 276 F.R.D. 364, 371 (C.D. Cal. 2011) (quoting *In re Plastic Additives Antitrust Litig.*, No. 03-cv-2038, 2010 WL 3431837, at *15 n.13 (E.D. Pa. Aug. 31, 2010)). By isolating the impact of a single explanatory variable on prices, regression models are particularly useful for calculating antitrust damages. *See, e.g.*, *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002) ("[R]egression analyses . . . are generally accepted methods for proving antitrust damages.").[20] They are also useful tools for courts to examine whether antitrust impact and/or damages are common to a class. *See, e.g., In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 95–96 (D. Conn. 2009) (concluding that plaintiffs' regression analysis showed there were common issues of antitrust impact and damages that predominated over individual issues); *In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 1002 (D. Minn. 2023) (noting that regression analysis is one way to show class-wide impact (citing *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 676 (9th Cir. 2022))).

Under the Rule 12(b)(6) standard, the Court "need not accept as true legal conclusions or unwarranted factual inferences." *In re Travel Agent II*, 583 F.3d at 903 (citations omitted).

---

[20] *See also In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 213 (E.D. Pa. 2017) ("Regression analysis has become increasingly common in antitrust litigation" and is useful as "a method of determining damages."); *In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 1008 (D. Minn. 2023) ("[A] multiple regression analysis . . . is a well-accepted method of calculating damages in antitrust cases." (citations omitted)).

Conclusions on what regression analyses can show "are not conclusions of law" but instead are "based on factual inferences." *In re Credit Default Swaps ("In re CDS") Auctions Litig.*, 710 F. Supp. 3d 895, 945 (D.N.M. 2023). At the pleading stage, a statistical analysis "need only be plausible." *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 364 (S.D.N.Y. 2019).[21] "Merely pointing out that there are problems with the analysis" will not suffice to defeat the statistical analysis under this pleading standard. *Id.* At this early stage of litigation, the Court is not free to "draw inferences in favor of Defendants or to discredit well-pled factual allegations that are not obviously false." *In re CDS*, 710 F. Supp. 3d at 945.

To establish their model, plaintiffs relied on the "well-known and widely accepted dummy variable multiple regression methodology." (ADP PAC ¶ 152; EPP PAC ¶ 282; DPP PAC ¶ 155.) They proceeded by comparing the prices during the period affected by the alleged unlawful conduct to competitive prices during the immediately preceding period (the "benchmark period"). (ADP PAC ¶ 151; EPP PAC ¶ 281; DPP PAC ¶ 154.) The price of all tires was assigned to be the dependent variable.[22] (ADP PAC ¶ 153; EPP PAC ¶ 283; DPP PAC ¶ 156.) Due to limitations in publicly available data, plaintiffs relied on several methods to estimate the but-for prices of tires during the alleged damages period. They relied on publicly available tire price information (ADP PAC ¶ 158; EPP PAC ¶ 288; DPP PAC ¶ 161) and calculated a Fisher price index (ADP PAC ¶ 164; EPP PAC ¶ 294; DPP PAC ¶ 167).

---

[21] The court in *In re GSE Bonds* held that the complaint had adequately pleaded a conspiracy. However, this was based on "rare smoking gun" direct evidence which "unmistakably show[ed] traders, acting on behalf of . . . defendants, agreeing to fix prices at a specific level before bringing the bonds to the secondary market." 396 F. Supp. 3d at 361. No similar "smoking gun" evidence exists in the PACs.

[22] The Court reiterates that the product at issue in this case is replacement tires. Plaintiffs' regression model estimates price increases for all tires, including original equipment manufacturer ("OEM") tires that are not pleaded as part of the price fixing conspiracy. Notwithstanding this, the Court will accept plaintiffs' inferences that: (1) since there is no alleged price fixing of OEM tires and they are presumably competitively priced, the model underestimates alleged conspiracy-related overcharges of replacement tires; and (2) because replacement tires make up the vast majority of tire sales, including new tires does not significantly reduce the accuracy of the regression analysis.

Plaintiffs' explanatory variable of interest is the dummy variable that "indicates whether a given price observation falls inside the alleged damages period (set to 1 if within the damages period and set to 0 otherwise)." (ADP PAC ¶ 153; EPP PAC ¶ 283; DPP PAC ¶ 156.) They next incorporated other control variables that may impact tire prices: raw material costs, labor costs, production of automobiles, average vehicle miles traveled, general inflation as measured by the consumer price index, and a COVID-19 indicator variable (equal to 1 from February 2020 to April 2020 and zero otherwise).[23] (ADP PAC ¶¶ 165–73; EPP PAC ¶¶ 295–303; DPP PAC ¶¶ 168–76.)

Plaintiffs ran their regression model and used three separate price indices as but-for prices during the damages period to compare and estimate supracompetitive overcharges. (ADP PAC ¶¶ 176–77; EPP PAC ¶¶ 306–07; DPP PAC ¶¶ 179–80.) The multiple regression analysis estimates a 5.4% overcharge in tire prices during the class period. (ADP PAC ¶ 175; EPP PAC ¶ 305; DPP PAC ¶ 178.) Plaintiffs then attribute this alleged overcharge to conspiratorial conduct and claim that, because the overcharge results in "actual prices fall[ing] outside the range of prices that would have prevailed under the noncollusive benchmark [determined by a high confidence interval]," this econometric evidence should be characterized as a "super plus factor." (ADP PAC ¶ 185; EPP PAC ¶ 315; DPP PAC ¶ 153.)

The Court is not convinced that plaintiffs' econometric analysis plausibly alleges anticompetitive conduct. First, the Court finds dubious plaintiffs' invitation to characterize their regression analysis as a "super plus factor"—a status no other court has yet endorsed as to

---

[23] These variables are similar to those alleged in DPP's prior consolidated complaint. (*See* DPP Compl. ¶ 125.) The only major difference is DPP's prior complaint included calendar month fixed effects (which accounted for seasonality in prices), while the proposed amendments include a variable for average vehicle miles traveled. (*Compare* DPP Compl. ¶ 125 *with* DPP PAC ¶ 173.) Now, all plaintiffs plead these variables and provide more details on what data each variable includes.

regression models or other forms of evidence.[24] *See In re Generic Pharmaceuticals Pricing Antitrust Litig.*, No. 16-md-2724, 2024 WL 4989070, at *13–14 (E.D. Pa. Dec. 5, 2024) (excluding expert witness's "Conditional Probability" test on the narrow point of being a "'super' plus factor" despite it purporting to indicate collusion "by over 99 percent," but accepting expert's opinion on plus factor strength more generally).[25]

More critically, however, plaintiffs' conclusion that the estimated 5.4% overcharge demonstrates defendants' conspiracy to fix prices is more properly characterized as an inference. The Court need not accept such inferences unless they are supported with sufficient factual allegations. *See In re Travel Agent II*, 583 F.3d at 903 (citations omitted). "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant[s'] conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013). Indeed, "[t]he reasonableness of one explanation for an incident depends, in part, on the strength of competing explanations." *Id.* at 505.

Here, the causal inference plaintiffs ask the Court to make from the regression model is undermined by the most obvious alternative explanation for the price increase: parallel conduct in the context of an oligopolistic market. Plaintiffs argue that their indicator variable has detected conspiracy, but an obvious alternative explanation is that it could instead be measuring conscious

---

[24] "Super-plus factors" are defined as plus factors that "allow a strong inference of collusion." *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09 Civ. 2227, 2015 WL 5003528, at *3 (S.D.N.Y. Aug. 20, 2015) (excluding economist's opinions regarding "super-plus factors" on grounds that they had not been shown to be the product of reliable principles and methods), *aff'd* 899 F.3d 87 (2d Cir. 2018); *see generally* William E. Kovacic, et al., *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393 (2011) (discussing the concept of "super plus factors"). Although the concept has never been endorsed by a court, that is not to say that there can never be such a thing as a super plus factor if consensus, built on robust evidence, develops at a future point. Considering the lack of plausibility in plaintiffs' econometric plus factor, the Court declines to characterize it as a super plus factor here.

[25] *See also Anderson News*, 2015 WL 5003528, at *3 (excluding expert opinion on super plus factor but allowing it regarding the existence of plus factors); *In re Dealer Management Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1060 (N.D. Ill. 2022) (inviting defendants to raise the issue of using the term "super-plus factor" in a motion in limine if plaintiffs refer to their pricing evidence with that term).

parallelism. *See Okla. Firefighters Pension & Ret. Sys.*, 2024 WL 4202680, at *8 (explaining how plaintiffs' own pleaded statistical data allegations undermine the inference they ask the court to make because the data had an "obvious alternative explanation").

Both phenomena can cause prices to increase to supracompetitive levels. *See Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 133 S. Ct. 2578, 125 L. Ed. 2d 168 (1993) (noting that, like an agreement in restraint of trade, conscious parallelism in an oligopoly can lead to firms "setting their prices at a profit-maximizing, supracompetitive level" (citations omitted)); *see also In re Cedar Shakes & Shingles*, 2020 WL 832324, at *10 (same). This means both will correlate similarly with the dependent variable in the regression analysis. But conscious parallelism and conspiratorial conduct are also mutually exclusive. If defendants acted in a mere consciously parallel manner, then they necessarily failed to reach the point of actual agreement. It is only when defendants have an actual meeting of the minds that they cross the threshold from conscious parallelism into unlawful conspiracy.

Therefore, it is likely not possible for this regression analysis to, say, account for conscious parallelism as a control variable and estimate the effect of only conspiratorial conduct on the dependent variable. *See* Rubinfeld, *supra*, at 324 (3d ed.).[26] Here, the Court is not convinced the regression model alone can distinguish between the two causes of supracompetitive pricing to

---

[26] "It is essential in multiple regression analysis that the explanatory variable of interest not be correlated perfectly with one or more of the other explanatory variables. If there were perfect correlation between two variables, the expert could not separate out the effect of the variable of interest on the dependent variable from the effect of the other variable. In essence, there are two explanations for the same pattern in the data . . ." and "when two or more variables are highly, but not perfectly, correlated—that is, when there is *multicollinearity*—the regression can be estimated, but some concerns remain. The greater the multicollinearity between two variables, the less precise are the estimates of individual regression parameters, and an expert is less able to distinguish among competing explanations for the movement in the outcome variable (even though there is no problem in estimating the joint influence of the two variables and all other regression parameters)." Rubinfeld, *supra*, at 324 (3d ed.). Applied in this case, plaintiffs cannot simultaneously control for conscious parallelism while testing for collusion because the time periods for both are presumably the same. This would lead to a regression where two variables are perfectly correlated with each other, leading to the issue of multicollinearity. Ambiguity between conspiracy and conscious parallelism is still present.

plausibly show a conspiracy.

Plaintiffs contend in their reply brief that "conscious parallelism . . . suggests that Defendants would react similarly to identical economic factors" and that "[b]y accounting for factors that legitimately affect tire prices, Plaintiffs' regression analysis reveals that actual prices in the U.S. tire market exceed the range of prices that would have prevailed in the absence of collusion." (Doc. No. 328, at 29.) In other words, plaintiffs believe that conscious parallelism is not an "obvious alternative explanation" because their regression model controls for common market conditions that affect all defendants. But conscious parallelism is not limited only to situations where producers make similar business decisions in the face of uniform market conditions. Rather, conscious parallelism encompasses the more general phenomenon "by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Grp. Ltd.*, 509 U.S. at 227 (citing 3 Phillip Areeda & Donald Turner, *Antitrust Law* ¶ 404 (1978); Frederic Scherer & David Ross, *Industrial Market Structure and Economic Performance* 199–208 (3d ed. 1990)). The Court is unconvinced that controlling for "factors that legitimately affect tire prices" would necessarily isolate the effect of the alleged conspiracy and eliminate conscious parallelism as a plausible alternative explanation. Distinguishment would require pairing the model with other factual allegations pointing toward conspiracy or tending to exclude independent action, allowing the statistical evidence to "build[] on a theory that describes the variables[.]" *See* Rubinfeld, *supra*, at 311 (3d ed.).

But plaintiffs fail to do that here. Plaintiffs' regression model does not cure the problem of "rational, independent actions taken by oligopolists . . . be[ing] nearly indistinguishable from

horizontal price fixing." *Valspar Corp.*, 873 F.3d at 191. Plaintiffs' other plus factors do not place their model in a context that reduces this ambiguity. This is poignantly relevant because even if rising input costs and other factors "may not have been the real reason for increasing prices" as plaintiffs claim, that would "not show whether the real reason was interdependence or a conspiracy." *In re Blood Reagents*, 266 F. Supp. 3d at 775 (quoting *In re Chocolate Confectionary*, 801 F.3d at 411).

Instead, plaintiffs' regression model appears to presume the existence of a conspiracy. "[A] litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000). But that is what plaintiffs have done here. They assign the dummy variable as representing a price overcharge that they believe is attributable to a conspiracy. They then control for other supply and demand impacts on tire prices by adding to the model additional explanatory variables. After running the regression with these controls, the dummy variable coefficient is computed to show a 5.4% price increase not attributable to the other control variables.[27] Plaintiffs then conclude this price increase must be from a price fixing conspiracy. This is clearly circular logic.

At best, plaintiffs' regression analysis is as consistent with an inference of conspiracy as with parallel but unilateral action. That is especially true because defendants operate in an oligopolistic market. The regression model does not cure the distinguishment issue in this market. *See Valspar Corp.*, 873 F.3d at 191 (noting that oligopolies pose "a special problem under § 1 because rational, independent actions taken by oligopolists can be nearly indistinguishable from

---

[27] Plaintiffs' regression also compares two other tire price indices which show overcharges of 6.0% and 5.0%. (*See* ADP PAC ¶ 176; EPP PAC ¶ 306; DPP PAC ¶ 179.)

horizontal price fixing"). And "courts do not credit charts and analyses that are 'as consistent with parallel, market-following behavior . . . as they are with participation in a price-fixing scheme.'" *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 509 (M.D. Tenn. 2023) (quoting *In re Commodity Exchange, Inc. Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 227 (S.D.N.Y. 2018)). As they stand, "plaintiff[s'] statistical models defeat themselves." *Okla Firefighters Pension & Ret. Sys.*, 2024 WL 4202680, at *8. Given the failure of the model to show conspiracy as a more plausible cause than the obvious alternative explanation, the Court finds plaintiffs' econometric-based allegations of price fixing implausible.

Defendants go further in challenging the regressions, making much ado about whether the analysis was properly conducted.[28] Here, at the pleading stage, the Court gives great deference to plaintiffs' assurances as to the accuracy and relevance of the used raw data, proper calculation and relevance of indices used to estimate but-for prices, and adequate specification of all explanatory variables. These pleadings address the Court's prior concern that the regressions were not transparent as to data and variables used, did not detail the statistical methodology, and could be used to explain any data set. (*See* Doc. No. 317, at 66–82.) The Court accepts as plausible that, after controlling for plaintiffs' identified variables, there was an estimated 5.4% increase in the

---

[28] Defendants point out that the coefficient estimates in the regression model present obvious errors. The coefficient for the natural log of the control variable for labor costs, ln(Labor cost), is estimated to have a value of -2.325, meaning that a 100% increase in labor cost correlated with a 232.5% decrease in tire prices. (*See* ADP PAC ¶ 175 & Table 1; EPP PAC ¶ 305 & Table 1; DPP PAC ¶ 178 & Table 1.) It is true that this estimation appears to defy economic intuition; *ceteris paribus* one would expect prices to rise in the face of rising labor costs. This seemingly paradoxical relationship might potentially undermine the validity of plaintiffs' regression model. *See* ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* Ch. 6, Section C.4 (3rd ed. 2017) (recognizing that "quantification will be weakened if the defendant can show that it conflicts with basic economic forces").

Notwithstanding this oddity, the Court assumes the model accurately captures the correlation between the dummy variable and tire prices. This is because "with many variables in a regression model, it is not uncommon for particular coefficients to have unexpected signs; hence, while it is valuable to check whether the overall pattern of coefficient signs makes economic sense, econometric models need not be rejected simply because a small number of coefficients . . . have unexpected signs." *Id.* There could be a legitimate explanation for this observation. The Court gives plaintiffs the benefit of the doubt. Instead, the relevant issue here is the ambiguity between interdependence and conspiracy.

price of tires. But accepting this estimation does not require the Court to accept plaintiffs' conclusion that this was a price increase caused by a conspiracy. As stated previously, "[e]ven the best regression equation cannot prove causation." *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. at 260. A regression can, at best, show "a correlation that can give rise to an inference that causation exists." *Id.* And here, plaintiffs' failure to adequately connect the regression output to their purported conclusion is what makes their conspiracy allegations implausible.

Plaintiffs implore the Court to hold otherwise. They cite several cases where courts accepted multiple regression models like those in the PACs as a plus factor that plausibly alleges conspiracy. But the cited authorities are all distinguishable. One group discusses regressions in the pleading context; the other is at later stages of litigation. The Court discusses each group in turn.

The first group of cases plaintiffs rely on presents factual allegations that more strongly suggest prior agreements. In *In re RealPage*, plaintiffs alleged a hub-and-spoke price fixing conspiracy among competitor residential apartment landlords and a revenue management software company. 709 F. Supp. 3d 478. Plaintiffs conducted a multiple regression analysis of the impact of various explanatory factors on the price defendants charged for rent. *Id.* at 507–09. Their analysis uncovered an unusual correlation where vacancy rates—which previously explained 83% of rental price variations between 2011 and 2016—suddenly began to only weakly correlate with rental price beginning in 2016. *Id.* at 507. Plaintiffs alleged that the abrupt shift corresponded with the moment defendants jointly implemented the revenue management software to synchronize a new pricing strategy resistant to normal supply and demand factors. *Id* at 507.

Although the court in *In re RealPage* found that the regression plausibly pointed to a conspiracy, it considered the regression as evidence of *parallel conduct* rather than as a plus factor. *Id.* Plaintiffs offered the regression to show the unusual untethering in correlation between rental

price and vacancies. They explained that this untethering would be highly improbable unless defendants had agreed to change their pricing strategy in concert. And the conclusion regarding the regression was supported with other factual allegations of how defendants' revenue management software operated. By tying the regression with other factual allegations, plaintiffs placed the defendants' business conduct in a context that would make little sense if it were purely independent action. An inference of conspiracy was much more reasonable for the *In re RealPage* court to make.

In this case, plaintiffs' regression analysis is equally consistent with conscious parallelism. Plaintiffs merely point to the regression and declare that average tire prices are 5.4% higher than they should be, then proffer this in an attempt to plausibly allege a conspiracy. But here, unlike in *In re RealPage*, interdependent conduct is a coherent, competing, and obvious explanation given the existing pricing pressures and oligopolistic dynamics. Plaintiffs' regression model does not provide, nor is accompanied by, "further factual enhancement[s]" that would take each defendants' commercial efforts beyond "neutral territory." *Twombly*, 550 U.S. at 557.

Plaintiffs also relied heavily on *In re CDS*, which dealt with a wholly distinct factual context. 710 F. Supp. 895. In that case, defendants were major market participants in credit default swap (CDS) auction markets. *Id.* at 907. Defendants had unique positions in that market: they were the dominant participants, they helped create the auction settlement process that created reference prices for all CDS sales, they met in private "working groups" where they discussed strategy and proposed rules, they were all involved in a Determination Committee that administered the bidding process, and they pushed for favorable auction rules that were later adopted in the CDS auction market. *Id.* at 911–14. CDS auction initial markets were supposed to be secret and would be expected to be priced around the prior day's bond market price when there are normal information

60

asymmetries. *Id.* at 925. But the *In re CDS* plaintiffs used statistical evidence, including regression models, to show that defendants' bids: (1) skewed markedly from the prior day's market price, and (2) were all similarly skewed in a way that would manipulate the CDS price to be favorable for defendants. *Id.* at 925–27. Plaintiffs explained that the closely synchronized and significant departure from the prior day's price would be exceedingly improbable if defendants were submitting truly secret and independent bids; the results were more consistent with defendants coordinating to skew CDS bids to their benefit. *Id.*

Importantly, the regression analysis in *In re CDS* was paired with other facts to bolster the inference that defendants agreed to rig bids and fix CDS market prices. It was inconsistent with independent action. The court in *In re CDS* had good reason to find a plausible conspiracy and deny a motion to dismiss. *Id.* at 946.

But here, plaintiffs' econometric estimates are just as readily explainable by independent business conduct. The regression model is not combined with viable plus factors to place defendants' conduct in a factual context necessary to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The second grouping of cases plaintiffs rely on discuss regression models in inapposite contexts. Several considered a regression model in the context of measuring damages where the court did not analyze the statistical evidence for sufficiently stating a claim. *See, e.g.*, *In re Cattle & Beef Antitrust Litig.*, 687 F. Supp. 3d 828 (D. Minn. 2023) (discussing regression analysis used to show damages in the context of pleading antitrust standing). Indeed, "[d]amages are measured only after each plaintiff has demonstrated that the defendant's conduct caused the plaintiff to suffer an antitrust injury." *Olean Wholesale*, 31 F.4th at 666; *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) (stating that proof of injury must be distinguished from

calculation of damages). Other cases discuss regressions at the class certification stage, where the court reviewed the statistical analyses to determine whether there was class-wide impact. *See, e.g., In re EPDM*, 256 F.R.D. at 95–103 (concluding that plaintiffs' regression analysis showed there were common issues of antitrust impact and damages that predominated over individual issues). Still others discussed statistical models under different procedural postures. *See, e.g.*, *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) (reviewing statistical pleadings in the context of establishing antitrust standing); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 665 (7th Cir. 2002) (reversing grant of summary judgment in favor of defendant on grounds that plaintiffs' regression was enough evidence for the jury to weigh and indicating that the court would consider appointing an independent expert); *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-620, 2015 WL 5767415, at \*5–15 (E.D. Pa. July 29, 2015) (reviewing admissibility and methodological deficiencies in expert's regression model under *Daubert* standard).

The fact that other courts accepted regression models under different circumstances does not compel this Court to do so here. Plaintiffs' econometric model cannot plausibly distinguish between conscious parallelism and conspiracy. Nor does it complement other plus factors but instead leaves only "an account of [each] defendant's commercial effort [that] stays in neutral territory." *Twombly*, 550 U.S. at 557. This plus factor cannot rule out the obvious alternative explanation of conscious parallelism in an oligopoly. In this respect, the model does not appear to explain more than individual action "unaided by an advance understanding among the parties[.]" *Id.* at 557, n.4. Accordingly, the econometric evidence plus factor does not nudge the complaint toward plausibly stating a claim.

d)      *Price Signaling*

The plaintiffs, in their previous complaints, alleged that defendants used "price signaling" in public earnings calls and other public media to show "intent to increase prices by publicly announcing future price increases a month or two months in advance of the effective date." (Doc. No. 317, at 50 (quoting DPP Compl. ¶ 75; EPP Compl. ¶¶ 141, 145; ADP Compl. ¶ 52).) Plaintiffs quoted several statements made by defendants which they believed were "covert messages to other defendants in furtherance of the alleged price-fixing conspiracy." (*Id.* at 51 (citing DPP Compl. ¶¶ 77–100; EPP Compl. ¶¶ 141–76; ADP Compl. ¶¶ 52–65).)

Reviewing the prior price signaling allegations, the Court found that "nearly all of plaintiffs' factual allegations . . . include legal conclusions or unsupported speculation as to the meaning of the statements and their intended audience." (*Id.* at 54.) The Court also found that the cited statements were all "descriptions of current market trends, observations of competitors' behavior, comments on past events, general indications of the defendants' own pricing strategy moving forward, or responses to investors' or analysts' questions." (*Id.* at 61 (citation modified).) The Court ultimately concluded that "there is no basis to treat defendants' public comments . . . as circumstantial evidence of an unlawful conspiracy." (*Id.* at 66.)

In the PACs, the amended price signaling plus factor allegations (which simply add more of the same type of statements) have a similar benign character; they do not raise the conspiracy allegations above the minimum threshold of plausibility. Once again, the general allegation here is that defendants used public statements on earnings calls and other media to signal their intent to increase prices or willingness to follow others' price increases in the future. (ADP PAC ¶ 88; EPP PAC ¶ 156; DPP PAC ¶ 123.) Defendants are accused of having understood their co-conspirators to be closely monitoring public statements for those signals. (ADP PAC ¶¶ 89–91; EPP PAC ¶

156; DPP PAC ¶¶ 118–20.) Through that monitoring, defendants allegedly communicated directives to increase prices and enforced compliance with the cartel. (ADP PAC ¶ 145; EPP PAC ¶ 156; DPP PAC ¶ 123.) This is again submitted to support allegations of a plausible prior agreement to fix prices of replacement tires.

The supplemented information under this plus factor falls into four general categories: (1) confidential witness statements; (2) additional class period public statements; (3) comparisons of public statements within the class period with pre-2020 statements; and (4) allegations that the pricing statements were not justified. Below, the Court explains by category why the price signaling allegations are not "largely inconsistent with unilateral, lawful conduct." *In re Musical Instruments*, 798 F.3d at 1194.

### i) Confidential Witness Statements

The PACs allege that two confidential witnesses affirm that the earnings call statements were meant to be price signals to further the conspiracy. But the allegations regarding the confidential witnesses are insufficiently specific. Thus, the Court cannot endorse their conspiracy inferences. As explained above, a confidential witness's allegations need only be sufficiently detailed to meet the plausibility standard. *In re Cattle I*, 2020 WL 5884676, at *5. But the Court is not obliged to accept a confidential witness's inferences or conclusions. *See City of Pontiac*, 92 F.4th at 396.

Plaintiffs' confidential witness allegations are bereft of the minimum factual context for plausibility. The PACs identify an anonymous former Michelin employee who was a "pricing manager who worked in the United States for over seven years, including during the [c]lass [p]eriod[.]" (DPP PAC ¶ 118; *see* ADP PAC ¶ 90; EPP PAC ¶ 272.) This quote is the full factual background for this witness. From this, plaintiffs expect the Court to understand the witness's job

and "how their interactions in [that] job[] would lead to them acquiring the knowledge they allegedly possess." *In re Cattle I*, 2020 WL 5884676, at *5 (citation omitted). It is unclear what exact duties this employee's job entailed, other than they had some vague nexus to pricing. It is also unclear with whom this witness interacted and when they did so, or why their connections would give them the knowledge to make the conclusions about price signaling.

The PACs go on to claim that this particular Michelin employee "understood these price announcements to be 'signal[s] to other companies.'" (EPP PAC ¶ 272 (alteration in original); *see* ADP PAC ¶ 90; DPP PAC ¶ 118.) The employee then alleges that Michelin both signaled price increases via those announcements and raised its own prices in response to competitor announcements. (EPP PAC ¶ 272; *see* ADP PAC ¶ 90; DPP PAC ¶ 118.) These statements are the anonymous witness's own conclusions and inferences about the purpose and intended audience of defendants' earnings call statements. They require accepting as plausible the witness's inferences in order for the Court to conclude that this was part of a prior agreement. But these allegations are equally consistent with independent conduct or interdependence in the tire industry. *See Micron Tech.*, 400 F. Supp. 3d at 919 (declining to accept inference of unlawful conduct from allegations that competitors made careful observations of each other's price announcements and adjusted their own conduct based on competitor actions); *In re Dynamic Random Access Memory Indirect Purchaser Litig. ("DRAM")*, No. 4:18-cv-2518, 2020 WL 8459279, at *6 (N.D. Cal. Nov. 24, 2020) (concluding that price signaling allegations merely demonstrated interdependence). And because there is almost no factual background on how this witness is in a position to know what they are concluding about the earnings calls, the Court is not inclined to accept plaintiffs' invitation to infer conspiracy by virtue of their witness's say-so.

The PACs make similar allegations for a confidential witness from Pirelli. This witness's

65

full factual background is described as: "[a] former Pirelli employee, who served as product training manager in the United States for almost a year[.]" (EPP PAC ¶ 273; *see* ADP PAC ¶ 91; DPP PAC ¶ 119.) This witness claims that defendants' accounting managers exchanged pricing information, including future pricing, at in-person meetings in the U.S. (ADP PAC ¶ 91; EPP PAC ¶ 273; DPP PAC ¶ 119.) The Pirelli employee also states that competitors understood price increase announcements to be signals. (ADP PAC ¶ 91; EPP PAC ¶ 273; DPP PAC ¶ 119.)

But this witness also lacks sufficient background explanation to show how their job duties placed them in a position to know about the defendants' understanding of price announcements. Furthermore, the allegations are "far too generic[.]" *In re DRAM*, 2020 WL 8459279, at *10. There is no clear explanation of the content of the pricing data exchanged at in-person meetings, who exactly the data was shared with, why the data in this context was suspect (other than it vaguely included "future pricing"), or how this was incorporated into the alleged conspiracy. *See id.* (finding conclusory confidential witness claims that failed to allege "who, did what, to whom (or with whom), where, and when"). Importantly, plaintiffs do not explain at what time the pricing information exchange occurred or when this confidential witness worked for Pirelli. These allegations are as vague and conclusory as those of the Michelin employee. Declaring a public price statement to be a "signal" does not, on its own, plausibly show antitrust malfeasance. *See id.* at *6. Indeed, an exchange of price information "can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978).

These allegations fail to place the conduct in a context of plausible conspiracy. Plaintiffs' own conclusions that the price announcements were in furtherance of a conspiracy need not be accepted by the Court. Amending the pleadings to have confidential witnesses chant the same

conclusions does not convert them into factual allegations either. The Court declines to infer conspiracy from these witness statements.

### ii) New Class Period Public Statements

Plaintiffs dedicate several pages to new examples of purported price signaling, detailing many of defendants' public statements. (*See* ADP PAC ¶¶ 121–26, 137–42; EPP PAC ¶¶ 243–50; DPP PAC ¶¶ 123–31.) But this is all more of the same as in their original consolidated complaints. Like before, these allegations are all deficient for at least one of several reasons: (1) they are too vague; (2) they are too conclusory; (3) some of the allegations regard statements made in response to shareholder questions; (4) they show a context of legitimate business conduct where each defendant describes its own past and expected future behavior, predicts industry trends, and makes observations of competitor behavior; or (5) they are equally consistent with conscious parallelism.

Many of the new allegations are too vague to plausibly infer conspiracy.[29] One example is Pirelli CEO's alleged statement that "[a]s we mentioned, there is price stability in the industry and there is a low level of inventory that is supporting some thoughts, positive thoughts concerning the price environment for the beginning of 2021 as well." (EPP PAC ¶ 244.) This statement, like other prior statements the Court previously rejected, is not a clear indication of an explicit invitation to collude or clearly directed at one or several competitors. *Cf. In re Delta/AirTran Baggage Fee Antitrust Litig. (In re Delta I)*, 733 F. Supp. 2d 1348, 1356 (N.D. Ga. 2010) (finding conspiracy plausible where defendant airline AirTran stated in an earnings call that it had not implemented a new bag fee because competitor Delta had not done so, but would strongly consider if competitor did as well; Delta implemented a bag fee two weeks after call; then AirTran followed with an

---

[29] (*See, e.g.,* ADP PAC ¶¶ 93, 95, 97 99, 131–32; EPP PAC ¶¶ 168, 173, 175 178–79, 183–84, 187–88, 209, 245, 248; DPP PAC ¶¶ 84–85, 89, 96, 113, 125.)

identical fee days later); *United States v. Am. Airlines Inc.*, 743 F.2d 1114, 1116 (5th Cir. 1984) (finding invitation to collude at the pleading stage where airline executive explicitly stated to a competitor in an earnings call: "Raise your goddamn fares twenty percent. I'll raise mine the next morning . . . You'll make more money and I will too.").

Other allegations are also "naked assertion[s] of conspiracy," *Twombly*, 550 U.S. at 557, and as conclusory as those in the original complaints.[30] Plaintiffs quote dozens of public statements by company executives and pair them with declarations that they must be veiled invitations to collude. EPPs stated: "Michelin also engaged in veiled invitations to collude. On earnings calls, a Michelin executive stated that the company was resisting price decreases because 'we want to send a signal that having a price war in this environment is not a good business decision.'"[31] (EPP PAC ¶ 250.) To say that the earnings call statement was a "veiled invitation[] to collude" is a conclusion, not a factual allegation. But the statement's character strikes the Court as ambiguous at best, especially in light of defendants' conscious awareness of the oligopolistic market in which they operated. A defendant's open awareness they share economic interdependence with competitors is not on its own suggestive of illegality. *See Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 830 (N.D. Ill. 2017) (finding that statements merely expressing a speaker's awareness of economic interdependence with competitors did not run afoul of antitrust law because "it is legal to act as a tacitly colluding oligopolist" and "[d]efendants may take independent actions in recognition of [interdependence]"). Many other similar allegations involve ambiguous statements that, at best,

---

[30] (*See, e.g.,* ADP PAC ¶¶ 95, 119–20, 125; EPP PAC ¶¶ 173, 231, 243, 250; DPP PAC ¶¶ 84, 91, 95, 108–09, 114, 117, 125.)

[31] The complaint leaves unclear on what date this statement was made. This quote is placed in a part of the PACs discussing evidence of conspiracy during the class period. (EPP PAC ¶ 250.) But earlier in the same complaint, this statement is quoted as being made on an earnings call in 2019, before the class period. (EPP PAC ¶ 167 n.43.) Either way, plaintiffs clearly meant this allegation to bolster the plausibility of inferring a prior agreement, which they previously stated could have potentially commenced before the start of the class period. (*See* EPP PAC ¶ 1; ADP PAC ¶ 88; DPP PAC ¶ 80.)

show defendants' awareness of their interdependence.[32] Plaintiffs' claims that these statements are indicative of a prior agreement are also unjustifiably conclusory on that ground. As the Court previously found, "[i]t is the conclusory nature of [the] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." (Doc. No. 317, at 55–56 (quoting *Iqbal*, 556 U.S. at 681).)

Some of the alleged statements are responses to investor or analyst questions on earnings calls.[33] This context abates suspicion. *See Micron Tech.*, 400 F. Supp. 3d at 920 (stating that earnings call statements made in response to investor questions and about topics that concern investors "weighs against their illegality"); *see also In re Delta/Airtran Baggage Fee Antitrust Litig. (In re Delta II)*, 245 F. Supp. 3d 1343, 1373–74 (N.D. Ga. 2017) (noting statements concerning business strategies made publicly on earnings call with investors are "precisely the type of information companies legitimately convey to their shareholders"), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018). For example, one allegation regards an analyst asking Goodyear's earnings call representative: "[C]an you just maybe give us some color on what you're seeing with regard to price discipline? Do you think that the industry is going to kind of take the tack [sic] of trying to support pricing and in order to compensate for inflation?" (ADP PAC ¶ 134.) The response by Goodyear's agent was: "So I would say, yes, I think that there is an acknowledgement of what price and mix has to do in the marketplace to deal with the environment we're in." (*Id.*) Many other earnings calls statements are similarly answers to valid public questions. (*See, e.g.*, ADP PAC ¶¶ 137–40; DPP PAC ¶¶ 124, 127–29.) These responses to investor questions do not plausibly support an inference of conspiracy.

---

[32] (*See, e.g.,* ADP PAC ¶¶ 93–95, 97, 99, 116, 130–31, 133–34, 137–40; EPP PAC ¶¶ 168, 172–75, 178–79, 181–84, 187, 190, 194, 243–50; DPP PAC ¶¶ 84–85, 90, 96, 101, 106, 110, 114, 123–29.)

[33] (*See, e.g.,* ADP PAC ¶¶ 117, 122, 133–34, 137–40; EPP PAC ¶ 175; DPP PAC ¶¶ 94, 111, 124, 127–29, 148.)

Still another point of fault is that the allegations, on a plain reading, describe a context of legitimate business dealings where each defendant describes its own past and expected future behavior, predicts industry trends, and makes observations of competitor behavior.[34] These price signaling allegations are more properly characterized as descriptions of "commercial effort [that] stays in neutral territory," *Twombly,* 550 U.S. at 557, rather than being suggestive of a prior agreement. Again, this is all more of the same.

For example, many earnings call statements simply said that the market was favorable to upward price movement, that there were good opportunities to recover on increased costs, or that the individual defendant was willing to raise prices if necessary or possible. One involved a statement from a Michelin executive explaining that the company was raising tire prices because of "changing business dynamics and rising costs of raw materials." (EPP PAC ¶ 181.) Another, from Bridgestone's Global CEO, stated that defendants "were all 'feeling this same wind' and were all 'firmly working with these winds.'" (ADP PAC ¶ 137.) Many other similar allegations quote defendants as responding to market dynamics or anticipating and responding to competitor behavior. (*See* ADP PAC ¶¶ 139–40; EPP PAC ¶¶ 182–85; DPP PAC ¶¶ 110–11.) These allegations "constitute individual Defendants' indications of their own future behavior and descriptions of their past behavior, predictions of industry trends, and observations about competitor behavior." *Micron Tech.*, 400 F. Supp. 3d at 918–19 (finding that public statements "stop short of giving rise to a reasonable inference of illegal collusion"). That some of the statements were forward-looking does not render them suspect in this context. Plaintiffs' price signaling allegations can more likely be explained as defendants engaging in sequential

---

[34] (*See, e.g.,* ADP PAC ¶¶ 93–95, 97, 99, 107–09, 121–26, 130–41; EPP PAC ¶¶ 168, 172–75, 178–79, 181–84, 187–88, 192–94, 209–10, 243–50; DPP PAC ¶¶ 84–85, 90–91, 94, 96, 110–14, 123–30.)

parallelism.

In another allegation, a Goodyear executive is quoted as saying that "9 out of 10 of our consumer tire manufacturers out there, the ones that we monitor, they've announced price increases since November [2020] of about 5% to 8 %[.]" (DPP PAC ¶ 123.) In yet another, Bridgestone's Global GEO is cited as noticing that "the industry as a whole has been trying to raise prices quite fast." (*Id.* at ¶ 129.) Contrary to plaintiffs' conjecture, these allegations are consistent with permissible conduct where "[c]ompetitors in concentrated markets watch each other like hawks." *In re Text Messaging Antitrust Litig.*, 782 F.3d at 874–75. Competitors often consider their rivals' actions before making their own business decisions. *Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169 (6th Cir. 1995) (finding that banks' public publishing of certain fees is "at least as consistent with their independent interests as it is with collusion" and that they "naturally are interested in surveying the market . . . to make strategic competitive decisions"); *see also Valspar Corp.*, 873 F.3d at 192 ("How does one order a firm to set its prices *without regard* to the likely reactions of its competitors?" (emphasis in original)). Moreover, plaintiffs' allegations relating to each defendant's awareness of competitor actions is equally consistent with an awareness of shared economic interdependence. The earnings calls portray "firms engag[ing] in an action that becomes known to its rivals, who can then choose whether to imitate the move." *See Ross*, 35 F. Supp. 3d at 440. Once again, defendants' alleged statements here are consistent with sequential parallelism. . Rather than point to conspiracy, they are "more likely explained by lawful, unchoreographed free-market behavior." *In re Travel Agent II*, 583 F.3d at 908; *see also Kleen Prods. LLC*, 276 F. Supp. 3d at 830 ("[I]t is legal to act as a tacitly colluding oligopolist[.]")

Plaintiffs provide several quotes where defendants refer to competitors' "price discipline" in continuing to raise prices. (*See, e.g.*, EPP PAC ¶ 178; DPP PAC ¶ 131.) These, too, are simply

71

observations and expectations of a dramatically changing tire market. There is a meaningful difference "between the [d]efendants' observation that competitors are behaving with 'discipline' and circumstances where defendants have called upon their competitors to 'exercise' discipline and therefore invited them to behaving in a certain way." *Micron Tech.*, 400 F. Supp. 3d at 919. Defendants' statements as alleged fall neatly into the former description, not the latter.

Another example is a mis-quoted statement of a 2022 Bridgestone earnings call where the CEO is incorrectly quoted as stating that "going forward, it's very critical for the price increase to take hold, especially in the United States[,]" that Bridgestone would "continu[e] to execute strategic price management, including price increase[s,]" and that "all competitors . . . have to do the same." (EPP PAC ¶ 249.) This statement also appeared in DPP's original complaint. (DPP Compl. ¶ 99.) The Court, in a prior hearing, identified this same quote as incorrectly omitting the word "had" and that the accurate statement made in the earnings call was "all competitors . . . *have had* to do the same." (Doc. No. 295, at 106 (emphasis added).) This error gave the impression of a forward-looking statement and directive to competitors. In reality, the speaker was commenting on past pricing and forecasting their own strategy. Plaintiffs' counsel acknowledged this and assured the Court it was a mere typographical error. (*Id.* at 106.)[35] Now, DPPs have apparently ignored their admitted prior error that the Court (and defendants) previously pointed out to them and re-pleaded this exact mis-quote. DPPs are admonished for this repeated error. Moreover, the

---

[35] The hearing transcript reads as follows:

> Ms. Lerner: I can speak on behalf of the direct purchasers. So, Your Honor, we apologize. That is a typographical error. Although, looking at the statement as a whole, a pledge is something forward-looking, right?
>
> THE COURT: No, no. No, no. You said, "All other competitors have to do the same." But that's not what the person said, right? The person said "have had to do the same." . . . A world of difference, correct?
>
> Ms. Lerner: Yes. Correct.

(Doc. No. 295, at 106.)

Court finds that there is nothing nefarious to infer from this statement. It was simply an observation of what had transpired in the industry.

The Court could go on and on listing many other examples. They all fail to plausibly show conspiracy. The point here is that placing each individually selected statement in the context where it was uttered reveals only legitimate business activity. This context is critical, because stating a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

### iii) Comparison of Public Statements within the Class Period with Pre-2020 Statements

Plaintiffs' exercise in comparing defendants' pre-class pricing statements does not place the class period statements in a suspect light. These statements simply show a prior failure of each defendant to maintain a price increase due to different countervailing market pressures. (*See, e.g.,* ADP PAC ¶ 112 ("During Goodyear's Q1 2017 earnings call, its CEO stated that 'volumes have been weaker than expected, especially in replacement tires'" and "'we believe the timing of our price increases, which came relatively early in the quarter . . . had a negative effect on our volume'"); DPP PAC ¶ 105.)[36]

Plaintiffs also point out as suspect an instance of alleged reluctance on the part of defendants' executives to make forward-looking statements. (*See, e.g.*, EPP PAC ¶ 231 ("On a December 17, 2018 Q&A Conference Call, [an analyst] asked 'about the Q4 outlook and what you have seen in terms of the market pricing and competition . . . . Do you think that this decline in the oil price will kind of put pressure on your sales prices in 2019? So do you see it as a positive or negative overall?' Hille Korhonen, Nokian's President & CEO, stated: 'Well, I would not like to

---

[36] (*See also* ADP PAC ¶¶ 111–19, 121–26, 129–41; EPP PAC ¶¶ 230–33, 240–50; DPP PAC ¶¶ 101–07, 109–15, 123–30.)

comment the fourth quarter sales at this point of time, so we are sticking to our guidance.'").)

Plaintiffs claim this shows defendants believed forward-looking statements were suspect and previously refrained from them, but began making forward-looking statements starting in 2020 as a necessary tool to execute the conspiracy. (*See* ADP PAC ¶ 129.)

The pre-2020 statements and the class period statements both strike the Court as having the same innocuous character and intent. Defendants' post-2020 statements appear to have been simply reporting on market conditions, discussing business strategy, and answering investor and analyst questions, just as in the pre-2020 statements. Although there is some contrast, it is not suspect. Even by plaintiffs' own admission, market conditions changed dramatically during the class period due to the COVID-19 pandemic, the Ukraine war, and other market conditions, thereby supporting double-digit percentage price increases. Therefore, it is unsurprising that class period statements contrast in tone and content during the class period. There is an "obvious alternative explanation" for that contrast. *See Twombly*, 550 U.S. at 567. And there can be valid, non-conspiratorial reasons for making forward-looking statements one year but not in a prior year. In the overall context that the PACs present, the comparison of pre-2020 and post-2020 public statements does not plausibility show conspiracy.

### iv)     *Plaintiffs Contention that Pricing Statements Were Not Justified*

The EPP PAC makes the additional argument that defendants' forward-looking public pricing statements were not warranted because: (1) securities laws do not mandate future pricing disclosures (EPP PAC ¶¶ 157–66); (2) defendants knew not to make forward-looking price statements because they implicate antitrust risk (EPP PAC ¶¶ 211–27); and (3) defendants' customers did not demand future price announcements. (EPP PAC ¶¶ 237–39.) The DPP PAC makes a similar general argument that "[d]efendants' publicly announced price increases were of

no value to their customers." (DPP PAC ¶ 120.)

The Court disagrees with the characterization of defendants' forward-looking price statements as wholly unjustified. Contrary to what plaintiffs imply, U.S. antitrust doctrine does not categorically prohibit all forward-looking price statements. *See Williamson Oil Co.,* 346 F.3d at 1307–08 (rejecting argument that forward-looking pricing statements constituted signals to collude). Even where securities law might not explicitly require future pricing disclosures at earnings calls, it does more generally require public companies to disclose "events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments)." 17 C.F.R. § 229.303(b)(2)(ii). This disclosure standard applies to all defendants that are publicly traded companies.[37] Furthermore, courts have refused to construe corporate public statements as invitations to collude where the communications contain "the type of information companies legitimately convey to their shareholders," and instead limit such an inference to "far more detailed communications with no public purpose." *In re Delta II*, 245 F. Supp. 3d at 1372 (N.D. Ga. 2017) (citing *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1276 (N.D. Ga. 2002), *aff'd sub nom. Williamson Oil Co.*, 346 F.3d 1287).[38]

It is true that public pricing statements can, in some contexts, arouse legitimate conspiracy suspicion. *See In re Fragrance*, 2025 WL 579639, at *5–9 (finding plausible conspiracy where price signaling allegations were paired with a DOJ investigation, prior scholarship suggesting cartel behavior, unusually close association at trade associations, and parallel price increases

---

[37] The Court notes that Michelin and Continental are not publicly traded companies. (*See* EPP PAC ¶ 156.)

[38] Plaintiffs' own citations confirm the value of defendants' disclosures. *See* R. Steuer et al., *Avoiding the Traps in Investor and Analyst Calls*, N.Y.L.J. (Mar. 8, 2010) (discussing FTC position that "antitrust challenges are appropriate only in the limited circumstances where the information would not have been publicly communicated, even to investors and analysts interested in the company's business strategy" (internal quotation marks omitted)).

beginning in 2018). Shrewd attorneys are aware of potential antitrust scrutiny from public statements and counsel clients accordingly. But one's exercise in caution does not necessarily indicate scienter. And the fact that one makes such statements with knowledge of potential scrutiny does not invariably mean they must have done so in furtherance of antitrust malfeasance. The content of the challenged statements and the overall context must support an inference of conspiracy.

That context does not exist here. As explained above, and as the Court had previously concluded in its prior memorandum opinion and order (*see* Doc. No. 317, at 50–66), defendants' public pricing statements are "the type of information companies legitimately convey to shareholders" because they detail prevailing industry concerns and describe market conditions. *See In re Delta II*, 245 F. Supp. 3d at 1372.

Plaintiffs also contend that customers and the general public did not demand future pricing information. Defendants' statements, however, do have a clear public purpose. Several earnings call statements are answers to investor and analyst questions, including questions about future pricing. (ADP PAC ¶¶ 138 (Bridgestone executive stating in an earnings call that "You asked if the price increases were at its limit now. Our response is, we do not see it that way."), 140 ("During an earnings call . . . Pirelli's General Manager of Operations was asked whether it was planning to implement price hikes 'quarter-by-quarter like [its] competitors.'"); *see, e.g.*, ADP PAC ¶¶ 122, 134, 137–40, 204; EPP PAC ¶ 175; DPP PAC ¶¶ 94, 111, 124, 127–29, 148.) This context "weighs against their illegality." *Micron Tech.*, 400 F. Supp. 3d at 920. Advanced notice of a price increase can be valuable to resellers and consumers as well as in a company's rational interest to disclose. *See In re Coordinated Pretrial Proc. In Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 448 n.14 (9th Cir. 1990). Moreover, the statements do not meet the "far more detailed communications"

threshold that tends to favor plausibility. *See In re Delta II*, 245 F. Supp. 3d at 1372.

* * *

The Court sees no chicanery in defendants' public statements. Their statements are "more likely explained by lawful, unchoreographed free-market behavior." *In re Travel Agent II*, 583 F.3d at 908 (citing *Iqbal*, 556 U.S. at 680; *Twombly*, 550 U.S. at 557–59) (internal quotation marks omitted). This plus factor is rejected.

e)      *Opportunities to Conspire*

The prior consolidated complaints asked the Court to infer a plausible conspiracy based on many opportunities the defendants had to conspire in restraint of trade. Plaintiffs first pointed to trade associations as opportunities for defendants to meet each other and discuss price fixing plans. (Doc No. 317, at 37.) The prior complaints "devote[d] over 80 paragraphs to identifying various industry events that provided defendants opportunities to conspire." (*Id.* at 39 (citing DPP Compl. ¶¶ 133–47; EPP Compl. ¶¶ 206–39; ADP Compl. ¶¶ 108–46).) The Court found these allegations to be insufficient because "[a]t no point [did] plaintiffs even speculate—much less plausibly allege—that defendants actually conspired or exchanged confidential information at any of these events." (*Id.* (citation modified).) Mere attendance at trade association meetings did not plausibly suggest conspiracy. (*Id.*)

Second, plaintiffs made much ado about defendants' use of third-party revenue management software and pricing consultants. They saw these two opportunities to conspire as platforms for defendants to coordinate and maintain supracompetitive pricing. (*Id.* at 40.) As to these allegations, the Court concluded that "[a]t most, plaintiffs . . . alleged that it was possible for defendants to use a licit tool for illicit means[.]" (*Id.* at 44.) The Court also found that plaintiffs did not explain "what non-public information was supposedly exchanged or how it was, or even

77

how it *could* have been, used to make sure that each [defendant] acted in accordance with the agreement to increase prices." (*Id.* (alteration in original) (emphasis in original) (quotation marks and citation omitted).) The Court, therefore, held that the opportunity to conspire plus factor did not plausibly suggest a conspiracy. (*Id.* at 45–46.)

The ADP and EPP plaintiffs do not add any new substantive allegations under this plus factor. Their PACs merely retain the same allegations which fell short of the pleading standard. While there are a few minor additions across the PACs, these amendments are all either vague, conclusory, or do not otherwise change the context of the plus factor to plausibly show conspiracy. (*See, e.g.*, ADP PAC ¶ 224 (adding the words "competitors' business sensitive information and coordinate").) Once again, the opportunity to conspire plus factor in ADP and EPP PACs does not nudge either amended complaint toward plausibility.

The DPP PAC incorporates the factual allegations from the prior consolidated complaint into its opportunities to conspire plus factor. The DPP PAC also supplements the allegations regarding this plus factor. The additions are: (1) use of USTMA Market Data Program and sharing of confidential information; and (2) a joint venture for tire distribution between Goodyear and Bridgestone.

### i.     *USTMA Market Data Program and Sharing of Confidential Sales Data*

DPPs allege that defendants used their trade association membership in USTMA—wherein several executive officers of defendant entities are active participants—to further the conspiracy by using meetings to coordinate and take advantage of USTMA's Market Data Program. (DPP PAC ¶¶ 192, 195.) Defendants use the data program to "share real-time sales data with each other" and circulate "monthly reports of SKU-by-SKU shipments and sales." (DPP PAC ¶ 195.) The program prepares joint demand forecasts for tires; defendants use this to "share valuable

information and reduce competition[.]" (*Id.*)

These allegations do not give the Court a factual basis to infer conspiracy. Membership in USTMA is not, on its own, suspect. "It is well-settled that trade associations often serve legitimate functions, such as providing industry information to members, conducting research to further industry goals, and promoting demand and that, because of these valid purposes, attendance at trade events does not imply an anticompetitive agreement." *Micron Tech.*, 400 F. Supp. 3d at 918; *see also* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, § 4.5, at 176 (3rd ed. 2005) ("[O]ne should not infer price fixing merely from the fact that competitors had an opportunity to meet at trade association conventions, and one of the items on the agenda was declining market conditions.")

Moreover, DPPs have failed to illustrate how the Market Data Program operates as an anticompetitive instrument. An "exchange of price data and other information among competitors does not invariably have anticompetitive effects." *U.S. Gypsum Co.*, 438 U.S. at 441 n.16. A salient factor in the viability of antitrust complaints "has been the inclusion of specific allegations concerning time, place, and person versus general allusions to 'secret meetings,' 'communications,' or 'agreements.'" *Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*, No. 12-2146, 2013 WL 3337676, at *8 (C.D. Cal. June 28, 2013) (quoting *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1256–57 (W.D. Wash. 2009)). Here, other than characterizing the data used in the Market Data Program as "real-time," about "shipments and sales," and that the data is "confidential, non-public" and "granular," DPPs do not say much about what the data actually contain. DPPs do not plausibly allege how this data is used to reduce competition. *Cf. In re RealPage*, 709 F. Supp. 3d at 510–12 (explaining how revenue management software took residential rental companies' sensitive pricing and supply data, used it

to recommend rental prices that would outperform the market, and managed competitor participants to ensure they adopted pricing recommendations). These allegations do not make a conspiracy inference plausible.

### ii. Joint Venture and Distribution Between Defendants

DPPs allege that two defendants in particular—Bridgestone and Goodyear—formed a U.S. tire distribution joint venture in 2018 called TireHub. (DPP PAC ¶ 208.) Prior to the joint venture, the two entities maintained separate tire distribution networks. (DPP PAC ¶ 209.) "Instead of remaining competitors for sales, Goodyear and Bridgestone combined Goodyear's company-owned wholesale distribution network with Bridgestone's Tire Wholesale Warehouse chain to form TireHub." (*Id.*) TireHub also sells Pirelli tires. (*Id.*)

"Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." *Petruzzi's IGA Supermarkets, Inc. v. Darlin-Delaware Co.*, 998 F.2d 1224, n.15 (3d Cir. 1993). Furthermore, "[j]oint ventures are presumably good things because they reduce firms' costs[.]" Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 2104a (5th ed. 2024); *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984) (finding joint ventures "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively").

DPP's allegations on this joint venture are cursory. They merely describe coordination in distribution, which is distinct from pricing and selling tires. DPPs then point out that TireHub presents an opportunity for Bridgestone and Goodyear to meet and conspire to fix prices. They conclude this plausibly shows that these defendants agreed not to compete. But DPPs fail to explain why or how the joint tire distribution network was an instrument to price fix. DPP's allegations amount to nothing more than pointing to an opportunity to conspire and concluding defendants

80

must have done so. This does not plausibly show conspiracy. *See In re Travel Agent Comm'n Antitrust Litig. (In re Travel Agent I)*, No. 1:03-cv-30000, 2007 WL 3171675, at *9 (N.D. Ohio Oct. 29, 2007) ("Proof that Defendants had an opportunity to conspire" through "jointly formed business ventures" does not "satisfy [plaintiffs'] burden of proving a price-fixing agreement.").

The joint venture and distribution allegations do not nudge the opportunities to conspire plus factor toward plausibility. Nor does combining them with the USTMA Market Data allegations help plaintiffs. These allegations do not change the context of the other opportunity to conspire allegations that DPPs incorporated from their prior consolidated complaint. Accordingly, this plus factor fails to plausibly suggest a conspiracy to fix prices among defendants.

### f) Market Characteristics and Antitrust Recidivism[39]

The market characteristic and antitrust recidivism plus factors that plaintiffs allege in their PACs remain relatively unchanged when compared to the prior consolidated complaints. Standing alone, these plus factors do not plausibly point to a conspiracy. Considered alongside those plus factors with substantive amendments, they still fall short of plausibility.

The PACs add no new allegations regarding the unique market characteristics of U.S.

---

[39] Plaintiffs' prior common motive to conspire plus factor has been removed from the PACs. The prior consolidated complaints had alleged that defendants "faced shrinking profit margins" due to COVID-19 public safety measures, thus they were "motivated to offset the downward pricing pressures from soft demand and the difficulty of increasing prices in a commodity market where competition is largely based on price." (Doc No. 317, at 30 (quotation marks and citation omitted).) Plaintiffs had failed to raise prices in 2017 because of countervailing competitive pressures but succeeded in 2020 "by agreeing on coordinated price increases." (*Id.* (quoting DPP Compl. ¶ 128).)

The Court rejected this plus factor. Although "defendants may have been motivated to increase profits, plaintiffs [fell] short of plausibly alleging that defendants were motivated to conspire as a means of doing so." (*Id.* at 31.) The motive to conspire plus factor had "fail[ed] to account for conscious parallelism and the pressures of an interdependent market." (*Id.* at 32 (citation omitted).) Defendants' failed price increase attempts in 2017 showed that "it was neither irrational nor suggestive of conspiracy that certain defendants tried again in 2020[.]" (*Id.* at 33.)

Plaintiffs remove "common motive to conspire" as an explicit plus factor from their PACs. (*See* Doc. Nos. 323-2, at 117–18; 324-2, at 46–47; 325-2, at 70.) The only allegation from this plus factor that they retain is the comparison between defendants' failed 2017 price increase and their successful increases beginning in 2020. The Court has already addressed that allegation and concluded it does not nudge the PACs toward plausibility.

replacement tire sales. They once again allege that the tire market is characterized by:

(1) A prevailing oligopoly where market power is concentrated in a handful of firms, making cartel formation and maintenance easier (ADP PAC ¶ 78; EPP PAC ¶¶ 211–12; DPP PAC ¶¶ 74–78);

(2) Products that are interchangeable, meaning that defendants primarily compete on price, with interchangeability making cartel collusion more likely (ADP PAC ¶¶ 208–09; EPP PAC ¶¶ 362, 364; DPP PAC ¶¶ 224, 226);

(3) Tire price inelasticity in response to demand due to limited availability for consumers to defer necessary tire replacement, making it easier for defendants to enact supracompetitive prices without losing revenue (ADP PAC ¶¶ 211–15; EPP PAC ¶¶ 357–61; DPP PAC ¶¶ 221, 223); and

(4) High barriers to market entry for new competitors due to large start-up costs and practical market exit difficulties, leading to market concentration and facilitating collusive incentives (ADP PAC ¶¶ 205–07; EPP PAC ¶¶ 353–55; DPP PAC ¶¶ 216–20).

The Court previously held that these plus factor allegations were "relevant but far from dispositive." (Doc. No. 317, at 50 (quoting *Kleen*, 276 F. Supp. at 823).) The Court concluded that "while parallel conduct exist[ed], the fact that the replacement tire industry is susceptible to collusion d[id] little to . . . render the alleged conspiracy plausible." (*Id.*)

The prior memorandum opinion and order's conclusions as to this plus factor apply here as well. Plaintiffs' market characteristic allegations did not point toward plausibility previously, and their recycled market characteristics allegations do not do so now. This is true even when considering them alongside the supplemented allegations in other plus factors, which also do not

plausibly show a conspiracy. As previously stated, "[p]laintiffs have done nothing more than show that in an oligopoly, each company is aware of the others' actions. This is the nature of the economic interdependence of the companies in an oligopoly." *Holiday Wholesale Grocery Co.*, 231 F. Supp. 2d at 1275. Once again, the tire market characteristics do not alter the conspiracy analysis in favor of plaintiffs.

Regarding defendants' antitrust recidivism plus factor, the amended pleadings add no new allegations. The prior consolidated complaints alleged that defendants had a "global history of antitrust violations" since at least 2001. (Doc. No. 317, at 82 (quotation marks and citations omitted).) Plaintiffs submitted this as a plus factor, stating that "[p]rior price collusion demonstrates the [d]efendants are motivated to engage in price-fixing and willing to violate antitrust laws." (*Id.* at 86 (citing Doc. No. 266, at 62) (alterations in original).) But the Court was unconvinced, holding that "the price-fixing conspiracy . . . [was] not made any more plausible by the existence of unrelated conspiracies involving long-departed executives and/or unconnected corporate entities in foreign jurisdictions." (*Id.* at 87.) There was no "common intent between the prior misconduct and the instant alleged conspiracy." (*Id.* at 86.) Moreover, the antitrust recidivism allegations did not implicate all named defendants (*id.* at 86–87), and some involved only settlements or preliminary investigations (*id.* at 83–84).

In the PACs, plaintiffs again allege that "there is a history of antitrust violations by Tire manufacturers." (ADP PAC ¶ 277; EPP PAC ¶ 374; *see* DPP PAC ¶¶ 234–39.) They bring forth the same allegations under this plus factor as in the prior consolidated complaints. They do not, however, explain why the Court's prior holding should not also apply here, given that the factual pleadings are nearly identical. And the other new allegations in the PACs do not place the prior recidivism pleadings in a different context than before. Accordingly, the Court again finds that the

83

antitrust recidivism allegations do not nudge the complaint toward a plausible conspiracy.

### g) The Collective Plausibility of Plaintiffs' Allegations

Mindful that the Court must evaluate allegations of a conspiracy as a whole, rather than simply "dismembering it and viewing its separate parts," *See Cont'l Ore Co.*, 370 U.S. at 699, the Court now examines plaintiffs' alleged plus factors collectively to determine whether they place the price increases "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. "Actions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances." *SD3*, 801 F.3d at 425. But "the mere presence of one or more . . . 'plus factors' does not necessarily mandate the conclusion that there was an illegal conspiracy between the parties, for the court may still conclude, based upon the evidence before it, that the defendants acted independently of one another, and not in violation of the antitrust laws." *Balaklaw v. Lovell*, 822 F. Supp. 892, 903 (N.D.N.Y 1993) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)).

Taking a holistic view of each PAC, the Court holds they do not plead a plausible conspiracy. The Court has indulged every permissible inference to attempt to construe plaintiffs' plus factor allegations in a light that shows the parallel behavior "would probably not result from . . . independent responses to stimuli, or mere interdependence unaided by an advance understanding among the parties[.]" *Twombly*, 550 U.S. at 557, n.4 (citing Philip E. Areeda & Herbert Hovenkamp, *supra*, at ¶ 1425 (2d ed.)). But the collective allegations illustrate "a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 545. They are at best a "restatement of conscious parallelism endemic to an oligopoly." *Micron Tech.*, 400 F. Supp. 3d at 922 (quotation omitted).

84

The PACs illustrate a context of business conduct more likely explained by many obvious alternative explanations. As plaintiffs have conceded in their complaints, non-collusive factors (such as COVID-19, the Ukraine war, and volatile market dynamics) contributed to most of the price increases. They claim that only conspiracy could explain the remaining 5% price increases. But the plus factors meant to nudge the parallel conduct toward a plausible conspiracy can just as easily be explained by conscious parallelism and follow-the-leader pricing in an oligopoly. Even plaintiffs' own allegations demonstrate a sequential pattern of price increases, where one defendant reacts in short order to another's price increase, to be followed by another defendant, in a cycle of price hikes spanning weeks or months. (*See* ADP PAC ¶ 105 (showing table of defendants' announced price increases by date and percentage increase); EPP PAC ¶ 154 (same); DPP PAC ¶ 81 (same).) That is to be expected, as "[c]ompetitors in concentrated markets watch each other like hawks." *In re Text Messaging Antitrust Litig.*, 782 F.3d at 874–75. Defendants' alleged actions are consistent with mere parallel conduct and nothing more.

Moreover, the allegations regarding each defendant's public facing conduct do not show "further circumstance pointing toward a meeting of the minds[.]" *Twombly*, 550 U.S. at 557. The public pricing statement allegations amount to mere "naked assertion[s] of conspiracy[.]" *Id.* Indeed, the underlying market conditions defendants faced—continued upward pricing momentum caused by COVID-19 and Ukraine war market impacts, general inflation, supply chain disruptions, raw material shortages, and volatile input costs—along with the oligopoly in which defendants operate (where conscious parallelism is often prevalent), offer a plainly obvious alternative explanation for defendants' behavior. Placed in the proper context, defendants' alleged statements in earnings calls read as sensible and legally permissible. And the allegations regarding trade meeting association attendance, use of revenue management software and USTMA Market Data

Program, joint ventures, and other opportunities to conspire amount to no more than "an account of [each] defendant's commercial efforts." *Id.* The antitrust recidivism allegations fare no better for plaintiffs. Collectively, these plus factors portray parallel conduct which "stays in neutral territory" rather than "rais[ing] a suggestion of a preceding agreement[.]" *Id*. The parallel conduct plaintiffs illustrate "could just as well be independent action[.]" *Id.* That "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted) (cleaned up).

Indeed, the context of the PACs sets them apart from cases where a prior agreement would explain otherwise unusual market observations. *See, e.g.*, *In re RealPage*, 709 F. Supp. 3d at 506–08 (noting that lack of correlation between vacancy rates and rental unit pricing made sense if defendants had agreed not to compete); *In re Cattle II*, 2021 WL 7757881, at *1–8 (recognizing that conspiracy among meat packers would explain unusual fed cattle purchasing practices that caused economically erratic widening price margin between fed cattle purchases and post-slaughter beef sales); *In re CDS*, 710 F. Supp. 3d at 943–45 (observing that unusual synchrony in non-public bond bidding made sense if bidders conspired). They also contrast with cases where some investigation or statement revealed a plausible underlying agreement. *See, e.g.*, *In re Eur. Gov't Bonds*, 2022 WL 768680, at *21 (finding plausibility after EC investigation's final decision finding antitrust infringement); *In re Delta I*, 733 F. Supp. 2d at 1359–61 (finding conspiracy to be plausible where defendant airline made earnings call statements directed at competitor which explicitly invited competitor to impose a baggage fee and clearly indicating the fee would be promptly reciprocated).

These plus factors, considered in concert, do not nudge the allegations toward plausibly showing a conspiracy. Reviewed together, they show nothing more than parallel conduct.

* * *

Plaintiffs have again "failed to allege sufficient facts plausibly suggesting (not merely consistent with) an agreement . . . because defendants' conduct 'was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior.'" *In re Travel Agent II*, 583 F.3d at 908 (quoting *Iqbal*, 556 U.S. at 680; *Twombly*, 550 U.S. at 557–59). And without a plausible pleading of conspiracy, the PACs do not properly plead a § 1 claim. The Court therefore holds that amendment of the Sherman Act claims would be futile.

### 3. State Law Claims

The ADP and EPP PACs plead claims under several state antitrust statutes, consumer protection laws, and common law causes of action, subject to insignificant alterations compared to the original complaint. (ADP PAC ¶¶ 323–527; EPP PAC ¶¶ 450–764.) As with the prior pleadings, these claims hinge on the same nexus of facts which would fail to make a plausible showing of conspiracy under the Sherman Act.[40] (*See generally* ADP PAC; EPP PAC.) Accordingly, they are also inadequately pled.[41] The Court holds that amendment of the state law claims would also be futile.

## IV. CONCLUSION

Without a plausible showing of antitrust conspiracy, there can be no liability under U.S. antitrust law. The PACs' tandem of parallel conduct and plus factors fails to add additional facts

---

[40] Plaintiffs concede that if their Sherman Act claims fail, their state law claims must also fail. (Doc. No. 295, at 126.)

[41] *See generally In re Cattle I*, 2020 WL 5884676, at *6 (dismissing state antitrust, consumer protection, and unjust enrichment claims because the claims "all rely on the same alleged price-fixing conspiracy creating the Sherman Act claim, which the Court finds deficient"); *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 544 (N.D. Tex. 2014) ("[E]ach state law requires the same sort of concerted action § 1 requires. Therefore, since the Court already found the price fixing conspiracy allegations implausible, it must conclude that the Complaint's state antitrust law claim is also inadequately pled."); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1025 ("Since plaintiffs' federal and state-law antitrust claims are predicated on the same allegations of conspiracy, they likewise are insufficient to state a claim for conspiracy.").

which would nudge the conspiracy allegations toward plausibility. They still describe parallel conduct that is not only consistent with, but indeed more likely explained by, lawful, independent action. The PACs would be futile because they would fail a Rule 12(b)(6) motion. And plaintiffs have been afforded two opportunities to present all available facts to support their claims. Having twice failed to meet the pleading standard, dismissal with prejudice for each captioned case is proper.

For the reasons stated above, as well as those in the Court's prior memorandum opinion and order to the extent it applies to this set of facts (Doc. No. 317), plaintiffs' motions for leave to amend their respective consolidated complaints (Doc. Nos. 323, 324, and 325) are **DENIED WITH PREJUDICE.** The Court will separately enter final judgment in favor of defendants as to each consolidated class.

**IT IS SO ORDERED.**

Dated: March 31, 2026

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**